**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**

LARRY KLAYMAN

        Plaintiff,

v.

REFEREE J. LEE MARSH
301 South Monroe Street
Tallahassee, Florida, 32301

        and

HONORABLE CARLOS G. MUNIZ
500 South Duval Street
Tallahassee, Florida, 32399

        and

HONORABLE JORGE LABARGA
500 South Duval Street
Tallahassee, Florida, 32399

        and

HONORABLE JOHN D. COURIEL
500 South Duval Street
Tallahassee, Florida, 32399

        and

HONORABLE JAMIE R. GROSSHANS
500 South Duval Street
Tallahassee, Florida, 32399

        and

HONORABLE RENATHA FRANCIS
500 South Duval Street
Tallahassee, Florida, 32399

        and

HONORABLE MEREDITH L. SASSO

**Case Number:** 4:26 CV 00104-AW-mAF

FILED USDC FLND PN
FEB 27 '26 PM 2:51

1

500 South Duval Street
Tallahassee, Florida, 32399

and

HONORABLE CHARLES CANADY
500 South Duval Street
Tallahassee, Florida, 32399

and

THE SUPREME COURT OF FLORIDA
500 South Duval Street
Tallahassee, Florida, 32399

and

THE FLORIDA BAR
651 East Jefferson Street
Tallahassee, Florida 32399

and

FLORIDA OFFICE OF BAR COUNSEL
651 East Jefferson Street
Tallahassee, Florida 32399

and

PATRICIA ANN TORO SAVITZ
651 East Jefferson Street
Tallahassee, Florida 32399

and

SHANEE HINSON
651 East Jefferson Street
Tallahassee, Florida 32399

Defendants.

## COMPLAINT

Plaintiff Larry Klayman. ("Mr. Klayman") brings this action against (1) Referee J. Lee Marsh ("Referee Marsh"); (2) The Honorable Carolos Muniz ('Justice Muniz"), The Honorable Jorge Labarga ("Justice Labarga"), The Honorable John D. Couriel ("Justice Couriel"), The Honorable Jamie R. Grosshans ("Justice Grosshans"), The Honorable Renatha Francis ("Justice Francis"), The Honorable Meredith L. Sasso ("Justice Sasso"), The Honorable Charles Canady ("Justice Canady"), The Supreme Court of Florida (collectively "The Florida Supreme Court Defendants") and (3) The Florida Bar, Florida Office of Bar Counsel ("FOBC"), Patricia Ann Toro Savitz ("Savitz"), and Shanee Hinson ("Hinson") (collectively the "Bar Defendants") for relief under 42 U.S.C. § 1983.

## JURISDICTION AND VENUE

1.      This Court has federal question jurisdiction over this case pursuant to 28 U.S.C § 1331.

2.      Venue is proper pursuant to 28 U.S.C. § 1391(b)(2), (3) in that a substantial part of the events or omissions giving rise to Plaintiff's claims arose in this district

## THE PARTIES

3.      Mr. Klayman is an individual and a citizen and resident of Florida. He is a prominent conservative and Republican public interest activist and advocate and private practitioner who, prior to the events set forth herein, had been a member continuously in good standing with The Florida Bar since his admission on December 7, 1977, almost half a century. Mr. Klayman's mission has been to promote ethics in the legal profession which included judicial ethics and accountability, which is why he founded first Judicial Watch in 1994 and subsequently Freedom Watch in 2004. In addition to founding these organizations, Mr. Klayman has also had a distinguished career as both a conservative and Republican public interest activist

and private attorney. In 2003-2004 he also ran as a Republican candidate for the U.S. Senate in Florida, among other prominent endeavors. Exhibit A: *Biography.*

4.     Referee Marsh is an individual, state court judge and in this context a referee in Florida's Second Judicial District for Leon County.

5.     Justice Muniz is an individual and the Chief Justice of the Supreme Court of Florida.

6.     Justice Labarga is an individual and a Justice of the Supreme Court of Florida.

7.     Justice Couriel is an individual and a Justice of the Supreme Court of Florida.

8.     Justice Grosshans is an individual and a Justice of the Supreme Court of Florida.

9.     Justice Francis is an individual and a Justice of the Supreme Court of Florida.

10.    Justice Sasso is an individual and a Justice of the Supreme Court of Florida.

11.    Justice Canady is an individual and was formerly Justice of the Supreme Court of Florida who retired on December 31, 2025.

12.    The Supreme Court of Florida is the highest court in the state of Florida and the judicial body which oversees and decides matters concerning attorney discipline.

13.    The Florida Bar regulates the practice of law in the state of Florida.

14.    FOBC administers to and prosecutes attorney discipline matters in the state of Florida.

15.    Savitz is an individual and is employed by FOBC as Deputy Director of Lawyer Regulation.

16.    Hinson is an individual and is employed by FOBC as Chief Branch Discipline Counsel in Tallahassee.

## STANDING

4

17.     Mr. Klayman has standing to bring this action because he has been directly affected, harmed, and victimized by the unlawful conduct of the Defendants complained of herein. His family, colleagues and client interests have also been severely harmed by the unethical and illegal acts and practices of all of the Defendants herein. Damages to Mr. Klayman surpass and will surpass the millions of U.S. dollars, as well as damaging to his reputation, good will and generally his financial livelihood and emotional well-being of himself, his family, colleagues and clients.

18.     Their injuries are proximately related to the conduct of Defendants, each and every one of them, jointly and severally.

## FACTS

### *Background Facts*

19.     This case involves the unconstitutional deprivation of Mr. Klayman's due process and equal protection rights and the selective First Amendment viewpoint discrimination of the Defendants with regard to an attorney reciprocal discipline proceeding styled *The Florida Bar v. Klayman*, SC23-1219 ("the Reciprocal Proceeding").

20.     On November 6, 2025, the Supreme Court of Florida issued an order suspending Mr. Klayman from the practice of law for twenty-four (24) months (the "Suspension Order"), with an onerous reinstatement provision. The Suspension Order incredibly contained zero (0), that is no citations to the record.

21.     On January 23, 2026, the Supreme Court of Florida issued an order denying Mr. Klayman's Motion for Rehearing on the Suspension Order (the "Rehearing Order"). The Rehearing Order contained no legal or factual reasoning, and in its entirety stated, "Respondent's motion for rehearing is hereby denied. Respondent's motion to stay is also denied. Any other

motions or requests for relief are denied."

22.    Mr. Klayman's Motion for Rehearing and Motion to Stay are incorporated by reference and attached hereto as Exhibit B and Exhibit B-1, respectively.

23.    The Reciprocal Proceeding and Suspension Order are based on reciprocal discipline proceeding involving the suspension order of the District of Columbia Court of Appeals in *In re Klayman*, 20-BG-583 (D.C.C.A.) (the "Sataki Suspension Order") and suspension order from the District of Columbia Court of Appeals in *In re Klayman*, 18-BG-100 (D.C.C.A.) (the "Judicial Watch Suspension Order").

24.    The Rehearing Order, the Suspension Order, and everything that occurred prior in the District of Columbia were the result of a cascading series of legal and factual errors and bias and prejudice that began in the District of Columbia. At each and every step of the process, Mr. Klayman's arguments and evidence were not given proper weight and consideration, and no review of the record occurred. Each and every person or entity along the series of cascading events simply adopted wholesale and "rubber stamped," without giving any consideration much less weight to the record,  creating a *fait accompli* where Mr. Klayman was not afforded a bona fide and good faith, much less legitimate, review of the actual facts and legal arguments involved.

### *Facts Pertaining to Events in the District of Columbia*

25.    The Sataki Suspension Order and the Judicial Watch Suspension Order stem from a highly partisan Democrat and leftist District of Columbia attorney apparatus concerning events that occurred in or around 2010 and 2006, now sixteen (16) and twenty (20) years ago respectively.

26.    The Sataki Suspension Order involved Mr. Klayman's representation of a woman,

Elham Sataki, who approached him claiming, it turns out later falsely, that she had been sexually harassed and retaliated against by her managers for complaining about the harassment at her place of employment, Voice of America ("VOA").

27.     During his long and distinguished legal career, Mr. Klayman has represented several women who have been the real victims of sexual harassment or abuse. Examples of these types of cases litigated by Mr. Klayman include but are not limited to Alice Alyse, Juanita Broaderick, Paula Jones, Kathleen Willey, Dolly Kyle Browning, Gennifer Flowers, and of course Sataki and others. Because of his commitment to women's rights, Mr. Klayman generally is inclined consider and to accept these cases when they are presented to him. Based on his experience with this type of case, he recognizes the debilitating and harmful effect that this type of harassment and can have on women in the workplace and in their daily lives. In short, he is a strong advocate for and believer in the advancement of women's rights and has consistently advocated against the discrimination and pay-gap issues that persist still in the workplace. In this regard, one of the material witnesses who testified on his behalf in the Sataki Suspension Order is his personal friend, famed women's rights attorney, Gloria Allred, who testified that although Mr. Klayman had referred Ms. Sataki to her firm, her firm chose not to represent Ms. Sataki.

28.     When Mr. Klayman was not able to achieve a favorable result in Sataki's litigation—although not due to lack of zealous effort and diligence on his part as testified to by Sataki's union representative, Mr. Timothy Shamble ("Mr. Shamble")—Sataki selfishly struck out and unfairly blamed Mr. Klayman and initiated bar complaints against him in the District of Columbia, Florida, and Pennsylvania. In this regard, Ms. Sataki mocked and disparaged Mr. Klayman's religion and falsely accused him of taking bribes:

> I do not know if you are Christian or Jewish, because whichever suits you best, you become one. But I believe in karma and what you have done with my case and losing

7

it. Ms. Sataki also wrote: And what you have done with my case and losing it and not stopping working on it when I ordered you, one day you'll answer to God, even if you throw your life and play with people life. I am nobody, just a little girl who was retaliated and harassment by some VOA employee and you seed (sic) that you can help me. Not only did you not help me, but destroyed my life to nothing....

Mr. Klayman are you happy now that you've complete destroyed and lost my case? A case with so many evidence and witnesses. Only a very bad and clueless attorney could lose it, or lost it on purps (sic) because you made a dill (sic), with the other party.

29.    In this regard, Mr. Shamble, Sataki's union president who Mr. Klayman worked closely with on her behalf, testified before the Ad Hoc Hearing Committee ("AHHC") in the District of Columbia that: "I've had several employees that have hired attorneys, and they have asked for the union to cooperate with them and to, you know, help them with their cases. But, in all honesty, I've never seen one go as far and as dedicated as Mr. Klayman was towards Ms. Sataki. I felt like he went above and beyond."

30.    As set forth in detail below, no action was taken by any of the jurisdictions in which Sataki filed bar complaints at the time, evidencing the lack of merit of Sataki's allegations.

31.    The Specification of Charges in the Sataki Suspension Order was not filed by District of Columbia Office of Disciplinary Counsel ("DCODC") until 2017 and in the Judicial Watch Suspension Order until 2013. This equates to an approximate seven (7) year egregious unjustified delay in both cases before the disciplinary proceedings were even initiated by DCODC.

32.    Under Florida law, this egregious unjustified delay renders both of these proceedings time barred.

33.    This seven (7) year delay by the District of Columbia attorney discipline apparatus can only be explained by the emergence of the District of Columbia attorney discipline

8

apparatus as a weapon to eliminate conservative and Republican activist attorneys from the practice of law around 2017 after President Trump began his first term as President, as set forth in detail in the following section. This occurred when the prior Bar Counsel, Wallace "Gene" Schipp retired, and a new one, Hamilton Fox, a rabid partisan Democrat and leftist took over. Joining him was another partisan rabid leftist, Julia Porter, who became his deputy. A simple review of Federal Election Commission donation records reveals only in part the partisan Democrat leftist makeup of the District of Columbia Bar discipline apparatus and the court which oversees it, the District of Columbia Court of Appeals.

34.    The highly partisan District of Columbia attorney discipline apparatus not only refused to dismiss these matters as time barred, it also ran roughshod over Mr. Klayman's due process rights. These due process violations include, but are not limited to:

(a) Ignoring the extremely prejudicial delay by DCODC in commencing these matters;

(b) Denying Mr. Klayman discovery despite the seven (7) year delay by DCODC in even filing Specifications of Charges;

(c) Refusing to give bona fide consideration to Mr. Klayman's arguments and evidence, including seven (7) material witnesses in the Sataki Suspension Order who all gave compelling testimony that Mr. Klayman did not commit any ethical violation - with these witnesses including Mr. Shamble, Keya Dash, Gloria Allred, the Honorable Stanley Sporkin, the latter a retired federal judge;

(d) Ignoring the fact that DCODC's lone witness in the Sataki Suspension Order, the complainant Elham Sataki ("Sataki") was impeached on numerous

occasions;

(e) Engaging in the illegal and unconstitutional practice of "stacking" disciplinary proceedings;

(f) Issuing a Sataki Suspension Order that did not contain a single cite to the record, effectively "rubber stamping" what was prepared at prior stages by the Board on Professional Responsibility ("Board"), which presides over and is supposed to review the findings of the Ad Hoc Hearing Committee ("AHHC").

(g) Ignoring the fact that VOA' Office of Civil Rights ("OCR"), which tends to favor the employee,  investigated Ms. Sataki's allegations of sexual harassment and workplace retaliation and found that she had lied and not been truthful about what had occurred. Accordingly, Mr. Klayman was deceived into representing her.

35.    In the Sataki Suspension Order, the AHHC in the District of Columbia was comprised of Michael Tigar ("Tigar"), chairperson Warren Anthony Fitch ("Fitch"), and a layperson who participated only in a minimal fashion.  Mr. Klayman was greatly concerned that Tigar was a part of the AHHC, given his proud, radical communist views being diametrically opposed to Mr. Klayman's conservative public interest activism. Fitch also proved to be Mr. Tigar's ideological kin, as he was extremely deferential to Tigar throughout the AHHC hearing. Exhibit C-1; Jack Cashill, *'Free speech' advocate works to silence Larry Klayman*, World Net Daily, Jan 1. 2020.

36.    Throughout the course of the AHHC hearing, the AHHC were hyper-fixated on the fact that Mr. Klayman and Ms. Sataki had included Hillary Clinton in a *Bivens* lawsuit,

although she was only included because her position as Secretary of State meant she was the head of the Voice of America's Board of Governors at the time, meaning that she was clearly a necessary party, as the Sataki Matter involved Sataki's employment at Voice of America. Mr. Klayman had also named conservative personal friend of Mr. Klayman, the conservative Blanquita Collum, who was also a governor of VOA, as a Defendant. There was no political motivation for any of Mr. Klayman's actions, yet the AHHC was tellingly hyper-fixated on manufacturing a political motivation into the matter.

37.     This resulted in a fatally flawed, wholly concocted and dishonest  AHHC Report that gave no weight to the compelling testimony of not only Mr. Klayman, but also his seven (7) material witnesses and instead adopted wholesale testimony from Sataki that had been thoroughly impeached. In the District of Columbia proceedings, Mr. Klayman's full name was publicized for public consumption leading to him being smeared in the media while the impeached complainant had her name redacted and was only identified through here initials, E.S.

38.     Then, at the Board, sitting chairman Matthew Kaiser ("Mr. Kaiser") also proved to be ideologically opposed to Mr. Klayman. Mr. Kaiser served as lead counsel in a civil lawsuit against former President Donald Trump for assault stemming from January 6, 2021. *Garza v. Trump et al*, 1:23-cv-00038 (D.D.C.). Mr. Kaiser has also written articles for Above the Law where he has severely criticized Trump and "tyranny."[1]

39.     This resulted in a Board Report that effectively adopted wholesale the fatally flawed AHHC Report, with no bona fide review or consideration of Mr. Klayman's meticulously detailed arguments showing the legal and factual errors contained therein.

40.     Finally, the District of Columbia Court of Appeals ("DCCA") then once again

---

[1] Matt Kaiser, *Trump and Tyranny*, Above the Law, July 26, 2016, available at: https://abovethelaw.com/2016/07/trump-and-tyranny/

adopted wholesale and effectively "rubber stamped" the Board's Report, issuing a Sataki Suspension Order which ignored Mr. Klayman's compelling factual and legal arguments and material witnesses and which contained no record cites.

41.    Thus, in sum, in the District of Columbia, Mr. Klayman's due process and other rights were flat-out ignored, with no bona fide consideration being given at any stage. This resulted in a cascading series of factual and legal errors that Mr. Klayman was not afforded any opportunity to correct.

### Facts Pertaining to District of Columbia's Selective First Amendment Viewpoint Discrimination

42.    It has regrettably become widely known that the District of Columbia attorney discipline apparatus has become highly politicized and partisan, which politicization has been compounded and thus increased significantly as a reaction to the prospect and actuality to and of the second Trump presidency. This has resulted in a District of Columbia attorney discipline apparatus that has selectively targeted attorneys who are conservative and Republican activist and pro-Trump attorneys, such as Mr. Klayman, for removal from the practice of law. Exhibit C-1; *Articles Regarding Politicization of the District of Columbia Attorney Discipline Apparatus*.

43.    This First Amendment selective viewpoint discrimination and prosecution is in violation of landmark precedent from the U.S. Court of Appeals for the District of Columbia Circuit in *Frederick Douglass Found., Inc. v. District of Columbia*, 82 F.4th 1122 (D.C. Cir. 2023), which gave rise to litigation brought by Mr. Klayman styled *Klayman v. District of Columbia Court of Appeals et al*, 1:24-cv-2997 (D.D.C.).

44.    The fact that Mr. Klayman and numerous other prominent Republican and conservative activist attorneys have become targeted for legal removal in the District of Columbia has even been observed by liberal Harvard law professor emeritus Alan Dershowitz's

12

book, "Get Trump," which compared the state of affairs to the "kind of ridicule that suspected communists faced during the era of Sen. Joe McCarthy in the 1950s." Exhibit C-1.

45.    This is underscored by the fact that during the Trump years in particular, ethics complaints were filed, accepted and initiated against Trump White House Counsellor Kellyanne Conway[2] over remarks she made on cable news, against former Trump Attorney General William Barr[3] (the complaint was outrageously and incredibly filed by all prior presidents of the District of Columbia Bar as well as a former senior bar counsel) for withdrawing the indictment of General Mike Flynn and for remarks he made on Fox News, Senators Ted Cruz[4] and Josh Hawley[5] over their role in advocating for President Trump in the 2020 presidential election, Professor John Eastman[6] who served as a legal counsel for President Trump, and of course former U.S. Attorney and New York City Mayor Rudy Giuliani[7]  over his representation of President Trump, to name just a few.  Indeed, Giuliani was just recently disbarred by the D.C. Bar over his association with and legal representation of President Trump. And, as the most recent example, Trump Department of Justice Acting Assistant Attorney General for the Civil Division Jeffrey Clark has been recommended to be disbarred by the Board.

46.    As detailed in the attached article by Benjamin Weingarten of Real Clear

---

[2]    https://www.washingtonpost.com/politics/law-professors-file-misconduct-complaint-against-kellyanne-conway/2017/02/23/442b02c8-f9e3-11e6-bf01-d47f8cf9b643_story.html
[3]    https://thehill.com/regulation/court-battles/508489-more-than-two-dozen-dc-bar-members-urge-disciplinary-probe-of-ag
[4]    https://www.texasstandard.org/stories/lawyers-law-students-officially-file-grievances-seeking-to-disbar-senator-ted-cruz/
[5]    https://thehill.com/homenews/state-watch/534783-attorneys-urge-missouri-supreme-court-to-probe-hawleys-actionsof
[6]    https://www.reuters.com/legal/ex-top-justice-dept-officials-testimony-sought-ethics-hearing-trump-ally-clark-2022-10-06/
[7]    https://www.law.com/newyorklawjournal/2021/03/03/nyc-bar-details-complaints-calling-for-full-attorney-discipline-investigation-of-giuliani/#:~:text=Under%20the%20New%20York%20state,censured%20or%20receive%20no%20punishment.

Investigations titled *From Lawfare to Barfare: Another Way to Target Trump Allies*, <u>Exhibit C-1</u>, the Board recommended disbarring Jeffrey Clark over letter that was simply drafted over the 2020 presidential election and not ever even sent, underscoring the rank partisanship.

47.     On the other hand, when a complaint was filed against leftist Democrat lawyer David Kendall of Williams & Connolly over his admitted involvement in the destruction of Hillary Clinton's 33,000 emails, many classified, and illegally retained on a private server, which complicity is not even in dispute, ODC summarily and quickly rejected a complaint filed by former Justice Department lawyer and conservative lawyer and public interest advocate Ty Clevenger, who was also pursued by ODC with the goal of disbarring him as well.

48.     Furthermore, Kevin Clinesmith, the former senior FBI lawyer and admittedly anti-Trump partisan who dishonestly falsified a surveillance document in the Trump-Russia investigation and who pled guilty to felony charges—was completely ignored by ODC and only temporarily suspended for only <u>five (5) months</u> after he pled guilty, and only after ODC's "blind eye" was uncovered and subjected to negative publicity. In stark contrast, the Michigan Bar automatically suspended Clinesmith immediately upon his felony conviction, and then ordered a suspension period of two (2) years. Paul Sperry, *D.C. Bar Restores Convicted FBI Russiagate Forger to 'Good Standing' Amid Irregularities and Leniency*, Real Clear Investigations, Dec. 16, 2021, <u>Exhibit C-1</u>.

49.     Finally, as disclosed in a report written by Paul Sperry in Real Clear Investigations titled "Trump's Toughest Foe Could Be Harris Lawyer Marc Elias" (the "Elias Article"), <u>Exhibit C-1</u>, details how Marc Elias' ("Elias") efforts to use the court system to prevent Donald Trump from being elected president. The Elias Article discloses in pertinent part:

> The longtime Democratic Party lawyer has already filed more than 60 preelection lawsuits to stop Trump from becoming president again by combatting what he

calls Republican "voter suppression" efforts such as requiring voters to provide identification at the polls.

…

At the same time, Elias has been sending letters to election officials in Georgia and other key swing states threatening legal action if they uphold challenges to voter rolls to remove noncitizens and other ineligible registrants.

…

As general counsel to Hillary Clinton's 2016 presidential campaign, he helped lead the effort to manufacture and leak spurious "opposition research" claiming to reveal illicit ties between Trump and Russia. Elias later testified that he was worried – then as now – that Trump was a threat to democracy: "I received information that was troubling as someone who cares about democracy." That "information" turned out to be a fictitious "dossier" linking Trump to the Kremlin crafted by former British spook and FBI informant Christopher Steele, who huddled with Elias in his Washington office.

…

But Elias has since taken on other clients – including Kamala Harris – who have more than made up for the loss in revenue. So far in this election cycle, the latest FEC filings show the Elias Law Group has received a total of more than $22 million in disbursements from a host of major Democratic and anti-Trump clients.

50.     Concerning Elias' efforts with regard to the 2016 election, "[s]pecial Counsel John Durham found Elias intentionally sought to conceal Clinton's role in the dossier. According to court records, Elias acted as a cutout for more than $1 million in campaign payments for the dossier." As the Elias Article set forth, the Durham probe as disclosed by Paul Sperry "**raised ethical issues with the D.C. Bar** and Elias' former law firm, Perkins Coie, reportedly leading to their breakup in August 2021…." Given that Elias was never disciplined by the D.C. Bar, the only conclusion is that this was also covered up and buried by the D.C. attorney discipline apparatus.

### *Facts Pertaining to Proceedings Before Referee Marsh*

51.     On August 29, 2023, an egregious over three (3) years after the DCCA issued the

Judicial Watch Suspension Order and nearly one (1) year after the DCCA issued the Sataki Suspension Order, Savitz and Hinson at FOBC initiated reciprocal discipline proceedings in Florida against Mr. Klayman.

52.     This reciprocal discipline proceeding was assigned to Referee Marsh.

53.     Mr. Klayman immediately moved to stay this matter pending the outcome of his ongoing collateral challenges to the Sataki Suspension Order, including litigation in the District of Columbia pursuant to D.C. Superior Court Rule 60, *Klayman v. Sataki et al,* 2022-CAB-005235 (D.C. Sup. Ct.) (the "Rule 60 Action") to set aside the Sataki Suspension Order and in Florida for fraud by Sataki in *Klayman v. Sataki*, 502022CA010491XXXXMB (15th Jud. Cir. Fla.) (the "Florida Sataki Action")

54.     Numerous other Courts and jurisdictions had stayed reciprocal discipline pending these collateral challenges, including the Supreme Court of Pennsylvania, the U.S. Court of Appeals for the Fifth Circuit, the U.S. District Court for the Middle District of Florida, the U.S. District Court for the Northern District of Texas.

55.     Referee Marsh, however, arbitrarily and capriciously and based on what later became apparent was his bias and prejudice and animus toward Mr. *Klayman* refused to stay this matter for that matter seek a stay as moved for by Mr. Klayman before the Supreme Court of Florida.

56.     Immediately, Mr. Klayman raised the issue that the Sataki Suspension Order was clearly time barred under Florida law.

57.     This is because the complainant, Sataki, filed bar complaints against Mr. Klayman on or around October 20, 2011 not only in the District of Columbia, but also in Florida and Pennsylvania as well. Mr. Klayman provided Referee Marsh with evidence of this fact. First, in

Sataki's October 20, 2011 complaint filed with DCODC , in response to the question "Have you filed a complaint about this matter anywhere else," she responded, "Complaint also filed in Pennsylvania and Florida." Then, this was further confirmed as recently January 5, 2023, when Ms. Sataki through her counsel, Robert O. Saunooke, in the Florida Sataki Action confirmed that she had sent a disciplinary complaint to Florida in 2011 in her Motion to Amend Answer and Motion to Dismiss.

58.    Based on this uncontroverted fact alone, this reciprocal discipline proceeding should never have been brought under both the doctrines of statute of limitations and laches. Fla. Bar Rule 3-7.16(a)(1); *Fla. Bar v. Phoenix*, 311 So. 3d 825, 831 (Fla. 2021). This is because at the time that these complaints were filed, none of these jurisdictions pursued disciplinary proceedings against Mr. Klayman, meaning that they must have logically at that time determined that there was no probable cause, much less clear and convincing evidence, to pursue any disciplinary action against Mr. Klayman.

59.    Mr. Klayman raised this and other compelling issues which under bright-line precedent of the Supreme Court of Florida in *Fla. Bar v. Kandekore*, 766 So. 2d 1004, 1007 (Fla. 2000) and its progeny required the rejection of reciprocal discipline at the March 27 – March 28, hearing before Referee Marsh as well as in a subsequent Proposed Order containing meticulously detailed record cites supporting each of the underlying facts setting forth and supporting his legal arguments.

60.    In stark contrast, Hinson, Savitz and FOBC's proposed order which was strategically devoid of any record cites and contained a number of legal and factually false and fraudulent statements.

61.    Despite Referee Marsh having asked for and been granted by the Supreme Court

17

of Florida up and until May 31, 2024 to issue his Report- thereby leaving him with ample time to carefully review both parties' submissions - he rushed in haste to adopt wholesale FOBC's patently deficient, false and fraudulent proposed order just incredibly only a few days after having received it on May 1, 2024. The ultimate order not coincidentally contained no record cites to the actual evidence. And he completely ignored the proposed order of Mr. Klayman, which made specific references to the actual record.

62.     This was severely prejudicial and harmful to Mr. Klayman because this allowed the cascading series of legal and factual errors to continue from the District of Columbia, as FOBC had effectively just mirrored the DCCA's Sataki Suspension Order and the Judicial Watch Suspension Order.

63.     The result of this was, in essence, a sham, prejudged proceeding before Referee Marsh where Mr. Klayman was not afforded an opportunity for a bona fide review. The DCCA's legal and factual errors were simply passed through and rubber stamped by Referee Marsh and FOBC and placed before the Supreme Court of Florida.

64.     This sham, prejudged proceeding was perpetrated and enabled by a highly biased and prejudiced and what appeared to be an emotionally unstable Referee Marsh as well as FOBC's Hinson and Savitz who acted as an appendage if not ideological kin of the biased District of Columbia attorney discipline apparatus.

65.     The bias and prejudice and animus towards Mr. Klayman exhibited by Referee Marsh forced him to move for his recusal in his Updated and Renewed Motion for Recusal and to Vacate Report and Recommendation (the "Recusal Motion"). As set forth in the Recusal Motion, Referee Marsh:

(a) falsely and without legal or factual basis accused Mr. Klayman of dishonesty;

18

(b) denied Mr. Klayman due process with regard to necessary discovery;

(c) refused to hold FOBC accountable for intentional false statements;

(d) refused to correct, much less review the record when his false statements were corrected by Mr. Klayman;

66.    Beyond this, Referee Marsh also made numerous hostile, acrimonious and belittling statements towards Mr. Klayman that evidence not only bias and prejudice, but also a clearly deep personal animus and dislike of Mr. Klayman.

67.    At the March 27 – 28 sanctions hearing in this matter, Mr. Klayman was repeatedly cut off, mocked, and simply not allowed to present his case. Referee Marsh also abbreviated the hearing, preventing Mr. Klayman from calling many of the witnesses that he wished to call. Referee Marsh gave little to no consideration to the multitude of experts who testified that this proceeding is indisputably time-barred.

68.    For instance, in order to get around the fact that the Sataki had long ago, --- years to be exact, submitted a bar complaint against Mr. Klayman in Florida in 2011 which was not acted upon, Referee Marsh manufactured an alternate, bizarre and disrespectful "reality" in finding:

> There is no indication of what address it was sent to, whether it was sent to the proper place. It could have been sent to the governor. It could have been sent to the legislature. It could have been sent to the local 7-11, for all the referee knows. There's a paucity of evidence for it actually being sent to the Florida Bar." March 28 Transcript at 202:4 – 12.

69.    This is a baffling and wholly improper statement for a jurist to make, as Referee Marsh chose, without any evidence, to simply mockingly **presume** that Sataki lacked the mental capacity to follow even basic directions, which is improper. If any presumption was proper, it should have been to presume that Sataki was able to follow simple directions and sent her

19

complaint to the right place. This is exactly why Mr. Klayman repeatedly tried to depose The Florida Bar's Intake Director, Shanell Schuyler, to receive confirmation that The Florida Bar did, in fact receive Ms. Sataki's complaint back in 2011, but was predictably not able to get a straight answer from her, another instance of the extreme passage of time and unjustified delay by DCODC severely harming and prejudicing Mr. Klayman.

70.     Referee Marsh also repeatedly minimized and dismissed Mr. Klayman's exhibits and arguments as "political ax grinding" March 28 Transcript at 144:18, and as "MSNBC vs. Fox," March 27 Transcript at 169:23, despite there being no evidence proffered by FOBC to counter Respondent Mr. Klayman's argument that the District of Columbia attorney discipline apparatus has evolved into a highly-politicized weapon aimed at eliminating conservative and Republican activist, and in particular pro-Trump attorneys, from the practice of law.

71.     Referee Marsh also took offense to Mr. Klayman's conservative and Republican public interest activism and advocacy, as he *sua sponte* referenced former president Bill Clinton's ethics complaint as an unnecessary and highly irrelevant not too veiled shot against Respondent Mr. Klayman, who has sued the Clintons on many occasions in the past as part of his public interest advocacy work:

> ""It's going to come up now, is that, some, jeez, now, some 25 years ago or so, there was a prominent Democrat attorney who happened to be president of the United States. And there was a conservative organization that thought the fact that he lied under oath during a deposition showed he was unfit to be an attorney, not -- just because they're a conservative organization and they want to -- and this was not Judicial Watch -- "Well, you might have had this -- the group that actually pushed for the sanctions in the state of Arkansas that was -- there was another group that was Southeastern --Legal Foundation. So, again, the fact that they're a conservative organization, have very conservative leanings, don't like the policies of this prominent Democrat who is trying to enlarge the government. They want limited government. They want conservative principles. And they feel he is not doing that. Are they not able to go seek sanctions from the Bar despite the underlying misconduct of that individual attorney? I mean, that's the part that I have a problem with, where this political implication is, why don't we throw

politics out of this and stick with what are the facts. March 27 Transcript at 9:17 – 10:17.

72.     Then, at the March 27 and March 28 hearing, Referee Marsh even refused to allow Mr. Klayman the ability to enter crucial evidence into the record, including incredibly the underlying records in the Sataki Suspension Order and Judicial Watch Suspension Order in the District of Columbia and crucial exculpatory evidence in the Sataki Suspension Order.

73.     Specifically, Referee Marsh refused to admit Respondent Exhibits 79 and 80 into the record – USB drives containing the entire underlying records in the two disciplinary proceedings at issue as well as Respondent Exhibit 81 - video of Complainant Elham Sataki's interview publicizing her case. The Referee's refusal to admit Respondent Exhibit 79 and 80 serves as undisputable evidence of the Referee having prejudged this matter, as there is absolutely no prejudice to any party in simply having access to a full record, which record every other court and jurisdiction considering the issue of reciprocal discipline actually required that Respondent Mr. Klayman produce. This is even more so the case with regard to Respondent Exhibit 81, which is compelling exculpatory evidence that conclusively shows that Respondent Mr. Klayman did not commit even the primary ethical violation at issue in the Sataki Matter – improperly using publicity and disclosing client confidences. The Referee even refused to watch the video to determine its relevance before refusing to admit it into the record, clearly showing once again his prejudgment.

74.     It became evident that Mr. Klayman would not receive a fair adjudication before Referee Marsh, which forced him to file his Recusal Motion. Fla. Stat Fla. Stat. § 38.10 provides the following:

> Whenever a party to any action or proceeding makes and files an affidavit stating fear that he or she will not receive a fair trial in the court where the suit is pending on account of the prejudice of the judge of that court against the applicant or in

favor of the adverse party, the judge shall proceed no further.....

75.    Thus, under Florida statutes, as well as black-letter common law, *see e.g. Menada, Inc. v. Arevalo*, 341 So. 3d 1189, 1191 (Fla. Dist. Ct. App. 2022), Referee Marsh had a duty to recuse himself but he refused to do so. Later, the Supreme Court of Florida and its Justices would ignore the judicial misconduct and bias and prejudice of Referee Marsh, circling the wagons to protect a fellow judge in rubber stamping Referee Marsh's so called recommended suspension.

76.    The Bar Defendants cynically and unethically took advantage of Referee Marsh's clear bias and prejudice and, in concert with DCODC who they admit to having been in contact with, served as the appendage of the District of Columbia attorney discipline apparatus to inflict as much harm to Mr. Klayman as possible in his home state and jurisdiction where he primarily practices.

77.    Mr. Klayman sought and was initially granted discovery by Referee Marsh to take depositions of members of the District of Columbia attorney discipline apparatus.

78.    The Bar Defendants obstructed and obfuscated this discovery and given that they admitted to being in contact with DCODC, on information and belief informed the would-be deponents that subpoenas had been issued by Referee Marsh for their depositions, allowing them to evade and delay the process.

79.    This warning provided the District of Columbia deponents an opportunity to evade service of process of the subpoenas issued by Referee Marsh, lie to the process servers that Mr. Klayman had hired to effectuate service of process,  and delay and obfuscate discovery to the point where Mr. Klayman ultimately did not have the opportunity to depose them.

80.    Then, on the eve of the scheduled deposition of Shanell Schuyler -  the FOBC

22

employee whom Hinson personally identified as the person most likely to elicit the information that Referee Marsh stated was relevant – FOBC baselessly stated that Ms. Schuyler would not appear without a subpoena. FOBC was informed that a subpoena was not necessary under Florida law, *Plantation-Simon, Inc. v. Bahloul*, 596 So. 2d 1159, 1161-62 (Fla. Dist. Ct. App. 1992), yet Ms. Schuyler still did not appear for the scheduled deposition, at great cost and expense to Mr. Klayman.

81.     This intentional obstruction and obfuscation of discovery ultimately worked, when at the March 27 hearing before Referee Marsh, he reversed course and denied all discovery. This left Mr. Klayman without discovery, in violation of his due process rights.

82.     Throughout this proceeding, Defendants Hinson and Savitz also made numerous false and misleading, if not fraudulent, material statements, apparently having been emboldened by Referee Marsh's clear favoritism towards them. These false statements include but are not limited to:

(a) Claiming without any evidence that The Florida Bar had not received Sataki's Complaint in 2011 when it was sent to them, and then taking advance of the unjustified delay occasioned by the District of Columbia to obstruct and obfuscate discovery to prevent Mr. Klayman from proving otherwise;

(b) implying that Mr. Klayman intentionally hid the fact that Honorable Reggie Walton ("Judge Walton") issued two orders, one on August 29, 2022 and the second on August 30, 2023 in another case styled *Klayman v. Porter et al*, 21-cv-3109 (D.D.C.). In fact, and in actuality, Mr. Klayman made it abundantly clear that he was providing to the Referee the "initial" order, as the subsequent "clarification" order was already on the record and in possession of the

23

Referee. Thus, Mr. Klayman simply attached the "initial" order in the interest of completeness and maintaining a full and accurate record.

(c) stating that Mr. Klayman had a duty to supplement his interrogatory responses with his experts, despite there being no legal authority supporting that assertion. Instead, well-settled law, including the Florida Rules of Civil Procedure clearly state that there is no duty to update interrogatory responses. *See Cousins v. Duprey*, 325 So. 3d 61, 73 (Fla. Dist. Ct. App. 2021); Fla. R. Civ. P. 1.280(f).

(d) stating that Mr. Klayman was precluded from taking the depositions of the third-party deponents as a result of the D.C. Superior Court in the Rule 60 Case staying discovery. The Rule 60 Case is a civil suit filed by Mr. Klayman. He has complied with the D.C. Superior Court's order in that civil suit. This, on the other hand, is a reciprocal discipline proceeding where Mr. Klayman is attempting to defend himself, and within the purview of the Florida Supreme Court.

(e) On the eve of the scheduled deposition of Shanell Schuyler - whom FOBC's Ms. Hinson identified as the person most likely to elicit the information that the Referee stated was relevant – FOBC baselessly stated that Ms. Schuyler would not appear without a subpoena. FOBC was informed that a subpoena was not necessary under Florida law, *Plantation-Simon, Inc. v. Bahloul*, 596 So. 2d 1159, 1161-62 (Fla. Dist. Ct. App. 1992), yet Ms. Schuyler still did not appear for the scheduled deposition, at great cost and expense to Mr. Klayman.

24

(f) stating that Rule 60 Case had been closed, when in actuality, it was subject to appeal to the D.C. Court of Appeals, and in fact, has been appealed to the D.C. Court of Appeals.

83.     Defendants Hinson and Savitz are ideologically and politically the  opposite of Mr. Klayman, but ideologically and politically akin those in the Democrat and leftist DC Bar discipline apparatus,   which explains in part their conduct throughout this matter and why they chose to serve as an appendage of the highly partisan District of Columbia attorney discipline apparatus, which is Democrat and leftist.[8] Ms. Savitz harbors a personal resentment towards him as a result of Mr. Klayman referring to the District of Columbia Attorney Discipline Apparatus' actions as an "abortion" of justice. When Mr. Klayman said that, Ms. Savitz snapped back at him saying that his language was "unprofessional." However, Mr. Klayman did not mean any offense and was using the term "abortion" in its generic sense, defined as "arrest of development (as of a part or process) resulting in imperfection."

### Facts Pertaining to Events Before the Supreme Court of Florida

84.     Referee Marsh's Report, a virtually verbatim super copy of FOBC's proposed report containing zero (0) record cites, was therefore presented to the Supreme Court of Florida.

85.     Mr. Klayman once again attempted to seek bona fide review of the factual and legal errors that had cascaded to this point, in addition to seeking a ruling on his Recusal Motion.

86.     At the oral argument, the Justices of the Florida Supreme Court recognized the many flaws with the reciprocal discipline proceeding, including that during the interim  period of delay, Mr. Klayman had practiced law in Florida as a member continuously in good standing:

Chief Justice Carlos Muniz: I'm sorry to interrupt you. The logic it seems like sort

---

[8] This can be confirmed through political donations publicly available on the Federal Election Commission website.

of the logic of the reciprocal discipline the reason we don't relitigate all of that is just the idea you have a problem in another state you go through the process it results in some kind of discipline in a perfect world if someone else with due process is already deciding this person should not be practicing and offering the services to the public for two years you want to protect people in Florida for the same two years. I think the problem here is the stacking of the time especially in the context where the wrongdoing is from 15 years ago basically. Can you address that?

87.    The Supreme Court of Florida also recognized the due process and stacking issues:

Justice: I'm sorry to interrupt I just want to give you a chance to address just something I'm kind of struggling with with this case which is it seems like there is some attractiveness to the idea that regardless of what happened here it was a long time ago there was discipline in DC. Adding two more years to it might be overkill.

Justice: But the case for protecting the public from harm seems to me to be substantially weakened by the delay that the bar seems to have taken in this matter. If Mr. Klayman because of his conduct was at substantial risk to the public why did you wait so long to act?

Chief Justice Carlos Muniz: Can I ask you a question is the two years suspension here necessary to protect the public or is this more essentially just a punishment.

88.    Despite clearly recognizing the numerous issues, the Florida Supreme Court Justices then chose to ignore them, in addition to having ignored their oath of office as Justices and abdicated their duties to review this matter by issuing the November 6, 2025 Suspension Order containing no record cites and simply "rubber stamping" what was submitted to it by Referee Marsh. It is clear that none of the Justices ever reviewed the actual record.

89.    Mr. Klayman moved for rehearing, meticulously pointing out the number of legal and factual errors contained in the Suspension Order containing zero (0) record cites, yet on January 23, 2026, the Florida Supreme Court Justices cavalierly denied this motion with zero legal or factual reasoning, showing that no one actually reviewed the record prior to issuing these order. Exhibit B-1; *Motion for Rehearing*, incorporated herein by reference in whole.

26

90.     This left unaddressed a number of case-dispositive and crucial issues, including but not limited to:

(a) That this disciplinary proceeding was time-barred not only in Florida, but also in the District of Columbia;

(b) That Mr. Klayman's due process rights were violated at every single stage of this proceeding;

(c) That this reciprocal discipline proceeding at this time, decades later, was "purely punitive" given that Mr. Klayman has practiced without issue in Florida during this entire period, as suggested by the justices of the Supreme Court of Florida at oral argument;

(d) That there was a lack of grounds to impose reciprocal discipline on Mr. Klayman;

(e) The bias and prejudice of Referee Marsh and the Recusal Motion; and

(f) The "stacking" of disciplinary proceedings, which practice the Supreme Court of Florida had found to be illegal in *Fla. Bar v. Rubin*, 362 So. 2d 12 (Fla. 1978).

91.     In this regard, Mr. Klayman filed on February 3, 2026 an "Expedited Motion for Issuance of Findings of Fact and Conclusions of Law." Exhibit C, incorporated herein by reference.

92.     Then, on February 20, 2026, the Court denied Mr. Klayman's Expedited Motion for Issuance of Findings of Fact and Conclusions of Law as "unauthorized." The Court gave Mr. Klayman the "back of its hand" for simply asking for findings of fact and conclusions of law, which is not "unauthorized." Exhibit D. What is "unauthorized" is not doing one's job and a lack

of respect for the oath of office sworn by the Florida Supreme Court Justices, and a blatant disregard for their role as justices of the highest court in Florida and Mr. Klayman's constitutional and other legal rights.

93.    This has resulted in a gross miscarriage of justice, as the Florida Supreme Court Justices have cavalierly and intentionally violated their oath of office and shirked and then continued to ignore and flout their judicial responsibilities. This oath requires:

> I, , a citizen of the State of Florida and of the United States of America, and being an officer of the Florida State Courts System and a recipient of public funds as such officer, do hereby solemnly swear or affirm that I will support the Constitution of the United States and of the State of Florida.

94.    Then, when Hinson and Savitz filed a Petition for Order to Show Cause on February 6, 2026 against Mr. Klayman, the Florida Supreme Court Justices issued an order within minutes, in stark contrast to the months and months that Mr. Klayman had to wait before obtaining any type of decision on his motions, some of which still have not been acted upon.

## FIRST CAUSE OF ACTION
### 42 U.S.C. § 1983 – Denial of Due Process
### Referee Marsh

95.    Plaintiff repeats and re-alleges all of the previous allegations of the entirety of this Complaint, including in other causes of action, and incorporate them herein in support of this count with the same force and affect, as if fully set forth herein again at length.

96.    42 U.S.C. § 1983 provides

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law....

97.    Defendants, each and every one of them, jointly and severally, were acting under

28

the color of state law.

98.    Defendants, acting in their individual capacities, each and every one of them, jointly and severally, outside of the scope of their official duties, and without any valid claim of immunity, violated Mr. Klayman's constitutional due process rights under the Fourteenth Amendment to the Constitution.

99.    Specifically, Referee Marsh (1) refused to review the record and adopted wholesale the factual and legal errors submitted to him by the Bar Defendants, (2) made condescending, biased remarks and personal attacks on Mr. Klayman, (3) refused to recuse himself in violation of both Florida statute and common law, (4) refused to hold the Bar Defendants accountable for their false statements, which falsity was demonstrated to him by Mr. Klayman, (5) prejudged this entire matter as evidenced by his failure to admit highly relevant and necessary evidence into the record.  In addition, it is clear that he never reviewed the actual evidentiary record.

100.    Intentionally violating an individual's rights is not within the scope of Defendants' official duties as they can made no valid claim of immunity.

101.    Mr. Klayman seeks damages as plead herein and both temporary and permanent injunctive relief ordering that the that the Suspension Order be vacated as well as damages allowable under 42 U.S.C. § 1983.

**SECOND CAUSE OF ACTION**
**42 U.S.C. § 1983 – Denial of Due Process**
**Bar Defendants**

102.    Plaintiff repeats and re-alleges all of the previous allegations of the entirety of this Complaint, including in other causes of action, and incorporate them herein in support of this count with the same force and affect, as if fully set forth herein again at length.

103.    42 U.S.C. § 1983 provides

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law....Defendants, each and every one of them, jointly and severally, were acting under the color of state law.

104.    Defendants, acting in their individual capacities, each and every one of them, jointly and severally, outside of the scope of their official duties, and without any valid claim of immunity, violated Mr. Klayman's constitutional due process rights under the Fourteenth Amendment to the Constitution.

105.    Specifically, The Bar Defendants (1) knowingly made false and misleading, if not fraudulent statements to Referee Marsh and refusing to cite the record in their submissions to him; (2) obstructed and obfuscated discovery which had been ordered by Referee Marsh, including but not limited to be being in contact with the District of Columbia bar officials and warning them about subpoenas which Referee Marsh had issued and therefore allowing them to evade service of process, and (3) violating their ethical duty as prosecutors under Rule Regulating Florida Bar 4-3.8 to "refrain from prosecuting a charge that the prosecutor knows is not supported by probable cause."

106.    In this regard, they have violated Rule Regulating Florida Bar 4-3.8's comment, which states, "A prosecutor has the responsibility of a minister of justice and not simply that of an advocate."

107.    Intentionally violating an individual's rights is not within the scope of Defendants' official duties as they can made no valid claim of immunity.

108.    Mr. Klayman seeks damages as plead herein and both temporary and permanent

30

injunctive relief ordering that the that the Suspension Order be vacated as well as damages allowable under 42 U.S.C. § 1983.

## THIRD CAUSE OF ACTION
### 42 U.S.C. § 1983 – Denial of Due Process
### Florida Supreme Court Defendants

109.    Plaintiff repeats and re-alleges all of the previous allegations of the entirety of this Complaint, including in other causes of action, and incorporate them herein in support of this count with the same force and affect, as if fully set forth herein again at length.

110.    42 U.S.C. § 1983 provides

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law....Defendants, each and every one of them, jointly and severally, were acting under the color of state law.

111.    Defendants, acting in their individual capacities, each and every one of them, jointly and severally, outside of the scope of their official duties, and without any valid claim of immunity, violated Mr. Klayman's constitutional due process rights under the Fourteenth Amendment to the Constitution.

112.    Specifically, the Florida Supreme Court Defendants (1) abdicated their duties and responsibilities by refusing to review the record and adopted wholesale the factual and legal false statements errors submitted to them by the Bar Defendants which was then adopted wholesale by Referee Marsh; (2) refused to address the issue of Referee Marsh's required recusal and/or disqualification, and (3) refused to issue required findings of fact and conclusions of law. The Florida Supreme Court Defendants therefore violated their oaths of office and did not do their jobs.

31

113.    Intentionally violating an individual's rights is not within the scope of Defendants' official duties as they can made no valid claim of immunity.

114.    Mr. Klayman seeks damages as plead herein and both temporary and permanent injunctive relief ordering that the that the Suspension Order be vacated as well as damages allowable under 42 U.S.C. § 1983.

## FOURTH CAUSE OF ACTION
### 42 U.S.C. § 1983 – Denial of Equal Protection
### Referee Marsh

115.    Plaintiff repeats and re-allege all of the previous allegations of the entirety of this Complaint, including in other causes of action, and incorporate them herein in support of this count with the same force and affect, as if fully set forth herein again at length.

116.    42 U.S.C. § 1983 provides

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law....

117.    Defendants, each and every one of them, jointly and severally, were acting under the color of state law.

118.    Defendants, acting in their individual capacities, each and every one of them, jointly and severally, outside of the scope of their official duties, and without any valid claim of immunity, violated Mr. Klayman's constitutional equal protection rights under the Fourteenth Amendment to the Constitution.

119.    As set forth in paragraphs 42 – 45, Mr. Klayman has been treated differently by the Defendants because he is a conservative, Caucasian male.

120.    These equal protection violations began in the District of Columbia, where Mr.

Klayman's full name was publicized for public consumption leading to him being smeared in the media while the impeached complainant had her name redacted and was only identified through here initials. This is one example of how the District of Columbia attorney discipline apparatus has been widely recognized to have been weaponized against conservative and Republican activist attorneys, and in particular those who are perceived to support President Donald J. Trump, and was then furthered and continued by Referee Marsh who also harbors demonstrable animus towards Mr. Klayman and is not emotionally stable.

121.    Mr. Klayman seeks damages as plead herein and both temporary and permanent injunctive relief ordering that the that the Suspension Order be vacated.

**FIFTH CAUSE OF ACTION**
**42 U.S.C. § 1983 – Denial of Equal Protection**
**The Florida Bar Defendants**

122.    Plaintiff repeats and re-allege all of the previous allegations of the entirety of this Complaint, including in other causes of action, and incorporate them herein in support of this count with the same force and affect, as if fully set forth herein again at length.

123.    42 U.S.C. § 1983 provides

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law....

124.    Defendants, each and every one of them, jointly and severally, were acting under the color of state law.

125.    Defendants, acting in their individual capacities, each and every one of them, jointly and severally, outside of the scope of their official duties, and without any valid claim of immunity, violated Mr. Klayman's constitutional equal protection rights under the Fourteenth

33

Amendment to the Constitution.

126.    As set forth in paragraphs 42 – 50, Mr. Klayman has been treated differently by the Defendants because he is a conservative, Caucasian male.

127.    These equal protection violations began in the District of Columbia, where Mr. Klayman's full name was publicized for public consumption leading to him being smeared in the media while the impeached complainant had her name redacted and was only identified through here initials, E.S. This is one example of how the District of Columbia attorney discipline apparatus has been widely recognized to have been weaponized against conservative and Republican activists attorneys and was then furthered and continued by The Florida Bar Defendants who also harbor animus towards Caucasian, male, conservative and Republican activist attorneys.

128.    Mr. Klayman seeks damages as plead herein and both temporary and permanent injunctive relief ordering that the that the Suspension Order be vacated.

## SIXTH CAUSE OF ACTION
### 42 U.S.C. § 1983 – Denial of Equal Protection
### Florida Supreme Court Defendants

129.    Plaintiff repeats and re-allege all of the previous allegations of the entirety of this Complaint, including in other causes of action, and incorporate them herein in support of this count with the same force and affect, as if fully set forth herein again at length.

130.    42 U.S.C. § 1983 provides

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law....

131.    Defendants, each and every one of them, jointly and severally, were acting under

34

the color of state law.

132.    Defendants, acting in their individual capacities, each and every one of them, jointly and severally, outside of the scope of their official duties, and without any valid claim of immunity, violated Mr. Klayman's constitutional equal protection rights under the Fourteenth Amendment to the Constitution.

133.    As set forth in paragraphs 42 – 50, Mr. Klayman has been treated differently by the Defendants because he is a conservative, Caucasian male.

134.    These equal protection violations began in the District of Columbia, where Mr. Klayman's full name was publicized for public consumption leading to him being smeared in the media while the impeached complainant had her name redacted and was only identified through here initials, E.S. This is one example of how the District of Columbia attorney discipline apparatus has been widely recognized to have been weaponized against conservative and Republican activists attorneys and continued by the Florida Supreme Court Defendants who also harbor animus towards Caucasian, male, conservative and Republican activist attorneys.

135.    Mr. Klayman seeks damages as plead herein and both temporary and permanent injunctive relief ordering that the that the Suspension Order be vacated.

### SEVENTH CAUSE OF ACTION
**42 U.S.C. § 1983 – First Amendment Selective Prosecution and Retaliation**
*Referee Marsh*

136.    Plaintiff repeats and re-allege all of the previous allegations of the entirety of this Complaint, including in other causes of action, and incorporate them herein in support of this count with the same force and affect, as if fully set forth herein again at length.

137.    42 U.S.C. § 1983 provides

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to

be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law....

138.    Referee Marsh was at all material times acting under color of state law.

139.    Referee Marsh, acting in his individual capacity, outside of the scope of his official duties, and without any valid claim of immunity, violated Mr. Klayman's constitutional rights under the First Amendment to the Constitution.

140.    Referee Marsh has retaliated against Mr. Klayman for exercising his First Amendment rights as a conservative and Republican public interest activist attorney.

141.    Referee Marsh has  retaliated by having (1) refused to review the record and adopted wholesale the factual and legal errors submitted to him by the Bar Defendants, (2) made condescending, biased remarks and personal attacks on Mr. Klayman, (3) refused to recuse himself in violation of both Florida statute and common law, (4) refused to hold the Bar Defendants accountable for their false statements, which falsity was demonstrated to him by Mr. Klayman, (5) prejudged this entire matter as evidenced by his failure to admit highly relevant and necessary evidence into the record. It is clear that Referee Marsh never reviewed the actual record

142.    This was done in order to silence Mr. Klayman's First Amendment conservative and Republican activism and  advocacy by taking away his license to practice law and therefore perform such public advocacy.

143.    Mr. Klayman seeks damages as plead herein and both temporary and permanent injunctive relief ordering that the that the Suspension Order be vacated.

**EIGHTH CAUSE OF ACTION**
**42 U.S.C. § 1983 – First Amendment Selective Prosecution and Retaliation**
*Florida Bar Defendants*

144. Plaintiff repeats and re-allege all of the previous allegations of the entirety of this Complaint, including in other causes of action, and incorporate them herein in support of this count with the same force and affect, as if fully set forth herein again at length.

145. 42 U.S.C. § 1983 provides

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law....

146. The Florida Bar Defendants were at all material times acting under color of state law.

147. The Florida Bar Defendants, acting in their individual capacities, each and every one of them, jointly and severally, outside of the scope of their official duties, and without any valid claim of immunity, violated Mr. Klayman's constitutional rights under the First Amendment to the Constitution.

148. The Florida Bar Defendants have retaliated against Mr. Klayman for exercising his First Amendment rights as a conservative and Republican public interest activist attorney.

149. Specifically, The Bar Defendants (1) knowingly made false and misleading, if not fraudulent statements to Referee Marsh and refusing to cite the record in their submissions to him; (2) obstructed and obfuscated discovery which had been ordered by Referee Marsh, including but not limited to be being in contact with the District of Columbia bar officials and warning them about subpoenas which Referee Marsh had issued and therefore allowing them to evade service of process, and (3) violating their ethical duty as prosecutors under Rule

Regulating Florida Bar 4-3.8 to "refrain from prosecuting a charge that the prosecutor knows is not supported by probable cause."

150.    In this regard, they have violated Rule Regulating Florida Bar 4-3.8's comment, which states, "A prosecutor has the responsibility of a minister of justice and not simply that of an advocate."

151.    This was done in order to silence Mr. Klayman's First Amendment conservative and Republican activism and advocacy by taking away his license to practice law and therefore perform such public activism and advocacy.

152.    Mr. Klayman seeks damages as plead herein and both temporary and permanent injunctive relief ordering that the that the Suspension Order be vacated.

## NINTH CAUSE OF ACTION
### 42 U.S.C. § 1983 – First Amendment Selective Prosecution and Retaliation
### *Florida Supreme Court Defendants*

153.    Plaintiff repeats and re-allege all of the previous allegations of the entirety of this Complaint, including in other causes of action, and incorporate them herein in support of this count with the same force and affect, as if fully set forth herein again at length.

154.    42 U.S.C. § 1983 provides

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law....

155.    The Florida Supreme Court Defendants were at all material times acting under color of stat law.

156.    The Florida Supreme Court Defendants, acting in their individual capacities, each and every one of them, jointly and severally, outside of the scope of their official duties, and

without any valid claim of immunity, violated Mr. Klayman's constitutional rights under the First Amendment to the Constitution.

157.    The Florida Supreme Court Defendants have retaliated against Mr. Klayman for exercising his First Amendment rights as a conservative and Republican public interest activist attorney who, ever since he founded Judicial Watch, Inc., and later Freedom Watch, has served as a watchdog over unethical and illegal conduct by judges, both federal and state.

158.    The Florida Supreme Court Defendants have retaliated by (1) abdicated their duties and responsibilities by refusing to review the record and adopted wholesale the factual and legal errors submitted to them  by the Bar Defendants which was then adopted wholesale by Referee Marsh; (2) refused to address the issue of Referee Marsh's required recusal. Egregiously, not one of them actually reviewed the actual record. In doing so they have violated their oaths of office and have not fulfilled their duties as Justices of the Supreme Court of Florida, which is to diligently mete out justice based on the facts and the law.

159.    This was  in order to silence Mr. Klayman's First Amendment conservative and Republican activist litigation which has been critical of judges and his other anti-establishment advocacy by unjustly suspending  his license to practice law and therefore perform such public advocacy.[9]

160.    Mr. Klayman seeks damages as plead herein and both temporary and permanent injunctive relief ordering that the that the Suspension Order be vacated.

**PRAYER FOR RELIEF**

---

[9] Part of Mr. Klayman's First Amendment advocacy are demonstrated and recounted in part in three books which he has published. These books are (1) Larry Klayman, Whores: Why and How I Came to Fight the Establishment, New Chapter Pub, Jan 1, 2009 , (2) Larry Klayman, It Takes a Counter-Revolution: Wake Up America!, Post Hill Press, Feb. 8, 2022 , and (3) Larry Klayman, It Takes a Revolution: Forget the Scandal Industry!, Post Hill Press, Oct. 27. 2020.

WHEREFORE, Plaintiff Klayman prays for the following relief:

(1)     An order setting aside and vacating the  Supreme Court of Florida's November 6, 2025 Suspension Order;

(2)     Compensatory, general, and special damages as well as punitive damages pursuant to 42 U.S.C. § 1983 as may be determined by the trier of fact;

(3)     Permanent and preliminary injunctive relief;

(4)     Punitive damages; and

(5)     Any other relief that the Court may deem proper.

## DEMAND FOR JURY TRIAL

**Plaintiff demands a trial by jury on all counts as to all issues and counts so triable.**

DATED:  February 25, 2026                                          Respectfully submitted,

                                                                                       Larry Klayman
                                                                                       7050 W. Palmetto Park Rd
                                                                                       Boca Raton FL 33433
                                                                                       Email: leklayman@gmail.com
                                                                                       Phone: 561-558-5336

                                                                                       *Pro Se*

40



ORIGIN ID:PHKA          (310) 595-0800
LARRY KLAYMAN
KLAYMAN LAW GROUP, P.A.
7050 W. PALMETTO PARK ROAD
SUITE 15-264
BOCA RATON, FL 33433
UNITED STATES US

SHIP DATE: 26FEB26
ACTWGT: 1.00 LB
CAD: 105024589/INET4535

BILL SENDER

TO  **ADONNA BRIDGES**
    **USDC N.D. FLA. CLERK**
    **ONE NORTH PALAFOX ST**

    **PENSACOLA FL 32502**
    18504358440                  REF:
    INV:
    PO:                          DEPT:



FedEx
Express

**FedEx**

TRK#  0201

**8891 1726 0999**

**XS PNSA**

FRI - 27 FEB 10:30A

PRIORITY OVERNIGHT

32502

FL-US                BFM

Part # 156297-435  RRDB2  EXP

PRIORITY OVERNIGHT
**539-1547**
4266 FRI 02/27  08 13
1 N PALAFOX ST
PENSACOLA,FL
32502 59495 15
EIP 7     SP PD 100 Y