# EXHIBIT B

**IN THE SUPREME COURT OF FLORIDA**

| | | |
|---|---|---|
| THE FLORIDA BAR, | } | |
| Complainant | } | **Case Number: SC23-1219** |
| v. | } | **TFB File No. 2020-00,515 (2A)** |
| LARRY ELLIOT KLAYMAN | } | |
| Respondent. | } | |

**RESPONDENT LARRY ELLIOT KLAYMAN'S MOTION TO STAY**

Respondent Larry Elliot Klayman ("Mr. Klayman") hereby moves this honorable Court for an order staying implementation of the Court's November 6, 2025 Suspension Order ("Florida Suspension Order") pending (1) the outcome of his Motion for Rehearing, Exhibit 1, and (2) ongoing collateral challenges to the underlying suspension order in the District of Columbia in *In re Klayman*, 20-BG-583 (D.C. Ct. App.) (the "Sataki Suspension Order").

**FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

The Court must respectfully stay this proceeding because Mr. Klayman will otherwise suffer irreparable injury to his

constitutional due process rights. Under *Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009), such an injury to his constitutional due process rights always constitutes an irreparable injury. Furthermore, Mr. Klayman has a reasonable likelihood of success not only because of the merits of Mr. Klayman's Motion for Rehearing, Exhibit 1, which is incorporated herein by reference, but also because the merits of Mr. Klayman's ongoing collateral challenges to the Sataki Suspension Order. These ongoing collateral challenges comprise (1) an action pursuant to D.C. Superior Court Rule 60, *Klayman v. Sataki et al*, 2022-CAB-005235 (D.C. Sup. Ct.) (the "Rule 60 Action") and (2) an action for fraud currently pending in the Fifteenth Judicial Circuit for Palm Beach County styled *Klayman v. Sataki*, *Klayman v. Sataki*, 2022-CA-010491 (15th Jud. Cir. Fla.) (the "Florida Action").

Public policy and the need to have a fair and just appellate review also respectfully necessitates this stay, which will not result in any prejudice to the parties or this honorable Court. The potential harm to Mr. Klayman is far greater than to The Florida Bar.

## I. The Rule 60 Action

The Rule 60 Action was filed by Respondent Mr. Klayman in the D.C. Superior Court pursuant to D.C. Superior Court Rule 60 and alleged that the Sataki Suspension Order was obtained through the use of prosecutorial misconduct, fraud, perjury, and the suborning of perjury by the District of Columbia Office of Disciplinary Counsel ("DCODC") and the Complainant, Elham Sataki ("Ms. Sataki"). Exhibit 3; *Amended Complaint in the Rule 60 Action.* A favorable ruling in the Rule 60 Action would moot the underlying suspension order as well as this reciprocal discipline matter, as it pertains to the Sataki Suspension Order. The Rule 60 Action is currently pending before the District of Columbia Court of Appeals ("DCCA") and there exists significant grounds for a reversal, including but not limited to:

a. the underlying suspension order was procured through fraud and perjury as well as prosecutorial misconduct; *See* Rule 60 Complaint. Exhibit 3.

b. a court's power to grant relief ""does not limit a court's power to: (1) entertain an independent action to relieve a party from a judgment, order, or proceeding; or (2) set aside a judgment for fraud on the court."

c. failing to apply the correct standard on a Rule 12(b)(6) motion, where the Court should accept "all of the allegations in the complaint as true" and "construe all facts and

inferences in favor of the plaintiff." *Murray v. Wells Fargo Home Mortg.*, 953 A.2d 308, 316 (D.C. 2008);

d. finding that the Complaint failed to assert a cause of action for "civil conspiracy" where the Court was required to accept all of the allegations in the complaint as true. *Id.*; and

e. Denying leave to amend, despite the fact that "leave to amend a complaint should be freely given in the absence of undue delay, bad faith, undue prejudice to the opposing party, repeated failure to cure deficiencies, or futility." *Richardson v. United States,* 193 F.3d 545, 548-49 (D.C. 1999).

Given the meris on appeal, which would moot the prospect of reciprocal discipline, it would be prudent—notwithstanding the even more important considerable merits of the contemporaneously filed Motion for Rehearing before this Court—for this honorable Court to allow for completion of the appellate process to allow Mr. Klayman to exhaust his legal due process and other rights. This is what this Court's sister court has done, the Supreme Court of Pennsylvania, and other jurisdictions where Mr. Klayman is licensed to practice law; the U.S. Court of Appeals for the Fifth Circuit, the U.S. District Court for the Middle District of Florida, and the U.S. District Court for the Northern District of Texas. *See* <u>Exhibit 2</u>.

This is not only a matter of allowing due process rights to run their course, particularly given what is at stake with regard to what is a potentially career ending reciprocal discipline Suspension Order by this Court, but is also necessary to preserve the limited time and resources of the Court and Mr. Klayman, who has already been severely drained financially due to these reciprocal discipline proceedings throughout the nation, compounded by untimely stacked reciprocal proceedings before this Court as a result of the actions of The Florida Bar.

## II. The Florida Action

The Florida Action was filed by Mr. Klayman to directly address the fraud perpetrated by Ms. Sataki before the Ad Hoc Hearing Committee ("AHHC") in the Sataki Matter. Exhibit 4; Complaint in the Florida Action. As detailed in the attached Complaint, at the AHHC hearing, Ms. Sataki gave false and fraudulent testimony that (1) she did not approve the use of publicity with regard to her case in which Mr. Klayman represented her, (2) she did not want to move to Los Angeles and was forced to do so by Mr. Klayman, and (3) that she had wanted Mr. Klayman to dismiss her case. This false and fraudulent testimony ultimately led

to the Sataki Suspension Order, and eventually this instant reciprocal discipline proceeding. This matter is currently pending before the Honorable Maxine Cheesman of the Fifteenth Judicial Circuit.

**III. Numerous Court Have Stayed Reciprocal Discipline Proceedings**

As shown above, numerous other Courts and jurisdictions have stayed reciprocal discipline proceedings pending the outcome of Mr. Klayman's collateral challenges to the Sataki Suspension Order because they have recognized that if Mr. Klayman succeeds in these collateral challenges, the Sataki Suspension Order would be vacated, thus mooting out any reciprocal discipline. To reiterate, courts and jurisdictions which have stayed reciprocal discipline proceedings include (1) the Supreme Court of Pennsylvania, (2) U.S. Court of Appeals for the Fifth Circuit, (3) the U.S. District Court for the Middle District of Florida, and (4) the U.S. District Court for the Northern District of Texas. These orders are attached hereto as Exhibit 2.

Mr. Klayman had also previously moved the assigned Referee at the outset of this reciprocal discipline matter, Referee J. Lee

Marsh ("Referee Marsh"), to ask this Court to stay the reciprocal discipline matter as the Supreme Court of Pennsylvania and other courts and jurisdictions have done. This request by Mr. Klayman to ask this Court to stay was certainly not unreasonable, as Referee Marsh had on prior occasions sought extensions from this Court, including an extension of time to issue his Report. Regrettably, Referee Marsh declined to do so despite precedent from other courts and jurisdictions, as further indication of why Mr. Klayman's Motion to Recuse and to Vacate Report and Recommendation and Updated Motion to Recuse and to Vacate Report and Recommendation needs to be considered by this Court, among other compelling reasons for his recusal or disqualification.

## LEGAL STANDARD

"When entertaining an application for a stay the factors to be considered for exercise of the Court's discretion are (i) the probability of irreparable injury if no stay is granted, (ii) the remediable quality of any such injury, and (iii) the likelihood of ultimate success on the merits." *Sullivan v. State*, 372 So. 2d 938, 941 (Fla. 1979). Here, the probability of irreparable injury is exceptionally high, in conjunction with the other *Sullivan* factors.

Furthermore, a stay is also required to allow sufficient and needed time for Mr. Klayman's due process rights to proceed forward to preserve and protect the integrity of this honorable Court's appellate process as a matter of public policy. Sufficient time is necessary for the Court to thoroughly review the record and correct a manifest injustice in the form of the Florida Suspension Order, which this Court in *Strazzulla v. Hendrick*, 177 So. 2d 1, 3 (Fla. 1965) found can be corrected at any time: "We may change 'the law of the case' at any time before we lose jurisdiction of a cause and will never hesitate to do so if we become convinced, as we are in this instance, that our original pronouncement of the law was erroneous and such [ruling resulted in manifest injustice. In such a situation a court of justice should never adopt a pertinacious attitude."

## LEGAL ARGUMENT

### I. Mr. Klayman Will Suffer Irreparable Injury Absent a Stay

If Mr. Klayman is to be sanctioned and close his practice of law before his Motion for Rehearing and collateral challenges have been decided, he will suffer irreparable harm. This irreparable harm is in the form of a violation to his due process rights, which

constitutional injury always constitutes irreparable harm under *Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009). As set forth in detail in Mr. Klayman's' Motion for Rehearing, there have been a multitude of due process violations throughout this entire proceeding, both at the District of Columbia level and at the Florida level. These include (1) the enormous delay by the District of Columbia attorney discipline apparatus, which was then compounded by Florida Office of Bar Counsel ("FOBC"), (2) the denial of discovery in both the District of Columbia and in Florida compounding the harm caused by the delay, (3) the "stacking" of disciplinary proceedings, and (4) the lack of a neutral and unbiased District of Columbia attorney discipline apparatus and Referee in this Florida proceeding. Moreover, Mr. Klayman was effectively denied due process by this Court failing to consider the record and simply adopting wholesale a biased and flawed Report by Referee Marsh, which levied a potentially career ending sanction.

Furthermore, Mr. Klayman has already been brought to his knees financially by reciprocal discipline proceedings which are incredibly time-consuming and costly in terms of financial resources to defend. Not only has Mr. Klayman been forced to

devote a huge amount of his time to defending reciprocal discipline—which time is diverted from his public interest advocacy and litigation as well as private practice, preventing him from servicing existing clients and obtaining new ones—he has also had to expend significant cost in hiring legal representation as well. As a result, he is representing himself *pro se* in this matter, as he does not have the financial resources left to hire representation. To make matters even worse, FOBC has now instituted another meritless and stacked reciprocal discipline matter based on the August 7, 2025 suspension order of the very partisan if not "weaponized" District of Columbia Court of Appeals in *In re Klayman*, 24-BG-689 (D.C.C.A.) (the "Bundy Suspension Order" or the "Bundy Matter"). These matters together have brought Mr. Klayman to the point of financial ruin.

If Mr. Klayman is forced to now expend what is left of his dwindling time and financial resources defending reciprocal discipline matters not only in Florida, but all over the country, he will not be able to recover. Even if and when Mr. Klayman's Motion for Rehearing and/or collateral challenges are successful, Mr. Klayman will have already been bankrupted. On the other hand,

given the enormous delay that has already occurred, through no fault of Mr. Klayman, there is simply no prejudice to any party and this Court to allow the Motion for Rehearing and collateral challenges to conclude before considering whether to implement the Florida Suspension Order. This will allow Mr. Klayman to save what is left of his already depleted time and financial resources and avoid irreparable injury. Finally, the harm to his family clients, colleagues will be more than considerable if his legal challenges are not allowed to run their course.

## II. Mr. Klayman's Reasonable Likelihood of Success on the Merits

In particular, a thorough review of his Motion for Rehearing and his briefs in this appeal, demonstrates that Mr. Klayman also has a reasonable likelihood of success. Exhibit 1. The Motion for Rehearing directly challenges the entirety of the Florida Suspension Order and would also vacate the Florida Suspension Order if successful. There are multiple grounds upon which the Motion for Rehearing is based.

*First*, both Florida Suspension Order is time-barred. The Florida Suspension Order is based on two underlying suspension

orders from the District of Columbia, the Sataki Suspension Order and the Judicial Watch Suspension order. The Sataki Suspension Order involves events that occurred in 2010, now fifteen (15) years ago. The Judicial Watch Suspension Order involves events that occurred in 2006, now nearly twenty (20) years ago. Under any measure of reason, these proceedings should be time-barred now, in the year 2025. This is particularly true with regard to the Sataki Suspension Order, in which the complainant filed a disciplinary complaint with The Florida Bar on or around October 20, 2011, now over fourteen (14) years ago. Because no action was taken, at that time, it is clear that FOBC at that time determined there was no probable cause, much less clear and convincing evidence, to pursue any disciplinary action against Mr. Klayman.

*Second*, there was a paucity of proof of misconduct, as set forth in full in the Motion for Rehearing. Exhibit 1. The Florida Suspension Order is egregiously factually and legally flawed. The was simply not considered by whoever was assigned to draft the Florida Suspension Order as it appears to have been adopted virtually wholesale from the Report of Referee Marsh and therefore contains no record cites for this reason. Referee Marsh's Report was

a virtual identical super copy of FOBC's Proposed Report, which was itself effectively a super copy of the District of Columbia Court of Appeals ("DCCA") and also contained no record cites. The result of this was a cascading series of legal and factual errors that Mr. Klayman had no bona fide opportunity to remedy at any step of this proceeding and in and of itself denied him due process. Based on the record, Court must, at this time, consider, digest Mr. Klayman's Motion for Rehearing and remedy the unfortunate situation that has ensued before a manifest injustice occurs.

*Third*, there has been "stacking" of disciplinary proceedings, which practice has been found to be expressly forbidden by this Court in *Florida Bar v. Rubin*, 362 So.2d 12 (Fla. Sup. Ct. 1978). As set forth in full in the Motion for Rehearing, without this "stacking" and had the Sataki Matter and the Judicial Watch Matter been timely handled, notwithstanding the paucity of proof, the suspensions would have already run. And, the suspension period in the Judicial Watch Matter and the Sataki Matter would have run concurrently had FOBC not intentionally held the Judicial Watch Matter back in order to "stack" disciplinary proceedings.

*Fourth*, Mr. Klayman was denied due process not only due to the delay and "stacking," but also due to having been denied discovery not only at the District of Columbia level, but also by Referee Marsh in Florida. Given the extraordinary amount of delay that had occurred, discovery was necessary to remedy somewhat the extreme passage of time, which resulted in memories fading, records being lost and witnesses becoming unavailable to testify.

Mr. Klayman incorporates his Motion for Rehearing to support further grounds for granting a stay of this Court's Florida Suspension Order, to avoid unnecessary irreparable harm before his due process rights are exhausted in the interest of justice and fundamental fairness.

## CONCLUSION

WHEREFORE, Respondent Mr. Klayman respectfully requests that this Court stay implementation of the Florida Suspension Order until he has had a full opportunity to litigate his Motion for Rehearing and his collateral challenges to the Sataki Suspension Order, which is the same course of action that a sister Supreme Court, the Supreme Court of Pennsylvania and other courts and jurisdictions have also found to be a prudent course of action. This

would promote the interests of due process, justice, fundamental fairness, and judicial efficiency, while preserving the resources of both the Court and Respondent Mr. Klayman. After decades of litigation, where bars have not acted timely or in good faith, to say the least, there is no prejudice to allowing Mr. Klayman's due process rights to proceed forward before Mr. Klayman is given a potential "death penalty" to effectively end, at age 74, his distinguished and successful career.

A stay is also required to allow sufficient and needed time for Mr. Klayman's due process rights to proceed forward to preserve and protect the integrity of this honorable Court's appellate process and its fine reputation.

WHEREFORE, Mr. Klayman respectfully requests that this motion be granted.

Dated: December 3, 2025 Respectfully submitted,

By: /s/ Larry Klayman

Larry Klayman, Esq.
Klayman Law Group P.A.
7050 W. Palmetto Park Rd
Boca Raton, FL, 33433
Tel: 561-558-5536 (cell)
leklayman@gmail.com

*Pro Se*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on December 3, 2025, a true copy of the foregoing was filed via the Court's electronic filing system and served via the Court's ECF procedures on all counsel of record to:

Patricia Ann Toro Savitz - psavitz@floridabar.org

Shanee L. Hinson - shinson@floridabar.org

Mark Mason – mmason@floridabar.org

*/s/ Larry Klayman*

# EXHIBIT 1

**IN THE SUPREME COURT OF FLORIDA**

| | | |
|---|---|---|
| THE FLORIDA BAR, | } | |
| Complainant | } | **Case Number: SC23-1219** |
| v. | } | |
| LARRY ELLIOT KLAYMAN | } | |
| Respondent. | } | |

**RESPONDENT LARRY ELLIOT KLAYMAN'S MOTION FOR REHEARING**

Respondent Larry Klayman ("Mr. Klayman") hereby this honorable Court pursuant to Florida Rule of Appellate Procedure 9.330 for rehearing of the Court's November 6, 2025 [1] order suspending Mr. Klayman from the practice of law in Florida for twenty-four (24) months (the "Suspension Order"). Exhibit 1. The Suspension Order is based upon a reciprocal discipline proceeding involving the suspension order of the District of Columbia Court of Appeals in *In re Klayman*, 20-BG-583 (D.C.C.A.) (the "Sataki

[1] Mr. Klayman has moved the Court for an extension to file this Motion, with consent from FOBC. This, along with other filings by Mr. Klayman, has not disposed of by this Court.

Suspension Order") and suspension order from the District of Columbia Court of Appeals in *In re Klayman*, 18-BG-100 (D.C.C.A.) (the "Judicial Watch Suspension Order").

The Sataki Suspension Order and the Judicial Watch Suspension Order stem from a highly partisan District of Columbia attorney apparatus concerning events that occurred in or around 2010 and 2006, respectively. Not only are these reciprocal proceedings time-barred under Florida law, there is a paucity of proof of any ethical violation as well as a multitude of due process violations that have occurred. With no disrespect, these due process violations have surprisingly continued before this Court, where it has issued a Suspension Order apparently without having carefully reviewed the Mr. Klayman's briefs and actual record, resulting in a very cursory Suspension Order containing no record cites.

Mr. Klayman has been a member continuously in good standing with The Florida Bar for nearly forty-eight (48) years. The only slight blemish on his record was a public reprimand which occurred in 2011 and involved a period of great financial difficulty when he was having a hard time repaying a negotiated settlement fee. It did not involve Mr. Klayman's ability or practice as an

attorney representing clients in Florida. He has practiced law in Florida without even a blemish since that time. Accordingly, the reciprocal discipline proceedings and resulting Suspension Order at this point, in the year 2025—now nineteen (19) years removed from the events of the Judicial Watch Matter, fifteen (15) years removed from the Sataki Matter, and fourteen (14) years removed from his agreed public reprimand—are purely punitive at this point, as alluded to by this Court at oral argument:

> Justice: NOW IT IS 2025 15 YEARS AGO WAS HE PRACTICING? I KNOW THERE WAS EVENTUALLY DISCIPLINE IN DC . HOW MANY YEARS PERCY FOCUSING BETWEEN 2010 AND NOW I'M WONDERING IS THERE ANY INDICATION OF ANY WRONGDOING IN THAT TIME? Exhibit 2 at 6.
>
> Justice: I'M SORRY TO INTERRUPT I JUST WANT TO GIVE YOU A CHANCE TO ADDRESS JUST SOMETHING I'M KIND OF STRUGGLING WITH WITH THIS CASE WHICH IS IT SEEMS LIKE THERE IS SOME ATTRACTIVENESS TO THE IDEA THAT REGARDLESS OF WHAT HAPPENED HERE IT WAS A LONG TIME AGO THERE WAS DISCIPLINE IN DC. ADDING TWO MORE YEARS TO IT MIGHT BE OVERKILL. Exhibit 2 at 6.

The Court's astute observations at oral argument were correct. At this stage, reciprocal discipline is purely punitive and calculated to effectively provide a virtual "death sentence" effectively ending Mr. Klayman's long, distinguished practice of law in Florida for the past

forty-eight (48) years – nearly half a century. This violates well-established precedent that attorney discipline must "protect the public from unethical conduct" and "not deny the public the services of a qualified lawyer." 4 Fla. Jur. 2d Attorneys at Law §107. Thus, where a proceeding is purely punitive and where Mr. Klayman has an established track record of ethical practice law in Florida for nearly half of a century, the current Suspension Order, if left uncorrected, constitutes more than a manifest injustice.

Importantly, this Court has held that a Court may correct what would be a manifest injustice at any time under *Strazzulla v. Hendrick*, 177 So. 2d 1, 3 (Fla. 1965). "We may change 'the law of the case' at any time before we lose jurisdiction of a cause and will never hesitate to do so if we become convinced, as we are in this instance, that our original pronouncement of the law was erroneous and such ruling resulted in manifest injustice. In such a situation a court of justice should never adopt a pertinacious attitude." This is exactly the type of manifest injustice which has thus far occurred in this case.

## I. INTRODUCTION AND STATEMENT OF THE CASE

Mr. Klayman has had a distinguished legal career as a public interest conservative and Republican activist attorney as the founder of both Judicial Watch, Inc. and Freedom Watch, Inc, and in his private practice. He ran for U.S. Senate in Florida in 2003 – 2004. He is a citizen and resident of Florida and primarily practices in this jurisdiction for both his public interest and private capacities. He had been a proud member continuously in good standing with The Florida Bar since his admission on December 7, 1977, nearly forty-eight (48) years ago, almost half a century. In short, he cherishes the honor and privilege of practicing law in Florida, and his ability to do so is crucial to the well-being of his legal career, his livelihood, and his family, colleagues, and his clients.

**a. The Sataki Suspension Order**

During his long and distinguished legal career, Mr. Klayman has represented several women who have been the victims of sexual harassment or abuse. Examples of these types of cases litigated by Mr. Klayman include but are not limited to Alice Alyse, Juanita Broaderick, Paula Jones, Kathleen Willey, Dolly Kyle Browning, Gennifer Flowers, and of course Ms. Elham Sataki and

others. Because of his commitment to women's rights, Mr. Klayman generally is inclined to accept these cases when they are presented to him. Based on his experience with this type of case, he recognizes the debilitating effect that this type of harassment and can have on women in the workplace and in their daily lives. In short, he is a strong advocate for and believer in the advancement of women's rights and has consistently advocated against the discrimination and pay-gap issues that persist still in the workplace. In this regard, one of the material witnesses who testified on his behalf in the Sataki Suspension Order is his personal friend, famed women's rights attorney, Gloria Allred. Sataki Hearing Transcript 1096 – 1100.

Accordingly, when in or around 2010, now fifteen (15) years ago, Complainant Elham Sataki ("Ms. Sataki") sought Mr. Klayman's legal representation for alleged sexual harassment[2] that had occurred at her place of employment, Voice of America ("VOA"), Mr. Klayman agreed to represent her. With Ms. Sataki crying and

---

[2] Unbeknownst to Mr. Klayman at the time, these allegations of sexual harassment turned out to be false, as found by Voice of America's Office of Civil Rights after its investigation, further impeaching Ms. Sataki's credibility.

claiming to be destitute, his heart went out to her. He therefore agreed to represent her *pro bono* because representing victims of sexual harassment is a cause that he truly believes is worth fighting for. Ultimately, Mr. Klayman was not able to achieve a favorable outcome for Ms. Sataki, but it certainly was not for lack of effort or zealous and diligent representation as evidenced by the fact that Ms. Sataki's union representative and president at VOA, Mr. Timothy Shamble ("Mr. Shamble") who formed a *de facto* legal team with Mr. Klayman and Ms. Sataki, testified under oath: "I've had several employees that have hired attorneys, and they have asked for the union to cooperate with them and to, you know, help them with their cases. But, in all honesty, I've never seen one go as far and as dedicated as Mr. Klayman was towards Ms. Sataki. I felt like he went above and beyond." Sataki Hearing Transcript 903 - 04. Mr. Shamble even testified that he referred others who were aggrieved by VOA to Mr. Klayman. Respondent Exhibit ("FRX") 24 at 901- 902: "Q. Why did you recommend me to another employee? A. Another employee came to me, Ms. Vera Wiley, who wanted an aggressive attorney for her case, and I recommended that she contact you." Indeed, Mr. Klayman was never charged with a lack of

competent legal representation, even by a very partisan if not widely recognized "weaponized" District of Columbia Office of Bar Disciplinary Counsel. Thus, there was never any finding that whatever type of feelings Mr. Klayman felt towards Ms. Sataki adversely impacted his legal representation of her.

But Mr. Klayman's dedicated effort and zealous representation did not placate Ms. Sataki, who became upset when she did not win her case. As a result, she reactively blamed him and filed bar complaints against Mr. Klayman in the District of Columbia as well as in Florida and Pennsylvania on or around October 20, 2011, now nearly fifteen (15) years ago. This is confirmed in Ms. Sataki's October 20, 2011 complaint filed with District of Columbia Office of Disciplinary Counsel ("DCODC") where, in response to the question "Have you filed a complaint about this matter anywhere else," she responded, "Complaint also filed in Pennsylvania and Florida." FRX 7. This is further confirmed as recently January 5, 2023, when Ms. Sataki through her counsel Robert O. Saunooke confirmed that she had sent a disciplinary complaint to Florida in 2011 in her Motion to Amend Answer and Motion to Dismiss filed in an ongoing case

styled *Klayman v. Sataki*, 2022-CA-010491 (15th Jud. Cir. Fla.). FRX 8.

Based on this uncontroverted fact alone, this reciprocal discipline proceeding should never have been brought under both the doctrines of statute of limitations and laches. Fla. Bar Rule 3-7.16(a)(1); *Fla. Bar v. Phoenix*, 311 So. 3d 825, 831 (Fla. 2021). This is because at the time that these complaints were filed, none of these jurisdictions pursued disciplinary proceedings against Mr. Klayman, meaning that they must have logically at that time determined that there was no probable cause, much less clear and convincing evidence, to pursue any disciplinary action against Mr. Klayman.

The Court regrettably failed to give proper weight and consideration to this because the Suspension Order has been adopted virtually wholesale from the Report of the Referee, Hon. J. Lee Marsh ("Referee Marsh"). The Suspension Order contains no record cites for this reason, as Referee Marsh's Report—which was a virtual identical super copy of Florida Office of Bar Counsel's ("FOBC") Proposed Report (which was itself effectively a super copy of the District of Columbia Court of Appeals ("DCCA") FRX 3—also

contained no record cites. The result of this was a cascading series of legal and factual errors that Mr. Klayman had no bona fide opportunity to remedy at any step of this proceeding.

Chief amongst this cascading series of legal and factual errors was the refusal to give bona fide consideration to the issues of laches and statute of limitations. FOBC manufactured out of thin air an argument, which Referee Marsh tellingly chose not to question, that there was no evidence that The Florida Bar had actually received the complaint from Ms. Sataki in 2011. At the sanctions hearing, Referee Marsh made the following flippant, disrespectful, mocking and uncalled for statement, evidencing his mindset and bias as discussed below in further detail:

> There is no indication of what address it was sent to, whether it was sent to the proper place. It could have been sent to the governor. It could have been sent to the legislature. It could have been sent to the local 7-11, for all the referee knows. There's a paucity of evidence for it actually being sent to the Florida Bar." Transcript March 28, 2024. at 202:4 – 12.

Then, in his Report, the Referee stated, "that there is no indication of the complaint being made under penalty of perjury or that it may or may not have been served in Florida.....Accordingly, this referee finds that Respondent failed to show that the original complaint

was ever transmitted to or received by The Florida Bar." Report at 15. The Referee's statements are plainly unsupported by the record. There is not one iota of actual record evidence that The Florida Bar did not receive Ms. Sataki's Complaint in 2011 and in response to this fact, Referee Marsh simply illogically presumes that Ms. Sataki sent her Complaint in 2011 to "the governor" or a "local 7-11" instead of the address that certainly would have been provided on the actual complaint itself. Of course, Mr. Klayman is left without any avenue to prove where Ms. Sataki's Complaint was sent going n fifteen (15) years later because Florida Bar records are destroyed after five (5) years. This is the exactly the type of severe prejudice that the doctrine of laches was intended to remedy.

Referee Marsh's contrived presumption – made out of thin air -- is, in any event, highly illogical, as the Court is certainly aware that the overwhelming majority of people are able to properly address and send a letter to their desired location and not some random "local 7-11" instead. Indeed, the Pennsylvania Bar confirmed that it received a complaint from Ms. Sataki on or around October 20, 2011 and closed the file without any adjudication, FRX 27, further evidencing the fact that The Florida Bar received the

complaint as well contemporaneously. Then, in his Report, Referee Marsh stated, "that there is no indication of the complaint being made under penalty of perjury or that it may or may not have been served in Florida.....Accordingly, this referee finds that Respondent failed to show that the original complaint was ever transmitted to or received by The Florida Bar." Report at 15. This is belied by the fact that the Supplemental Complaint clearly includes the attestation that Ms. Sataki "certifies to the Office of Bar Counsel that the statements in the foregoing Complaint are true and correct to the best of my knowledge." FRX 7.

It therefore is evident that Referee Marsh was looking for a way to discredit the evidence presented by Mr. Klayman, no matter how illogical. This, and the Referee's conduct, are the reasons exactly why Mr. Klayman was forced to file his Updated and Renewed Motion for Recusal and to Vacate Report and Recommendation, Ind. 89, which was notably and erroneously left unaddressed by the Court in its Suspension Order.

In the District of Columbia, Ms. Sataki's Complaint was also not acted upon for seven (7) years, rendering it abandoned under its own rules. FRX 15.. However, in 2017 when Bar Counsel Hamilton

Fox, III ("Fox") took over DCODC, it transformed and morphed into a highly partisan weaponized tool to attempt to remove conservative and Republican activist attorneys like Mr. Klayman from the practice of law. Exhibit 5. The politicization of the District of Columbia attorney discipline apparatus has become widely known and recognized, particularly in the age of Donald Trump, as set forth in Mr. Klayman's prior briefs. DCODC, taking advantage of the lack of a statute of limitations in that jurisdiction for attorney discipline matters, literally used a private investigator to hunt down Ms. Sataki in order to file its Specification of Charges on July 20, 2017, seven (7) years later. FRX 4. Then, Mr. Klayman was forced to appear before a hostile and biased Ad Hoc Hearing Committee comprised of an avowed communist, Michael Tigar ("Tigar") who early career had been fired, at the urging of FBI Director J. Edgar Hoover, from his High Court clerkship by Justice William Brennan for his subversive communist ties. FRX 30. Joining Mr. Tigar was the committee chair, Anthony Warren Fitch, also of the ideological left. He at every step of the way seemed to defer to Mr. Tigar and appeared and acted as if he was in awe of him. FRX 24.

This bias regrettably helps explains why Mr. Klayman was denied even basic discovery despite the seven (7) year delay by DCODC in filing its Specification of Charges, which passage of time resulted in memories fading, documents having been discarded and lost, and witnesses becoming unavailable. During this time period, one of Mr. Klayman's key material witnesses, Professor Ronald Rotunda sadly passed away without and Ms. Sataki's psychologist, Dr. Arlene Aviera ("Dr. Aviera") who had contemporaneously treated Ms. Sataki during the underlying events around 2010 and was aware of all of the details of Respondent Mr. Klayman's representation of Ms. Sataki, contracted terminal illness and was unavailable to testify.

As shown in FRX 17, Mr. Klayman on numerous occasions sought and was denied even basic discovery from Dr. Aviera and others, including in his February 15, 2018 Motion to Notice and Have Issued Subpoenas Duces Tecum to Take the Depositions of Elham Sataki and Arlene Aviera. FRX 17. In that motion, Respondent Mr. Klayman wrote, "[i]t is thus believed that the deposition testimony of...Ms. Aviera will disclose crucial exculpatory evidence necessary for Respondent's defense, and reveal that he

acted properly at all times and even sought to get Ms. Sataki other counsel."

Tellingly, even this simple request was vehemently opposed by DCODC and then denied by the AHHC despite discovery clearly being allowed and an integral part of the attorney discipline process, particularly in a case such as this one where DCODC delayed over seven (7) years to even file a Specification of Charges, resulting in passage of time causing memories to fade, documents to be discarded and lost, and witnesses to become unavailable. *See* Board on Professional Responsibility Rules, Chapter 3. Importantly, whether discovery was allowed is an important and crucial factor that this Court must consider in determining whether to adopt discipline from another jurisdiction. *Florida Bar v. Tipler*, 8 So. 3d 1109, 1117 (Fla. 2009).

Then, even further prejudicing Mr. Klayman, and taking advantage of the AHHC's refusal to allow Mr. Klayman <u>any discovery</u>, and the fact that their delay had caused Dr. Aviera to be unavailable to testify due to illness, DCODC and Ms. Sataki on the eve of the commencement of the hearings in this proceeding, very conveniently "discovered" so called records from Dr. Aviera that

were previously undisclosed and introduced them into the record. The AHHC did not care that these "cherry picked" so called records from Dr. Aviera constituted unsubstantiated hearsay by virtue of her not being available to authenticate them (and thus should have been inadmissible), much less an inaccurate representation of the facts. Respondent Mr. Klayman therefore renewed his request for discovery at the hearing, citing this significant due process violation, yet was still denied by the highly partisan and biased AHHC:

> At this point, for the record, as your Honor may recall, I had requested to be able to depose Dr. Aviera. That would have alleviated this issue, and I was denied. That's why I also needed her file, because this is just selective things that are being produced by Bar Counsel from her file, not the whole file. So this is a highly prejudicial area of testimony for her to be testifying, A, without my having discovery, which I requested early on, and B without Dr. Aviera to testify. FRX 24 at 132.

The due process violations did not end there. Mr. Klayman was not even allowed to take the deposition of Ms. Sataki, despite the over seven (7) year delay caused by DCODC in even filing the Specification of Charges. Had Mr. Klayman been allowed to depose Ms. Sataki, he would have been able to avoid the severe prejudice that resulted from DCODC and Ms. Sataki conspiring to introduce a

litany of alleged and specious unauthenticated records for the first time literally on the eve of the hearing, without giving Mr. Klayman any opportunity to review them, as set forth above. And, even more importantly he would have been able to uncover fraudulently withheld exculpatory evidence in the form of a video interview of Ms. Sataki publicizing her case, despite falsely claiming, belatedly at one point, at the hearing that she did not approve of publicity in her case, which Referee Marsh refused to even allow into the record, further denying his due process rights.

Even without having been granted any discovery, during the AHHC hearing Mr. Klayman presented seven (7) material witnesses including Mr. Shamble, Keya Dash, Gloria Allred, the Honorable Stanley Sporkin, the latter a retired federal judge, that conclusively refuted every single one of DCODC's manufactured arguments. To the contrary, DCODC did not have a single material factually substantive witness other than Ms. Sataki, whose testimony was impeached and refuted at every turn. FRX 24. This made no difference to the biased and hostile AHHC, however, who used the AHHC to push their biased agenda, including taking umbrage and being hyper fixated on the fact that Mr. Klayman had filed a *Bivens*

Complaint on behalf of Ms. Sataki naming their ideological kin Hillary Clinton as a defendant, despite the fact that Ms. Clinton was Secretary of State and as such was the head of the Voice of America's Board of Governors at the time, meaning that she was clearly a necessary party and Mr. Klayman had also named conservative personal friend of Mr. Klayman, the conservative Blanquita Collum, who was also a governor of VOA, as a Defendant. There was no political motivation for any of Mr. Klayman's actions, yet the AHHC tellingly "bent over backwards" to try to improperly *ex post facto* insert this into the proceeding. This led to the following erroneous finding in the Board Report, which Mr. Klayman was never given a bona fide opportunity to correct. The Board Report stated:

> The Hearing Committee found – that Respondent's litigation strategy was driven by a desire to harm then Secretary of State Hillary Clinton and by a desire for publicity for himself...He filed suit on behalf of E.S. against VOA and named the members of the Broadcasting Board of Governors individually – the Board is chaired ex officio by the Secretary of State, who, at the time, was Hillary Clinton. Board Report at 8.

In addition to this clear political bias, Mr. Klayman, ironically, also fell victim to bias as a white male during a period the #MeToo

movement. Because the Complainant was a woman, in violation of Mr. Klayman's equal protection rights, her testimony was readily accepted by the AHHC regardless of how thoroughly it was impeached, and the testimony of Mr. Klayman and all of his material witnesses were given no weight, much less largely even referred to. This is highlighted by the fact that Mr. Klayman's name appears in the Sataki Suspension Order , but Ms. Sataki is referred to as E.S. As a result, Mr. Klayman's name and reputation has been smeared all over the leftist anti-conservative media and Ms. Sataki was protected in a case where Mr. Klayman was not charged with sexual harassment, because there was no such thing!

**b. The Judicial Watch Suspension Order**

In effectively adopting the Judicial Watch Suspension Order, FRX 3, the Court also failed to properly consider the significant record evidence showing the multitude of legal and factual errors at issue. Importantly, in the Judicial Watch Suspension Order, the DCCA found we [the Court] are not left with 'serious doubt' or 'real skepticism' that M. Klayman can practice ethically." FRX 3 at 30. There are several other factors, which are omitted from the

Suspension Order that show a paucity of proof, which are set forth in detail in this motion.

Chief among these factors, beyond even the "paucity of proof," is the egregious unjustified delay caused by DCODC in this matter as well, resulting in the "stacking" of disciplinary proceedings. This practice has been held to be unethical and illegal in Florida, as this Court has found in *Florida Bar v. Rubin*, 362 So.2d 12 (Fla. Sup. Ct. 1978). The stacking is shown through the following timeline:

**Around 2006** – Underlying events; Mr. Klayman's representation of Ms. Benson, Ms. Cobas, and Mr. Paul.

**October 1, 2013** – DCODC institutes a Specification of Charges. FRX 42.

**June 11, 2020** – D.C. Court of Appeals suspends Mr. Klayman for ninety (90) days.

**August 29, 2023** – FOBC initiates reciprocal discipline complaint.

Just like the Sataki Suspension Order, this proceeding should have been time-barred in the District of Columbia under the doctrine of laches, given the approximate twelve (12) year delay between the events at issue and DCODC issuing its Specification of Charges, in addition to the additional egregious and unjustified three (3) year delay in Florida to commence reciprocal discipline – a total of about

fifteen (15) years. FRX 42. This constitutes stacking because had Judicial Watch Matter and the Sataki Matter been timely handled, notwithstanding the paucity of proof, the suspensions would have already run. And, the suspension period in the Judicial Watch Matter and the Sataki Matter would have run concurrently had FOBC not intentionally held the Judicial Watch Matter back in order to "stack" disciplinary proceedings. This type of conduct is not permittable, as also opined and documented by Professor Rotunda:

> That brings up the problem of laches. The doctrine of laches bars untimely claims not otherwise barred by the statute of limitations.... Laches applies to bar a claim when a plaintiff has unreasonably delayed in asserting a claim and there was undue prejudice to the defendant as a result of the delay. *Jeanblanc v. Oliver Carr Co.*, 1995 U.S. App. LEXIS 19995, *9 (D.C. Cir. June 21, 1995). Among the inequities that the doctrine of laches protects against is the loss of or difficulty in resurrecting pertinent evidence. *Id.*
>
> Note that Mr. Klayman left Judicial Watch on September 19, 2003. He filed his appearance on behalf of Ms. Cobas on August 7, 2006 — long after he left Judicial Watch. There is no claim that he violated any confidences of Judicial Watch or that he earlier represented Judicial Watch against Ms. Cobas. This Bar Complaint was filed on May 1, 2014. The delay in filing the complaint was nearly 8 years.
>
> The conduct alleged by Bar Counsel occurred between seven and eight years ago. Given the substantial delay in bringing the present Petition before the Board, Mr.

> Klayman's ability to defend this case has been detrimentally prejudiced, particularly as recollection and memory fade over the course of approximately seven to eight years and witnesses and the individuals involved may be unavailable in support of Mr. Klayman's defense. In Paul's case, for instance, he is in federal prison in Texas. Ms. Cobas has health problems and Ms. Benson is now an 83-year-old woman. The Bar should not use this unique factual situation to discipline Mr. Klayman given the equitable doctrine of laches. FRX 45.

Next, the egregious over three-year delay by FOBC in initiating reciprocal discipline severely compounds the even greater prejudicial harm stemming from the delay in the District of Columbia, and the doctrine of laches must be applied here as well. This is notwithstanding the fact that FOBC's motivation in delaying the reciprocal discipline proceeding was apparently due to a transparent improper and unethical attempt to "stack" disciplinary proceedings—the Judicial Watch Suspension Matter with the Sataki Suspension Matter— again a practice that has been expressly forbidden by this very Court in *Rubin*:

> Whatever other objects the rule may seek to achieve, it obviously contemplates that *the Bar should not be free to withhold a referee 's report which it finds too lenient until additional cases can be developed* against the affected attorney, in an effort to justify the more severe discipline which might be warranted by cumulative misconduct. The Bar's violation of the prompt filing requirement in this case, to allow a second grievance proceeding against

> Rubin to mature, is directly antithetical to the spirit and intent of the rule. In addition, it has inflicted upon Rubin the 'agonizing ordeal' of having to live under a cloud of uncertainties, suspicions, and accusations for a period in excess of that which the rules were designed to tolerate. (emphasis added).

*See also Fla. Bar v. D'Ambrosio*, 25 So. 3d 1209 (Fla. 2009) (referring to the practice of "stacking" disciplinary proceedings as unfair).

Thus, in sum, had Judicial Watch Matter and the Sataki Matter been timely addressed, notwithstanding the paucity of proof, the suspensions would have already run. And, the suspension period in the Judicial Watch Matter and the Sataki Matter would have run concurrently had FOBC not intentionally held the Judicial Watch Matter back in order to "stack" disciplinary proceedings. Without this intentional and calculated delay, Mr. Klayman would not now, at the age of seventy-four (74) be facing stacked disciplinary proceedings that could amount to a "death sentence" to end his legal career, if the Suspension Order is not reheard, corrected based on the record and the law, and this manifest injustice remedied.

**c. Proceedings Before Referee Marsh**

The inexcusable delay and denial of due process in both disciplinary proceedings at issue was not limited to just the District of Columbia. This continued in Florida before Referee Marsh and FOBC.

*First*, even assuming that there were substantive grounds to impose discipline on Mr. Klayman, which as set forth herein there are not, Mr. Klayman has been severely prejudiced by the significant delay in this matter. Notwithstanding the fact that The Florida Bar had already declined to prosecute the Sataki Suspension Order in 2011, it further tacked on to the egregious delay in the District of Columbia by holding back reciprocal discipline in the Judicial Watch Suspension Order for three (3) years and the Sataki Suspension Order for nearly one (1) year in order to "stack" these proceedings in direct contravention of this Court's jurisprudence in *Rubin*. FRX 3. Had the FOBC acted timely, any period of suspension regardless of its lack of merit, would again have already concluded. Now that Mr. Klayman is seventy-four (74) years old, he is facing these "stacked" disciplinary proceedings all at once in what can only be explained as a punitive attempt to end his legal career in Florida by FOBC.

During this interim period, Mr. Klayman has practiced law in Florida as a member continuously in good standing. Mr. Klayman did in 2011, fourteen (14) years ago, agree to a public reprimand with regard to an issue regarding repayment of a fee during a time of great financial difficulty, which had no relation to his ability to practice law. This was recognized by Chief Justice Carlos Muniz at the oral argument in this matter:

> Chief Justice Carlos Muniz: I'M SORRY TO INTERRUPT YOU. THE LOGIC IT SEEMS LIKE SORT OF THE LOGIC OF THE RECIPROCAL DISCIPLINE THE REASON WE DON'T RELITIGATE ALL OF THAT IS JUST THE IDEA YOU HAVE A PROBLEM IN ANOTHER STATE YOU GO THROUGH THE PROCESS IT RESULTS IN SOME KIND OF DISCIPLINE IN A PERFECT WORLD IF SOMEONE ELSE WITH DUE PROCESS IS ALREADY DECIDING THIS PERSON SHOULD NOT BE PRACTICING AND OFFERING THE SERVICES TO THE PUBLIC FOR TWO YEARS YOU WANT TO PROTECT PEOPLE IN FLORIDA FOR THE SAME TWO YEARS. I THINK THE PROBLEM HERE IS THE STACKING OF THE TIME ESPECIALLY IN THE CONTEXT WHERE THE WRONGDOING IS FROM 15 YEARS AGO BASICALLY. CAN YOU ADDRESS THAT? Exhibit 2 at 8.

*Second*, Referee Marsh' Report, which contained no record cites, was a virtual super copy of the proposed Report submitted by FOBC, which also contained no record cites. This was despite Referee Marsh having received a proposed order from Mr. Klayman

which was well documented and conformed to the actual evidence. Exhibit 3. In this regard, Mr. Klayman's proposed order had meticulously detailed record cites supporting each of the underlying facts setting forth and supporting his legal arguments, in stark contrast to FOBC's proposed order which was strategically devoid of any record cites. Surprisingly, Referee Marsh had asked and been granted by this Court up and until May 31, 2024 to issue his Report, thereby leaving him with ample time to carefully review both parties' submissions. Instead, Referee Marsh rushed in haste to adopt wholesale FOBC's patently deficient proposed order just incredibly only a few days later on May 1, 2024. Further prejudicing Mr. Klayman is the fact that FOBC essentially just mirrored the District of Columbia Court of Appeals' order of suspension, which itself was incredibly devoid of record cites. Thus, Mr. Klayman did not receive a bona fide review and/or adjudication at any level comporting with due process, with each step of the process the entity or Referee essentially adopting whatever was presented to it, resulting in a cascading series of legal and factual errors that went uncorrected. Regrettably, the Suspension Order of this Court, which must be reversed, appears to have been hastily

written and effectively adopts Referee Marsh' Report. It also contains no record cites. This belies the fine reputation of this Court, as the Suspension Order is simply put, not well reasoned or supported by the facts. The Court had a duty to thoroughly review the record and Mr. Klayman's briefs, and appears to have abdicated, for whatever reason, this solemn responsibility to ensure due process and equal protection resulting in a severe compounding of the due process violations and harm to Mr. Klayman. It now behooves this Court to correct what would be a manifest injustice, which it has the authority to do under *Strazzulla v. Hendrick*, 177 So. 2d 1, 3 (Fla. 1965). "We may change 'the law of the case' at any time before we lose jurisdiction of a cause and will never hesitate to do so if we become convinced, as we are in this instance, that our original pronouncement of the law was erroneous and such ruling resulted in manifest injustice. In such a situation a court of justice should never adopt a pertinacious attitude."

## II. LEGAL STANDARD

*First,* Fla. R. App. P. Rule 9.330(a)(2)(A) says: "[a] motion for rehearing shall state with particularity the points of law or fact that, in the opinion of the movant, the court has overlooked or

misapprehended in its order or decision." This Motion sets forth in detail the factual record material and the law that was overlooked by the Court in the Suspension Order.

Furthermore, when the Court is presented with an issue of reciprocal discipline, the law is well settled that the Court is "not automatically bound by an out-of-state determination of guilt by a disciplinary agency." *Fla. Bar v. Kandekore*, 766 So. 2d 1004, 1007 (Fla. 2000). The Florida Supreme Court has established the following standard for determining whether another jurisdiction's findings should be accepted as conclusive:

> [W]hen the accused attorney shows that the proceeding in the foreign state was so deficient or lacking in notice or opportunity to be heard, that there was such a paucity of proof, or that there was some other grave reason which would make it unjust to accept the foreign judgment as conclusive proof of guilt of the misconduct involved Florida can elect not to be bound thereby. *Id.*

*See also Fla. Bar v. Wilkes*, 179 So. 2d 193 (Fla. 1965). *Wilkes* explained the logic behind the decision to not automatically adopt findings made in other jurisdictions:

> For at least two reasons it would be incongruous to apply the principle of the full faith and credit provision to judgments of disbarment. First, the issues adjudicated are not the kind to which the clause was intended to apply.... Second, to our knowledge neither of the

> principles under discussion has ever been held to require one state automatically to admit to practice an individual merely because a sister state has admitted him. (Those states which do admit to practice on a showing of admission in certain other states do so on the basis of reciprocity, and not on any obligation of comity or full faith and credit.) Thus, if these principles do not control or affect admission to practice there is no logical basis upon which they can be made applicable to disbarment or removal from practice. This is so because the authority and responsibility of the state is the same in admission to practice as it is in disbarment. It is to protect the public against those who for any reason are unfit to practice law. Both functions are given to this court under our state constitution and we must exercise both or abdicate our constitutional mandate under Art. V, Sec. 23, Florida Constitution, F.S.A. *Id.* at 196.

*See also Florida Bar v. Tipler*, 8 So. 3d 1109 (Fla. 2009), Furthermore, even where proof of "guilt" by another jurisdiction is deemed adopted, a finding to that effect does not apply to the discipline imposed. "[T]he discipline awarded in the foreign judgment is not binding on Florida." *Id.* at 201. Lastly, whether discovery was allowed in a foreign jurisdiction is a factor this Court must consider in determining whether to adopt discipline from another jurisdiction. *Id.* at 1117.

Here, all of these factors under *Kandekore* are present. There was (1) a lack of due process in the District of Columbia and Florida due to unconscionable and egregious delay and a lack of discovery,

(2) a clear paucity of proof, and (3) a manifest injustice in the form of "stacking," as well as the other grounds enumerated herein, which constitute a "grave reason which would make it unjust to accept the foreign judgment as conclusive proof of guilt." These significant issues, and in particular the denial of due process and delay, were glossed over by the Court in its Suspension Order and must be thoroughly considered, reviewed, digested, and corrected at this time, in order to prevent a manifest injustice.

## III. LEGAL ARGUMENT

### a. The Record Reflects a "Paucity of Proof" Under *Kandekore*

As set forth above, this Court is not automatically and slavishly beholden to the orders of the DCCA if it is shown that there was a "paucity of proof" in the District of Columbia disciplinary proceedings. As set forth herein the record is replete with both testimonial and non-testimonial evidence demonstrating the "paucity of proof." For whatever reason, this record material was not considered by the Court in issuing its Suspension Order, which contained no record cites just like Referee Marsh's Report and

FOBC's Proposed Report. Put simply, this record material **must be considered**.

**i. Sataki Suspension Order**

The Suspension Order primarily finds that Mr. Klayman did not abide by Ms. Sataki's wishes with regard to publicity and termination and that he had failed to have a written fee agreement with Ms. Sataki. The record evidence conclusively disproves these findings, along with each and every finding of misconduct by the DCCA.

**1. Use of Publicity**

The record is replete with evidence, both testimonial and non-testimonial, from Ms. Sataki herself as well as other material witnesses that Ms. Sataki at all times consented to, and even participated personally in, garnering publicity for her case as a tool to try to settle her case favorably. The record supports no other possible conclusion, and as such there can be no possible finding that there was "clear and convincing" evidence of an ethical violation.

*First,* Ms. Sataki's own admissions conclusively show that she agreed to publicity:

Q: "Did you ultimately agree with Mr. Klayman about the publicity? A: "I did." FRX 24 at 775.

Q: "And that we agreed we would get some positive publicity here to try to coerce VOA into a favorable settlement so you could be in LA, correct?" A: "Correct." FRX 24 at 397 – 398.

Q: "You are aware that, and you testified to this yesterday, that I believed that you had agreed to that and I wrote articles that were very favorable to you. You're aware of that?" A. "Yes." Q. And I sent you copies of them at the time." A. "Yes." Q. "Emailed them to you." A. "Yes, you did."..... "Q. But you are aware that I copied you on an email to Los Angeles Times where I was trying to get an interview for you?".... "And you never sent me back anything saying, "Larry don't do this. I don't want to have an interview with the LA Times." A. "Correct, I -- correct." FRX 24 at 398 – 403.

A: I explained to you my problem with VOA. ... So I don't know why this conversation was so intimate to you (about her alleged harassment and workplace retaliation), because it was definitely not intimate to me. **Everybody knew. In that case, I had an intimate conversation with everybody**." FRX 24 at 329.

We talked about that, the fact that publicity always is going to help everybody. You always said that." FRX 24 at 759.

Q. The question was you never, ever went to Mr. Shamble and said, "Don't use publicity on my behalf and please instruct Mr. Klayman not to use publicity on my behalf, too"? You never said that to Mr. Shamble. You never went to Mr. Shamble with that. A. No, I didn't. FRX 24 at 762.

*Second*, the unrefuted testimony of Mr. Shamble, who had contemporaneous knowledge of everything that occurred by virtue of his role as Ms. Sataki's union representative who worked closely with Mr. Klayman and Ms. Sataki more than confirms this:

> A) Q: "Did there come a time when we had discussions, you, me and her, about using publicity to try to coax the agency into settlement or a reasonable solution?" A. "Yes." Q. "Was she present at the time?" A. "Yes. It was in my office." FRX 24 at 892
>
> B) Q. "And did there come a point in time when you actually went with her and distributed publicity?" A. "I remember one time. The VOA was on the mall here in Washington, some kind of public -- it might have been a recruitment fair or something. But we had an article and both her and I were distributing it to people in the vicinity, tried to let people know and to let the agency know that, you know, we were going to publicize this."…. Q. "And she was there when she gave it out and she approved of that?" A. "Yes. We were both on the mall handing that out." FRX 24 at 893 – 894.
>
> C) "[w]e've done it. It's something that you can use to pressure managers, if they're intractable, you know, to try to get them to come to some sort of agreement. We have our own website, so we use it, too."

This is further confirmed in the supplemental affidavit of Mr. Shamble, FRX 79, <u>Exhibit 4</u>:

> 1. I sat in and was present at, at least, one meeting with Larry Klayman and Elham Sataki where using public relations such as press articles and news stories to describe and publicize the alleged sexual and workplace

harassment of Elham at VOA was discussed. Indeed, the idea was that public relations could help push the agency into a settlement or resolution of Elham's claims especially since the VOA had been consistently ranked as one of the worst agencies in the federal government according to the OPM

2. In this regard, attached is an email between Larry Klayman, Elham and two other broadcaster of VOA, who Larry Klayman was also seeking to help - as they too along with others in the Persian News Network branch of VOA believed that they were experiencing work place harassment of various sorts -- about an interview with the Los Angeles Times.

3. The understanding was that this public relations strategy, including interviews and articles, might also serve to convince congressmen on Capitol Hill to step in and help Elham settle or resolve her claims with VOA. In this regard, Larry Klayman asked me to accompany him to the offices of congressmen on Capitol Hill to make the case for them to help Elham and some others at VOA in the Persian News Network that were subject to alleged sexual and/or workplace harassment. At, at least one event, we handed out a flyer about Elham' s alleged claims to get support for, her and pressure the VOA to reach a beneficial settlement. VOA management is generally non-responsive to amicably resolving such issues.

4. Public relations can influence entities such as VOA and congressmen to take positive action, as the press can be very influential in this regard. It was my impression that Elham understood this and approved it.

5. As a broadcaster and TV anchor, I believed that Elham understood the benefit of public relations. I am not aware that any public relations about Elham's situation were anything but positive and complimentary about her.

*Third,* testimony of multiple other material witnesses also confirmed that Ms. Sataki at all times consented to, and even participated personally in, garnering publicity for her case as a tool to try to settle her case favorably. This includes the testimony of Joshua Ashley Klayman:

> Q. During the meeting with Ms. Sataki, did she discuss the issue of her case and what was being done? A. Yes, quite openly. And I met her multiple times. It wasn't that I just met her one time. Yes, she was quite open with what the circumstances of her challenges were. Q. Did she discuss the issue of publicity in her case? A. She did. I mean, she was very, very open, which -- I'm not a litigator. I don't really know anything about litigations, but I was surprised that she was so open. FRX 24 at 1524.

This also includes the testimony of Keya Dash testified that he was present at a dinner with Mr. Klayman and Ms. Sataki where they sought the assistance of then Speaker of the House of Representatives John Boehner regarding Ms. Sataki's case:

> Q. What did I say to Ms. Sataki about Mr. Boehner?
> A. "Let's go talk to Mr. Boehner."
> Q. With regard to helping her?
> A. That's right. To plead her case to him and enlist his support.
> Q. What did you observe at that point? Did we then go over and I introduced Ms. Sataki?
> A. I observed a couple of things: that you knew him, that you were friendly with him, that he heard the case. He

> seemed very interested in it. In fact he seemed to side with her. And that it was a good interaction.
> Q. Were you aware as to whether or not I then sought his help?
> A. Excuse me?
> Q. Are you aware whether or not we sought his help to resolve a situation with her at Voice of America after that?
> A. Yes, I am aware that that was the entire purpose. FRX 24 at 1346 – 1347.

Mr. Dash also testified that Ms. Sataki sought his help personally to publicize her case using his connections in the Persian community:

> Q. So, Mr. Dash, you used your personal efforts and the prestige of your family in the Persian community to try to help Ms. Sataki? A. Yes. I believe she knew I was reluctant to help in the beginning and **she tried to have me coax them, and I did**. I did speak to her. FRX 24 at 1361 (emphasis added).

*Fourth*, the encounter with Mr. Boehner was also testified to under oath by Mr. Klayman, who confirmed that after this encounter, he and Ms. Sataki personally met with Mr. Boehner to seek his assistance with her case:

> When the meeting ended, he gave her a kiss on the cheek. It wasn't anything untoward. And he said "I just wish you well and we'll help you." So we went up to his office, too, and we asked them for help, and nothing ever transpired there either. I was getting very disillusioned that he wouldn't help somebody like this, you know, who had a need." FRX 24 at 988.

*Fifth*, Mr. Klayman incredibly learned during the Board briefing process that Ms. Sataki had participated in making a documentary about her case, with intimate personal details about her against VOA which further undercuts any possible false claim that Ms. Sataki did not agree to publicize her case.[3] The video, which is in Ms. Sataki's Iranian native language, Farsi, was translated by one of Respondent Mr. Klayman's witnesses, Keya Dash, as well as a respected Farsi certified translator who used to work for VOA. FRX 13-6. To be certain of and confirm the content, Respondent Mr. Klayman had the documentary translated by Mohammad Moslehi, a certified translator who did translations for VOA. FRX 13-6. Mr. Moslehi translates this "smoking gun" as follows:

> Whenever I am at my desk and I am not paying attention, he allows himself, to touch me under variety of pretexts.
> (displaying Elham [Sataki]'s photo) former broadcaster of VOA.
> Mr. Falahati, Asal has written this for us, Well: let us answer the first caller (by the name of - Translator) Hossain from Kerman. Hello, go ahead please.
> (displaying photo of Mehdi Falahati) broadcaster for the VOA network VOA: Voice of America

[3] https://www.youtube.com/watch?v=e3g5f61muZ4

Voice of America has been recognized as the worst entity of American government. Therefore, lots of such coteries and issues exist there. Everybody says that the atmosphere is of a security one. Nobody can talk with anybody. Everybody makes insinuations against one another. The environment is very dirty.

This week is second evening of being online with the subject of presidential elections in Iran and it's outcome, with your phone calls, emails and online weblogs and websites that Elham [Sataki] will introduce to you.

Regarding Mr. Falahati: He repeatedly asked me to go out with him. I didn't want to do it. Mr. Falahati and I started the ONLINE show together and we were performing it together. Aside from other aspects, it was very unprofessional.

When two individuals appear on camera and conduct a show, going out on a date, since it can directly affect the show is not right. They may fight with each other and that will affect the show, and vice-versa. He was not the type of person that I would accept his offer, and say that, all right let's go on a date.

The problem was, he did not know how to take a no. After a while I reached to the point that I was always calling sick and did not go to work. Since I wanted to start working, and Mr. Falahati wanted to come to my desk and again ask me let's go have a coffee or have dinner. And this no, and saying no to him repeatedly had become exhausting for me, had made me very tired. I went to Suzanne who was our executive producer and told her the situation, that he (Mr. Falahati) does so. and I (Elham [Sataki]) don't know what to do at this point. Personally, I am not able to handle it.

The situation will go over the board of the status of going out for dinner, and he will come to my desk and while I am not paying attention, under various excuses touch me. Since I was afraid, I told her (Suzanne) that, can you handle it without anybody to know?? That day she told me that "Legally I cannot do it and you must formally file a complaint."

> Mr. Falahati wanted to take revenge, since I complained and stated that the situation was so. As I was behind my desk, twice he came to my desk (audio censored) the dress that I had on and my bra-cord. I hollered at him (audio censored) he laughed and said "don't tell anybody." I was not feeling well. I was seeing psychiatrist. I was seeing psychologist. I was not feeling well. All the documents are available. Everything related (to this matter) exists. I was seeing doctor and the doctor was prescribing relaxing pills for me to take.
> At this point, I am just saying, Mr. Falahati is a sick person that has not done so just with me, but the system of VOA has problem. Jamshid Chalangi testified for me. Look what happened? Mahmonir, another lady testified for me. She suffered a lot. Mr. Ali Sajjadi and Mr. Falahati were friends. At that time Mr. Sajjadi was very powerful there. They all got together. And even Suzanne who was my executive producer and was mad from this incident, she teamed up with them. And this caused the problem to be difficult for me, and no attorney was taking my case, because this case had become very big. And when the case became so big, then the Board of Governors had to defend itself, and defending itself caused the case to become against me. And they say that Elham left, Falahati stayed. When they fired me, I was not the only girl. There are a number of others.
> Caption displaying Falahati and [Sataki] with written scripts.
> The lawsuit against Mehdi Falahati due to the VOA influence did not get to anywhere, and El ham Sattaki was fired from this network .. After a short period of time Jamshid Chalangi and Ms. Mahmonir Rahimi were fired from this network.
> Display of Mehdi Falahati laughing loud.

It is clear to see how this crucial piece of evidence completely destroys the fabricated allegation that Respondent Mr. Klayman

ignored Ms. Sataki's "wishes" to not use publicity, in addition to the avalanche of testimony set forth above and underscores why it was such an unexplainable and egregious error for the Referee to refuse to admit this piece of crucial evidence into the record. March 27 Transcript at 214. The record therefore must be opened up to include this crucial evidence disproving one of the primary bases upon which the Suspension Order rests.

**2. Failure to Cease Representation**

Furthermore, the record does not support any finding that there was an ethical violation for a failure to terminate his representation of Ms. Sataki. The Court's Suspension Order vaguely references that Ms. Sataki "wrote Klayman a letter telling him withdraw the remaining lawsuit" without providing any record cite as to what letter the Court is relying upon.

If the Court is referring to the November 15, 2010 letter, the record clearly shows that it was sent by Ms. Sataki to the wrong address and it was not received by Mr. Klayman. This is proven through the testimony of Ms. Sataki who admits that this was "a mistake."

> Q. Now, turn to the next page. This is a letter which you claim was sent to me terminating my services on or about November 15th, 2010. That's the date that you claim you terminated by services, correct? A. Correct. Q. Now look at the address there. Klayman Law Firm, 2000 Pennsylvania Avenue, Northwest, Suite 345, Washington, D.C., 20006. Are you aware that's not my address? A. That was the only address I could find of you. Q. You're aware that the address is actually 2020 Pennsylvania Avenue, Northwest? A. So that was a mistake. Q. So, since you had the wrong address, isn't it likely that I never got this letter, even if you sent it? FRX 24 at 539 – 541.

If the Court is referring to the August 4, 2010 letter purportedly terminating Mr. Klayman's services, the record shows that it was written to Mr. Danforth Austin and not Mr. Klayman. Furthermore, as shown in the testimony of Mr. Klayman, it was obviously not written by Ms. Sataki, whose English proficiency was poor:

> So this is part and parcel to the problems that I was having during that period in time. That's why I wanted to contact her. Because I was getting communications that didn't appear to come to her. It wasn't in her way of speaking. It wasn't in her English. It was in virtually perfect English, as the letter to Mr. Austin demonstrates. That's why I needed to be able to talk to her, and that's why the first. FRX 24 at 1041.

Mr. Klayman had a duty to confirm that the alleged "communications" were actually coming from Ms. Sataki, during a

period of time that communication with her had become extremely difficult as testified to by Mr. Shamble:

> Q: "Based on your testimony, you were aware I was having difficulty interacting and communicating with Ms. Sataki?" A. "Correct." FRX 24 at 928.

Given that Mr. Klayman had a duty of zealous and competent representation to his client, Ms. Sataki, he could not terminate representation based on alleged communications from her which were clearly not written by her personally given her poor English proficiency. Mr. Klayman simply did what any ethical lawyer would do in that situation, which is to ensure that his client did not lose her legal rights. Ms. Sataki could have still filed a civil rights complaint when the VOA Office of Civil Rights denied her administrative claim and it was Mr. Klayman's responsibility to preserve that right should she wish to pursue it. Ms. Sataki could have prevented this situation had she simply responded to Mr. Klayman and Mr. Shamble at that time to confirm whether she actually wanted her cases terminated. Her lack of response put Mr. Klayman in an impossible situation, and Mr. Klayman simply erred on the side of caution to preserve her legal rights. And as conclusive evidence that Mr. Klayman, at his time and expense, acted

pursuant to Ms. Sataki's wishes, Ms. Sataki herself filed a notice of appeal, purportedly *pro se*, later that year, which would not have been possible without Mr. Klayman acting to protect her legal rights. FRX 24 at 1031.

### 3. Lack of a Written Fee Agreement

Neither the DCCA nor the Board concluded that Mr. Klayman had violated any rule for not having a written fee agreement with Ms. Sataki. Specifically the DCCA wrote: "[t]he Board, however, did not explicitly state its own conclusion on that issue.... we see no need to address that issue given the other violations that we uphold." FRX 3 at 58. Despite this, in his Report, Referee Marsh gratuitously wrote that Mr. Klayman was "found to have violated the District of Columbia Rules of Professional Conduct...1.5(b)..." which was then adopted by the Court in its Suspension Order. The record clearly reflects that there is no ethical violation here because there was never any fee agreement between Mr. Klayman and Ms. Sataki. The record shows that the representation was *pro bono.*

The record shows that from the beginning of the representation, it was agreed that the representation would be *pro*

*bono*. In fact, this was one of the several areas where Ms. Sataki's testimony was impeached by her own admissions:

> Mr. Klayman: "And I told you that I would help you as a friend, did I not?"
> Ms. Sataki: "You told me you help me, yes."
> Mr. Klayman: "Yeah, and that you had no money, that I would help you and not charge you, correct?"
> Ms. Sataki: **Yes. We talked about that**. At the end you're going to get 40 percent. I explained, I don't have any money to pay for a lawyer, but then you said that I – we can -- at the end, "because this is a strong case and I'm going to help you with that," and we get 40 percent. We talked about that."
> Mr. Klayman: **"It's not true that that 40 percent came up at that time at that dinner. It did not come up, did it?"**
> Ms. Sataki: **"I don't remember."**
> Mr. Klayman: **Then why did you just say that?"** FRX 24 at 332 – 333 (emphasis added).

This is buttressed by the unrefuted testimony of Mr. Klayman detailing this agreement:

> And I said, "Well, I'll try to help you, and, you know, I'll do it out of friendship. We're now friends." I mean, I do that. I'm not wealthy. I don't have much. I never made a lot of money, and so it was clear I would do it pro bono for her and try to help her, you know. FRX 24 at 977.

It was not until later on, when the representation of Ms. Sataki became difficult as previously discussed that Mr. Klayman **proposed** a contingency fee of 50% **going forward**. This was admitted by Ms. Sataki as well:

> Q: But what I was talking about, Ms. Sataki, is if I continued to represent you, given the difficulty in our relationship, regardless of what the cause was, then I'm saying then I **want 50 percent going forward, correct**?" A. "Correct." Q. "But we never got to that point, because representation ceased before I ever started to pursue any damage claims, correct?" FRX 24 at 557 – 558 (emphasis added).

This **proposal** was never agreed to, which is why there was never anything memorialized in writing. "The basic elements of an enforceable contract are offer, acceptance, consideration, and sufficient specification of essential terms." *Jericho All-Weather Opportunity Fund, LP v. Pier Seventeen Marina & Yacht Club*, 207 So. 3d 938, 941 (Fla. Dist. Ct. App. 2016). Here, there was an offer, but no acceptance by Ms. Sataki. Thus, there was no valid contract between the parties to memorialize into writing. And, lastly, it is crucial that Mr. Klayman has, to this day, never tried to collect a single dollar from Ms. Sataki despite having paid himself the expense of the litigation as a friend—further conclusively proving that the agreement between the parties was a *pro bono* relationship. FRX 24 at 1058. This is best summarized in the legal opinion of Professor Rotunda:

> Mr. Klayman tells me that he did disclose the fee when they first talked about the case. The fee was zero - he did

> it as a pro bono matter. Several months later, when the case got more difficult than either of them expected, he told the client that he would have charge a fee. Or, of course, she would retain another lawyer and he could transfer the files to that other lawyer. She chose not to hire a new lawyer and he proposed a contingent fee. She never signed a fee agreement because she was hard to contact and the case ended at her request. He never charged her any fee. FRX 9.

### 4. "Emotional Interest" is Not an Ethical Violation

The Court alluded to Mr. Klayman's emotional interest in Ms. Sataki, but the bottom line is that this is not an ethical violation in any jurisdiction. Indeed, this entire "issue" exemplifies the due process issues that have plagued this entire proceeding from its initiation in the District of Columbia. The cascading series of legal and factual errors with no bona fide review and no record citations has allowed false "facts" to become the law of the case. No matter how much evidence that Mr. Klayman presents to refute these false "facts," this evidence is simply ignored as this matter proceeded up the line with each step "rubber stamping" whatever had been presented from the prior stage.

The DCCA did not find that Mr. Klayman had any sexual or romantic feelings towards Ms. Sataki. It was Referee Marsh who

gratuitously inserted, without any record evidence, that Mr. Klayman had expressed "romantic feelings" towards Ms. Sataki. This also underscores the issues that have plagued this proceeding.

This is once again belied and refuted by the record, which contains uncontroverted testimony by Mr. Klayman on this matter. Mr. Klayman explained that it was true that he cared deeply for Ms. Sataki, but the "love" he had for her was in a platonic sense and he never intended a sexual or romantic relationship with her:

> I never wanted a sexual relationship. I never had a sexual relationship. I never touched her. I'm someone who gravitates to somebody and, you know, I did love Ms. Sataki, but it wasn't in any way intended to be a long-term relationship or marriage or anything like that. Because I was going through a difficult period of my life and I sympathized with her and I fell in love with her. And I did that because I kind of projected to myself, too, the difficulties that I was going through at the time. And it was 1 a way also of trying to forget about my issues, you know, and trying to help other people. And I felt bad for her. I had gotten divorced before that. I felt that I didn't do enough to try to help. Maybe I was responsible in part for the earlier divorce, I didn't give enough attention to my female wife. So I wanted -- I'm not trying to psychoanalyze myself, but I'm basically trying to say that I tried to help her. I tried to help out a woman in need. I believe in women's rights. Ms. Allred's my friend. You know, we're politically different. So it was a combination of factors. I said that: "I'm not your boyfriend. I don't want to be your boyfriend." That's in the correspondence. FRX 24 at 1080 – 1081.

Given this, it is clear that there was simply no evidence of any ethical violation. "Emotional interest" is not a real ethical violation in any jurisdiction. Neither the D.C. Court of Appeals nor the Referee have provided a single piece of legal authority finding that it is. This is for good reason—there almost certainly is not a single jurisdiction who has found that an attorney is not allowed to care deeply for, or even love, their client. Such an illogical finding would mean that attorneys are prohibited from representing spouses, family members, and even friends. Bar associations can only police the **actions** of their members. It is impossible for them, or frankly anyone, to police nebulous, undefinable, subjective **feelings**—particularly in a situation where there has been a near decade and a half delay. Most people cannot accurately remember how they felt one week ago, much more nearly fifteen (15) years ago.

Conclusively proving this argument is the fact that nearly every bar association has actually implemented rules pertaining to sexual relationships between attorneys and clients. This shows that bar associations have considered this issue and decided that only an **actions** can give rise to attorney discipline. Here, the record unequivocally reflects that there was no sexual component to Mr.

Klayman and Ms. Sataki's relationship, and thus there is no conflict of interest.

Even more, assuming *arguendo*, that there was a sexual component to Mr. Klayman and Ms. Sataki's relationship, it is extremely telling that this would still not have been an ethical violation under Florida's rules. In Florida, sexual relationships with clients are not prohibited unless that relationship "exploits or adversely affects the interests of the client or the lawyer-client relationship." Fl. St. Bar Rule 4-8.4. Given that there is not even an allegation of a sexual component to this relationship, there is simply no ethical violation here.

Furthermore, importantly, there are no allegations that Mr. Klayman failed to represent Ms. Sataki zealously, diligently, or competently, as found by AHHC chairperson Mr. Fitch, FRX 24 at 166, and the fact that Mr. Shamble testified that he actually recommended Mr. Klayman to many other VOA employees after seeing how hard he worked for Ms. Sataki. FRX 24 at 902. Mr. Shamble also testified, "I've had several employees that have hired attorneys, and they have asked for the union to cooperate with them and to, you know, help them with their cases. But, in all

honesty, I've never seen one go as far and as dedicated as Mr. Klayman was towards Ms. Sataki. **I felt like he went above and beyond**." FRX 24 at 903- 04 (emphasis added).

The finding that Mr. Klayman had been rendered him "nonfunctional" as a result of his "feelings" for Ms. Sataki was made without context. Mr. Klayman only said this to Ms. Sataki to explain to her why she should get new counsel to represent her—and indeed, as set forth below—referred her to other counsel, Gloria Allred and Tim Shea. It was Ms. Sataki who refused to retain new counsel and demanded that Mr. Klayman continue representing her, as found by the Board. FRX 6 at 11. This only occurred because of the conduct of Ms. Sataki, who when she did not get what she wanted, became incredibly angry and belligerent at Mr. Klayman. This was manifested in emails where she mocked and disparaged Mr. Klayman's religion as a Messianic Jew and accused him of taking bribes to undermine her case, despite him having gone "above and beyond" to help her *pro bono* as testified by Mr. Shamble. FRX 24 at 903- 04. For instance, Ms. Sataki wrote the following email to Mr. Klayman:

> I do not know if you are Christian or Jewish, because whichever suits you best, you become one. But I believe in karma and what you have done with my case and losing it.' Ms. Sataki also wrote: And what you have done with my case and losing it and not stopping working on it when I ordered you, one day you'll answer to God, even if you throw your life and play with people life. I am nobody, just a little girl who was retaliated and harassment by some VOA employee and you seed (sic) that you can help me. Not only did you not help me, but destroyed my life to nothing....
>
> Mr. Klayman are you happy now that you've complete destroyed and lost my case? A case with so many evidence and witnesses. Only a very bad and clueless attorney could lose it, or lost it on purps (sic) because you made a dill (sic), with the other party. FRXX 26 at 62.

When Ms. Sataki was not abusing and berating Mr. Klayman, she shifted her focus to trying to manipulate him into buying things for her, including a Mercedes Benz convertible, which she admitted at the AHHC hearing. FRX 24 at 429, 432-35. This was confirmed by Mr. Klayman's witness, Joshua Ashley Klayman, who testified "I mean, I vacillated between kind of liking her and being suspicious of her, quite frankly, as your sister...she was very forward in terms of requesting different things for her personally." FRX 24 at 1527 – 1528.

It was therefore due to this conduct that Ms. Sataki that Mr. Klayman advised her to seek new counsel. However, again, the

record reflects that even if there was a conflict of interest – where there categorically was not - it was waived by Ms. Sataki. The record indisputably shows that once Mr. Klayman realized that his representation of Ms. Sataki was becoming difficult due to their personal relationship, he advised Ms. Sataki to seek other counsel, such as Ms. Gloria Allred or Tim Shea. FRX 24 at 1079 – 1080. Despite this, it was Ms. Sataki who directed Mr. Klayman to continue representing her. This is shown in the Board's Report where it wrote Respondent Mr. Klayman "repeatedly communicated his feelings to [Ms. Sataki]" and "she asked him to continue with the representation." FRX 6 at 11.

Thus, in sum, there is a paucity of proof that there was any conflict of interest. The record clearly shows that Mr. Klayman simply had cared deeply for Ms. Sataki, which is not an ethical violation in any jurisdiction, and even if it was, it was waived by Ms. Sataki

**ii. Judicial Watch Suspension Order**

Importantly, in the Judicial Watch Suspension Order, the DCCA clearly found: "we [the Court] are not left with 'serious doubt' or 'real skepticism' that M. Klayman can practice ethically." FRX 3

at 30. There are several factors, which are omitted from the Court's Suspension Order, that show a paucity of proof that there was any ethical violation.

*First*, DCCA found that Mr. Klayman had not acted dishonestly or testified untruthfully, and that he had acted under what he believed to be advice of counsel that he did not have any conflict of interest. Mr. Klayman had sought the advice of a District of Columbia, Daniel Dugan, Esq. ("Mr. Dugan") on this specific issue. Mr. Klayman testified the following:

> And I want to add one other point, and I'm glad you asked it, Mr. Corcoran, and I believed that Mr. Duggan had given the advice of counsel that I could do this, otherwise he wouldn't have prepared the pleading. So that's another one of my defenses in this case. This is a very reputable firm in Philadelphia, and he's a seasoned litigator. FRX 44 at 359.

The DCCA rejected any allegation that Mr. Klayman had testified dishonestly in this regard:

> Additionally, Mr. Klayman's testimony was to the effect that the circumstances caused him to believe that Mr. Dugan had given the advice of counsel. We agree with the Board that there was not proof by clear and convincing evidence that Mr. Klayman testified dishonestly as to his belief and recollection. Accordingly, we accept the Board's conclusion rejecting the finding that Mr. Klayman testified falsely. FRX 3 at 29.

Mr. Dugan further testified that he would not have taken any action that he believed violated the D.C. Rules of Professional Conduct, such as filing an opposition to Judicial Watch's motion to disqualify if he did not have grounds to do so:

> Q: As a member of both the District of Columbia Bar, and as a member of the U.S. District Court for the District of Columbia, you would not take any action or file any pleading (denying a conflict), which you believed violated any D.C. Bar rule or the rule of the District Court?
> A: That's correct. FRX 44 at 687.

*Second*, the Honorable Royce Lamberth ("Judge Lamberth"), the jurist presiding over Mr. Paul's case, was the only person who ruled that Mr. Klayman should be disqualified as a result of a conflict of interest. *Paul v. Judicial Watch, Inc.*, 571 F. Supp. 2d 17, 27 (D.D.C. 2008). FRX 49. No other court, including the courts presiding over the matters involving Ms. Benson and Ms. Cobas, issued an order disqualifying Mr. Klayman, and Mr. Klayman ceased representation in those cases after Judge Lamberth ruled, evidencing his good faith. In fact, Judge Lamberth took special note of the extraordinary circumstances in this case, specifically of the potential hardship to the client, Mr. Paul, which informed Mr. Klayman's actions:

> ...the Court takes note of Paul's argument that he will suffer prejudice if Mr. Klayman is disqualified...the essence of the hardship that Paul asserts will result from disqualification of Klayman is an inability to obtain alternate counsel for lack of financial resources. The Court is not unsympathetic to this concern. FRX 49.

*Third*, despite granting Judicial Watch's Motion to Disqualify, Judge Lamberth chose not to sanction Mr. Klayman which demonstrates that Judge Lamberth did not believe that Mr. Klayman's conduct warranted any sanctions and/or discipline. As Judge Lamberth presided over Mr. Paul's case, he had firsthand knowledge of all of the intricate facts at issue in that matter. Thus, his decision must be afforded great deference.

*Fourth,* not only did Judge Lamberth choose not to sanction Mr. Klayman, he actually took time out of his incredibly busy schedule to testify on his behalf at the AHHC hearing in the voluntarily, without being subpoenaed. FRX 47. Judge Lamberth provided the AHHC with compelling testimony that he believed that there was, at a minimum, a clear ambiguity with regard to Mr. Klayman's representation of Mr. Paul, and that as such, there was a "legitimate debate about [Mr. Klayman's] conduct." FRX 47. Judge Lamberth further testified that he did not see fit to refer Mr.

Klayman Bar Counsel in the District of Columbia, despite having done so on numerous occasions in the past with other lawyers:

> Well, I -- during the course of my career, I have referred a number of matters to Bar Counsel. Sometimes I -- I think I felt I was overwhelming them with the numbers of referrals I've made. It seems to me in a case like this, where there was a legitimate debate about the conduct -- although I -- I ended up saying it was clear in the opinion, but it took me a number of pages to say it. FRX 47.

Judge Lamberth further explained the extraordinary circumstances involved in this case, particularly with regard to Mr. Paul's situation:

> ...but also that there was some notion I had that Mr. Paul was in a very bad position. He was unable to afford counsel, he couldn't find other counsel. He was in a bind, and I had some feeling that there was a situation that was unusual, in the sense that counsel for Mr. Paul, who had previously been with Judicial Watch, found himself in an awkward position, where he had a very needy client who needed services who could not otherwise afford services. And so I thought it was a fairly unusual circumstance. FRX 47.

Thus, where the presiding jurist over Mr. Paul's case voluntarily took the time to testify on Mr. Klayman's behalf that he did not think Mr. Klayman's conduct was sanctionable, there clearly exist a "paucity of proof" of misconduct under *Kandekore.*

*Fifth,* in addition to Judge Lamberth's testimony, Mr. Klayman provided the AHHC with the opinion one of the nation's preeminent experts in legal ethics, Professor Rotunda, who came to the same conclusion as Judge Lamberth in his letter opinion of June 2, 2014, FRX 45, and as reflected in his sworn hearing testimony. FRX 46. Indeed, Professor Rotunda, one of the top legal experts in professional ethics in the nation before he sadly died, observed: "[t]he situation involving these particular clients...provided a unique set of circumstances, one that the D.C. Rules of Professional Conduct do not expressly take into account. Given this unprecedented situation, Respondent, out of necessity, attempted to correct the wrongs caused by Judicial Watch . . ." Specifically, Professor Rotunda opined, pro bono, that Mr. Klayman was acting under the doctrine of necessity to preserve the rights of his clients:

> One should also consider Mr. Klayman's actions in light of the doctrine of necessity. We know that judges can decide cases even if they are otherwise disqualified if there is no other judge available to decide the case. For example, the Court of Claims applied the "rule of necessity" and held that, under that rule, its judges could hear the case involving their own salaries. Otherwise, no judge would be available to decide some important legal questions. The court then turned to the judges' substantive claim and denied it. Atkins v. United States, 556 F.2d 1028 (Ct.Cl.1977) (per curiam), cert. denied,

> 434 U.S. 1009 (1978). See also, *United States v. Will*, 449 U.S. 200 (1980). The *Will* Court explained: "The Rule of Necessity had its genesis at least five-and-a-half centuries ago. Its earliest recorded invocation was in 1430, when it was held that the Chancellor of Oxford could act as judge of a case in which he was a party when there was no provision for appointment of another judge."
>
> Faced with the dilemma of either representing Cobra, Paul, and Benson, or allowing them to lose their legal rights, Mr. Klayman sided with the rights of the clients, in accordance with Rule 1.3, and thus, justifiably, chose to represent them. FRX 45.

Mr. Klayman only did what he did because Cobas, Paul, and Benson could not afford other counsel, and Mr. Klayman, in that regard, represented them *pro bono* for no reason other than to protect their rights, as found by Professor Rotunda: "Further establishing Mr. Klayman's ethical intentions is the fact that he represented these aggrieved individuals pro bono and paid court and other costs out of his own pocket simply to protect the rights of Cobas, Paul, and Benson." FRX 45.

*Sixth*, in any event, Mr. Klayman has taken CLE courses on conflict of interest, showing that the Court's finding that Mr. Klayman lacked any contrition or remorse is not true. Mr. Klayman has taken the steps to ensure that he will not be placed in this type

of situation ever again, and in the unlikely event that he is, he will know exactly what he needs to do.

**b. There Has Been a Deprivation of Due Process And Other "Grave Reason" To Decline Reciprocal Discipline Due to Stacking**

In addition to the clear paucity of proof with regard to both the Sataki Suspension Order and the Judicial Watch Suspension Order, there has been a significant deprivation of due process and other "grave reason" constituting a manifest injustice that requires that reciprocal discipline be denied under *Kandekore.*

**i. Mr. Klayman Was Denied Discovery**

As set forth above, Mr. Klayman was denied discovery in the Sataki Suspension Order by the District of Columbia attorney discipline apparatus. This alone constitutes a severe due process violation, particularly given the extreme seven (7) year delay by DCODC in filing it Specification of Charges. FRX 4.

In this reciprocal discipline proceeding, this due process violation was amplified by Referee Marsh, who also denied Mr. Klayman necessary discovery. As set forth in Mr. Klayman's Updated and Renewed Motion for Recusal and to Vacate Report and Recommendation, Ind. 89, which was left unaddressed by the

Court in its Suspension Order, Mr. Klayman had sought and was granted the depositions of members of the District of Columbia attorney discipline apparatus, Hamilton Fox III, Matthew Kaiser, Warren Anthony Fitch, Michael Tigar and H. Clay Smith. Referee Marsh initially issued subpoenas for these depositions. Then, during the March 27, 2024 hearing before Referee Marsh, he quashed these subpoenas, leaving Mr. Klayman no opportunity to file an interlocutory appeal with this Court. As a result, Mr. Klayman has been forced to participate in a reciprocal discipline proceeding, nearly a decade and a half after the events had occurred, without any discovery at any level. This is a severe deprivation of his due process rights.

#### ii. The Significant Delay At Every Level Constitutes Unethical and Illegal Stacking

For the Court's convenience, below is a brief timeline of relevant dates in both the Judicial Watch Suspension Order and the Sataki Suspension Order, which show the clear inexcusable delay as well as the stacking of disciplinary proceedings, which was not addressed by this Court in the Suspension Order. This "stacking" is

a prime example of FOBC's bad faith and improper conduct and evidence of its intent to punish Mr. Klayman.

**Around 2006** – Underlying events; Mr. Klayman's representation of Ms. Benson, Ms. Cobas, and Mr. Paul

**2010 – 2011**: Mr. Klayman's representation of Ms. Sataki.

**November 2, 2010**: Ms. Sataki files a complaint against Mr. Klayman with DCODC. FRX 7.

**July 7, 2011**: DCODC sends Ms. Sataki a letter asking for a written reply to Mr. Klayman's explanations on or before July 15, 2011 which stated "[i]f we do not hear from you promptly, we may assume that you are satisfied with the attorney's explanations." FRX 15. Ms. Sataki never replied. FRX 16.

**October 24, 2011**: Ms. Sataki files Supplemental Complaint with DCODC where she attests - with a certification that this is true and correct to the best of her knowledge - "Complaint also filed in Pennsylvania and Florida." FRX 7. This included a signed attestation that Ms. Sataki "certifies to the Office of Bar Counsel that the statements in the foregoing Complaint are true and correct to the best of my knowledge." FRX 7. This renders the Referee's primary reason to try to discredit that Ms. Sataki's supplemental complaint as not being made "under penalty of perjury" completely erroneous.

**October 1, 2013** – DCODC institutes a Specification of Charges in the Judicial Watch Suspension order. FRX 42

**January 15, 2014**: H. Clay Smith, Assistant Bar Counsel of DCODC emails a private investigator to try to "locate a complainant that has dropped off the map." Mr. Smith admits that Ms. Sataki did not respond to their July 7, 2011 letter and that they have not heard from her since 2011, thereby abandoning her complaint against Mr. Klayman. FRX 16.

**July 20, 2017**: DCODC files a Specification of Charges. FRX 4.

**June 11, 2020** – D.C. Court of Appeals suspends Mr. Klayman for ninety (90) days in the Judicial Watch Suspension Order

**January 7, 2021**: The D.C. Court of Appeals "temporarily" suspends Mr. Klayman.

**September 15, 2022**: The D.C. Court of Appeals suspends Mr. Klayman for another eighteen (18) months.

**August 9, 2023**: FOBC initiates this reciprocal discipline matter in Florida for both the Judicial Watch Suspension Order and the Sataki Suspension Order.

Florida imposes a six-year statute of limitations for attorney discipline matters. The Bar is required to open an investigation "within 6 years from the time the matter giving rise to the investigation is discovered or, with due diligence, should have been discovered." Bar Rule 3-7.16(a)(1); *Fla. Bar v. Phoenix*, 311 So. 3d 825, 831 (Fla. 2021). And, in addition to this hard statute of limitations, Florida also imposes the doctrine of laches to unjustifiable delays in attorney discipline matters. *See The Florida Bar v. Walter*, 784 So.2d 1085 (Fla. Sup. Ct. 2001). Based on the above timeline,

*First*, given that Ms. Sataki filed a disciplinary complaint with The Florida Bar stemming from Mr. Klayman's representation in 2011, FRX 7, and there was no action taken by The Florida Bar for more than six (6) years, this matter is precluded by the statute of limitations. The *ex post facto*

*Second*, at a minimum, the doctrine of laches applies to both matters given that the underlying events of the Judicial Watch Matter occurred around 2006 – now nearly twenty (20) years ago – and the underlying events of the Sataki Matter occurred around 2010 – now fifteen (15) years ago. Both the District of Columbia attorney discipline apparatus and The Florida Bar had ample opportunity to prosecute these matters decades ago without working a severe prejudice to Mr. Klayman caused by delay and they chose not to do so, and instead piled on two untimely proceedings which worked to unduly punish him. This is a textbook application of the doctrine of laches and a violation due to stacking.

*Third*, the timeline above clearly shows that the "stacking" of disciplinary proceedings has occurred, not only in the District of Columbia but also in Florida. FOBC had notice of the Judicial Watch Suspension Order in 2020 and withheld reciprocal discipline

for over three (3) years in order to stack it with the Sataki Suspension Order. This practice has been expressly forbidden by this Court in *Florida Bar v. Rubin*, 362 So.2d 12 (Fla. Sup. Ct. 1978):

> Whatever other objects the rule may seek to achieve, it obviously contemplates that *the Bar should not be free to withhold a referee 's report which it finds too lenient until additional cases can be developed* against the affected attorney, in an effort to justify the more severe discipline which might be warranted by cumulative misconduct. The Bar's violation of the prompt filing requirement in this case, to allow a second grievance proceeding against Rubin to mature, is directly antithetical to the spirit and intent of the rule. In addition, it has inflicted upon Rubin the 'agonizing ordeal' of having to live under a cloud of uncertainties, suspicions, and accusations for a period in excess of that which the rules were designed to tolerate. (emphasis added).

*See also Fla. Bar v. D'Ambrosio*, 25 So. 3d 1209 (Fla. 2009) (referring to the practice of "stacking" disciplinary proceedings as unfair)

*Fourth*, this Court, at oral argument, already recognized the due process and stacking issues caused by this delay despite ultimately failing to give this crucial issue proper consideration and weight.

> Justice: I'M SORRY TO INTERRUPT I JUST WANT TO GIVE YOU A CHANCE TO ADDRESS JUST SOMETHING

> I'M KIND OF STRUGGLING WITH WITH THIS CASE WHICH IS IT SEEMS LIKE THERE IS SOME ATTRACTIVENESS TO THE IDEA THAT REGARDLESS OF WHAT HAPPENED HERE IT WAS A LONG TIME AGO THERE WAS DISCIPLINE IN DC. ADDING TWO MORE YEARS TO IT MIGHT BE OVERKILL. Exhibit 2 at 3.
>
> Justice: BUT THE CASE FOR PROTECTING THE PUBLIC FROM HARM SEEMS TO ME TO BE SUBSTANTIALLY WEAKENED BY THE DELAY THAT THE BAR SEEMS TO HAVE TAKEN IN THIS MATTER. IF MR KLAYMAN BECAUSE OF HIS CONDUCT WAS AT SUBSTANTIAL RISK TO THE PUBLIC WHY DID YOU WAIT SO LONG TO ACT? Exhibit 2 at 5.
>
> Chief Justice Carlos Muniz: CAN I ASK YOU A QUESTION IS THE TWO YEARS SUSPENSION HERE NECESSARY TO PROTECT THE PUBLIC OR IS THIS MORE ESSENTIALLY JUST A PUNISHMENT. Exhibit 2 at 5.

This Court's skepticism, if not alarming surprise, concerning the enormous delay caused by the District of Columbia attorney discipline apparatus and then FOBC was well-taken, but for whatever reason, was also essentially side-stepped and not a significant or real factor in the Suspension Order.

*Fifth*, the Court must give proper weight and consideration to the opinion letters of Professor Rotunda, one of the preeminent experts in legal ethics. With regard to the Judicial Watch Suspension Order, Professor Rotunda opined:

> That brings up the problem of laches. The doctrine of laches bars untimely claims not otherwise barred by the statute of limitations.... Laches applies to bar a claim when a plaintiff has unreasonably delayed in asserting a claim and there was undue prejudice to the defendant as a result of the delay. *Jeanblanc v. Oliver Carr Co.*, 1995 U.S. App. LEXIS 19995, *9 (D.C. Cir. June 21, 1995). Among the inequities that the doctrine of laches protects against is the loss of or difficulty in resurrecting pertinent evidence. *Id.*
>
> Note that Mr. Klayman left Judicial Watch on September 19, 2003. He filed his appearance on behalf of Ms. Cobas on August 7, 2006 — long after he left Judicial Watch. There is no claim that he violated any confidences of Judicial Watch or that he earlier represented Judicial Watch against Ms. Cobas. This Bar Complaint was filed on May 1, 2014. The delay in filing the complaint was nearly 8 years.
>
> The conduct alleged by Bar Counsel occurred between seven and eight years ago. Given the substantial delay in bringing the present Petition before the Board, Mr. Klayman's ability to defend this case has been detrimentally prejudiced, particularly as recollection and memory fade over the course of approximately seven to eight years and witnesses and the individuals involved may be unavailable in support of Mr. Klayman's defense. In Paul's case, for instance, he is in federal prison in Texas. Ms. Cobas has health problems and Ms. Benson is now an 83-year-old woman. The Bar should not use this unique factual situation to discipline Mr. Klayman given the equitable doctrine of laches. FRX 45.

With regard to the Sataki Suspension Order, Professor Rotunda opined on June 2, 2014:

> A very surprising item about this complaint is that it was filed over five years ago about alleged events that occurred in. December 2009 and shortly thereafter. The complainant, Elham Sataki, made similar complaints to the Pennsylvania Bar and the Florida Bar, both of which dismissed the complaint years ago. For some reason, [DCODC] sat on this complaint for years and is now resurrecting it.... The caselaw shows that DCODC is subject to laches. FRX 9.

Accordingly, this delay has severely harmed and prejudiced Mr. Klayman and serves as a compelling reason under *Fla. Bar v. Kandekore*, 766 So. 2d 1004, 1007 (Fla. 2000) why this Court is "not automatically bound by an out-of-state determination of guilt by a disciplinary agency."

**c. There Has Been A Manifest Injustice That Must be Corrected Under *Kandekore***

Crucially, *Kandekore* provides another basis beyond the paucity of proof and denial of due process, which Mr. Klayman has already shown above, which demonstrates that the Court is not bound by the Sataki Suspension Order and the Judicial Watch Suspension Order. There has been a manifest injustice here, which under *Kandekore* constitutes a "grave reason which would make it unjust to accept the foreign judgment."

Put simply, the Suspension Order is factually and legally wrong. The record in this case was simply ignored by whoever was assigned to draft the Suspension Order. This sidesteps the duty of this Court on appeal, which is defined as "The complaint to a superior court of an injustice done or error committed by an inferior one, whose judgment or decision the court above is called upon to correct or reverse.[4]" The Suspension Order has been adopted virtually wholesale from the Report of Referee Marsh and therefore contains no record cites for this reason. Referee Marsh's Report was a virtual identical super copy of FOBC's Proposed Report, which was itself effectively a super copy of the DCCA's opinion, FRX 3, and also contained no record cites. The result of this was a cascading series of legal and factual errors that Mr. Klayman had no bona fide opportunity to remedy at any step of this proceeding.

This instant Motion for Rehearing has done everything necessary to encapsulate the record and provide the Court with the necessary facts that it <u>must</u> now thoroughly consider and digest before issuing a ruling. Another ruling containing no record cites or evidence would deny due process and equal protection rights, where

---

[4] https://thelawdictionary.org/appeal/#google_vignette

Mr. Klayman entire legal career is at stake. The Court must take the time that it needs—no matter how long—to carefully, thoroughly, and methodically review the record evidence presented in this motion. Anything short of this would be a catastrophic denial of Mr. Klayman's due process rights and a gross manifest injustice. It now behooves this Court to correct this manifest injustice, which is its duty to do under *Strazzulla v. Hendrick*, 177 So. 2d 1, 3 (Fla. 1965). "We may change 'the law of the case' at any time before we lose jurisdiction of a cause and will never hesitate to do so if we become convinced, as we are in this instance, that our original pronouncement of the law was erroneous and such [ruling resulted in manifest injustice. In such a situation a court of justice should never adopt a pertinacious attitude."

**d. The Sanction Imposed By The Court is Not Supported By Case Law**

The cases used by this Court to justify its currently punitive Suspension Order simply do not apply to the facts of this case.

In *Fla. Bar v. Herman*, 8 So. 3d 1100 (Fla. 2009), the attorney was suspended from the practice of law for ninety days with a probation period of two years. *Id.* at 1102. Herman, represented

companies Aero Controls and Triple J Leasing—companies in the business of selling and repairing component airplane parts and leasing aircrafts, respectively—in a contract dispute and litigation over the purchase of an aircraft and in a lease agreement of another aircraft to Air Kazakhstan. *Id.* The trial in the contract dispute concluded in February of 2018 and the lease agreement matter concluded in March of 2018. *Id.* In June of 2018, Herman incorporated a company called Nation Aviation as a direct competitor to Aero Controls and Triple J Leasing. Even more, Herman put Thomas Bristow—Aero Controls' former top salesman—in charge of his company. Then:

> By January 1999, Herman was the sole monetary investor in Nation Aviation. At that point, he had to choose between closing Nation Aviation and losing his investment or allowing Bristow to run the company exclusively as a seller and lessor of aircraft parts. Herman chose the latter, putting his company (which was now under the direction of his client's former top salesman) in direct competition with his client, Aero Controls. **The referee concluded that Herman, who was still representing Aero Controls, should have called Titus at that point to disclose the conflict and request a waiver, but did not, because of monetary concerns. His failure to disclose was dishonest and deceitful**. *Id.* at 1103 (emphasis added).

To the contrary, any conflict of interest that Mr. Klayman may have had in the Judicial Watch Suspension Order was certainly not driven by monetary concerns. He was acting solely in the interests of his clients, under the doctrine of necessity, as opined by Professor Rotunda. There was also nothing dishonest or deceitful in Mr. Klayman's conduct. He never hid anything from anyone. Thus, *Herman* is similarly inapplicable to the facts here.

In *The Florida Bar v Rush*[5], 361 So.3d 796 (Fla. 2023), the attorney was suspended for a period of three years on a set of facts that is not even remotely comparable or even similar to the facts at issue here. In *Rush*, the attorney was retained in an eminent domain action between his clients, North Park, and Florida Department of Transportation ("FDOT") involving placement of a drainage pond on the property. *Id.* at 799. Rush insisted on pursuing a "nonmonetary benefit" argument involving relocating the drainage pond because it would entitle him to an award of statutory attorney's fees. *Id.* While Rush's clients initially agreed, they later

[5] *The Florida Bar v. Lee Segal*, SC2023-1067 (Fla. Aug. 10, 2023) [TFB # 2021-10,292(6D), et al.] and *The Florida Bar v Joseph Scott Lanford*, SC21-1008 [2016,30, 658(18C)] are non-published opinions that have no precedential effect.

changed their minds when a buyer of the property was not able to fund the purchase until the eminent domain case was settled. *Id.* Rush was then instructed to settle the eminent domain action quickly to facilitate the sale of the property. *Id.* Despite this instruction, "Rush began filing a series of unauthorized pleadings and motions in the eminent domain case seeking to preserve and advance his claim for attorney's fees based on his nonmonetary benefits argument." *Id.* Rush even "sent FDOT a settlement proposal waiving monetary benefits in favor of Rush's nonmonetary benefits argument." *Id.* at 800. When North Park hired additional counsel to settle the eminent domain case as quickly as possible. Mr. Petitt, Rush refused to cooperate with him, leading to confusion by the Court further delaying the eminent domain case. *Id.* Rush then threatened counsel for FDOT at a hearing to the extent where he "continued to berate her and followed the pair out of the courthouse." *Id.* As a result, FDOT refused to settle informally with North Park, further delaying the eminent domain action. Lastly, when Mr. Petitt sent Rush a client-approved settlement offer for Rush to sign and submit to FDOT with the instruction that it could not be modified, Rush still modified the language without approval

because he feared that the language constituted a waiver of his attorney's fees. *Id.* When Rush was finally terminated, he sued North Park seeking fee arbitration and 21 causes of action, all of which were denied. *Id.* Free from Rush's interference, North Park and FDOT settled whereby North Park was paid the monetary value of the property taken. Despite this, Rush still continued to seek his attorneys' fees based on his nonmonetary benefit argument. Under these egregious facts, Rush was suspended for three years.

The facts of *Rush* cannot even remotely be applied analogously here. Rush's actions were driven solely by his desire to maximize the amount of attorney's fees he would receive, and in that regard, ignored direct instructions from his clients and even committed fraud to achieve his goals. He sued his clients to try to collect his fees. To the contrary, Mr. Klayman's only interests were to help Ms. Sataki achieve her desired outcome and to preserve her legal rights when she became unresponsive. Mr. Klayman has never once asked to be paid back and has certainly never tried to collect a single penny from Ms. Sataki. These cases are completely distinguishable.

With regard to the appropriate sanction, the case that the Court should strongly consider is its precedential holding in *Fla.*

*Bar v. Glick*, 383 So. 2d 642 (Fla. 1980). In *Glick*, the attorney was found to have committed serious ethical violations on the following facts:

> ...respondent improperly handled a quiet title suit; that, although he had not been and would not be successful in clearing the title to the property, and, even though he had not undertaken any efforts to clear the title of the interest reserved to the state, respondent closed the transaction and allowed his client to take title to the property without advising his client that the defects in the title continued to exist; that respondent prepared an incomplete deed; and that respondent has never refunded to his client the $ 1,000 fee paid for the handling of the quiet title suit. The complaint charged, and the referee also found, that respondent was asked to represent a party in a breach of warranty suit; that he failed to notify his client of the date of the hearing on the matter and, because his client failed to appear at the hearing, the court dismissed the client's action; that respondent did not initiate contact with his client within a reasonable time before the scheduled hearing in order to prepare for the final hearing and to arrange for the attendance of witnesses; and that respondent never attempted to reopen the case. *Id.* at 643.

The attorney was found guilty of violating Florida Bar Code of Professional Responsibility Disciplinary Rule 6-101(A)(1), (A)(2), and (A)(3) and FOBC recommended a sixty-day suspension and probation. The Court, however, took particular note of the attorney's thirty (30) year career practicing law in Florida without disciplinary history and that the charges did not involve dishonesty

or fraud, *id.*, and instead only ordered a public reprimand and one year conditional probation. These facts line up with this instant case perfectly. Mr. Klayman has been a member continuously in good standing with The Florida Bar for forty eight (48) years – almost half a century! The charges against him do not involve dishonesty or fraud, and even more, do not involve his competency, diligence, or zeal in representing clients. Thus, similar to *Glick*, notwithstanding his innocence, in the worst case scenario Mr. Klayman should receive, at most, a public reprimand or probation.

**e. The Court Must Address Mr. Klayman's Updated and Renewed Motion for Recusal and to Vacate Report and Recommendation**

In its Suspension Order, the Court did not and thus failed to address Mr. Klayman's Motion for Recusal and to Vacate Report and Recommendation and Updated and Renewed Motion for Recusal and to Vacate Report and Recommendation, Ind. # 89. This crucial issue needed to be addressed by the Court especially because Referee Marsh's Report was effectively adopted wholesale in the Order. This runs contrary to Fla. Fla. Stat. § 38.10, which states:

> Whenever a party to any action or proceeding makes and files an affidavit stating fear that he or she will not receive a fair trial in the court where the suit is pending on account of the prejudice of the judge of that court against the applicant or in favor of the adverse party, the judge shall proceed no further.....

The issue of Referee Marsh's bias and prejudice was never addressed in the context of his having been subject to motions to recuse himself or be disqualified. The Court should have dealt with this issue, which was briefed extensively, as it bears on the content of his Report, which it adopted virtually wholesale. As shown herein, Referee Marsh must be disqualified and as a result, the Suspension Order must be vacated and, if not remedied by this Court, this matter remanded to an unbiased and neutral Referee. There is simply too much at stake for Mr. Klayman for any other outcome to occur, and the Court must take this issue up now, at a minimum, after having ignored it when it was raised in Mr. Klayman's' initial briefing. *See* Mr. Klayman's Initial Brief at 66: "Those concerns are set forth in detail in Mr. Klayman's Updated and Renewed Motion for Recusal and to Vacate Report and Recommendation, which was denied by the Referee after just one

day. (R-90, 4347). Those recusal and/or disqualification grounds must now be considered by this Court.")

Importantly, the threshold for disqualification is not high. "Actual bias or prejudice need not be shown, **rather it is the appearance of bias or prejudice** which requires disqualification." *Menada, Inc. v. Arevalo*, 341 So. 3d 1189, 1191 (Fla. Dist. Ct. App. 2022) (emphasis added). In *Franco v.* State, 777 So. 2d 1138 (Fla. Dist. Ct. App. 2001), the Court held, " trial court's prejudice against an attorney may be grounds for disqualification when such prejudice is of a degree that it adversely effects the litigant." Furthermore, there is a "longstanding, well-established Florida Supreme Court rule that a trial court may not address the truth of the facts alleged in a motion to disqualify." *Manuel v. Est. of Manuel*, 367 So. 3d 520, 522 (Fla. Dist. Ct. App. 2023). *See also Hayslip v. Douglas*, 400 So. 2d 553 (Fla. Dist. Ct. App. 1981) (The judge against whom the motion is directed shall determine only the legal sufficiency of the motion. The judge shall not pass on the truth of the facts alleged. If the motion is legally sufficient, the judge shall enter an order of disqualification and proceed no further in the action.")

*Brown v. St. George Island, Ltd.*, 561 So. 2d 253 (Fla. 1990) held "When a party seeks to disqualify a judge under section 38.10, the judge cannot pass on the truth of the statements of fact set forth in the affidavit....The facts and reasons for the belief of prejudice must be taken as true, and the judge may only pass on the legal sufficiency of the motion and supporting affidavits to invoke the statute." *Id.* at 255. In *Brown*, this Court held that a judge must be disqualified where he stated that he would not believe a litigant, effectively accusing him of being dishonest. *Id.* at 257.

In *Peterson v. Asklipious*, 833 So. 2d 262 (Fla. Dist. Ct. App. 2002), the Fourth District Court of Appeals found that the trial judge should have been disqualified where he declined to allow a party to introduce testimonial evidence and stating that he would not believe the party in any event. *Id.* at 263. *See also Edwards-Freeman v. State*, 138 So. 3d 507, 509 (Fla. Dist. Ct. App. 2014) ("A judge's gratuitous remarks about counsel or her character undermine respect for the judiciary and the proceedings and leave an impression that the judge is not fair and impartial.")

**i. Referee Marsh Sua Sponte Increased the Sanction Requested by FOBC Without Any Legal or Factual Basis**

One of the key indicators of Referee Marsh's extrajudicial bias and prejudice is that he *sua sponte* increased the sanction from the FOBC's requested eighteen (18) months to twenty-four (24) months without any basis to do so, and which the Referee himself recognized was a "rare" occurrence. March 28 Transcript at 210 ("This is the rare case where I'm going to go above what the Bar is asking for."). Despite FOBC only seeing fit to seek eighteen (18) months, and even if the suspension periods for both disciplinary matters were added together, it would only total twenty-one (21) months, Referee Marsh went beyond even that number to twenty-four (24 months), which can only be explained by an extrajudicially biased and prejudiced mindset towards Respondent Mr. Klayman, as detailed below.

**ii. Referee Marsh Refused To Accept Highly Relevant Evidence Into the Record**

Referee Marsh also incredibly refused to admit FRX 79 and 80 into the record – USB drives containing the entire underlying records in the two disciplinary proceedings at issue as well as FRX

81 - video of Elham Sataki's interview publicizing her case. Referee Marsh's refusal to admit FRX 79 and 80 serves as undisputable evidence of the Referee having prejudged this matter, as there is absolutely no prejudice to any party in simply having access to a full record, which record every other court and jurisdiction considering the issue of reciprocal discipline actually required that Respondent Mr. Klayman produce. Indeed, the Court must respectfully open up the record in this regard.

This is even more so the case with regard to FRX 81, which is compelling exculpatory evidence that conclusively shows that Mr. Klayman did not commit the primary ethical violation at issue in the Sataki Suspension Order – improperly using publicity and disclosing client confidences. Referee Marsh would not even watch the video to determine its relevance before refusing to admit it into the record, clearly showing once again his prejudgment; how could he possibly know whether the video was relevant if he would not even take the time to watch it? Referee Marsh's prejudged mindset is shown thorough the exchange between the parties:

> MR. KLAYMAN: The Court may wish to see certain things.

> THE COURT: Well, "may wish to see" doesn't -- again, why do they see it -- I think this a fundamental misunderstanding. In 47 years, I think that -- the record is different than evidence admitted in an evidentiary hearing by which a, in this case, referee, in other cases a judge, and in other cases, a jury makes factual findings. So whether it goes up as part of the record is different than whether it is admitted into evidence. It's much like in a criminal case. If a defendant confesses and they confess all over themselves and there is a motion to suppress and it, say, is granted, then that is not admitted into evidence but it becomes part of the record that would go up on the appeal. So what is the relevance of that as to admissibility in this evidentiary hearing?
>
> MR. KLAYMAN: Here's my understanding, your Honor, is that courts, some of which, most of which have stayed reciprocal discipline, they have all asked me for the complete record. I provided it to them. So this is exactly what I provided at least with regard to Sataki to these courts that were considering reciprocal discipline.
>
> THE COURT: But we're not –
>
> MR. KLAYMAN: So I felt it was relevant here too as well.
>
> THE COURT: I got it. The objection is sustained. The Court finds it irrelevant for purposes of this evidentiary hearing. And that's 79 and 80....As to 81, the Court -- that goes along with -- the objection as to relevance is also sustained. We had previously discussed that matter as it related to the translation of the video. And so that will be sustained as well.

Referee Marsh then compounded his egregious these errors above by then refusing to admit into evidence articles concerning Respondent Mr. Klayman's character, FRX 84, 86, 91 – 98, despite

character being a pertinent area of inquiry during the sanctions hearing. Even more, the Referee, mockingly referred to a feature article by the Washington Post as an "advertisement for a book." March 28 Transcript at 156:9.

Referee Marsh's actions therefore indicate that he appears not to have been interested in the required effort to consider the truth. The entire underlying disciplinary record is thus essential to determining whether Respondent Mr. Klayman's due process rights were violated by the District of Columbia attorney discipline apparatus – a fundamental inquiry under *Fla. Bar v. Kandekore*, 766 So. 2d 1004, 1007 (Fla. 2000). The Referee's refusal to even allow all of this highly relevant evidence into the record shows that he had already prejudged the deprivation of due process and did not want any evidence to the contrary to be admitted into the record.

**iii. Referee Marsh Made Numerous Hostile, Belittling Statements Towards Mr. Klayman**

Referee Marsh also made numerous hostile, acrimonious and belittling statements towards Mr. Klayman that evidence not only bias and prejudice, but also a clearly deep personal animus and

dislike of Mr. Klayman. At the March 27 – 28 sanctions hearing in this matter, Mr. Klayman was repeatedly cut off, mocked, and simply not allowed to present his case. Referee Marsh also abbreviated the hearing, preventing Mr. Klayman from calling many of the witnesses that he wished to call. Referee Marsh gave little to no consideration to the multitude of experts who testified that this proceeding is indisputably time-barred. Prominent further examples of the Referee's extrajudicial bias and animus include, but are not limited to:

a) Discrediting the testimony of Respondent Mr. Klayman's expert, Robert Klein, Esq., as being "based...on the one line in Respondent's Exhibit 1 that say the complaint was provided to the State of Florida" and then following it up with the completely illogical argument that "There is no indication of what address it was sent to, whether it was sent to the proper place. It could have been sent to the governor. It could have been sent to the legislature. It could have been sent to the local 7-11, for all the referee knows. There's a paucity of evidence for it actually being sent to the Florida Bar." March 28 Transcript at 202:4 – 12. There is so much wrong with this that it is difficult to determine where to start. The referee, without a single shred of evidence in support, decides to simply **presume** that Ms. Sataki did not send her complaint to The Florida Bar. This completely disregards the fact that just about any adult is able to follow simple directions as to where to send things. Attorney discipline complaints all come with instructions on where to send them. The Referee decides to simply **presume** that Ms. Sataki lacked the mental capacity to follow even basic directions, which is improper. If any presumption was proper, it should have been to presume that

Ms. Sataki was able to follow simple directions and sent her complaint to the right place. This is why Respondent Mr. Klayman repeatedly tried to depose The Florida Bar's Intake Director, Shanell Schuyler, to receive confirmation that The Florida Bar did, in fact receive Ms. Sataki's complaint back in 2011, but was predictably not able to get a straight answer from her.

b) Repeatedly minimizing Respondent Mr. Klayman's exhibits and arguments as "political ax grinding" March 28 Transcript at 144:18, and as "MSNBC vs. Fox," March 27 Transcript at 169:23, despite there being no evidence proffered by FOBC to counter Respondent Mr. Klayman's argument that the District of Columbia attorney discipline apparatus has evolved into a highly-politicized weapon aimed at eliminating conservative and Republican activist attorneys from the practice of law.

c) Accusing Respondent of being "argumentative" and not "stick[ing] with facts" March 27 Transcript at 174:18 – 19 when he was simply raising pertinent issues, such the issue of FOBC "stacking" disciplinary proceedings.

> MR. KLAYMAN: And even though the District of Columbia doesn't have, apparently, a statute of limitations, laches does apply in the District of Columbia. And [Professor Rotunda] gets into that. And he gets into many of the cases that I've cited in this case, whether it was the Florida Bar vs. Rubin, about stacking. That's one of the issues here, your Honor. In fact, you can see it with what has happened with regard to the Judicial Watch complaint. That somehow arises from the dead at the same time that my suspension order is ending with regard to Sataki. The Bar could have brought that three years earlier, but they didn't. They held it back.
>
> THE COURT: Objection. Argumentative. Sustained. Sir, let's stick with facts. I'll let you make closing

argument, but you're going to eat up all your time in this hearing and not have the time to make a closing argument.

Despite instructing Respondent Mr. Klayman to save his "argument" for closing, the Referee then foreclosed that opportunity by only granting Respondent Mr. Klayman a mere fifteen (15) minutes in closing, most of which had to be devoted to correcting misstatements made by FOBC in their closing. *See also Id.* at 180: 11 – 17.

d) In issuing his ruling, the Referee ignored the strong character references of the Honorable Royce Lamberth, who actually presided over the Judicial Watch Matter, FRX 77, and was therefore in a uniquely qualified position to render an opinion, as well as the testimony of the Honorable Stanley Sporkin, FRX 24, in addition to devaluing Respondent Mr. Klayman's other character witnesses.

e) *Sua sponte* referencing former president Bill Clinton's ethics complaint as an unnecessary and highly irrelevant not too veiled shot against Respondent Mr. Klayman, who has sued the Clintons on many occasions in the past as part of his public interest advocacy work: ""It's going to come up now, is that, some, jeez, now, some 25 years ago or so, there was a prominent Democrat attorney who happened to be president of the United States. And there was a conservative organization that thought the fact that he lied under oath during a deposition showed he was unfit to be an attorney, not -- just because they're a conservative organization and they want to -- and this was not Judicial Watch -- "Well, you might have had this -- the group that actually pushed for the sanctions in the state of Arkansas that was -- there was another group that was Southeastern --Legal Foundation. So, again, the fact that they're a conservative organization, have very conservative leanings, don't like the policies of this prominent Democrat who is trying to enlarge the government. They want limited government. They want conservative principles. And they feel he is not doing that. Are they not able to go seek sanctions

from the Bar despite the underlying misconduct of that individual attorney? I mean, that's the part that I have a problem with, where this political implication is, why don't we throw politics out of this and stick with what are the facts. March 27 Transcript at 9:17 – 10:17.

f) Repeatedly cutting Respondent Mr. Klayman off and preventing him from making argument. As just one prominent example of the myriad of instances contained in the transcripts is the following exchange:

> MR. KLAYMAN: But when -- and if I may say this, please, if you may indulge me, when I began at the Justice Department, the first thing that I was told by my supervisor, the chief -- THE COURT: Sir, you've written that in your -- I have read that at least three times. We're not going to waste the Court's time -- MR. KLAYMAN: You're being very deferential to the Bar, your Honor. You're being very deferential to them. And you're cutting me off at every argument that I've made. *See also* March 27 Transcript at 57:1 – 6; 204:6 – 7; 205:3 – 4.

g) Diminishing the character testimony of Stephen Sulzer, Esq. simply because he was not familiar with the specifics of the underlying disciplinary proceedings. The Referee said "He had no specific knowledge of the underlying DC cases in this case. And he wasn't aware of the Florida Rules of Evidence. So the Court, although accepting it, reduces the value of that individual opinion based on some of the lack of personal knowledge about the underlying conduct which has occurred in this case." March 28 Transcript at 206:5 – 11. Mr. Sulzer was not there to testify as an expert about the disciplinary proceedings. He was there to give his opinion of Respondent Mr. Klayman's character. There was no basis for the Referee to openly diminish Mr. Sulzer's testimony.

h) Allowing a line of improper questioning by FOBC calling for Respondent Mr. Klayman's character witnesses to

speculate on Respondent Mr. Klayman's character based on assumptions and fabricated scenarios not in evidence. For instance, FOBC was allowed to ask "Mr. Barr, if all of these courts found that Mr. Klayman engaged in unprofessional conduct and failed to follow court rules, would you consider that good character?" over the strong objection of Respondent Mr. Klayman March 28 Transcript at 116.

i) On no fewer than three occasions during the March 27th to March 28th hearing abruptly stormed off the bench, without explanation why, while Mr. Klayman was on the witness stand, and made various noises which Respondent Mr. Klayman has never seen before. This conduct very reasonably placed Respondent Mr. Klayman in serious doubt that he could receive any semblance of a fair adjudication before the Referee[6].

**iv. Numerous Other Basis for Recusal Set Forth in Full in Mr. Klayman's Updated and Renewed Motion for Recusal and to Vacate Report and Recommendation Must Be Ruled Upon**

As set forth in full in Mr. Klayman's Updated and Renewed Motion for Recusal and to Vacate Report and Recommendation, the above is just a sampling of the multitude of reasons that Referee Marsh must be disqualified. Referee Marsh has also (1) falsely and without legal or factual basis accused Mr. Klayman of dishonesty,

---

[6] *See also* Affidavit of Frederick Sujat. Mr. Sujat was present at the hearing before Referee Marh and declared under oath the following: "At the March 28, 2024 hearing, I observed the demeanor and conduct of Referee Marsh, and it struck me that he was highly offensive and disrespectful towards Mr. Klayman and even strangely towards myself when I testified on Mr. Klayman's behalf." Exhibit 6.

(2) denied Mr. Klayman due process with regard to necessary discovery, (3) refused to hold FOBC accountable for intentional false statements, and (4) refused to correct the record when his false statements were corrected by Mr. Klayman. The Court must thoroughly review Mr. Klayman's Updated and Renewed Motion for Recusal and to Vacate Report and Recommendation, Ind. # 89, disqualify Referee Marsh, vacate his Report and therefore the Suspension Order and remand this for further proceedings before a neutral and unbiased Referee.

## IV. CONCLUSION

Put simply, the bottom line here is that the Court must thoroughly review the record evidence. This Motion has carefully and meticulously identified the necessary record evidence showing a clear paucity of proof of any ethical violation in either the Sataki Suspension Order or the Judicial Watch Suspension Order. The Court cannot once again simply "gloss over" this record evidence and abdicate its duty and responsibility to actually adjudicate this matter based on the record evidence. It cannot simply adopt without question the Report of a biased and prejudiced Referee

Marsh without giving necessary weight or consideration to the record evidence in this matter.

This Motion for Rehearing has undoubtedly identified for the Court with more than the pre-existing required record evidence that there was a paucity of proof of any ethical violation, which was originally set forth in Mr. Klayman's initial brief and reply brief to this Court and which was simply "glossed over" or side-stepped in the Suspension Order. As one compelling example, he has provided AHHC hearing pin cites in the Sataki Suspension Order where Ms. Sataki admits that she approved of pursuing her claims with publicity and even personally publicizing her case with her union representative, Mr. Shamble, on Capitol Hill. FRX 24 at 893. He has provided also unrefuted testimony from Mr. Shamble, Mr. Dash, Ms. Klayman, and others that Ms. Sataki at all times agreed to use publicity on her case. The final, most compelling evidence, which was for whatever reason not admitted by the Referee, is video evidence of Ms. Sataki participating in a documentary about her case! FRX 81.

This Motion for Rehearing, most importantly, has also shown this matter is time-barred at every level, with regard to both

disciplinary proceedings and also with regard to the egregious, unjustifiable delays which occurred in both in District of Columbia as well as in Florida. As perhaps the most prominent example, the record clearly reflects that Ms. Sataki filed a disciplinary complaint against Mr. Klayman on or around October 20, 2011, FRX 7, 8, and no action was ever taken or the Complaint dismissed by The Florida Bar. This is a clear-cut case which triggers the statute of limitations. The Referee and FOBC try to seize on the fact that any evidence that The Florida Bar received Ms. Sataki's disciplinary complaint in or around 2011 has long since been lost and/or destroyed given the now nearly fifteen (15) year passage of time. However, the Court must plainly realize that any harm flowing from this loss of evidence cannot be placed on Mr. Klayman, as he did not occasion this delay. Indeed, this type of situation is the exact reason why the doctrine of laches was created—to protect individuals from undue prejudice resulting from a delay that they simply had no control over.

The Motion for Rehearing has also shown a number of serious due process violations in this case in both the District of Columbia and Florida that must be considered by the Court. The most

prominent example is the fact that Mr. Klayman was completely denied discovery, despite the enormous passage of time caused solely by DCODC, which resulted in memories fading, records being lost and witnesses becoming unavailable to testify. In any jurisdiction, events such as these would clearly raise due process concerns.

Finally, this Motion for Reconsideration has shown a manifest injustice resulting from the record in this case was simply ignored by whoever was assigned to draft the Suspension Order. The Suspension Order has been adopted virtually wholesale from the Report of Referee Marsh and therefore contains no record cites for this reason. Referee Marsh's Report was a virtual identical super copy of FOBC's Proposed Report, which was itself effectively a super copy of the DCCA's order, FRX 3, and also contained no record cites. The result of this was a cascading series of legal and factual errors that Mr. Klayman had no bona fide opportunity to remedy at any step of this proceeding. This Court must now act to correct what would be a manifest injustice, which it has the authority to do under *Strazzulla v. Hendrick*, 177 So. 2d 1, 3 (Fla. 1965). "We may change 'the law of the case' at any time before we lose jurisdiction of

a cause and will never hesitate to do so if we become convinced, as we are in this instance, that our original pronouncement of the law was erroneous and such [ruling resulted in manifest injustice. In such a situation a court of justice should never adopt a pertinacious attitude."

In sum, this motion must be carefully reviewed and considered by the Court. The record here is clear. There has been a manifest injustice, which this Court has a duty to correct and remedy as a matter of due process and fundamental fairness. This is also respectfully necessary to preserve the integrity of this honorable Court's appellate process and its fine reputation.

Dated: December 3, 2025 Respectfully submitted,

By: */s/ Larry Klayman*

Larry Klayman, Esq.
Klayman Law Group P.A.
7050 W. Palmetto Park Rd
Boca Raton, FL, 33433
Tel: 561-558-5536 (cell)
leklayman@gmail.com

*Pro Se*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on December 3, 2025, a true copy of the foregoing was filed via the Court's electronic filing system and served via the Court's ECF procedures on all counsel of record to:

Patricia Ann Toro Savitz - psavitz@floridabar.org

Shanee L. Hinson - shinson@floridabar.org

Mark Mason – mmason@floridabar.org

*/s/ Larry Klayman*

# EXHIBIT 1

# Supreme Court of Florida

No. SC2023-1219

**THE FLORIDA BAR,**
Complainant,

vs.

**LARRY ELLIOT KLAYMAN,**
Respondent.

November 6, 2025

PER CURIAM.

We have for review a report of referee recommending that Respondent, Larry Elliot Klayman, be found guilty of professional misconduct and suspended from the practice of law. Klayman challenges the referee's report in its entirety.[1] We hereby approve the referee's findings of fact and recommendations as to guilt and sanctions. Accordingly, Klayman is suspended from the practice of law for a period of two years and ordered to pay the Bar's costs in the amount of $4,536.93.

---

1. We have jurisdiction. *See* art. V, § 15, Fla. Const.

## BACKGROUND

On August 29, 2023, The Florida Bar filed a Formal Complaint for Reciprocal Discipline against Klayman, alleging that he had been suspended from practicing law in the District of Columbia through a pair of orders issued by the D.C. Court of Appeals. The Bar alleged that under Rule Regulating The Florida Bar 3-4.6 (Discipline by Foreign or Federal Jurisdiction; Choice of Law), the D.C. suspension orders constitute conclusive proof of misconduct for purposes of a Florida Bar discipline proceeding.

Because the underlying conduct described in the complaint took place several years before Klayman was disciplined in D.C., Klayman argued that this disciplinary proceeding was time-barred on statute of limitations and laches grounds. On May 17, 2024, following a hearing on sanctions, the referee filed a report, concluding that the proceeding was not time-barred and that the D.C. Court of Appeals' suspension orders constituted conclusive proof of Klayman's guilt. For sanctions, the referee recommended suspending Klayman for a period of two years, explaining that the aggravating circumstances warrant a harsher sanction than that imposed by the D.C. Court of Appeals.

*Referee's Findings as to Count One*

The referee made the following factual findings regarding Count One of the Bar's complaint, which addressed Klayman's 90-day suspension imposed by the D.C. Court of Appeals in 2020.

In 1994, Klayman founded an organization called Judicial Watch and served as its in-house counsel until 2003. During his time with the organization, an employee named Sandra Cobas complained to Judicial Watch about employment conditions, and Klayman provided legal advice to Judicial Watch about Cobas' complaints. Cobas later filed a lawsuit against Judicial Watch in the Florida court system, but her case was dismissed. Then, without seeking consent from Judicial Watch to represent Cobas, Klayman entered an appearance on Cobas' behalf and filed a motion to vacate the court's dismissal order. He later filed a notice of appeal and an appellate brief on Cobas' behalf.

In a second case, Klayman, acting as Judicial Watch's chairman and general counsel in 2002, solicited donations for the organization from a donor named Louise Benson. Benson later sued Judicial Watch to recover her donated money, and Klayman

entered an appearance on her behalf—again without seeking consent from Judicial Watch.

In a third case, Klayman prepared a representation agreement on behalf of Judicial Watch in 2001 to represent a new client named Peter Paul. Paul later sued Judicial Watch for breach of the agreement, and Klayman entered an appearance on Paul's behalf—again without seeking consent from Judicial Watch.

Klayman's conduct in the above three cases was found to be violative of D.C. Rule of Professional Conduct 1.9 (Conflict of Interest) and resulted in Klayman being suspended for 90 days in D.C.

*Referee's Findings as to Count Two*

The referee made the following factual findings regarding Count Two of the Bar's complaint, which addressed Klayman's 18-month suspension imposed by the D.C. Court of Appeals in 2022. In 2010, Klayman began representing Elham Sataki in a sexual harassment suit. Klayman and Sataki agreed to a 40% contingency fee agreement with no retainer, but Klayman later unilaterally increased his fee to 50%. When negotiations with the defendant failed, Klayman encouraged Sataki to move from D.C. to

Los Angeles, and he paid for her relocation and living expenses. He and Sataki agreed that he would be reimbursed out of any award she won in the case, in addition to his fee.

Klayman filed a civil suit on Sataki's behalf against her supervisors and the individual accused of harassing her, but while Sataki wanted the matter to be handled quietly, Klayman engaged in a public strategy designed to draw attention to the case. He sued both the governing board of the company and the Broadcasting Board of Governors, which included several prominent figures, despite Sataki insisting that she wanted to focus only on her supervisors and the individual who harassed her. Klayman also wrote numerous public articles about the case in which he revealed confidential information. Sataki was against publication of the articles, but she agreed to the public approach after Klayman told her it would be beneficial to her case.

In April 2010, Klayman began to repeatedly express strong feelings for Sataki. When Sataki told him they could only be friends, he persisted. He told her that his feelings for her rendered him nonfunctional as a lawyer and that she would get better legal representation from someone else. Sataki wrote Klayman a letter

telling him to withdraw the remaining lawsuit, but Klayman did not dismiss the entire case and continued acting on Sataki's behalf. Sataki wrote Klayman another letter stating that his services had been terminated. She later wrote him again and reiterated that he was not representing her in any capacity, but he sent her a reply stating that he could not allow her legal rights to be lost. He then filed a notice of appeal in Sataki's civil case without speaking to her about whether she wanted to file an appeal.

During the hearing before the referee, Klayman denied having romantic intentions toward Sataki and insisted that he had consulted with Sataki about all actions taken on her case. Klayman also disputed the existence of a contingency fee agreement, and he denied pressuring Sataki to pursue publicity.

This conduct was found to be violative of numerous D.C. Rules of Professional Conduct and resulted in Klayman being suspended for a period of 18 months in D.C.

*Referee's Recommendations as to Guilt and Sanctions*

The referee found that Klayman admitted to the disciplinary orders imposed against him by the D.C. Court of Appeals and concluded that for purposes of a Florida Bar reciprocal discipline

proceeding, those orders are final and are conclusive proof of misconduct. The referee found no paucity of proof in the D.C. orders, no lack of notice or opportunity to be heard in D.C., and no other grave reason suggesting that this Court should elect not to be bound by the foreign judgments.

Based on the above findings, the referee recommends that Klayman be found guilty of the violations set forth in the complaint. For Count One, the referee recommends finding Klayman guilty of violating D.C. Rule of Professional Conduct 1.9 (Conflict of Interest). For Count Two, the referee recommends finding Klayman guilty of violating D.C. rules 1.2(a) (lawyer shall abide by client's decisions as to objectives of representation and shall consult with client as to means used); 1.4(b) (lawyer shall appropriately explain matter to client); 1.5(b) (requiring written agreement regarding representation); 1.5(c) (contingent fee agreement shall be in writing); 1.6(a)(1) and (a)(3) (lawyer shall not knowingly reveal a confidence or secret of a client or use such for lawyer's advantage); 1.7(b)(4) (lawyer shall not represent client if lawyer's professional judgment will be or reasonably may be adversely affected by the lawyer's own

personal interests); and 1.16(a)(3) (discharged lawyer shall withdraw from representation).

Regarding discipline, the referee recommends suspending Klayman for two years. The referee found several aggravators, including: (1) dishonest or selfish motive; (2) pattern of misconduct; (3) multiple offenses; (4) bad faith obstruction of the disciplinary proceeding by failing to comply with the rules or orders of a disciplinary agency; (5) submission of false evidence; (6) refusal to acknowledge the wrongful nature of the conduct; and (7) substantial experience in the practice of law. The referee also found that Klayman had a prior disciplinary offense, and while Klayman argued that his prior discipline was for minor misconduct, the referee explained that the consent judgment in that case included admissions to violations of rules that contemplated more than minor misconduct. The referee also found two mitigating factors: character and reputation (established by witness testimony at the sanction hearing); and remoteness of the prior offense.

**ANALYSIS**

In Bar discipline cases, this Court conducts a limited review of a referee's findings of fact. If a referee's findings are supported by

competent, substantial evidence, we will not reweigh the evidence or substitute our own judgment for that of the referee. *Fla. Bar v. Schwartz*, 284 So. 3d 393, 396 (Fla. 2019). For recommendations as to guilt, the referee's factual findings must be sufficient under the applicable rules to support the referee's conclusions. *Fla. Bar v. Shoureas*, 913 So. 2d 554, 557-58 (Fla. 2005). The party challenging a referee's findings of fact or recommendations as to guilt has the burden to show "that there is no evidence in the record to support those findings or that the record evidence clearly contradicts the conclusions." *Fla. Bar v. Germain*, 957 So. 2d 613, 620 (Fla. 2007).

Under Rule Regulating The Florida Bar 3-4.6, which addresses reciprocal discipline proceedings, whenever a foreign jurisdiction disciplines a lawyer who is also licensed in Florida, this Court has jurisdiction to discipline the same lawyer in Florida for the same misconduct. And "when an attorney is adjudicated guilty of misconduct by the disciplinary agency of another jurisdiction, the adjudication serves as conclusive proof of commission of the misconduct charged." *Fla. Bar v. Kandekore*, 766 So. 2d 1004, 1007 (Fla. 2000). While this Court is not automatically bound by

an out-of-state determination of guilt, we will only elect not to accept such foreign judgment if the accused attorney shows

> that the proceeding in the foreign state was so deficient or lacking in notice or opportunity to be heard, that there was such a paucity of proof, or that there was some other grave reason which would make it unjust to accept the foreign judgment as conclusive proof of guilt of the misconduct involved.

*Id.* (quoting *Fla. Bar v. Wilkes*, 179 So. 2d 193, 198 (Fla. 1965)).

Klayman argues that the D.C. Court of Appeals failed to provide notice and opportunity to be heard. However, he participated in every stage of the D.C. proceedings and has not shown that he was without notice or opportunity to be heard at any point in those proceedings. Thus, this Court would only elect not to be bound by the D.C. orders if "there was such a paucity of proof, or . . . some other grave reason which would make it unjust to accept the foreign judgment as conclusive proof of guilt." *Id.*

*Whether Paucity of Proof in the D.C. Orders Would Make It Unjust to Accept the Foreign Judgments as Conclusive Proof of Klayman's Guilt*

Klayman argues that the D.C. disciplinary proceedings failed to establish proof of guilt of the charged misconduct. He insists that they were sham proceedings initiated as retaliation for his conservative watchdog efforts against prominent liberal figures.

But whatever the circumstances may have been, the violations found in the D.C. Court of Appeals' 2020 and 2022 suspension orders are not without support in the record.

Regarding Klayman's conflict-of-interest violations, the record contains ample evidence that Klayman represented three clients in actions against Judicial Watch, an organization for which he had previously served as chairman and in-house counsel, and that he did so without first obtaining consent from Judicial Watch to represent the clients.

Regarding the misconduct involving Klayman's representation of Sataki, the record includes writings from Klayman in which he expressed to Sataki that his emotions had rendered him nonfunctional as a lawyer. The record also includes evidence that Klayman continued to represent Sataki after he made such statements, that he continued to act on her behalf and did not withdraw from representation after she tried to terminate his services, and that he wrote and published articles revealing confidential information about her case even after she terminated representation and stopped contacting him.

Furthermore, the record contains evidence that Klayman inappropriately explained legal matters to Sataki—filing motions and pleadings without her consent, engaging in strategies to which she was opposed, and repeatedly communicating strong feelings for her while explaining her legal options. All these actions support the D.C. Court of Appeals' conclusion that Klayman did not appropriately explain his client's legal options.

Regarding the found contingency fee violations, Klayman argues that he had never been working for a contingency fee, but the record contains emails between Sataki and Klayman in which she refers to an agreed 40% contingency fee and he demands a 50% fee based on his time and expense.

Klayman claims the referee in this case has exaggerated the D.C. suspension orders. He argues that the referee describes Klayman's feelings for Sataki as romantic or sexual, where the D.C. Court of Appeals only stated that Klayman had strong feelings for Sataki. But however the referee describes Klayman's behavior, it is the D.C. orders themselves—not the referee's summary of those orders—that serve as proof of Klayman's guilt. Even assuming the referee overstated Klayman's feelings for Sataki, Klayman was not

disciplined in D.C. for any misconduct of a sexual nature, and the referee has not recommended that Klayman be found guilty of any misconduct not included in the D.C. suspension orders.

*Whether Some Other Grave Reason Would Make It Unjust to Accept the Foreign Judgments as Conclusive Proof of Klayman's Guilt*

Because Klayman was given notice and opportunity to be heard in the D.C. disciplinary proceedings, and because the D.C. Court of Appeals' suspension orders do not have a paucity of proof such that we would decline to accept them as conclusive proof of guilt, we would only elect not to be bound by the foreign judgments if there is "some other grave reason which would make it unjust to accept the foreign judgment as conclusive proof of guilt of the misconduct involved." *Kandekore*, 766 So. 2d at 1007.

To that end, Klayman argues that the length of time between the underlying conduct and the initiation of disciplinary proceedings in D.C. is a grave reason for Florida not to be bound by the D.C. suspension orders. But this is a reciprocal proceeding, and D.C. has no statute of limitations for attorney discipline cases. Members of the D.C. Bar, including Klayman, are on notice that their misconduct can subject them to discipline in that jurisdiction,

even decades after the underlying conduct took place. The D.C. disciplinary proceedings were therefore not conducted in an untimely manner. Because the D.C. proceedings operated in accordance with governing law, we cannot say that it would be unjust to accept the D.C. suspension orders as conclusive proof of Klayman's guilt, even if similar charges would have had to be brought sooner in a case arising in Florida.

*Whether This Case Is Time-barred*

Klayman argues that even if the D.C. suspension orders were not so defective that this Court would decline to accept them for purposes of reciprocal discipline, this Florida disciplinary proceeding is time-barred. He relies on Rule Regulating The Florida Bar 3-7.16(a) (Limitation on Time to Open Investigation), which generally operates as a statute of limitations for lawyer discipline proceedings in Florida. Rule 3-7.16(a)(1) provides: "The Florida Bar must open an investigation initiated by The Florida Bar within 6 years from the time the matter giving rise to the investigation is discovered or, with due diligence, should have been discovered."

Notably, this case did not arise from a Florida Bar investigation following an inquiry or complaint filed by a

complaining witness; it arose as a reciprocal discipline proceeding initiated because the Bar learned of Klayman's suspension in D.C. A Florida Bar reciprocal discipline cause of action does not accrue until discipline has been imposed by a foreign jurisdiction. This is based on the general rule in Florida that "[a] cause of action accrues when the last element constituting the cause of action occurs." § 95.031(1), Fla. Stat. (2023); *see R.R. v. New Life Comm. Church of CMA, Inc.*, 303 So. 3d 916, 921 (Fla. 2020).

In a reciprocal discipline proceeding, the elements constituting the cause of action are the foreign judgments on which the reciprocal discipline is based, not the underlying conduct. Given that the D.C. orders giving rise to the present cause of action were issued in 2020 and 2022, and Klayman notified the Bar of those orders shortly after each order was issued, this reciprocal proceeding—opened in 2023—was initiated in a timely manner.

Notably, the referee analyzed the applicability of *Merkle v. Robinson*, 737 So. 2d 540 (Fla. 1999), in which this Court articulated a test for determining choice of law questions. Klayman argues that *Merkle* is inapplicable because the case specifically addressed tort actions, not lawyer discipline. But more broadly,

*Merkle* does not apply because the significant relationship test articulated in *Merkle* is geared toward resolving conflict-of-law issues. The timeliness of this reciprocal disciplinary proceeding turns on claim accrual, not on a conflict-of-law analysis. Thus, we need not engage in a significant relationship analysis to determine when this cause of action accrued.

**DISCIPLINE**

We now turn to the referee's recommendation to impose a two-year suspension for Klayman's misconduct. "Prior to making a recommendation as to discipline, referees must consider the Standards for Imposing Lawyer Sanctions, which are subject to aggravating and mitigating circumstances, and this Court's existing case law." *Fla. Bar v. Strems*, 357 So. 3d 77, 90 (Fla. 2022).

Our review of a referee's recommendation on discipline is broader than our review of a referee's findings of fact, for it is ultimately this Court's responsibility to determine the appropriate discipline. *Fla. Bar v. Alters*, 260 So. 3d 72, 83 (Fla. 2018) (citing *Fla. Bar v. Anderson*, 538 So. 2d 852, 854 (Fla. 1989)); *see also* art. V, § 15, Fla. Const. That said, we have recognized that the referee "is in a unique position to assess the credibility of witnesses, and

his judgment regarding credibility should not be overturned absent clear and convincing evidence that his judgment is incorrect." *Fla. Bar v. Tobkin*, 944 So. 2d 219, 224 (Fla. 2006) (quoting *Fla. Bar v. Thomas*, 582 So. 2d 1177, 1178 (Fla. 1991)). Notably, in a reciprocal discipline proceeding premised on an adjudication of guilt in a foreign jurisdiction, this Court is free to impose a more severe punishment than the punishment imposed by the sister state. *Fla. Bar v. Hagendorf*, 921 So. 2d 611, 614 (Fla. 2006).

*Standards*

In looking at the Standards, we find support for suspension as the presumptive sanction in this case. For Standard 4.2(b), the referee found that Klayman knowingly revealed information about his representation of Sataki, causing her injury or potential injury. For Standard 4.3(b), the referee found that Klayman knowingly failed to avoid conflicts of interest, causing injury or potential injury to his clients. Finally, for Standard 7.1(b), the referee found that Klayman knowingly engaged in conduct that was violative of duties he owed as a professional, causing injury or potential injury to his clients, the public, or the legal system. Klayman does not assert

that the referee erred in finding these Standards applicable, and we conclude that the referee did not err.

*Aggravating and Mitigating Factors*

"Like other factual findings, a referee's findings of mitigation and aggravation carry a presumption of correctness and will be upheld unless clearly erroneous or without support in the record." *Fla. Bar v. Scheinberg*, 129 So. 3d 315, 319 (Fla. 2013) (quoting *Germain*, 957 So. 2d at 621). A referee's finding that an aggravator or mitigator applies, or failure to find that an aggravator or mitigator applies, is due the same deference. *Id.* Accordingly, the party challenging a referee's finding of aggravation or mitigation "must establish there is a lack of evidence in the record to support such findings or that the record clearly contradicts the referee's conclusions." *Fla. Bar v. Horton*, 332 So. 3d 943, 949 (Fla. 2019) (quoting *Fla. Bar v. Glueck*, 985 So. 2d 1052, 1056 (Fla. 2008)).

Here, the referee found several aggravating factors, including: dishonest or selfish motive (Standard 3.2(b)(2)); pattern of misconduct (Standard 3.2(b)(3)); multiple offenses (Standard 3.2(b)(4)); bad faith obstruction of the disciplinary proceeding by intentionally failing to comply with rules or orders of the

disciplinary agency (Standard 3.2(b)(5)); submission of false evidence, false statements, or other deceptive practices during the disciplinary process (Standard 3.2(b)(6)); refusal to acknowledge the wrongful nature of the conduct (Standard 3.2(b)(7)); and substantial experience in the practice of law (Standard 3.2(b)(9)). The referee also found two mitigators: character or reputation (Standard 3.3(b)(7)); and remoteness of prior offenses (Standard 3.3(b)(13)).

Klayman does not argue that the record lacks competent, substantial evidence in support of the aggravating factors. Instead, he argues that the referee should have afforded greater weight to the character and reputation mitigator and should have found absence of a prior disciplinary record as an additional mitigator.

Regarding the first argument, while Klayman takes issue with how the referee describes his character and reputation, the referee nevertheless afforded significant weight to this mitigating factor, going so far as to state that Klayman's misconduct would warrant a greater sanction were it not for the significant character and reputation evidence presented on his behalf. Thus, Klayman has not shown that the referee erred in the degree of weight afforded to this mitigating factor.

As to whether the referee should have found absence of a prior disciplinary record as an additional mitigator, Klayman's argument is that while he has been disciplined in the past, it was long ago and only for minor misconduct. But in the prior instance, Klayman was publicly reprimanded after a formal complaint was filed, and he entered a consent judgment to violating rules that contemplated more than minor misconduct. Thus, the referee correctly found that Klayman's prior discipline was remote (a mitigating factor found by the referee), but it is not accurate to say Klayman has no prior discipline whatsoever.

Klayman further argues that the referee should have found two other mitigators: that Klayman lacked a dishonest or selfish motive and that he had a cooperative attitude during the disciplinary proceeding. But Klayman's explanations and scant excerpts from the record fail to establish that the referee clearly erred in declining to find that Klayman lacked a dishonest or selfish motive or that he had a cooperative attitude throughout the proceeding. *See Fla. Bar v. Herman*, 8 So. 3d 1100, 1106 (Fla. 2009) ("The fact that there is some evidence in the record to support

a finding that a mitigating factor might apply does not mean that the referee should have necessarily found it applicable.").

*Case Law*

Because the Standards "do not suggest the appropriate length of a suspension, the Court examines caselaw to determine whether the referee's recommendation . . . has a reasonable basis." *Fla. Bar v. Maurice*, 955 So. 2d 535, 541 (Fla. 2007).

In *Herman*, 8 So. 3d at 1106, an attorney was suspended for 18 months for failing to get consent from a client before starting a business that directly competed with the client's business. *Herman* was decided before we began to move toward imposing harsher sanctions, but even so, the lawyer in *Herman* had no prior discipline, had fewer aggravating factors, and had only engaged in a single conflict-of-interest violation, whereas Klayman committed numerous ethical violations, including three conflict-of-interest violations across separate cases.

In *Florida Bar v. Rush*, 361 So. 3d 796, 804 (Fla. 2023), we suspended an attorney for three years based in part on his "repeated failure to accede to [a client]'s clear directives and his unwillingness to put his client's interests over his own pecuniary

gain." Klayman engaged in similar behavior. However, a lesser sanction than that imposed in *Rush* is appropriate here, for the referee did not find that Klayman's misconduct while representing Sataki was motivated by pecuniary gain, and as noted above, the referee found significant character and reputation evidence in mitigation, justifying a lesser sanction.

Ultimately, the relevant Standards and existing case law support the referee's recommendation for a two-year suspension, and while that exceeds the discipline imposed by the D.C. Court of Appeals, this Court is free to impose a harsher sanction in a reciprocal discipline proceeding than that imposed in the foreign jurisdiction. For these reasons, we approve the referee's recommendations and suspend Klayman for two years.

## CONCLUSION

For the reasons stated above, we approve the referee's findings of fact and recommendations on guilt and sanctions. Accordingly, Larry Elliot Klayman is hereby suspended from the practice of law for two years. The suspension will be effective 30 days from the filing of this opinion so that Klayman can close out his practice and protect the interests of existing clients. If Klayman notifies this

Court in writing that he is no longer practicing and does not need the 30 days to protect existing clients, the Court will enter an order making the suspension effective immediately. Klayman shall fully comply with rule 3-5.1(h) and, if applicable, rule 3-6.1. Further, he shall accept no new business from the date this opinion is filed until he is reinstated.

Judgment is entered for The Florida Bar, 651 East Jefferson Street, Tallahassee, Florida 32399-2300, for recovery of costs from Larry Elliot Klayman in the amount of $4,536.93, for which sum let execution issue.

It is so ordered.

MUÑIZ, C.J., and CANADY, LABARGA, COURIEL, GROSSHANS, FRANCIS, and SASSO, JJ., concur.

THE FILING OF A MOTION FOR REHEARING SHALL NOT ALTER THE EFFECTIVE DATE OF THIS SUSPENSION.

Original Proceeding – The Florida Bar

Joshua E. Doyle, Executive Director, Patricia Ann Toro Savitz, Staff Counsel, and Mark Lugo Mason, Bar Counsel, The Florida Bar, Tallahassee, Florida,

for Complainant

Robert M. Klein of Freeman Mathis & Gary, LLP, Miami, Florida,

for Respondent

# EXHIBIT 2

>> Chief Justice Carlos Muniz: THIS IS THE FLORIDA BAR V. LARRY ELLIOT KLAYMAN CASE NO.SC2023-1219.
>> Robert M. Klein,Respondent: IT IS INDEED IF I MAY JUSTICE COURIEL THE START OF SOMETHING YOU SAID EARLIER TODAY DUE PROCESS REQUIRES PROCESS.
THAT IS THE VAST MAJORITY OF WHAT I'M HERE TO ARGUE. IS THAT THE MANNER IN WHICH THIS CASE HAS PROCEEDED HAS DENIED DUE PROCESS AT EVERY TURN STARTING WITH THE DISTRICT OF COLUMBIA.
AND THAT THIS MATTER SHOULD NEVER HAVE BEEN BROUGHT . WE ALSO ARGUED IT IS TIME-BARRED.
WITHOUT GETTING INTO THE CHRONOLOGY IN GREAT DETAIL WHICH WE SET FORTH IN THE BRIEF.
THERE IS NO QUESTION ABOUT THE FACT THAT THE ACTIONS THAT ARE THE SUBJECT OF THESE COMPLAINTS THAT WERE BROUGHT BY THE DISTRICT OF COLUMBIA INVOLVE MATTERS THAT RANGED IN TIME FROM 2006 -2010 SOME 15 YEARS AGO.
THERE WAS ALSO NO QUESTION ABOUT THE FACT THAT THE 2010 COMPLAINT THE COMPLAINT WAS SERVED IN THREE DIFFERENT JURISDICTIONS INCLUDING FLORIDA. PENNSYLVANIA AND THE DISTRICT OF COLUMBIA.
THE BAR GOES INTO GREAT DETAIL TRYING ARGUE TO THAT AS TO THE REFEREE NOTED IN HIS EARLY IN THE HEARING TRANSCRIPT THAT WE HAVE NO CONCLUSIVE PROOF THAT FLORIDA ACTUALLY RECEIVED THE COMPLAINT BUT WE HAVE ENOUGH TO RECORD A CERTIFIED FLORIDA BAR COMPLAINT FORM THAT FLAT OUT SAYS IN ADDITION TO MAKING THE COMPLAINTS FROM.
[LISTING NAMES] I ALSO FILED COMPLAINTS IN PENNSYLVANIA AND THE DISTRICT OF COLUMBIA.
>> Justice: AS AN ASIDE COUNSELOR CAN YOU ADDRESS THE STATEMENT ON PAGE 72 OF YOUR AMENDED INITIAL BRIEF THAT THERE IS AN ABSENCE OF PRIOR DISCIPLINE WHEN IN FACT THE REFEREE'S REPORT ACKNOWLEDGES THAT THERE WAS IN FACT A PRIOR PUBLIC REPRIMAND IS THAT AN OVERSIGHT?
>> Robert M. Klein,Respondent: YES IT WAS I HEARD ABOUT IT EARLIER IT WAS QUITE A LONG TIME AGO?
FRANKLY THAT SHOULD'VE BEEN CORRECTED.
WE WOULD'VE FILED AN AMENDMENT BECAUSE THERE WAS IN FACT A VERY MINOR PRIOR DISCIPLINARY MATTER INVOLVING A VERY LIMITED SUM OF MONEY AND THAT THE COURT BASED ON SAID THERE WAS NOTHING SIGNIFICANT ABOUT IT AND I'M GOING TO SAY A PUBLIC REPRIMAND AND THAT PORT OF TAMPA YES THERE WAS.
>> Justice: ON THE ISSUE OF THE COMPLAINT BEING SENT TO FLORIDA THOUGH IF WE THINK THE STATUTE OF LIMITATIONS TRIGGER FOR ORDER PURPOSES HERE THAT THE RELEVANT DATE WOULD BE WHEN THE DC DISCIPLINE HAPPENED THEN THIS PROCEEDING WOULD HAVE BEEN WITHIN THAT.
WHAT IS THE RELEVANCE I KNOW THAT YOU DISPUTE OR YOU CONTEST WHETHER THAT IS THE RELEVANT ARGUMENT IF WE THINK THAT IS THE RELEVANT ARGUMENT,

WHAT OTHER ELEMENTS WOULD BE WHETHER THERE WAS A COMPLAINT SENT TO FLORIDA OR NOT WHAT OTHER RELEVANCE WOULD THAT HAPPEN.

>> Robert M. Klein,Respondent: WHEN YOU HAVE SOMEBODY WHO'S BEEN SUBJECT TO YEARS OF THIS PLAN.

IN ANOTHER JURISDICTION, THEN FLORIDA IS ADVISED ABOUT THAT THE ORDERS THAT WERE ENTERED IN DISTRICT OF COLUMBIA AND DOES NOTHING FOR THREE YEARS, TO ME THE IDEA THAT YOU GOING TO ALLOW TIME IS PASSING MEMORIES ARE FADING.

DOCUMENTS ARE DISAPPEARING. THE IDEA THAT YOU CAN COME IN AND THEN SAY WE WILL START INVESTIGATING WE WILL START PROSECUTING AT THIS POINT IN TIME WHEN YOU HAVE A FULL-BLOWN RECORD LAID OUT FOR YOU SUGGESTED THAT HAS TO MEAN SOMETHING.

>> Chief Justice Carlos Muniz: YOU ARE SAYING LATCHES AS TO THE THREE YEAR GAP.

>> Robert M. Klein,Respondent: YES BECAUSE OF THE TIME THAT WAS INVOLVED OBVIOUSLY WE HAVE A SIX-YEAR PROBLEM IF YOU GO BACK TO 2010 THERE'S NO QUESTION ABOUT A LIMITATION ISSUE.

BUT THE IDEA OF LATCHES IS THAT YOU HAVE TO MOVE EXPEDITIOUSLY AND YOU CANNOT JUST SIT ON YOUR RIGHTS. WHEN THE CLOCK IS TICKING AND FLORIDA KNOWS WITHOUT QUESTION THAT THERE HAS BEEN AN EXTRAORDINARY PERIOD OF TIME FROM 2010 IN THE FIRST SATAKE COMPLAINT WAS FILED AND THE OTHER THREE TRANSGRESSIONS THAT WERE INVOLVED IN MR KLAYMAN'S REPRESENTATION ADVERSE TO HIS FORMER EMPLOYER ONE WOULD THINK THAT YOU WOULD WANT TO JUMP ON THOSE ACTIONS BECAUSE IF YOU LOOK AT AS A MATTER FACT THERE WERE SOME REALLY INTERESTING LANGUAGE I WOULD LIKE A QUOTE FOR THE COURT.

I THINK IT WAS IN RANDOLPH.

WHERE THE COURT IS TALKING ABOUT ASPIRATIONAL GOALS AND HOW THE BAR HAS AMENDED THE RULES AND WHAT THE BAR IS TALKING ABOUT IS PROMPT PROSECUTION OF THESE BAR COMPLAINTS BECAUSE OBVIOUSLY IF A LAWYER IS DOING SOMETHING THAT IS DETRIMENTAL TO THE PUBLIC AT LARGE HE NEEDS TO BE DISCIPLINED.

BUT THE FLIPSIDE OF THAT THE COURT NOTES IN RANDOLPH THE LAWYER IS ENTITLED NOT TO HAVE TO SIT AND WAIT TO HEAR WHAT IT IS THAT THEY ARE GOING TO DO AND WHAT HE SAYS WAS ACCORDING.

[LISTING NAMES] WAS WORKING ON THE AMENDMENTS TO THE BAR ACCORDINGLY WITH THE POWERS OF THE DISCIPLINARY RULE THOSE WHO TRESPASS UPON OUR ETHICS CAN EXPECT TO BE CALLED ON ACCOUNT IMMEDIATELY THERE WILL BE NO MORE 2.5 YEAR DELAYS. THE FINAL DISCIPLINARY ACTION WILL BE COMPLETE WITHIN APPROXIMATELY SIX MONTHS.

>> Justice: IS THERE A CASE WHERE WE APPLIED LATCHES WHERE WE APPLIED THE DOCTRINE OF LATCHES IN AT THIS POINT?

>> Robert M. Klein,Respondent: NOT TO MY KNOWLEDGE.

>> Justice: WHAT WOULD BE DIFFERENT FROM PRECEDENT THAT TAKES INTO

ACCOUNT THE PASSAGE OF TIME AND MITIGATION OR IN THE WEIGHT OF THE EVIDENCE IS ASSIGNED WHEN WE HAVE A RULE IN ESTABLISHING THE STATUTE OF LIMITATIONS WHAT WOULD BE THE JUSTIFICATION FOR THIS COURT TO SET A NEW COURSE AND APPLY LATCHES?

>> Attorney: BECAUSE I THINK THE IDEA OF LATCHES IS YOU CANNOT ALWAYS PIGEONHOLE SOMETHING DIRECTLY INTO A STATUTE. IT IS MORE OF AN EQUITABLE DOCTRINE AND IT'S THE OTHER THE SOMETHING IF YOU LOOK AT THE ENTIRE SITUATION IS NOT FAIR OR REASONABLE THAT IS A LARGE PART OF WHAT'S GOING ON HERE YOU HAVE PEOPLE WRITING AND SAYING IN A COUPLE CASES PRESENTED WITH THE COURT HAS THROWN OUT DISCIPLINARY ACTION THIS COURT HAS THROWN OUT DISCIPLINARY ACTION FOR FAILURE TO PROPERLY PROSECUTE IN THOSE CASES YOU USUALLY TALK ABOUT MATTERS THAT ARE PRINCIPALLY EQUITABLE.

WAS THIS FAIR?

WAS THIS PROCESS FAIR?

IN THIS CASE MR KLAYMAN WAS ALLOWED TO DISCOVERY.

IN THE DC ACTION HE WAS NOT ALLOWED TO TAKE ANY DEPOSITIONS.

THERE IS ACTUAL TESTIMONY IN THE RECORD FROM ONE OF THE LURES WITHOUT THE PROCEEDINGS THAT THEY WERE BRINGING IN DOCUMENTS FOR MS. SATAKE THAT THEY'VE NEVER SEEN BECAUSE THEY HAVE NEVER BEEN ALLOWED TO TAKE HER DEPOSITION AND THEY WERE NEVER ALLOWED TO PAPER DISCOVERY AT ALL BY THE WAY THAT WAS NOT A COURT DECISION THAT WAS A DECISION BY THE DC BAR. NOT TO ALLOW ANY OPPORTUNITY IN WHAT PROCESS IN WHAT PLANET ARE YOU REQUIRED TO GO AND CONFRONT SOMEBODY WHO WAS ACCUSING YOU OF MISCONDUCT AND NOT KNOW WHAT THEY'RE GOING TO SAY AND NOT HAVE THE DOCUMENTS THAT THEY WILL PRESENT FOR CONSIDERATION BY THE PANEL. THAT IS WHAT HAPPENED HERE. IN DC. THAT PERMEATES THIS ENTIRE PROCEEDING. BY THE WAY HE WAS DENIED THE OPPORTUNITY AT EVERY STEP OF THIS PROCEEDING TO TAKE ANY KIND OF DISCOVERY WHATSOEVER.

>> Justice: I'M SORRY TO INTERRUPT I JUST WANT TO GIVE YOU A CHANCE TO ADDRESS JUST SOMETHING I'M KIND OF STRUGGLING WITH WITH THIS CASE WHICH IS IT SEEMS LIKE THERE IS SOME ATTRACTIVENESS TO THE IDEA THAT REGARDLESS OF WHAT HAPPENED HERE IT WAS A LONG TIME AGO THERE WAS DISCIPLINE IN DC. ADDING TWO MORE YEARS TO IT MIGHT BE OVERKILL.

ON THE OTHER HAND IT SEEMS LIKE THERE IS NO ACCEPTANCE OF RESPONSE ABILITY EVEN AS TO THE THINGS THAT REALLY ARE NOT CONTESTED WITH THE CONFLICT OF INTEREST STUFF.

A LOT OF YOUR ARGUMENTS ARE JUST TRYING TO RELITIGATE WHAT HAPPENED IN DC WHICH KIND OF GOES AGAINST THE IDEA OF JUST SAYING LOOK, BE REASONABLE HERE.

IT SEEMS LIKE IF WE WERE INCLINED TO ESSENTIALLY JUST TREAT THIS MORE AS A MATTER OF "WHAT IS FAIR" IT SEEMS LIKE YOUR ARGUMENTS ARE KIND OF CROSSCUTTING.

THERE IS NOTHING THE MORE YOU TRY TO RELITIGATE DC AND THE MORE YOU DON'T ACKNOWLEDGE ANY KIND OF WRONGDOING OR ANYTHING THAT SORT OF LESS ATTRACTIVE YOUR FAIRNESS ARGUMENT I UNDERSTAND YOU ARE IN A TOUGH POSITION. CAN YOU JUST KIND OF HOW SHOULD WE DO ABOUT THAT.
>> Robert M. Klein,Respondent: I THINK THE QUOTE FROM THIS COURT MANY YEARS AGO THAT THE PROCESS ITSELF CAN ESSENTIALLY SUPPLANT FORMAL DISCIPLINE.
IF IT TAKES TOO LONG.
IF TOO MUCH TIME IS SPENT ON THE PROCESS ITSELF.
THAT IS PART OF WHAT WE ARE ARGUING HERE.
I THINK WHEN YOU DON'T HAVE A PROPER RECORD DEVELOPED I THINK THAT QUESTION REALLY GOES TO SOME OF THE SEPARATE CLAIMS THAT MR KLAYMAN BROUGHT AGAINST HIS FORMER EMPLOYER.
THERE IS JUST THIS ASSUMPTION THAT THERE WAS A CONFLICT. IF YOU GO THROUGH EACH ONE OF THE THREE OF THOSE SEPARATE EVENTS, I DON'T KNOW THERE WAS A CONFLICT AND YOU CANNOT TELL FROM THIS RECORD BECAUSE THE REALITY IS REPRESENTING SOMEBODY AGAINST A FORMER EMPLOYER IS NOT A PER SE CONFLICT UNLESS YOU HAVE SOME EVIDENCE THAT INFORMATION THAT WAS GAINED DURING THE COURSE OF YOUR EMPLOYMENT IS SOMEHOW BEING USED ADVERSE TO THE FORMER EMPLOYER. WE'VE HAD CREWS PLAN CASES WHERE THE CRUISE LINE WHEN AFTER THE FORMER IN-HOUSE COUNSEL WHO HAVE BECOME PLAINTIFFS COUNSEL THEIR REPORTED DECISIONS THING THAT IS NOT A CONFLICT. UNLESS YOU ARE SHOWN THERE IS INFORMATION THAT WAS GAINED THAT IS USED ADVERSE TO THE FORMER EMPLOYER. BUT THAT ASSUMPTION IS ESSENTIALLY MADE IN A DC AND IT HAS BEEN MIMICKED EVER SINCE.
ANOTHER INVOLVED WHETHER OR NOT THE MERE FACT THAT A CONTRACT HAD BEEN DRAFTED BY MR KLAYMAN MEANT HE COULD NOT REPRESENT SOMEONE ADVERSE TO THE JUDICIAL WATCH TO TALK ABOUT THE FACT THAT THEY WERE VIOLATING THE CONTRACT.
THOSE KINDS OF CASES HAVE BEEN IN FLORIDA ALL THE TIME AND LAWYERS ARE NOT NECESSARILY DISQUALIFIED. IF.
>> Justice: YOU ARE SAYING IT HAPPENS ALL THE TIME THAT LAWYERS DRAFT CONTRACTS THEN SUE THE SAME CLIENT OVER THAT CONTRACT.
>> Robert M. Klein,Respondent: I'VE BEEN REPRESENTING LAWYERS FOR OVER 50 YEARS LAWYERS ORIGINALLY SUED FOR GETTING INVOLVED IN A CASE WHERE THEY ARE ADVERSE TO THE FORMER EMPLOYERS SOME OF THEM INVOLVE INTERNAL CONTRACTS SOME OF THEM INVOLVE INTERNAL ORGANIZATION THE QUESTION BECOMES IS THERE ANYTHING INVOLVED IN THE PRIOR EMPLOYMENT THAT IS NECESSARILY GOING TO BE AT ISSUE IN THE NEW CASE. IF THAT IS THE CASE THE LAWYER CANNOT HANDLE THE CASE. THAT IS A CONFLICT. BUT THERE ARE OTHER CASES WHERE A LAWYER MAY BE A MATERIAL WITNESS TO THE CREATION OF A CONTRACT AND THE LAW FIRM THAT WORKED ON THAT WITH HIM PROSECUTE THE CASE BUT THAT LAWYER CANNOT PARTICIPATE AT THE TRIAL BECAUSE HE IS A WITNESS AT TRIAL. THERE ARE CASES ALONG THOSE LINES ALL OVER IT THE STATE.

THEY HAPPEN ALL THE TIME.
THE CONFLICT REALLY BECOMES ARE YOU USING INFORMATION THAT YOU GAINED THAT WOULD NOT HAVE BEEN PUBLIC INFORMATION. SUING SOMEBODY FOR CREATING A HOSTILE WORK ENVIRONMENT WITHIN THREE YEARS AFTER YOU LEFT, IT IS NOT A PER SE CONFLICT.
THERE IS NOT A HINT IN THIS RECORD OF WHAT INFORMATION WOULD HAVE BEEN USED FOR THAT WOULD'VE BEEN ADVERSE TO JUDICIAL WATCHES INTEREST. NOTHING. IT IS JUST NOT THERE.
I CAN GO ON.
>> Justice: YOU ARE WELCOME TO KEEP GOING BUT YOUR REBUTTAL.
>> Robert M. Klein,Respondent: LET ME TAKE ADVANTAGE OF REBUTTAL.
>> Chief Justice Carlos Muniz: OKAY.
>> Attorney: MAY IT PLEASE THE COURT MARK L. MASON, APPEARANCE FOR COMPLAINANT
>> Chief Justice Carlos Muniz: CAN I ASK YOU A QUESTION IS THE TWO YEARS SUSPENSION HERE NECESSARY TO PROTECT THE PUBLIC OR IS THIS MORE ESSENTIALLY JUST A PUNISHMENT.
>> Mark L. Mason,Complainant: THE TWO-YEAR SUSPENSION AS OPPOSED TO THE 18 MONTH WHICH WAS THE RECOMMENDATION THE FINDING
>> Chief Justice Carlos Muniz: 18 MONTHS OR TWO YEARS OR ANYTHING GIVEN THE TIME THAT HAS PASSED ETC. THERE IS ALREADY BEEN DISCIPLINE IN DC WHAT IS THE POINT OF ADDING ON TO THAT?
>> Mark L. Mason,Complainant: THE REFEREE'S HOLDING WAS THERE WAS SUBSTANTIAL AGGRAVATING CIRCUMSTANCES THAT LED TO HIS DECISION TO INCREASE IT TO A TWO-YEAR SUSPENSION.
IT WAS ALREADY MENTIONED EARLIER THE REFUSAL TO ACKNOWLEDGE WRONGDOING. THAT WAS A BIG ONE. THE PATTERN OF MISCONDUCT WE ARE TALKING ABOUT CONFLICT OF INTEREST THAT SPREAD OVER THE THREE JUDICIAL WATCH CASES AND IT ALSO INCLUDED THE 2020 SATAKE SUSPENSION ORDER.
>> Justice: BUT THE CASE FOR PROTECTING THE PUBLIC FROM HARM SEEMS TO ME TO BE SUBSTANTIALLY WEAKENED BY THE DELAY THAT THE BAR SEEMS TO HAVE TAKEN IN THIS MATTER.
IF MR KLAYMAN BECAUSE OF HIS CONDUCT WAS AT SUBSTANTIAL RISK TO THE PUBLIC WHY DID YOU WAIT SO LONG TO ACT?
>> Mark L. Mason,Complainant: WE DIDN'T WAIT SO LONG TO ACT WHAT WE DID WAS WE ACTED ON THE SATAKE SUSPENSION ORDER WHAT HE'S TALKING ABOUT WITH THE THREE YEARS ISSUE WAS THE JUDICIAL WATCH 90 DAY SUSPENSION ORDER. IN THAT CASE IT CAME UP DURING THE SECTION HEARING THAT THERE WAS A QUESTION RAISED ABOUT DID YOU NOTIFY THE FLORIDA BAR OF THIS ORDER?
HE ANSWERED YES I DID.
I FILED A PETITION FOR REHEARING AND ASKED THAT YOU WAIT.
DID NOT FOLLOW UP WITH US AGAIN IT FELL TO THE WAYSIDE THEN THE SATAKE SUSPENSION ORDER WE SEE THE LETTERS HE NEVER LET US KNOW ABOUT THE

OUTCOME OF THE PETITION FOR THAT HEARING WAS ADVERSE TO HIM. ON THAT POINT WE MOVED ON BOTH OF THEM TOGETHER BUT WE ONLY SAW THE 18 MONTH SUSPENSION WHEN WE WENT AND TOOK THE CASE TO THE REFEREE RATHER THAN COMBINING THE TWO AND SETTING THEM WHICH WAS SUGGESTED IN THE INITIAL BRIEF. THAT DIDN'T HAPPEN.

>> Justice: MISCONDUCT OCCURRED WHEN?

>> Mark L. Mason,Complainant: THE JUDICIAL WATCH CASES SPANNED FROM 2006-2008. THE SATAKE MATTER WAS MOSTLY IN 2010.

>> Justice: NOW IT IS 2025 15 YEARS AGO WAS HE PRACTICING? I KNOW THERE WAS EVENTUALLY DISCIPLINE IN DC . HOW MANY YEARS PERCY FOCUSING BETWEEN 2010 AND NOW I'M WONDERING IS THERE ANY INDICATION OF ANY WRONGDOING IN THAT TIME?

>> Mark L. Mason,Complainant: THE 2011 PUBLIC REPRIMAND HAPPENED DURING THAT WINDOW.

>> Chief Justice Carlos Muniz: THE ONE HERE IN FLORIDA VISITING JUST THE ONE HERE IN FLORIDA THAT WAS REFERENCED EARLIER.

>> Justice Charles Canady: WHAT DO WE KNOW ABOUT THE CASE?

>> Mark L. Mason,Complainant: IT WAS A PUBLIC REPRIMAND HAVING TO DO WITH HIS FAILURE TO PAY A CLIENT A MEDIATED SETTLEMENT I BELIEVE IT WAS $5000 HE SAID HE CANNOT AFFORD AT THE TIME JUST ENOUGH. IT TOOK INITIATION OF A BARBER SITTING BEFORE EVENTUALLY DID PAY IT.

NOW WHAT WE ARE HERE ON IS SUBSTANTIALLY WORSE CONDUCT I THINK THAT IS PART AND PARCEL OF WHEN YOU LOOK AT IT IN A PUBLIC REPRIMAND.

>> Justice Charles Canady: A MEDIATED SETTLEMENT OF WHAT.

>> Mark L. Mason,Complainant: IT HAD TO DO WITH HIS REPRESENTATION OF A CRIMINAL DEFENDANT WAS HAPPY WITH THE SERVICES IT WAS AGREED HE WOULD REIMBURSE I BELIEVE IT WAS $5000.

>> Justice: WHAT DO WE KNOW ABOUT WHAT HE'S BEEN UP TO SINCE 2010?

YOU MENTIONED THE 2011 ISSUE.

I'M TRYING TO GET A SENSE OF WE ARE TALKING ABOUT ON THE ONE HAND THE DC STUFF IS SERIOUS.

JUST SPEAKING FOR MYSELF I'M NOT REALLY INTERESTED IN RELITIGATING ALL OF THAT. ON THE OTHER HAND WE ARE BEING ASKED TO TACK TWO MORE YEARS ONTO THIS TO REMEDY OR TO ADDRESS CONDUCT THAT HAPPENED 15 YEARS AGO. I'M JUST TRYING TO UNDERSTAND IS THERE ANYTHING ELSE HOW LONG FOR THAT INTERIM TIME HOW LONG WAS HE ABLE STILL TO PRACTICE?

>> Mark L. Mason,Complainant: HE WAS SUBJECT TO AN END AND FIRM SUSPENSION WHILE THE DC SUSPENSION WAS ONGOING I'M NOT AWARE IF HE WAS READMITTED. HE HAS BEEN SUSPENDED IN PENNSYLVANIA IS ON A TEMPORARY LICENSE AS WELL I CANNOT SPEAK TO WHAT LAW HE PRACTICED ONCE HE WAS SUSPENDED.

>> Chief Justice Carlos Muniz: WHEN DID INTERIM SUSPENSION START.

>> Mark L. Mason,Complainant: THAT WOULD'VE BEEN DURING THE SATAKE APPEAL WHICH WOULD HAPPENED I'M NOT EXACTLY SURE THE YEAR.

IT HAPPENED DURING THE TERM OF THE APPEAL OF THE SATAKE SUSPENSION WHICH LED TO THE 2022 ORDER IT WENT THROUGH THIS VERY LONG APPEAL PROCESS WHICH IS PART AND PARCEL OF THE DELAY BECAUSE WE ARE ACTING ON A RECIPROCAL MATTER.
IT IS NOT A BOTHER WE RECEIVE SOMETHING IN 2011 WHICH IS STILL JUST CONJECTURE.
ON HIS PART IT WAS AN UNSWORN DOCUMENT IT WAS REFERENCED IT WAS NOT A FLORIDA BAR COMPLAINT FORM IT WAS NOT IT WAS A WASHINGTON DC BAR COMPLAINT FORM.
>> Chief Justice Carlos Muniz: LET'S ASSUME THAT THE BAR ACTED WITHIN A REASONABLE AMOUNT OF TIME IN THE PROCESS.
CAN YOU JUST WHAT IS THE POINT OF TWO MORE YEARS OF SUSPENSION?
>> Mark L. Mason,Complainant: THE POINT OF TWO MORE YEARS HAS TO DO WITH THE AGGRAVATING CIRCUMSTANCES THAT WERE SHOWN TO THE REFEREE.
IT WAS REFUSAL TO ACKNOWLEDGE ANY WRONGDOING WHATSOEVER HE IS STILL FRAMING IT AS THOUGH THIS IS A POLITICAL IDEOLOGY WITCHHUNT AGAINST THEM THERE WAS THE ACCUSATIONS AGAINST THE BAR COUNSEL THAT THE REFEREE REFERENCED IN THE REPORT REFEREE HAVING TO DO WITH OUR COUNSEL TIPPED OFF WITNESSES I WAS TRYING TO SUBPOENA. ABSOLUTELY NO FACTUAL BASIS TO ASSERT THAT. WHATSOEVER.
YET HE SAID IT ANYWAY.
IT WAS JUST THAT KIND OF CONDUCT THROUGHOUT THE HEARING AND THAT THIS NOTION THAT WAS NEVER ENTITLED WITH ANY DISCOVERY HE'S RECEIVED HEARING AND HEARINGS THE SATAKE WAS ALONE IT WAS A SIX-DAY FINAL HEARING THIS NOTION HE WAS NOT ENTITLED TO ANY DISCOVERY HE HAS TO TAKE TWO DEPOSITIONS AND THAT THERE IS A RULE IN DC THAT SAID YOU NEED TO SHOW COMPELLING NEED TO DO IT.
HE SIMPLY DID NOT DO THAT.
THERE IS THIS CONSTANT KIND OF OVERSTATEMENT OF NO DISCOVERY NO DUE PROCESS WHATSOEVER. BUT IT WENT THROUGH A THREE-TIER REVIEW PROCESS IN WASHINGTON DC. WHEN IT COMES TO US WE ARE NOT LOOKING TO RELITIGATE THE CASE I'M NOT GOING TO BANDY ABOUT ON THAT POINT TOO MUCH LONGER. WE TOOK IT AND WE ACTED TIMELY. WELL WITHIN IF YOU SAY 3â "7.16 IN A SIX YEAR RULE IF THAT APPLIES ALL IT WOULD BE TRIGGERED WHEN WE GET NOTICE OF THE SUSPENSION ORDERS. WE ARE WELL WITHIN THAT SECURE TIMEFRAME. WHAT IS HE TALKING ABOUT IS THE SEAT OF THE LONG THEIR ORDER SAID THE DELAY WAS UNFORTUNATE THERE IS NOT REALLY AN EXCUSE FOR IT BUT WE HAVE IN OUR STANDARDS UNREASONABLE DELAY IT IS A MITIGATING FACTOR AT BEST.
I'M NOT SAYING IT DOES NOT APPLY BUT IT WAS NOT ARGUED IN THE INITIAL BRIEF IT WAS THAT FOUND IN THE REPORT OF THE REFEREE. IT CAN APPLY BUT ULTIMATELY WHEN YOU LOOK AT ALL OF THESE AGGRAVATING FACTORS THE SELFISH MOTIVE THAT HE HAD WITH PURSUING THESE COMPLAINTS IN DC AND DRAWING UP ALL THIS MEDIA ATTENTION AND ALL THAT. AND YOU COMBINE IT WITH HIS MULTIPLE

OFFENSES AND THIS PATTERN THAT IS WHAT THE REFEREE WAS LOOKING OUT TO SAY, THIS IS WHERE THE REHABILITATIVE SUSPENSION IN THIS CASE A TWO YEAR SUSPENSION BASED ON AN 18 MONTH SUSPENSION ORDER MISCONDUCT DURING THE PROCEEDING AND HIS PRIORS THEY DID A 90 DAY SUSPENSION AND THE PUBLIC REPRIMAND.

>> Justice Charles Canady: CAN I ASK A QUESTION I'M SORRY IF YOU ALREADY SAID THIS WANT TO CLARIFY WHAT IS MR KLAYMAN'S CURRENT STATUS WITH THE FLORIDA BAR.

>> Mark L. Mason,Complainant: IHS CURRENT STATUS IF HE IS LICENSED.

>> Justice Charles Canady: THERE IS NO SUSPENSION.

>> Mark L. Mason,Complainant: THERE HAS NEVER BEEN ANY ACTION ON HIS LICENSE BUT THE FLORIDA BAR OTHER THAN A PUBLIC FORMAT IN 2011 NO CURRENT ACTION ON HIS LICENSE IS NOT RECEIVED ANY PENALTY FOR IT AT THIS TIME.

AT THIS POINT THIS IS WHAT THE PURPOSE OF RECIPROCAL DISCIPLINE IS FOR WE DON'T RELITIGATE ACCEPT THE FINDINGS OF GUILT MUST SEEK AND ESTABLISH HIS BURDEN.

HIS BURDEN IS GRAVE INJUSTICE.

A PAUCITY OF PROOF A COMPLETE WANT OF DUE PROCESS THAT IS WHAT THE CASE LAW SAYS HE IS NOT ESTABLISH THAT WHAT HE ESTABLISHED HE RAISED DUE PROCESS ARGUMENTS IN DC AND THEY FAILED.

IT WENT THROUGH 183 PAGE ORDER AND FIRST REVIEW THEN ANOTHER ORDER SAYING THAT ORDER RECOMMENDING A 33 MONTH SUSPENSION WAS TOO MUCH.

>> Chief Justice Carlos Muniz: I'M SORRY TO INTERRUPT YOU. THE LOGIC IT SEEMS LIKE SORT OF THE LOGIC OF THE RECIPROCAL DISCIPLINE THE REASON WE DON'T RELITIGATE ALL OF THAT IS JUST THE IDEA YOU HAVE A PROBLEM IN ANOTHER STATE YOU GO THROUGH THE PROCESS IT RESULTS IN SOME KIND OF DISCIPLINE IN A PERFECT WORLD IF SOMEONE ELSE WITH DUE PROCESS IS ALREADY DECIDING THIS PERSON SHOULD NOT BE PRACTICING AND OFFERING THE SERVICES TO THE PUBLIC FOR TWO YEARS YOU WANT TO PROTECT PEOPLE IN FLORIDA FOR THE SAME TWO YEARS. I THINK THE PROBLEM HERE IS THE STACKING OF THE TIME ESPECIALLY IN THE CONTEXT WHERE THE WRONGDOING IS FROM 15 YEARS AGO BASICALLY.

CAN YOU ADDRESS THAT?

>> Mark L. Mason,Complainant: I THINK A LOT OF THAT HAS TO DO WITH THE WAY THESE CASES GET LITIGATED AND DRAGGED OUT FRANKLY A RECIPROCAL DISCIPLINE SHOULD BE A QUICK MATTER IN WHICH THERE WAS OVERLAP.

>> Chief Justice Carlos Muniz: YOU AGREE IN THEORY IF YOU ARE LOOKING AT IT FROM A COMMON SENSE PERSPECTIVE IF DC THOUGHT THE PUBLIC NEEDED TO BE PROTECTED FROM DISPERSANT FOR COUPLE OF YEARS YOU WOULD GIVE FLORIDIANS THE SAME PROTECTION THEN EVERYBODY PRESENT AND HOPEFULLY THE PERSON ASKED THE WAY THEY SHOULD GOING FORWARD ISN'T THAT THE WAY IDEALLY IT SHOULD WORK?

>> Mark L. Mason,Complainant: CORRECT, IN DC WITH A SET IN THE SATAKE SUSPENSION ORDER IS HE NEEDED TO DEMONSTRATE HIS BUSINESS BEFORE BEING

REINSTATED TO THE PRACTICE OF LAW I THINK THAT IS VERY FAIR TO ASK FOR IN THIS CASE THE REFEREE THOUGHT IT WARRANTED A TWO YEAR. THE BAR REQUESTED 18 MONTHS SAME AS SUSPENSION ORDER AND THINK THAT WAS FAIR BASED UPON THE PATTERN OF MISCONDUCT.
THAT HE IS DONE HERE.
WE DID NOT ADD ON THE EXTRA 90 DAYS FROM THE JUDICIAL WATCH SUSPENSION ORDER HE FOUND WE RECOGNIZE THAT ONE IS A BIT OLDER.
WE WEREN'T GOING TO PUSH ON THAT BUT WHEN HE ACTED AS HE DID IN THE PROCEEDING AND RESULTED IN A VERY DELAYED PROCEEDING IT RESULTED IN A LOT OF ACCUSATIONS THROWN OUT ABOUT WHAT OUR COUNSEL DID WITH TIPPING OFF WITNESSES THE CASE WILL TAKE LONGER.
TO COMPLAIN THAT NOW IT IS 2025 BECAUSE HE TOOK SEVEN YEARS TO APPEAL JUST THAT JUDICIAL WATCH SUSPENSION ORDER THERE IS A SPECIFICATION TO THE CHARGES IN 2013 ON THAT ONE THAT IS HOW LONG IT TOOK BEFORE THE 2020 SUSPENSION ORDER HE DID A THREE-TIER REVIEW PROCESS EVERY SINGLE TIME WHERE HE GOT OPINIONS ALL THE WAY UP TO THE DISTRICT OF COLUMBIA COURT OF APPEALS AND THEY ULTIMATELY CONCLUDED THAT WAS ALWAYS GOING TO TAKE A SUBSTANTIAL AMOUNT OF TIME HE IS NOT ATTRIBUTABLE TO ALL THE DELAY ON THAT SAME BETTER UNDERSTAND DC TOOK A WHILE TO BRING THE CASE.
LONGER THAN THEY SHOULD HAVE. BUT WITHOUT PREJUDICE BY IT.
HE IS TALKING ABOUT LOST DOCUMENTS MEMORY IS FADED THEY REJECTED THOSE ARGUMENTS HIS RECOLLECTION WAS FUN MS. SATAKE RECOLLECTION WAS FINE THAT WAS THE FINDING HE DID NOT IDENTIFY A SINGLE DOCUMENT HE NEEDED OR THEY LOST. WHY WOULD HE GET RID OF THEM?
SHE MADE THE COMPLAINT IN 2010 AND A SUPPLEMENTAL IN 2011 HE WAS ON NOTICE OF THOSE COMPLAINTS WHY DID HE DELETE RECORDS THAT HE SAID HE DELETED?
IT IS NOT MAKE SENSE HE WOULD DO THAT BECAUSE WE NEVER TOLD THE CASE WAS CLOSED OUT.
ALL OF THESE NOTIONS THAT THESE DUE PROCESS ARGUMENTS RESULTED IN A PAUCITY PROOF OR WANT OF DUE PROCESS OR GRAVE INJUSTICE THESE ARE JUST TYPICAL ARGUMENTS THAT.
>> Justice Charles Canady: WHAT DO YOU SAY IN RESPONSE TO COUNSEL'S ARGUMENT THAT HE WAS DENIED DISCOVERY CAN YOU ADDRESS THAT.
>> Mark L. Mason,Complainant: I WOULD LIKE TO BE SPECIFIC ABOUT THAT BECAUSE THE DISCOVERY HE REQUESTED WAS TO DEPOSE TWO WITNESSES ONE WAS MS. SATAKE AND ONE WAS HER PSYCHIATRIST DR. [LISTING NAMES] WITH MS. SATAKE WITH THE RULE BEING IN COLUMBIA YOU NEED TO DEMOCRAT A COMPELLING NEED SHE WAS COMING FROM CALIFORNIA TO DC THE WAY THEY DO IT IN DC AT THE AD HOC COMMITTEE THEY PUT HER ON THE DAY HER TESTIMONY AND THEN HE DID SUBSTANTIAL CROSS-EXAMINATION. WHAT I MEAN BY SUBSTANTIAL SHE TESTIFIED FOR THREE OF THE SIX DAYS OF THAT FINAL HEARING.
HE WAS NOT LIMITED TO WHAT SHE SAID AND CROSS-EXAMINATION HE IS

EXPLORING OTHER AVENUES THROUGHOUT THAT ENTIRE PROCEEDING.
>> Justice Charles Canady: YOU ARE SAYING HE BASICALLY GOT THE DISCOVERY IN THE PROCEEDING.
>> Mark L. Mason,Complainant: GOT THE DISCOVERY IN THEIR PROCEEDING HE WAS ALLOWED TO EXPLORE IF THERE WAS A BREAK BEFORE THEY CONTINUED ON WITH OTHER WITNESSES SO HE COULD PREPARE HIS CASE IN CHIEF AS WELL. WITH REGARD TO THE PSYCHIATRIST HE WAS NOT ALLOWED TO DEPOSE THAT WAS ADDRESSED IN THE SUSPENSION ORDER.
THE TESTIMONY SHE WOULD'VE OFFERED IS INSUBSTANTIAL MOST OF IT WOULD'VE BEEN PRIVILEGED ANYWAY ALTHOUGH HE FALSELY CLAIMED THERE WAS NO DOCTOR-PATIENT PRIVILEGE REGARDING THAT DOCTOR. ON TOP OF THAT HE JUST WANT TO EXPLAIN THAT ANY EMOTIONAL ISSUES WITH MS. SATAKE ALLEGED EMOTIONAL ISSUES WERE NOT HIS FAULT IT WAS COMPLETELY IRRELEVANT TO WHAT THE RULE VIOLATIONS WORK WHICH WAS A CONFLICT OF INTEREST WHICH WAS FRANKLY ESTABLISHED JUST BY HIS EMAILS THAT HE SENT TO HER ALONE. AND NOTHING ELSE.
THERE WAS NOT JUST NO DUE PROCESS WERE NOT ALLOWED TO TAKE TWO DEPOSITIONS THAT WAS IT.
>> Chief Justice Carlos Muniz: IN THE UNUSUAL SITUATION HERE IF HE GOT A 90 DAY SUSPENSION HE WOULD HAVE TO SHOW IF HE WANTED TO BE REINSTATED IN FLORIDA HE WOULD HAVE TO SHOW ESSENTIALLY THAT THE PROBLEMS HAVE BEEN ADDRESSED THE BAR WOULD HAVE A CHANCE TO LOOK AND SEE WHAT HE'S BEEN UP TO SINCE 2010 THEY WOULD BE ABLE TO SEE WHAT THE STATUS OF WHAT'S GOING ON IN DC AND PENNSYLVANIA IS.
WHY ISN'T THAT ENOUGH TO PROTECT THE PUBLIC?
>> Mark L. Mason,Complainant: I THINK IT IS NOT ENOUGH TO PROTECT THE PUBLIC JUST BASED UPON WHAT THE REFEREE FOUND IN TERMS OF THE AGGRAVATING CIRCUMSTANCES.
MAINLY HIS REFUSAL BUT ALSO THE PATTERN AND JUST THIS IS SOMEONE WHO HAS HAD A LOT OF TIME TO REFLECT ON CONDUCT THAT HAPPENED AS EARLY AS 2006-2010 AND HE STILL NOT HAS ACKNOWLEDGED A SINGLE BIT OF WRONGDOING.
>> Chief Justice Carlos Muniz: IT SOUNDS TO ME IS ALMOST MORE PUNITIVE AND PARTLY BASED ON THE BEHAVIOR IN THIS PROCEEDING ITSELF.
>> Mark L. Mason,Complainant: I THINK THE REFEREE HAD A UNIQUE VANTAGE POINT TO GAUGE WHETHER TO SOMEONE WHO SHOULD BE GIVEN THE SHORTEST AMOUNT OF TIME BEFORE PETITIONING FOR REINSTATEMENT OR A SUBSTANTIAL AMOUNT OF YEARS. I THINK THE REFEREE'S REPORT JUSTIFIED WHY HE DID NOT ACCEPT THE 18 MONTH SUSPENSION AND DECIDED TO INCREASE IT TO A TWO-YEAR RECOMMENDATION.
WITH THAT I SEE HIM OVER MY TIME.
>> Chief Justice Carlos Muniz: I THINK I INTERRUPTED SOMEONE.
>> Justice: YOU KNOW WHEN THE BAR GOT NOTICED ABOUT THE 2020 ORDER?
>> Mark L. Mason,Complainant: YES, ACTUALLY IT WAS IN OCTOBER 2022 IT WAS ONE

OF HIS EXHIBITS IF I CAN FIND IT HERE.
>> Justice: OKAY IT WAS OCTOBER 2022 WHEN YOU WERE AWARE OF THE DC DISCIPLINE'S
>> Mark L. Mason,Complainant: CORRECT IN THE LETTER HE NOTIFIED US HE ALSO ASKED US TO STAY THE PROCEEDINGS WHILE HE DID COLLATERAL ATTACKS OF IT I JUST WANT TO ADD THAT INTO EXPLAIN A LOT OF THE DELAY.
>> Justice: WHEN DID THE BAR GET NOTICED IT WAS DONE.
>> OCTOBER 2022 THAT IS WHEN DC HAD CONCLUDED THE SATAKE MATTERS. HE WAS STILL PLANNING ON SUING ANOTHER AVENUES TO ATTACK THE JUDGMENT.
>> Justice: IT WAS ALMOST ABOUT A YEAR AFTER THAT HE FILED A PETITION FOR RECIPROCAL DISCIPLINE.
>> Mark L. Mason,Complainant: OUR COMPLAINT FOR RECIPROCAL WAS IN AUGUST 2023 JUST A LITTLE LESS THAN ONE YEAR.
>> Chief Justice Carlos Muniz: YOU CAN HAVE 30 SECONDS TO FINISH UP IF YOU WANT.
>> Mark L. Mason,Complainant: I WOULD JUST LIKE TO SAY IN CLOSING THAT I BELIEVE THAT THE REFEREE JUSTIFIED IT WITH THE CASE LAW PARTICULARLY THE RUSH CASE WHERE YOU PRIORITIZE A CLIENT'S INTEREST OR EXCEEDS ME ADVERTISING YOUR INTEREST OVER THE CLIENTS TO THE DETRIMENT OF THE CLIENT.
THAT WAS A THREE-YEAR SUSPENSION I'M NOT SUGGESTING HE NEEDS THAT MUCH BUT THERE IS CASE LAW THAT THE REFEREE ADDRESSED SUPPORTING THAT AND FOR THAT REASON WE ASK YOU ACCEPT THE TWO-YEAR SUSPENSION.
>> Chief Justice Carlos Muniz: THANK YOU VERY MUCH.
>> Robert M. Klein,Respondent:
>> Chief Justice Carlos Muniz: HAS YOUR CLAIM BEEN RESTATED EVERY YEAR HAS HE BEEN REINSTATED IN DC OR PENNSYLVANIA?
>> Robert M. Klein,Respondent: PENNSYLVANIA HE HAD A CLE REQUIREMENT THAT WAS ALL I DON'T BELIEVE THERE IS ANY SUSPENSION DURING THE PENDENCY OF THE APPEAL.
>> Chief Justice Carlos Muniz: WHAT ABOUT DC.
>> Robert M. Klein,Respondent: AS FAR AS I KNOW DC ITSELF GIVE NOTICE TO BOTH FLORIDA AND TO PENNSYLVANIA ABOUT THE RESULTS IS NOT JUST A MATTER.
>> Chief Justice Carlos Muniz: IS HE STILL SUSPENDED IN DC HAS HE BEEN REINSTATED IN DC.
>> Robert M. Klein,Respondent: AS FAR AS I KNOW HE HAS NOT APPLIED FOR REINSTATEMENT.
>> Chief Justice Carlos Muniz: HE HAS NOT APPLIED?
>> Robert M. Klein,Respondent: THE PROBLEM I'M HEARING WITH THIS IS THAT IF YOU DON'T GET DISCOVERY IN THE FIRST PLACE AND YOU ARE NOT ALLOWED TO TAKE DEPOSITIONS THE IDEA THAT HE MAY HAVE BEEN ABLE TO CROSS-EXAMINE THIS WITNESS CALLED MS. SATAKE IN PARTICULAR DOES VERY LITTLE IN TERMS OF DUE PROCESS.
BECAUSE THE REALITY IS YOU DON'T HAVE AN OPPORTUNITY TO LOOK AT THE DOCUMENTS YOU DON'T HAVE AN OPPORTUNITY TO FIND OUT IF SHE HAS OTHER

DOCUMENTS. EVEN FROM THE DOCUMENTS IN HER SUBMITTED THAT WERE SUBMITTED BY SATAKE IN THIS CASE THEY ARE BACK AND FORTH FOR THE BETTER PART OF EIGHT MONTHS THROUGHOUT 2010 AS TO WHAT IS GOING TO HAPPEN WHETHER OR NOT IT IS GOING TO HAPPEN. HOW IT IS GOING TO HAPPEN.

NO LAWYER IN FLORIDA IS OBLIGATED TO GET A CLIENT'S AUTHORITY TO DO EVERYTHING ANYTHING OTHER THAN THE ULTIMATE GOAL THAT IS THE CLIENTS ASPIRATION.

YOU DON'T TALK TO THE CLIENT ABOUT HOW YOU WILL PROSECUTE EVERY CASE THAT YOU WILL TAKE ON. BUT AT THE SAME TIME YOU CANNOT CROSS-EXAMINE ANYONE ABOUT WHAT THEY BELIEVE THEIR OPINIONS WERE OR WHAT THEY WERE TELLING YOU TO DO WHEN YOU DON'T HAVE ACCESS TO COMMUNICATIONS THAT WERE BEING HAD, FOR EXAMPLE WITH HER UNION REP WHO TESTIFIED UNDER OATH IN THIS CASE ALONG WITH THE YOUNG LAWYER WHO WENT TO THE HEARING ABOUT THE HOSTILITY, THAT WAS DIRECTED TOWARDS HER AND IT TO HIM AT ONE POINT OR ANOTHER. BY JUDICIAL WATCH. IN FACT THE LAWYER WHO TESTIFIED IN THIS CASE TESTIFIED UNDER OATH ABOUT THE MANNER IN WHICH MR. CLAIMANT WAS TREATED BY THE DC BAR DURING THOSE HEARINGS.

I WOULD ASK THE COURT TO TAKE A CLOSE LOOK AT THAT TESTIMONY BECAUSE IT IS VERY CLEAR THAT THINGS IN THIS DAY AND AGE WHEN EVERYBODY TALKS ABOUT WEAPONIZATION IT'S THE FIRST TIME EVER USED THAT WORD IN MY LIFE IF YOU LOOK AT THE WAY THIS PROSECUTION WENT DOWN AT THE DC BAR IT WAS NOTHING ABOUT IT THAT WAS AFFORDED ANY MANNER OF DUE PROCESS. THAT RESONATES THROUGHOUT THIS ENTIRE CASE.

THE CONCEPT OF CONFLICT MORPHED AND HAS MORPHED IN THIS CASE FIRST IT WAS HE WAS DOING THIS FOR HIS OWN PERSONAL GOOD. OR TO ADVANCE HIS OWN REPUTATION. THEN IT WAS BECAUSE HE HAD A ROMANTIC INTEREST IN MS. SATAKE. JUDGE LAMBERTH HIMSELF WHO DENIED THE MOTION THE CONFLICT ISSUES AND IT DENIED THE OPPORTUNITY TO TAKE DEPOSITIONS SAID THAT IT WAS A CLOSE CALL. HE HAS REFERRED LAWYERS ON MULTIPLE OCCASIONS TO THE BAR .

>> Chief Justice Carlos Muniz: I'M SORRY TO INTERRUPT YOU CAN HAVE ONE MINUTE TO INTERRUPT.

>> Robert M. Klein,Respondent: HE FELT IN THIS CASE THERE WAS NO REASON TO BELIEVE AS ELEVENTH CIRCUIT THE DC CIRCUIT NOTED IN ITS OPINION ANY REASON TO BELIEVE THAT MR KLAYMAN COULD NOT AND WOULD NOT PRACTICE ETHICALLY AND COMPETENTLY. IN FACT COMMENDED THE MANNER IN WHICH ALL OF THESE CASES ARE HANDLED. YOU LOOK AT ALL OF THESE PEOPLE WHO TESTIFIED IN THIS CASE THE ONLY ONE OF TESTIFIED ADVERSE TO MR. CLAIMANT WAS MS. SATAKE. AND SHE WAS IMPEACHED REGULARLY AS WAS NOTED BY THE COURT OF APPEAL. ON MULTIPLE ISSUES. WHEN CONFRONTED THAT IS THE WHOLE POINT IS CONFRONTATION WRITTEN TO BE ABLE TO CONFRONT SOMEONE YOU ENTITLED TO RUDIMENTARY DISCOVERY AND AT A MINIMUM A DEPOSITION NOT HAVE TO DO IT COLD -

>> Chief Justice Carlos Muniz:.THANK YOU VERY MUCH WE WILL BE IN RECESS FOR 10

MINUTES.
>> Marshal: ALL RISE

# EXHIBIT 3

**IN THE SUPREME COURT OF FLORIDA**
**(Before a Referee)**

| | | |
|---|---|---|
| THE FLORIDA BAR, | } | |
| Complainant | } | **Case Number: SC23-1219** |
| v. | } | |
| LARRY ELLIOT KLAYMAN | } | **TFB File No. 2020-00,515 (2A)** |
| Respondent. | } | |

## [PROPOSED] ORDER OF RESPONDENT

THIS CAUSE having been heard on March 27 – March 28, 2024 on the issue of Respondent Larry Klayman's reciprocal discipline ("Respondent"), and the Honorable J. Lee Marsh ("Referee") having considered the pleadings, having heard argument of counsel, and being otherwise fully advised in the premises, it is hereby **ORDERED:**

## I. INTRODUCTION AND BACKGROUND

The complaint for reciprocal discipline assigned to Florida Office of Bar Counsel ("FOBC") involves two suspension orders by the D.C. Court of Appeals ("DCCA"). The first is styled *In re Klayman*, 20-BG-583 (D.C.C.A.) (the "Sataki Suspension Order") and the second is styled *In re Klayman*, 18-BG-100 (D.C.C.A.) (the "Judicial Watch Suspension Order").

The underlying events in the Sataki Suspension Order began in 2010, fourteen (14) years ago. Complainant Elham Sataki ("Ms. Sataki") filed a complaint against Respondent on November 2, 2010, and a supplemental complaint on October 24, 2011. Respondent Exhibit ("FRX") 7. Yet the District of Columbia Office of Disciplinary Counsel ("DCODC") did not file a Specification of Charges until July 20, 2017, over seven years later. FRX 4. The DCCA issued the order of suspension on September 15, 2022, approximately 12 years later. Nearly one year later, on August 29, 2023, FOBC filed its reciprocal discipline complaint. FRX 3.

The events raised in the Judicial Watch Suspension Order took place in approximately 2006, some eighteen (18) years ago. The initial complaint was filed by Tom Fitton of Judicial Watch on January 23, 2008. Yet DCODC did not institute a Specification of Charges until October 1, 2013, nearly six (6) years later. FRX 43. It took approximately seven years, or until June 11, 2020, for the DCCA to issue an order of suspension. FRX 3. The record indicates that FOBC was notified of this suspension on or around June 11, 2020 via letter from the DCODC. Respondent's Supplemental Exhibit ("Supp.") 0047. FOBC did not file their reciprocal discipline complaint until August 29, 2023, over three years later. FRX 3.

## II. LEGAL STANDARD

When the Court is presented with an issue of reciprocal discipline, the law is well settled that the Court is "not automatically bound by an out-of-state determination of guilt by a disciplinary agency." *Fla. Bar v. Kandekore*, 766 So. 2d 1004, 1007 (Fla. 2000). The Florida Supreme Court has established the following standard for determining whether another jurisdiction's findings should be accepted as conclusive:

> [W]hen the accused attorney shows that the proceeding in the foreign state was so deficient or lacking in notice or opportunity to be heard, that there was such a paucity of proof, or that there was some other grave reason which would make it unjust to accept the foreign judgment as conclusive proof of guilt of the misconduct involved Florida can elect not to be bound thereby. *Id.*

*See also Fla. Bar v. Wilkes*, 179 So. 2d 193 (Fla. 1965). *Wilkes* explained the logic behind the decision to not automatically adopt findings made in other jurisdictions:

> For at least two reasons it would be incongruous to apply the principle of the full faith and credit provision to judgments of disbarment. First, the issues adjudicated are not the kind to which the clause was intended to apply.... Second, to our knowledge neither of the principles under discussion has ever been held to require one state automatically to admit to practice an individual merely because a sister state has admitted him. (Those states which do admit to practice on a showing of admission in certain other states do so on the basis of reciprocity, and not on any obligation of comity or full faith and credit.) Thus, if these principles do not

> control or affect admission to practice there is no logical basis upon which they can be made applicable to disbarment or removal from practice. This is so because the authority and responsibility of the state is the same in admission to practice as it is in disbarment. It is to protect the public against those who for any reason are unfit to practice law. Both functions are given to this court under our state constitution and we must exercise both or abdicate our constitutional mandate under Art. V, Sec. 23, Florida Constitution, F.S.A. *Id.* at 196.

*See also Florida Bar v. Tipler*, 8 So. 3d 1109 (Fla. 2009), Furthermore, even where proof of "guilt" by another jurisdiction is deemed adopted, a finding to that effect does not apply to the discipline imposed. "[T]he discipline awarded in the foreign judgment is not binding on Florida." *Id.* at 201. Lastly, whether discovery was allowed in a foreign jurisdiction is a factor this Court must consider in determining whether to adopt discipline from another jurisdiction. *Id.* at 1117.

## III. THE LAW

For the reasons set forth herein, the referee finds that no sanction is warranted with regard to either disciplinary proceeding. The Referee addresses each disciplinary proceeding *in seriatim* before addressing the sanction at the end of this order.

### A. The Sataki Suspension Order

Respondent has persuadingly argued that the Sataki Suspension Order is (1) time barred, (2) fits the criteria set forth under *Kandekore* requiring that the Referee decline to adopt the Sataki Suspension Order, and (3) constitutes the practice of "stacking." The Referee finds these arguments persuasive, for the reasons set forth below.

#### 1. The Sataki Suspension Order is Time Barred

Respondent has provided the Referee with case authority and expert testimony that the Sataki Suspension Order is time-barred by the statute of limitations and the doctrine of laches.

Under the applicable statute of limitations, The Florida Bar is required to open an investigation "within 6 years from the time the matter giving rise to the investigation is

discovered or, with due diligence, should have been discovered." Bar Rule 3-7.16(a)(1); *Fla. Bar v. Phoenix*, 311 So. 3d 825, 831 (Fla. 2021). Here, the record reflects that Ms. Sataki submitted a disciplinary complaint with The Florida Bar on or around October 24, 2011, FRX 7, nearly twelve (12) years prior to the filing by the FOBC of its reciprocal discipline complaint. See also FRX 8. The court determines that this proceeding was not timely filed.

The Referee finds particularly instructive the affidavit and testimony of Robert Klein, Esq. ("Mr. Klein") FRX 11. He opines that:

> "The Florida Bar would have investigated Ms. Sataki's Complaint back in 2011 when it was filed. The only reasonable conclusion is that The Bar found it to have no merit and dismissed it, as Mr. Klayman was never subjected to any form of discipline as a result of Ms. Sataki's Complaint. Now, some twelve (12) years following the filing of Ms. Sataki's complaint, I believe The Florida Bar should forgo initiating any disciplinary action which relates to Mr. Klayman's representation of Ms. Sataki." FRX 11 ¶ 19. "Under this scenario, full faith and credit should be given to The Florida Bar's decision to dismiss the Sataki Matter back in and around 2011, and The Florida Bar should not be allowed to relitigate this matter." FRX 11 ¶ 20.

Mr. Klein then provided the following sworn testimony on March 28, 2024:

> If, in fact, the Florida Bar investigated, and there is certainly record evidence that it did, then that – the determination by the Florida Bar not to proceed further should prevent any proceedings at this point in time based upon the same facts and the same allegations. And I believe that that's, you know, well established under Florida law and the Court -- the parties have negotiated the cases back and forth. I do believe that --in fact, there was a South Carolina opinion that I advanced in my affidavit that I found -- a South Dakota opinion that, really, I felt did a better job that I could, really, in summarizing, you know, why that is, you know. And if you look at the opinions that are cited, some of the opinions from other jurisdictions make it clear that each state really has to abide by its own rules and decide under its own laws whether or not to proceed and to what extent to proceed on claims being advanced against a lawyer in multiple jurisdictions. Tr. 89:6 – 23.

At the hearing, a choice of law issue was raised pursuant to *Merkle v. Robinson*, 737 So. 2d 540 (Fla. 1999). *Merkle* was a tort case involving statute of limitations for a medical malpractice case. *Merkle* expressly finds that "[t]his Court has held that **in tort actions** involving more than

one state, all substantive issues should be determined in accordance with the law of the state having the most 'significant relationship' to the occurrence and parties." *Id.* at 542 (emphasis added). The Referee finds that *Merkle* does not preclude application of Florida's six-year statute of limitations for the following reasons:

*First*, *Merkle* expressly limited its finding to tort actions. This instant matter is not a tort action. It is a reciprocal disciplinary process, and therefore an administrative proceeding.

*Second*, even assuming that the logic in *Merkle* might be applicable here, and analysis would still be required to determine which state has the most "significant relationship" to the occurrence and the parties. That assessment clearly favors the application of Florida law. This is a reciprocal discipline proceeding being conducted under the authority of the Florida Supreme Court. The rules applied to this case necessarily implicate Florida's rules, including the rules governing the Florida bar and the evidentiary rules governing the proceedings. For example, the court applied Florida's rules regarding the presentation of witness testimony by Zoom. Discovery was also governed by Florida's discovery rules. Finally, as Mr. Klein noted during his expert testimony, "if you look at the opinions that are cited, some of the opinions from other jurisdictions make it clear that each state really has to abide by its own rules and decide under its own laws whether or not to proceed and to what extent to proceed on claims being advanced against a lawyer in multiple jurisdictions." FRX 11 at 89. This appears to be particularly true to the extent that The Florida Bar is asking a Florida judge to limit a Florida lawyer's ability to practice law in Florida – not Washington DC.

This reasoning is confirmed by the Florida Supreme Court in *Fla. Bar v. Wilkes*, 179 So. 2d 193 (Fla. 1965), where the Court used the analogy of reciprocal admission to the Bar to explain why the Florida Bar ultimately governs issues of attorney reciprocal discipline:

> Second, to our knowledge neither of the principles under discussion has ever been held to require one state automatically to admit to practice an individual merely because a sister state has admitted him. (Those states which do admit to practice on a showing of admission in certain other states do so on the basis of reciprocity, and not on any obligation of comity or full faith and credit.) Thus, if these principles do not control or affect admission to practice there is no logical basis upon which they can be made applicable to disbarment or removal from practice. This is so because the authority and responsibility of the state is the same in admission to practice as it is in disbarment. It is to protect the public against those who for any reason are unfit to practice law. Both functions are given to this court under our state constitution and we must exercise both or abdicate our constitutional mandate under Art. V, Sec. 23, Florida Constitution, F.S.A. *Id.* at 196.

Lastly, the only rights affected by this proceeding are Respondent's right to practice law in Florida, within the purview of Florida's rules and laws. Based on that assessment, even if *Merkle* is in fact applicable – and Respondent argues that it is not – Florida's six-year statute of limitations would apply.

The doctrine of laches provides another, alternative basis upon which the Referee finds this matter to be time barred. Regardless of *Merkle*, it cannot be disputed that both Florida and the District of Columbia apply laches to attorney discipline proceedings. *See The Florida Bar v. Walter*, 784 So.2d 1085 (Fla. Sup. Ct. 2001) and *In re Williams,* 513 A.2d 793, 796 (D.C. 1986).

Respondent has provided evidence of prejudice occasioned by the unprecedented delays in this matter, including but not limited to the unavailability of witnesses such as Professor Ronald Rotunda and Dr. Arlene Aviera -both of whom are deceased - and the loss of records, including but not limited to evidence which should have been available to confirm that The Florida Bar received a complaint from Ms. Sataki in 2011. This is further underscored by the sworn affidavit testimony of Mr. Klein, who stated:

> [T]here can be little dispute about the fact that Mr. Klayman will be hampered in the defense of any proceedings initiated in Florida – as he was in the District of Columbia – given the extraordinary passage of time.... The fact that records have now been destroyed should not be used to the detriment of Mr. Klayman, *who did*

> *not occasion this delay*. To the contrary, this is precisely why courts in every state recognize laches as a defense to the prosecution of stale claims.... I believe that there should be a per se bar in place for the prosecution of a decade-old complaint. FRX 11 ¶ 23.

This was further persuasively emphasized by the proffered ethics opinion of one of the preeminent professional ethics experts, Ronald Rotunda, who had wanted to testify on Respondent's behalf, pro bono, but he passed away during the extremely prejudicial delay of seven (7) years caused by the delayed prosecution by DCODC. FRX 13-1. Thus, the Referee finds that under both Florida's statute of limitations and the doctrine of laches applicable in both Florida and the District of Columbia, this proceeding is time-barred.

**2. The Has Been a Deprivation of Due Process, Paucity of Proof, and other Grave Reasons Which Would Make it Unjust to Accept the Foreign Judgment as *Conclusive* Proof of Guilt**

The Referee recognizes here that he is "not automatically bound by an out-of-state determination of guilt by a disciplinary agency." *Fla. Bar v. Kandekore*, 766 So. 2d 1004, 1007 (Fla. 2000). The relevant inquiry is as follows:

> [W]hen the accused attorney shows that the proceeding in the foreign state was so deficient or lacking in notice or opportunity to be heard, that there was such a paucity of proof, or that there was some other grave reason which would make it unjust to accept the foreign judgment as conclusive proof of guilt of the misconduct involved Florida can elect not to be bound thereby. *Id.*

Respondent has introduced substantial evidence in the record that shows that he was deprived of due process at every stage of this disciplinary matter, which ties into a paucity of proof as to the issues in this matter, which include the failed recollection of several witnesses. This calls into question innumerable grave reasons that all serve to justify why this Referee should not to be bound by the Sataki Suspension Order.

**a. Respondent Was Denied Due Process**

The Referee finds that Respondent was denied his due process rights beginning at the Ad

Hoc Hearing Committee ("AHHC") stage. Respondent provided record evidence to demonstrate the highly partisan nature of the District of Columbia attorney discipline apparatus, *see e.g.* FRX 12, *Affidavit of Anthony Caso*. However, those concerns were also manifested in the composition of the AHHC, which included Michael Tigar, who has proudly advertised his communist ties and affinities, along with chairperson Warren Anthony Fitch, of a similar ideological bent. FRX 38. This bias resulted in discernable due process violations against Respondent, which include but are not limited to the following:

*First,* the Referee is particularly disturbed by the fact that the events underlying the Sataki Suspension Order began in 2010, fourteen (14) years ago. Yet this matter was not even instituted by DCODC until 2017 – over seven (7) years after the Complaint had been filed by the Complainant! FRX 4. The Referee believes that this represents an unjustifiable and prejudicial delay, that violates Respondent's due process rights, in addition to serving as a time-bar.

*Second,* Respondent was denied discovery, FRX 17, despite the fact that discovery is clearly allowed in a bar proceeding and represents an integral part of the attorney disciplinary process, particularly in a case such as this, where DCODC delayed over seven (7) years before it even filed a Specification of Charges. Without question, the resulting passage of time resulted in testimony by individuals whose memories had faded, the outright unavailability or loss of witnesses, as well as the loss of documents, which had obviously been discarded at some point. *See* District of Columbia Board on Professional Responsibility Rules, Chapter 3. Of particular importance is the fact that Respondent was not permitted to take the deposition of Ms. Sataki despite the over seven (7) year delay by DCODC in filing its Specification of Charges. The Referee also finds it compelling that Respondent provided evidence that he sought the deposition testimony of not only Ms. Sataki, but also her psychologist, Dr. Arlene Aviera ("Dr. Aviera"),

FRX 17. Respondent explained that deposition testimony of both Ms. Sataki and Dr. Aviera was essential as to Ms. Sataki's "psychological frame of mind and condition, both during the time that Respondent represented her and thereafter." FRX 17. By the time that the AHHC hearing occurred, Dr. Aviera was unavailable, since she had developed stage-four cancer. FRX 24 at 126. Yet throughout the AHHC hearing, on numerous occasions, Ms. Sataki testified about her interactions with Dr. Aviera, including sessions where they discussed Respondent. FRX 24 at 125: "...but it went to Mr. Klayman and everything that I had to deal with him on a daily basis. She started helping me with that." *See also* FRX 24 at 139, 184 – 185, 430 – 432. Respondent was never given an opportunity to explore – let alone refute – that testimony through any type of traditional discovery, due to the unavailability of Dr. Aviera as a witness, which was of course occasioned by the extraordinary delay in the presentation of this complaint. The Referee finds that Respondent's inability to explore that critical element of testimony constituted a denial of his due process rights. If an inability to secure legitimate discovery can be viewed as fundamental to the fairness and re- propriety of a civil proceeding, the Referee finds that it is far more essential in a proceeding which seeks to deprive Respondent of his right to practice law.

This problem was only compounded to the extent that record reflects that DCODC and Ms. Sataki were allowed to "discover" alleged records from Dr. Aviera that were previously undisclosed on the eve of the commencement of the AHHC hearing, where they were then allowed to introduce those records here. FRX 18, over the objection of Respondent. FRX 24 at 133 – 135. It was a due process violation to allow these documents into the record, despite the fact that the records included unsubstantiated hearsay. Dr. Aviera was not available to authenticate the records. Further, as was shown earlier, Respondent had been denied the opportunity to depose Dr. Avieira. FRX 18. That prejudice was not lost on AHHC, which

nevertheless introduced the documents into the record:

> I think that the Respondent's team must be concerned that these documents, if admitted and heard about, would be unduly prejudicial to him. But I don't know how to address that conundrum, because we're required to include the documents in the record and give a recommendation to the Board. FRX 24 at 204.

The Referee is unconvinced that the AHHC had no choice but to allow these unauthenticated documents into the record, as the transcript clearly reflects that it made the ultimate decision as to which documents would be proffered for the record.

The Referee has determined that Respondent was subjected to additional due process violations at the Board level. Respondent requested that the Board thoroughly review the record, which it appears they failed to do. FRX 19. Furthermore, when Respondent learned during the Board briefing process that Ms. Sataki had participated in making a documentary about her case, with intimate personal details about herself, against Voice of America ("VOA"), the Board refused to include this crucial piece of exculpatory evidence, which had not previously been disclosed by DCODC or Ms. Sataki. FRX 20. The Board Rules provide a mechanism for the record to be supplemented, Board Rule 13.7; nevertheless, for whatever reason, the Board chose not to include this highly exculpatory evidence.

The Board appears to have given undue and unjustified deference to the findings of the AHHC, which were the result of numerous due process violations, as is more fully as set forth above. The Board's refusal to thoroughly review the record and to conduct an independent analysis only serves to highlight – and compound – the due process violations that occurred at the AHHC.

The Referee also finds that the DCCA gave undue deference to the findings of the AHHC and Board; in essence, those findings were "rubberstamped." This is demonstrated by virtue of the fact that the DCCA's suspension order, FRX 3, *did not include a single record cite*, which

reflects that it was done in a hasty and conclusory manner which could not possibly have considered Respondent's arguments carefully.

In retrospect, the Referee now recognizes that Respondent's due process rights were further violated during the course of this ongoing reciprocal discipline proceeding, which Respondent set forth in full in his Motion for Recusal and/or Disqualification. Of particular importance in this regard are the third-party subpoenas that this Referee issued allowing Respondent to take the depositions of Messrs. Fox, Kaiser, Smith, Fitch, and Tigar. FRX 71. Despite being provided with conclusive evidence that these third-party deponents were willfully evading service of process, FRX 63, FRX 64 – constituting another due process violation by the D.C. attorney discipline apparatus. With the benefit of hindsight the Referee has concluded that he tacitly ratified this misconduct. In retrospect, the Referee now also recognizes that similar errors were made to the extent that he declined to accept as evidence the underlying disciplinary record in both disciplinary proceedings at issue along with the exculpatory evidence in the form of Ms. Sataki's video interview. This deprived Respondent of the ability to place a full and complete record in front of the Florida Supreme Court.

**b. There Was a Paucity of Proof**

The Referee also finds that there was a paucity of proof for each and every ethical violation that Respondent was charged with in the Sataki Suspension Order, based on Ms. Sataki's own testimony and other uncontroverted evidence.

*First*, the Referee finds that there was a paucity of proof that Respondent violated D.C. Rule of Professional Conduct ("Rule") 1.2 or Rule 1.6 with regard to pursuing Ms. Sataki's claims with publicity. To the contrary, the record reflects that Ms. Sataki gave informed consent to pursue her claims through the use of publicity. For instance, FRX 24 at 397 – 398 contains the

following admission from Ms. Sataki: Q: "And that we agreed we would get some positive publicity here to try to coerce VOA into a favorable settlement so you could be in LA, correct?" A: "Correct." Another admission is found in FRX 24 at 775: "Q: "Did you ultimately agree with Mr. Klayman about the publicity? A: "I did." Lastly, the Referee finds persuasive the uncontroverted testimony of Ms. Sataki's union representative, Timothy Shamble, that he and Ms. Sataki personally participated in publicizing her case. FRX 24 at 893 – 994: ".

> Q: "And did there come a point in time when you actually went with her and distributed publicity?"
> A. "I remember one time. The VOA was on the mall here in Washington, some kind of public -- it might have been a recruitment fair or something. But we had an article and both her and I were distributing it to people in the vicinity, tried to let people know and to let the agency know that, you know, we were going to publicize this."....
> Q. "And she was there when she gave it out and she approved of that?"
> A. "Yes. We were both on the mall handing that out." Tr. 893 – 894.

Other important examples of admissions by Ms. Sataki and other uncontroverted testimony can be found at FRX 24 at 96, 398 – 403, 329, 453 – 458, 892.

*Second*, the Referee finds that there was a paucity of proof that Respondent violated Rule 1.7 with regard to Ms. Sataki's decision to move to Los Angeles. The record reflects that Ms. Sataki repeatedly admitted that she wanted to be in Los Angeles. FRX 24 at 106 contains an admission that Ms. Sataki had proposed to VOA to transfer her to Los Angeles. Also:

> "Q: "You told me earlier your goal was to get out of the presence -- I'll go through it again -- get out of the presence of the alleged harasser, Falahati, and be transferred to Los Angeles, because you like Los Angeles a lot more than Washington, D.C., you had spent many years there, had family there, et cetera. You did say that to me during that dinner, right?" A. "Yes." *Id.* at 335.

The record also shows that Ms. Sataki would not accept employment in the Central News Division in Washington D.C. because she thought she was "being set up" to fail. FRX 24 at 346. Other important examples of admissions by Ms. Sataki and other uncontroverted testimony can

be found at FRX 24 at 347, 351, 354, and 369 – 370 (testimony that the move was necessary based on case strategy because Ms. Sataki was living with a coworker in D.C. at the time).

*Third*, the Referee finds that there was a paucity of proof that Respondent violated Rule 1.2 with regard to being terminated by Ms. Sataki as counsel. The record shows that Ms. Sataki admitted that she did not want to stop pursuing her case, as she even asked DCODC if they could litigate it for her. FRX 24 at 489:

> Q: "That you wanted Bar Counsel to file a sexual harassment case for you. You asked them that within the last year, against VOA."
> A: "I asked if it's doable."
> Q "And you asked Bar Counsel to do it for you, correct?
> A: "I asked if it's doable...."

Furthermore, the record reflects that the November 15, 2010 letter terminating Respondent as counsel was sent to the incorrect address. Ms. Sataki admitted that was a "mistake," FRX 24 at 540. The record also reflects that the August 4, 2010 letter was not written in Ms. Sataki's admittedly poor English, *id* at 310, which is why Respondent felt compelled to talk with her before simply dismissing all of her cases. FRX 24 at 1041. Respondent's suspicions were confirmed when Ms. Sataki admitted that the August 4, 2010 letter was *not* written by her, and instead was written with the assistance of Kathleen Staunton. FRX 24 at 156:"Q. Did someone help you write this particular letter? A. Yes. Q. Who is that? "A. Kathleen." This admission is confirmed on numerous other occasions. *Id.* at 301, 317, 469 – 474.

*Fourth*, the Referee finds that there was a paucity of proof that Respondent violated Rule 1.4(b) with regard to keeping Ms. Sataki informed on her litigation, specifically with regard to filing a Motion to Disqualify the Honorable Colleen Kollar Kotelly ("Judge Kotelly"). The record shows that Ms. Sataki was informed from the very beginning of Respondent's prior difficulties with Judge Kotelly. FRX 24 at 407 – 410:

> "Q. "And I told you at the time that we had drawn a very difficult judge that I had been in front of in the past. You remember that?" A: "Yes, I remember that.... That it was a very difficult judge, and that he had problem with that judge." Q. "And her name was Colleen Kollar-Kotelly, correct?" A. "Correct, I remember that." Q. "And I told you that I had had other cases with her where I had difficulty, right?" A. "Yes...." Q. "For that reason, I filed pleadings to try to get the case sent to another judge, Judge John Roberts, who the case had initially been assigned to, but then somehow it got reassigned to Judge Kotelly. You remember that?" A: "Yes." Q. "But that request for reassignment was denied by the court, correct?" "A. Yes."

The record also shows that Ms. Sataki was aware and remembered that Judge Kotelly had denied their request for even an evidentiary hearing, FRX 24 at 415, one of the grounds upon which a motion to disqualify was required.

*Fifth*, the Referee finds that there was a paucity of proof that Respondent violated Rule 1.5(b) with regard to the absence of a fee agreement. The record shows that the representation agreement was *pro bono* and the goal of Respondent and Ms. Sataki's representation agreement was to obtain equitable relief, and thus there would be no recovery of damages to split. FRX 24 at 335 – 336:

> Q. You told me earlier your goal was to get out of the presence -- I'll go through it again -- get out of the presence of the alleged harasser, Falahati, and be transferred to Los Angeles, because you like Los Angeles a lot more than Washington, D.C., you had spent many years there, had family there, et cetera. You did say that to me during that dinner, right ?
> A. Yes.
> Q. And we really didn't discuss at that dinner whether you could get damages for what had happened to you? The goal was to go back to LA and work for Persia News Network, for Voice of America there?
> A. Yes.
>
> ----
>
> Q. When we met I told you that I would try to help you, that I wasn't going to charge you for my legal services because it was offered in friendship.
> A. Yes, you said that.

The Referee is further persuaded by the fact that the record shows that Ms. Sataki knew that Respondent represented many of her colleagues at Voice of America *pro bono* as well, including

Mahmonir Rahimi and John Chalangi, and Kaveh, FRX 24 at 403 – 404, 424, that Respondent spent his own money to help Ms. Sataki without ever asking to be reimbursed, *Id* at 108 – 109, 350, and that Ms. Sataki recognized that her alleged harasser, Mr. Falahati, was destitute, so there could be no financial recovery even if a monetary judgment against him was pursued. *Id.* at 393.

*Sixth*, the Referee finds that there was a paucity of proof that Respondent violated Rule 1.7 with regard to "emotional interest." The record shows that there was never any romantic contact between Ms. Sataki and Respondent. FRX 24 at 142:

> Q. Did you ever have any romantic interactions with Mr. Klayman? A. Absolutely not. Q. Did you ever have any physical contact with Mr. Klayman, other than like a handshake? A. No.

The record also reflects that Respondent referred Ms. Sataki to Ms. Gloria Allred and another attorney named Tim Shea when it appeared to him that he should no longer represent her, *Id.* at 145, but it was Ms. Sataki who asked that Respondent continue to represent her. This uncontroverted finding by the Board itself, FRX 6 at 10, clearly indicates that there was a paucity of proof that Respondent violated Rule 1.7 in this regard.

**B. The Judicial Watch Suspension Order**

The Referee also finds that he is not bound by the Judicial Watch Suspension Order by the DCCA pursuant to *Kandekore*. The Referee finds the following portions of the record persuasive in this regard.

*First*, the Honorable Royce Lamberth ("Judge Lamberth"), the jurist presiding over the Judicial Watch Matter, was the only person who ruled that Respondent should be disqualified. *Paul v. Judicial Watch, Inc.*, 571 F. Supp. 2d 17, 27 (D.D.C. 2008). No other court, including the court presiding over the matters involving Lousie Benson and Sandy Cobas, issued an order

disqualifying Respondent. In fact, Judge Lamberth took special note of the extraordinary circumstances in this case, specifically of the potential hardship to the client, Mr. Peter Paul, which informed Respondent's actions:

> ...the Court takes note of Paul's argument that he will suffer prejudice if Mr. Klayman is disqualified...the essence of the hardship that Paul asserts will result from disqualification of Klayman is an inability to obtain alternate counsel for lack of financial resources. The Court is not unsympathetic to this concern. *Id.*

*Second*, despite granting Judicial Watch's Motion to Disqualify, Judge Lamberth chose not to sanction Respondent, which demonstrates that Judge Lamberth did not believe that Respondent's conduct warranted any sanctions and/or discipline. As Judge Lamberth presided over the Judicial Watch Matter, he was the only person with firsthand knowledge of all of the intricate facts at issue in that matter. Thus, his decision must be afforded great deference.

*Third*, not only did Judge Lamberth choose not to sanction Respondent, the Referee observes that he actually took time out of his incredibly busy schedule to testify on his behalf at the AHHC hearing in the voluntarily, without being subpoenaed. FRX 47. Judge Lamberth provided the AHHC with compelling testimony that he believed that there was, at a minimum, a clear ambiguity with regard to Respondent's representation of Mr. Paul, and that as such, there was a "legitimate debate about [Mr. Klayman's] conduct." FRX 47. Judge Lamberth further testified that he did not see fit to refer Respondent to Bar Counsel in the District of Columbia, despite having done so on numerous occasions in the past with other lawyers:

> Well, I -- during the course of my career, I have referred a number of matters to Bar Counsel. Sometimes I -- I think I felt I was overwhelming them with the numbers of referrals I've made. It seems to me in a case like this, where there was a legitimate debate about the conduct -- although I -- I ended up saying it was clear in the opinion, but it took me a number of pages to say it. FRX 47.

Judge Lamberth further explained the extraordinary circumstances involved in this case, particularly with regard to Mr. Paul's situation:

> ...but also that there was some notion I had that Mr. Paul was in a very bad position. He was unable to afford counsel, he couldn't find other counsel. He was in a bind, and I had some feeling that there was a situation that was unusual, in the sense that counsel for Mr. Paul, who had previously been with Judicial Watch, found himself in an awkward position, where he had a very needy client who needed services who could not otherwise afford services. And so I thought it was a fairly unusual circumstance. FRX 47.

Thus, where the presiding jurist over the Judicial Watch Matter voluntarily took the time to testify on Respondent's behalf that he did not think Respondent's conduct was sanctionable, the Referee is convinced that there exists a "paucity of proof" under *Kandekore*.

*Fourth*, in addition to Judge Lamberth's testimony, Respondent provided the AHHC with the opinion one of the nation's preeminent experts in legal ethics, Professor Rotunda , who came to the same conclusion as Judge Lamberth in his letter opinion of June 2, 2014, FRX 45, and as reflected in his sworn hearing testimony. FRX 46. Indeed, Professor Rotunda, one of the top legal experts in professional ethics in the nation observed: "[t]he situation involving these particular clients...provided a unique set of circumstances, one that the D.C. Rules of Professional Conduct do not expressly take into account. Given this unprecedented situation, Respondent, out of necessity, attempted to correct the wrongs caused by Judicial Watch . . ."

### C. FOBC Has Engaged in Stacking

> Whatever other objects the rule may seek to achieve, it obviously contemplates that *the Bar should not be free to withhold a referee 's report which it finds loo lenient until additional cases can be developed* against the affected attorney, in an effort to justify the more severe discipline which might be warranted by cumulative misconduct. The Bar's violation of the prompt filing requirement in this case, to allow a second grievance proceeding against Rubin to mature, is directly antithetical to the spirit and intent of the rule. In addition, it has inflicted upon Rubin the 'agonizing ordeal' of having to live under a cloud of uncertainties, suspicions, and accusations for a period in excess of that which the rules were designed to tolerate. *Florida Bar v. Rubin*, 362 So.2d 12 (Fla. Sup. Ct. 1978)

The Florida Supreme Court has made it clear that "the Bar has an obligation to process disciplinary cases in a fair and just [timely] manner." *Fla. Bar v. Kane*, 202 So. 3d 11, 19 (Fla.

2016). These cases stand for the proposition that FOBC is not permitted to "stack" disciplinary proceedings against Respondent, which they have attempted to do here.

The record shows that FOBC was aware of the Judicial Watch Suspension Order on or around June 11, 2020. Supp. 0047. It did not file its complaint for reciprocal discipline until August 29, 2023, over three years later. The only possible rationale for this nearly three-year delay is that FOBC was attempting to stack the discipline here with the Sataki Suspension Order, which FOBC almost certainly knew was ongoing, since it was admittedly in communication with DCODC. This is the precise conduct which has been expressly forbidden by the Florida Supreme Court in *Rubin,* and provides another compelling basis for this Referee to decline to recommend imposing reciprocal discipline on Respondent.

**D. No Sanction is Warranted Against Respondent Mr. Klayman**

For the reasons set forth above, the Referee finds that Respondent has more than shown "that the proceeding in the foreign state was so deficient or lacking in notice or opportunity to be heard," "that there was such a paucity of proof," and other "grave reasons" that the Referee is not bound by either order of suspension by the DCCA. The Referee instead finds that no sanctions are warranted against Respondent for the reasons set forth above as well as the following:

*First*, the Referee recognizes the extreme and unprecedented passage of time that has occurred in both matters. The Sataki Suspension Order involves events that occurred approximately fourteen (14) years ago; the Judicial Watch Suspension Order involves events that occurred approximately eighteen (18) years ago. This is far beyond what any Court would deem an acceptable amount of delay, particularly in Florida, which applies both a hard six-year statute of limitations and the doctrine of laches to attorney discipline matters. In fact, to paraphrase Mr. Klein's testimony, the court finds this delay to be per se unreasonable, prejudicial, and unfair.

Respondent has presented uncontroverted evidence in the form of Ms. Sataki's Supplemental Complaint, FRX 7, that she had filed a bar complaint against Respondent in or around October of 2011. Respondent then presented additional evidence that as recently as January of 2023, Ms. Sataki's counsel in another proceeding styled *Klayman v. Sataki*, 2022-CAB-010491 (15th Jud. Cir. Fla.) admitted that a disciplinary complaint was filed in Florida in or around 2011. FRX 8. Coupled with the testimony of Respondent's expert witness, Mr. Klein, the Referee can only conclude that The Florida Bar had already investigated the Sataki Suspension Order and decided that no discipline was warranted. Given the enormous unconscionable passage of time, and the fact that there have been no similar allegations against Respondent made during this interim period, the earlier decision by the Bar should be given full faith and credit and cannot now be resurrected and relitigated in 2024.

*Second*, the Referee acknowledges the cascading due process violations that have occurred at every step of these assorted proceedings, which have prevented Respondent from having a genuine opportunity to be heard or to present his case in the Sataki Suspension Order matter. This alone constitutes grounds for the Referee to reject the DCCA's opinion pursuant to *Kandekore*, *Wilkes,* and other cases stemming from those decisions. The lack of discovery afforded to Respondent also strongly weighs in favor of declining to impose yet another sanction at this late date. *See Tipler*, 8 So. 3d at 1117.

*Third*, the Referee takes cognizance of the mitigating factors set forth by The Florida Bar in its publication "Florida's Standards for Imposing Lawyer Sanctions." Many of those mitigating factors are readily applicable here. They include (1) absence of a prior disciplinary record, FRX 2 (certificate of good standing); (2) absence of dishonest of selfish motive, FRX 24 at 1225 (testimony of Tim Shamble); (3) full and free disclosure to bar and cooperative attitude,

FRX 10 (Letter to Florida Bar); (4) character and reputation evidence, FRX 77 (recommendation letter of Hon. Royce Lamberth), FRX 24 at 1316 – 1317 (testimony of Hon. Stanley Sporkin), March 28 transcript at 108 (testimony of Robert Barr), March 28 transcript at 49 (testimony of Stephen Sulzer), March 28 transcript at 8 (testimony of Frederick Sujat) and (5) timely good faith effort to rectify consequences of misconduct (Respondent took required CLE courses on conflict of interest). The Referee is further persuaded by the fact that there has never been any showing that Respondent acted *dishonestly;* to the contrary, the D.C. Court of Appeals in the Judicial Watch Suspension Order found that "we are not left with serious doubt or real skepticism that Mr. Klayman can practice ethically." RSX 3-1 (internal quotations omitted). In conjunction with the enormous passage of time that has occurred in this case, the Referee finds that it would be manifestly unjust to impose any sanction in this matter.

*Fourth,* the Referee recognizes that Respondent is entitled to present a full defense pursuant to his due process rights and cannot be sanctioned for attempting to do so. Respondent and his counsel, Mr. Richard Greenberg, cannot be sanctioned for inadvertently missing a deadline to file a dispositive motion, as this did not work any prejudice to FOBC or the Referee.

ACCORDINGLY, based on the foregoing, the Referee finds that he is not bound by the suspension orders issued by the DCCA in either disciplinary proceeding and instead recommends that Respondent not be sanctioned, or at the most be given an admonishment with time served, for reasons set forth in this order.

**DONE AND ORDERED** in chambers at Leon County, Florida, this ______ day of ______________, 2024.

_________________________________
The Honorable J. Lee Marsh
Circuit Court Judge

# EXHIBIT 4

# SUPPLEMENTAL DECLARATION OF TIM SHAMBLE

My name is Timothy Shamble and I am the president of the American Federation of Government Employees, Local 1812 which represents the broadcasters and journalists at the Voice of America (VOA), and hereby attest to the following information:

1. I sat in and was present at, at least, one meeting with Larry Klayman and Elham Sataki where using public relations such as press articles and news stories to describe and publicize the alleged sexual and workplace harassment of Elham at VOA was discussed. Indeed, the idea was that public relations could help push the agency into a settlement or resolution of Elham's claims especially since the VOA had been consistently ranked as one of the worst agencies in the federal government according to the OPM.
2. In this regard, attached is an email between Larry Klayman, Elham and two other broadcasters of VOA, who Larry Klayman was also seeking to help – as they too along with others in the Persian News Network branch of VOA believed that they were experiencing work place harassment of various sorts -- about an interview with the Los Angeles Times.
3. The understanding was that this public relations strategy, including interviews and articles, might also serve to convince congressmen on Capitol Hill to step in and help Elham settle or resolve her claims with VOA. In this regard, Larry Klayman asked me to accompany him to the offices of congressmen on Capitol Hill to make the case for them to help Elham and some others at VOA in the Persian News Network that were subject to alleged sexual and/or workplace harassment. At, at least one event, we handed out a flyer about Elham's alleged claims to get support for her and pressure the VOA to reach a beneficial settlement. VOA management is generally non-responsive to amicably resolving such issues.
4. Public relations can influence entities such as VOA and congressmen to take positive action, as the press can be very influential in this regard. It was my impression that Elham understood this and approved it.
5. As a broadcaster and TV anchor, I believed that Elham understood the benefit of public relations. I am not aware that any public relations about Elham's situation were anything but positive and complimentary about her.

I swear that the above is true and correct to the best of my recollection.

[signature]
Timothy Shamble

07/09/17
Date

# EXHIBIT 5




***Jeffrey Clark's 2023 arraignment photo on charges related to the 2020 election.***

When Jeffrey Clark was tapped to lead the second Trump administration's chief regulatory review office, it marked an astonishing redemption.

For years, congressional investigators and prosecutors had pursued the former Department of Justice official primarily over an unsent letter he drafted, in support of President Trump's 2020 election challenge, calling for Georgia to consider launching a last-minute legislative session to review its results.

Trump's return to power has not ended Clark's troubles: Washington, D.C.'s legal disciplinary authority has recommended he be disbarred over his conduct from five years ago. Lawyers for Clark claim that the effort seeks to punish "thought crime" regarding their client's belief in potential irregularities in an election that authorities declared devoid of widespread fraud.

Even as President Trump's critics now claim he is engaging in retribution against a wide range of past assailants, including former FBI Director James Comey, his supporters say Clark's case reveals there is an ongoing, politically motivated push to punish MAGA advocates. In their telling, the president's adversaries who weaponized the justice system through "lawfare" have opened another front in their war through "barfare."

**The Rise of Barfare**

Since 2020, Democratic officials and progressive groups established specifically to target conservatives have lodged bar complaints against dozens of Trump-allied attorneys such as Clark. While supporters of these efforts say they are trying to hold officeholders and advocates accountable for actions that betrayed the canons of ethical legal practice, conservative opponents say the push to punish their political foes via

the canons of ethical legal practice, conservative opponents say the push to punish their political foes via bar complaints, often brought in politically partisan jurisdictions, threatens not only the ability of presidents to receive counsel but the American legal system itself.

"The most politicized situations are the ones where the bar should be the most reticent," to consider punishing attorneys over their work, James Burnham, former DOGE general counsel, said during a recent panel discussion on alleged bar weaponization hosted by the right-leaning Federalist Society. "That's when lawyers are supposed to be the most creative and the most aggressive. But it's not the kind of situation where we want lawyers to be afraid to even engage in advocacy in the first place."

The Clark complaint concerned his activities in the final weeks of the first Trump administration, while he served in part as acting assistant attorney general for the Justice Department's Civil Division. Clark, an environmental and regulatory lawyer by background, believed that there was potentially election-altering fraud or irregularities in Georgia and other states, requiring resolution before the fast-approaching January 6, 2021, election certification date.



The Trump DOJ officials responsible for probing the 2020 election, Jeffrey Rosen (center) and Richard Donoghue (right), rejected Clark's analysis.
**AP**

In response, he wrote a draft letter dated Dec. 28 and addressed to Georgia leaders recommending that the state legislature convene a special session to further probe potential irregularities and take remedial steps as necessary if they impacted the election outcome.

Clark circulated the letter to acting Attorney General Jeffrey Rosen and Deputy Attorney General Richard Donoghue, who were responsible for probing 2020 election issues. Rosen and Donoghue disagreed with its thrust – especially the suggestion that there was potentially election-altering fraud – and declined to sign and deliver it.

## Trump Gets Wind

As Trump's election challenge proceeded, he got wind of Clark's views. Apparently finding an ally, the president floated the idea of making Clark acting attorney general. Clark allegedly offered to decline any such appointment if Rosen would sign off on the letter, the then-Democrat-led Senate Judiciary Committee would later report – an allegation Clark would flatly deny. In opposition to a possible appointment, Clark's superiors convened a Jan. 3, 2021, meeting with President Trump and other officials, at which several said they and other colleagues would resign en masse should the president elevate him.

Ultimately, the president backed off, and Clark's letter was consigned to the ashbin of history – until one or several ex-Trump administration officials leaked word of its existence and contents to the New York Times. The Times wrote about Clark's efforts in a Jan. 22 article titled "Trump and Justice Dept. Lawyer Said to Have Plotted to Oust Acting Attorney General."

A flurry of probes pertaining to the president's election challenge would follow. Clark – a Harvard- and Georgetown-educated litigator who had spent the bulk of his career as a partner at white-shoe law firm Kirland & Ellis – would spend the next several years facing the scrutiny of congressional committees, including the Democrat-dominated January 6 Committee, and prosecution in cases brought by Fani Willis in Fulton County, Georgia, and Special Counsel Jack Smith in Washington, D.C. In June 2022, he was forced to wait outside his home in his undergarments while federal investigators searched his suburban Virginia residence, seizing electronic devices in connection with their January 6 probe.



The House panel investigating the Jan. 6 attack on the Capitol held Clark in contempt for refusing to cooperate.
**AP**

In July 2022, in response to a complaint lodged by the then-Democrat-led Senate, the D.C. Board on Professional Responsibility charged Clark with violating the D.C. Rules of Professional Conduct. It accused him of engaging "in conduct involving dishonesty" by drafting the letter the board alleged contained false statements, and for "attempt[ing] to engage in conduct that would seriously interfere with the administration of justice."

The allegations against Clark rested in part on the argument that because his superiors disagreed with his views on potential election fraud in Georgia, Clark's assertions in the letter were fraudulent.

**Unprecedented Case**

In his defense, Clark invoked a slew of privileges, and raised myriad procedural and substantive arguments – including that the local D.C. disciplinary board lacked jurisdiction over Clark's conduct as a federal lawyer providing counsel to the president; that Clark enjoyed immunity from liability while rendering advice to the president; and that the purported false statements were merely proposed Justice Department positions for consideration by superiors – positions largely consistent, as his lawyers noted, with those raised by several U.S. Supreme Court justices and nearly 20 state attorneys general.

Clark's lawyers argued during his trial that "[N]o one has ever been charged by the D.C. Bar with attempted dishonesty in a draft letter that recommended a change in policy or position where that document was not approved and never even left the office."

His lawyers made the point that sanctioning him for such conduct would lead to a limitless array of disciplinary actions against attorneys over private or internal deliberations on behalf of clients should they hold contrarian views.

Government "lawyers will be afraid to give their candid opinions for fear of losing their careers. Likewise, lawyers will not join government for the same reason," Harry MacDougald, one of Clark's lawyers, told RealClearInvestigations.

> *"Government lawyers will be afraid to give their candid opinions for fear of losing their careers."*

On July 31, 2025, despite acknowledging "that there are no factually comparable prior disciplinary cases," a majority of the board recommended that Clark be disbarred. While rejecting Clark's arguments, including that he was protected as a government lawyer giving advice, the nine-member board said that the charges against him "focus on the truthfulness of the factual assertions" in the letter that he authored.

Although Clark's superiors had testified that Clark had "sincere *personal* concerns" regarding the integrity of the election, the board said, "they also agreed that the *Justice Department* had not identified potentially

outcome-determinative issues in Georgia or other states."

Therefore, his continued efforts to press officials to send the letter "constituted an attempt to make intentionally false statements about the results of the Justice Department's investigation," the board said.

The tribunal added that Clark "should be disbarred as a consequence and to send a message to the rest of the Bar and to the public that this behavior will not be tolerated."

The disbarment decision is pending before the D.C. Court of Appeals, which has final say over such decisions in the nation's capital.

**Claims of Unequal Justice**

In an August 2025 filing with the appeals court obtained by RCI detailing Clark's exceptions to the board's order, his counsel contrasted the disciplinary tribunal's treatment of the Justice Department lawyer with that of FBI lawyer Kevin Clinesmith. He received just a one-year suspension for doctoring a document submitted to the FISA Court supporting the government's FISA warrant application that enabled them to surveil Trump adviser Carter Page.

"The disciplinary process in the D.C. bar is radically disparate according to the political affiliation and views of the respondent attorney," Clark's lawyers charged.



Clark's lawyers said the D.C. Bar was far kinder to former FBI lawyer Kevin Clinesmith, whose actions hurt a Trump ally.
**YouTube/Fox News**

A preliminary review of public records indicates that a majority of the board that made the Clark recommendation was comprised of registered Democrats, individuals who had contributed to Democrat candidates, or public advocates of progressive causes. Only one board member was publicly identifiable as a Republican.

The board recommendation followed a trial before a separate three-member panel, at least two of whom were registered Democrats and had contributed financially to Democratic Party candidates, public records show.

The Office of Disciplinary Counsel, which handed down the original charges against Clark and effectively prosecutes such cases, is also headed by an attorney, Hamilton P. Fox III, who, according to public records, is a Democrat.

"D.C. voted Democrat more than 90% against Trump all three times he was on the ballot – the most lopsided margin in the country to have its own Bar," MacDougald noted on X in a response to the disciplinary authority's decision.

Many prominent Republicans also took issue with the actions of Trump and his confidantes in challenging the 2020 election. This includes the sole publicly identifiable Republican board member, Margaret M. Cassidy, a member of the Republican National Lawyers Association who concurred in the recommendation that Clark be disbarred.

After the panel handed down its recommendation to disbar Clark, MacDougald told RCI, "the reason Jeff has been singled out is lawfare – straight up political persecution."

# EXHIBIT 6

**IN THE SUPREME COURT OF FLORIDA**

| | | |
|---|---|---|
| THE FLORIDA BAR,<br><br>Complainant<br><br>v.<br><br>LARRY ELLIOT KLAYMAN<br><br>Respondent. | } | **Case Number: SC2025-1604** |

**AFFIDAVIT OF FREDERICK J. SUJAT**

1. I, Frederick J. Sujat swear under oath, that the following is true and correct and based on my personal knowledge and belief.

2. I am over the age of 18 and competent to testify to the matters set forth herein.

3. I attended the March 28, 2024 hearing before the Honorable J. Lee Marsh ("Referee Marsh") in the Sataki Matter as a material witness to Respondent Larry Klayman's strong character.

4. I have known Mr. Klayman for a long time and we have worked together for a very long time as well. I have a high regard for Mr. Klayman's ethics and character in the legal profession and generally.

5. I am a member in good standing with The Florida Bar.

6. At the March 28, 2024 hearing, I observed the demeanor and conduct of Referee Marsh, and it struck me that he was highly offensive and disrespectful towards Mr. Klayman and even strangely towards myself when I testified on Mr. Klayman's behalf.

7. [Blank]

8. For instance, he questioned and minimized my military history in what I perceived to a condescending manner, which I was entirely gratuitous and meant only to embarrass and harass me, as my military history was only given as background information and had no relevance to my testimony:

> THE COURT: **All right. The Court does have one question, Mr. Sujat. You had testified to your time with the Judge Advocate General for the Air Force. And then I have Respondent's 100, this document talking about your other professions. How much time did you actually spend on active duty in the Air Force, Air Force Reserve, or Air National Guard, actual active duty time?**
>
> THE WITNESS: That's very -- that's impossible for me to answer, your Honor, without getting documentation from the Department of Defense. I was a --
> THE COURT: Well, let's ball-park it. Hold on. I'll rephrase the question.
> THE WITNESS: Sure.
> THE COURT: **So what was your initial period of active duty?**
> ...
> THE COURT: **I don't need -- I'm trying to figure out the amount of time you spent on active duty.** Because I understand you retired as a colonel in the Guard. I'm just trying to decide -- I'm looking at this period of '74 to '76. It says Air Force and VA. Were you a VA employee? An Air Force employee? Both? When was your active duty time? That's what I'm trying to --
> THE WITNESS: Okay. Yeah. The active duty, I'd have to look at my DD-214. It was 190 days. It was --
> THE COURT: Were there any periods --
> THE WITNESS: That period started in March of '75 and ended in May of '75. And while I was there, I was assigned to the office -- the International Affairs Division of the Judge Advocate General of the Air Force. And while I was there and working on the manual, the international manual, they asked me, they said, do you want to work at the White House. And I said, that sounds pretty
> interesting. And they said, you know, Senator de Gaulle -- Goodell of New York needs someone to help over there. And so I offered to -- I believe that they were asking different agencies if they had people that they wanted to go over there. So that's how I -- that's how I spent my time. And after that, that's where I met lawyers, a Florida lawyer here who was with me there, who, he said, I'm working at the Board of Veterans Appeals. Would you like to work there. And so I said, okay, I'll work there as a civil servant.
> THE COURT: **Okay. So any active duty periods for greater than one year?**

THE WITNESS: No --
THE COURT: **Okay.**
THE WITNESS: -- continuous active duty.

March 28th Transcript at 44 – 46.

9. Other examples that I witnessed were Referee Marsh minimizing and mocking Mr. Klayman's proposed exhibits as "advertisement for a book" and as "political ax grinding." March 28th Transcript at 156:9 and 144:18

10. I also noticed that Judge Marsh frequently cut Mr. Klayman off and did not allow him a chance to speak uninterrupted and make his arguments.

11. While I was in the courtroom on March 28, 2024, I observed the behavior of Referee Marsh storming off the bench on more than one occasion. I had the impression that he despised Mr. Klayman.

12. At the conclusion of the hearing on March 28, 2024, Referee Marsh *sua sponte*, without any evident bona fide legal or factual basis, increased the eighteen month sanction sought by Florida Office of Bar Counsel to twenty-four months.

13. I hereby swear that the foregoing is true and correct under penalty of perjury of the state of Florida and the United States.

October 31, 2025

Frederick J. Sujat
Frederick Sujat

# EXHIBIT 2

12:12 P.M.

**Supreme Court of Pennsylvania**

**Disciplinary Docket No. 3 Docket Sheet**

**Docket Number: 2918 DD3**



**DOCKET ENTRY**

| Filed Date | Docket Entry / Representing | Participant Type | Filed By |
|---|---|---|---|
| **February 2, 2023** | **Order Granting Motion for Stay** | | Per Curiam |

Comments:
AND NOW, this 2nd day of February, 2023, the Motion to Stay is granted. Respondent shall keep this Court informed of the status of the proceedings before the Superior Court of the District of Columbia.

| Filed Date | Docket Entry / Representing | Participant Type | Filed By |
|---|---|---|---|
| **April 17, 2024** | **Respondent Larry Klayman's Supplement to Motion to Stay & Order Granting Stay** | Respondent | Klayman, Larry Elliot |
| **April 22, 2024** | **ODC's Answer to Supplement to Motion to Stay and Order Granting Stay** | Petitioner | Office of Disciplinary Counsel |
| **May 7, 2024** | **Order Extending the Stay Imposed on February 2, 2023** | | Per Curiam |

Comments:
AND NOW, this 7th day of May, 2024, upon consideration of Respondent's request to continue the stay imposed on February 2, 2023, and the Office of Disciplinary Counsel's answer, the stay shall remain in effect. Within 10 days of the date or filing of a dispositive ruling on his appeal by the District of Columbia Court of Appeals, Respondent shall notify this Court's Prothonotary, Western District Office, as well as the Office of Disciplinary Counsel, that the appeal to the District of Columbia Court of Appeals has been concluded and provide a copy of all related order, opinions, or judgments.

Neither the Appellate Courts nor the Administrative Office of Pennsylvania Courts assumes any liability for inaccurate or delayed data, errors or omissions on the docket sheets.

**IN THE SUPREME COURT OF PENNSYLVANIA**

| | | |
|---|---|---|
| In the Matter of | : | No. 2918 Disciplinary Docket No. 3 |
| | : | |
| LARRY ELLIOT KLAYMAN | : | No. 141 DB 2022 |
| | : | |
| | : | (District of Columbia Court of Appeals, No. 20-BG-583) |
| | : | |
| | : | Attorney Registration No. 54628 |
| | : | |
| | : | (Out of State) |

**ORDER**

**PER CURIAM**

**AND NOW**, this 2nd day of February, 2023, the Motion to Stay is granted. Respondent shall keep this Court informed of the status of the proceedings before the Superior Court of the District of Columbia.

Received 4/22/2024 12:57:35 PM Supreme Court Western District

Filed 4/22/2024 12:57:35 PM Supreme Court Western District
2918 DD3

IN THE SUPREME COURT OF PENNSYLVANIA

| | |
|---|---|
| In the Matter of | : No. 2918 Disciplinary Docket No. 3 |
| LARRY ELLIOT KLAYMAN | : No. 141 DB 2022 |
| | : (District of Columbia Court of Appeals, No. 20-BG-583) |
| | : Attorney Registration No. 54628 |
| | : (Out of State) |

**OFFICE OF DISCIPLINARY COUNSEL'S ANSWER TO RESPONDENT LARRY KLAYMAN'S SUPPLEMENT TO MOTION TO STAY AND ORDER GRANTING STAY**

Office of Disciplinary Counsel (PA-ODC), by Anthony P. Sodroski, Disciplinary Counsel-in-Charge, Special Projects, and Thomas J. Farrell, Chief Disciplinary Counsel, responds to Respondent's supplemental pleading filed April 17, 2024 ("supplemental pleading") and avers as follows:

1. By Opinion and Order decided September 15, 2022, the District of Columbia Court of Appeals ("the DC Court of Appeals") suspended Respondent from the practice of law.

2. On November 2, 2022, Respondent filed in the Superior Court for the District of Columbia ("DC Superior Court") a civil action against a former client (Ms. Elham Sataki), the District of Columbia Office of Disciplinary Counsel (DC-ODC), several DC bar counsel, two members of the Ad Hoc Hearing Committee, and one member of the DC Board on Professional Responsibility. ***Klayman v. Sataki, et al.***, No. 2022-005235 ("the ***Sataki*** case").

3. By Order dated February 2, 2023, this Honorable Court granted Respondent's motion to stay the within reciprocal disciplinary proceeding; on that date, the ***Sataki*** case was pending before the Honorable Ebony M. Scott, Associate Judge of DC Superior Court ("Judge Scott").

4. By Omnibus Order filed March 1, 2024, Judge Scott dismissed the ***Sataki*** case with prejudice.

5. On March 8, 2024, Respondent filed a Notice of Appeal to the DC Court of Appeals.

6. In his supplemental pleading, Respondent avers that Judge Scott "erred and there is a likelihood of success on appeal." These are conclusions of law to which no response is required.

7. The relief requested by Respondent is "that this matter remain stayed pending appeal."

8. PA-ODC does not oppose the stay remaining in place, but reserves the right to move to dissolve the stay at the conclusion of the appeal before the DC Court of Appeals. PA-ODC respectfully requests that the order provide that within ten days of the date or filing of a final order, opinion or judgment of the DC Court of Appeals, or any dispositive ruling on a timely petition for reconsideration thereof, whichever occurs later, Respondent shall notify this Court's Prothonotary, Western District Office, with copy to PA-ODC, that the appeal to the DC Court of Appeals has been concluded, and provide a copy of all orders, opinions or judgments. A proposed Order is attached.

Respectfully submitted,

OFFICE OF DISCIPLINARY COUNSEL

Thomas J. Farrell
Chief Disciplinary Counsel

By [signature]

Anthony P. Sodroski
Disciplinary Counsel-in-Charge,
Special Projects
1601 Market Street, Suite 3320
Philadelphia, PA 19103
(215) 560-6296

# IN THE SUPREME COURT OF PENNSYLVANIA

| | |
|---|---|
| In the Matter of | : No. 2918 Disciplinary Docket No. 3 |
| LARRY ELLIOT KLAYMAN | : No. 141 DB 2022 |
| | : (District of Columbia Court of Appeals, No. 20-BG-583) |
| | : Attorney Registration No. 54628 |
| | : (Out of State) |

## ORDER

**PER CURIAM**

**AND NOW**, this day of , 2024, after consideration of Respondent's request to continue the stay imposed by the Court on February 2, 2023, and Office of Disciplinary Counsel's answer, it is hereby ORDERED that the stay shall remain in effect. Within ten days of the date or filing of a final order, opinion or judgment of the District of Columbia Court of Appeals, or any dispositive ruling on a timely petition for reconsideration thereof, whichever occurs later, Respondent shall notify this Court's Prothonotary, Western District Office, with copy to Office of Disciplinary Counsel, that the appeal to the District of Columbia Court of Appeals has been concluded, and provide a copy of all orders, opinions or judgments.

IN THE SUPREME COURT OF PENNSYLVANIA

| | |
|---|---|
| In the Matter of | : No. 2918 Disciplinary Docket No. 3 |
| LARRY ELLIOT KLAYMAN | : No. 141 DB 2022 |
| | : (District of Columbia Court of Appeals, No. 20-BG-583) |
| | : Attorney Registration No. 54628 |
| | : (Out of State) |

PROOF OF SERVICE

I hereby certify that I am this day serving the foregoing document upon the person and in the manner indicated below, which service satisfies the requirements of Pa.R.A.P. 121:

Service by First Class Mail
addressed as follows:

Larry Elliot Klayman
7050 W. Palmetto Park Road
Boca Raton, FL 33433

Service by email to:

leklayman@gmail.com

(Respondent)

Date: April 22, 2024

Anthony P. Sodroski
Attorney Registration No. 32463
Disciplinary Counsel-in-Charge,
Special Projects

**CERTIFICATE OF COMPLIANCE**

I certify that this filing complies with the provisions of the *Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts* that require filing confidential information and documents differently than non-confidential information and documents.

Submitted by: Office of Disciplinary Counsel

Signature: Anthony P. Sodroski

Name: Anthony P. Sodroski, Counsel-in-Charge, Special Projects

Attorney No. (if applicable): 32463

# *United States Court of Appeals*

FIFTH CIRCUIT
OFFICE OF THE CLERK

LYLE W. CAYCE
CLERK

TEL. 504-310-7799
600 S. MAESTRI PLACE
NEW ORLEANS, LA 70130

December 8, 2022

Larry Klayman
7050 W. Palmetto Park Road
Boca Raton, FL 33433

Dear Mr. Klayman:

Further to your response to this Court's Order to Show Cause, please be advised that the order of suspension became final on December 7, 2022. However, the Court has chosen to withdraw the suspension order and hold this Court's reciprocal disciplinary proceeding against you in abeyance pending final disposition of your Superior Court Rule 60 complaint and writ of mandamus or certiorari petition proceedings.

Please advise this Court when the above-referenced proceedings are concluded. Failure to keep this Court informed of the status of the proceedings may result in the imposition of reciprocal discipline without further notice.

Please find enclosed a copy of an order withdrawing the order of suspension.

Very truly yours,

LYLE W. CAYCE, Clerk

By /s/ Melissa Shanklin
Melissa Shanklin, Deputy Clerk

Enclosure

# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit
**FILED**
December 8, 2022
Lyle W. Cayce
Clerk

**ORDER**

On November 2, 2022 this Court issued an order directing Larry E. Klayman to show cause why his right to practice before this Court should not be suspended reciprocal to a September 15, 2022 order of suspension issued by the District of Columbia Court of Appeals. This Court's self-executing show cause suspension order became effective December 7, 2022.

At the direction of the Chief Judge, IT IS ORDERED that the order of suspension hereby is WITHDRAWN.

LYLE W. CAYCE, Clerk
United States Court of Appeals for the Fifth Circuit

By Melissa Shanklin
Melissa Shanklin, Deputy Clerk

FOR THE COURT - BY DIRECTION
Address:
Clerk of Court,
U.S. Court of Appeals for the Fifth Circuit
F. Edward Hebert Building
600 S. Maestri Place
New Orleans, LA 70130

UNITED STATES COURT OF APPEALS FIFTH JUDICIAL CIRCUIT

**A True Copy**
**Certified Dec 08, 2022**
Lyle W. Cayce
**Clerk, U.S. Court of Appeals, Fifth Circuit**

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

IN RE: LARRY KLAYMAN Case No. 3:22-mc-14-JRK

______________________________________

**ORDER**

In response to this Court's Order entered January 13, 2023 (Doc. No. 3), Mr. Klayman filed an interim response (Doc. No. 4), and then an updated petition (Doc. No. 5), and also submitted a USB drive containing the record of the prior disciplinary proceedings in the District of Columbia. That record needs to be made part of this record. **The Clerk** is directed to **file** in the above-captioned matter all documents included in the USB drive submitted by Mr. Klayman on about January 27, 2023.

Mr. Klayman also filed a "Motion to the Chief Judge, the Honorable Timothy J. Corrigan, to Stay" (Doc. No. 6; "Motion"), on February 3, 2023. At Judge Corrigan's request, the undersigned is designated to decide the Motion. Upon review of the Motion and Mr. Klayman's other filings, the Motion is **GRANTED** to the extent that this matter is **STAYED pending further Order**.

Mr. Klayman is **DIRECTED** to immediately provide this Court with copies of any materials he provides to the United States Court of Appeals for the Fifth Circuit in response to the Clerk of that Court's December 8, 2022 letter to him directing that he advise that Court when the proceedings in the District of Columbia Superior Court are concluded and when the writ of mandamus or certiorari proceedings are concluded. **Mr. Klayman is advised that the failure to keep this Court informed of the status of those proceedings or any material change in circumstance may result in the imposition of reciprocal discipline without further notice.**

**DONE AND ORDERED** in Jacksonville, Florida on February 6, 2023.

James R. Klindt
JAMES R. KLINDT
United States Magistrate Judge

kaw
Copies to:
Hon. Timothy J. Corrigan
Chief U.S. District Judge
Middle District of Florida

Larry Klayman, Esquire

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

IN RE: LARRY E. KLAYMAN § Misc. No. 3:20-MC-043-B

Before FITZWATER, Senior District Judge, and BOYLE and O'CONNOR, District Judges.

**ORDER**

The hearing in this reciprocal discipline matter set for Tuesday, February 21, 2023, at 10:00 a.m. is vacated.

Respondent Larry E. Klayman, Esquire is directed to provide this panel with copies of any materials that he hereafter provides to the United States Court of Appeals for the Fifth Circuit in response to the December 8, 2022 letter to him from the clerk of that court directing that he advise that court when the proceedings in the District of Columbia Court of Appeals are concluded and that he keep the Fifth Circuit informed of the status of the proceedings in the District of Columbia Court of Appeals.

**SO ORDERED.**

January 11, 2023.

FOR THE PANEL

SIDNEY A. FITZWATER
SENIOR JUDGE

# EXHIBIT 3

**IN THE SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
**CIVIL DIVISION**

| | |
|---|---|
| LARRY KLAYMAN, an individual<br>7050 W. Palmetto Park Road<br>Boca Raton, FL, 33433<br><br>Plaintiff,<br>v.<br><br>ELHAM SATAKI<br>4141 Crisp Canyon Road #317<br>Sherman Oaks, CA, 91403<br><br>And<br><br>HAMILTON FOX<br>c/o 515 Fifth Street NW<br>Building A, Suite 117<br>Washington, DC 20001<br><br>And<br><br>ELIZABETH HERMAN<br>c/o 515 Fifth Street NW<br>Building A, Suite 117<br>Washington, DC 20001<br><br>And<br><br>H. CLAY SMITH, III<br>c/o 515 Fifth Street NW<br>Building A, Suite 117<br>Washington, DC 20001<br><br>And<br><br>JULIA PORTER<br>c/o 515 Fifth Street NW<br>Building A, Suite 117<br>Washington, DC 20001<br><br>And<br><br>OFFICE OF DISCIPLINARY COUNSEL<br>515 Fifth Street NW<br>Building A, Suite 117<br>Washington, DC, 20001<br><br>And<br><br>MATTHEW KAISER<br>1099 14th St NW | Case No.:2022-CAB-005235<br><br>**AMENDED COMPLAINT** |

Washington DC 20005

And

MICHAEL E. TIGAR
601 W Rosemary St #317
Chapel Hill, NC, 27516

And

WARREN ANTHONY FITCH
3930 Georgetown Court NW #602
Washington DC 20007

Defendants.

## I. INTRODUCTION

1. Plaintiff Larry Klayman ("Mr. Klayman") brings this action against individual Defendants Hamilton Fox ("Defendant Fox"), Elizabeth Herman ("Defendant Herman"), H. Clay Smith III ("Defendant Smith"), Julia Porter ("Defendant Porter"), Office of Disciplinary Counsel ("ODC"), Matthew Kaiser ("Defendant Kaiser), Michael Tigar ("Tigar"), and Warren Anthony Fitch ("Fitch") (collectively "Bar Defendants") and Elham Sataki ("Defendant Sataki") pursuant to D.C. Superior Court Civil Rule 60(d) which states that "[t]his rule does not limit a court's power to: (1) entertain an independent action to relieve a party from a judgment, order, or proceeding; or (2) set aside a judgment for fraud on the court." (hereinafter "Rule 60").

## II. PARTIES

2. Plaintiff Larry Klayman is an individual, a natural person. Mr. Klayman is at all relevant times a citizen and resident of the state of Florida.

3. Defendant Sataki is an individual, a natural person. Defendants Sataki is a citizen and resident of California.

4. Defendant Hamilton Fox is an individual, a natural person. At all material times, Defendant Fox was employed by ODC as Bar Disciplinary Counsel. Defendant Fox is a citizen and resident of the District of Columbia.

5. Defendant Elizabeth Herman is an individual, a natural person. At all material times, Defendant Herman was employed by ODC. Defendant Herman as a Deputy Bar Disciplinary Counsel and is a citizen and resident of the District of Columbia

6. Defendant H. Clay Smith III is an individual, a natural person. At all material times, Defendant Smith was employed by ODC as Assistant Bar Disciplinary Counsel Defendant Smith is a citizen and resident of the District of Columbia

7. Defendant Julia Porter is an individual, a natural person. At all material times, Defendant Porter was employed by ODC as Deputy Bar Disciplinary Counsel. Defendant Porter is a citizen and resident of the District of Columbia

8. Defendant Office of Bar Disciplinary Counsel serves as the chief prosecutor for attorney disciplinary matters, and purports to have a dual function: "to protect the public and the courts from unethical conduct by members of the D.C. Bar and to protect members of the D.C. Bar from unfounded complaints."

9. Defendant Tigar is an individual, natural person. Defendant Tigar was at all material times a member of the Ad Hoc Hearing Committee ("AHHC") in the disciplinary proceeding styled *In re Klayman*, 20-BG-583 (D.C.C.A.) (the "Sataki Matter"). Defendant Tigar is a citizen and resident of North Carolina.

10. Defendant Fitch is an individual, natural person. Defendant Fitch was at all material times a member and chairperson of the AHHC in the Sataki Matter. Defendant Fitch is a citizen and resident of Washington D.C.

11. Defendant Kaiser is an individual, natural person. Defendant Kaiser was at all material times the chairperson of the District of Columbia Board on Professional Responsibility ("Board."), which oversees ODC and the AHHC. Defendant Kaiser is a citizen and resident of the District of Columbia

## III. STANDING

12. Mr. Klayman has standing to bring this action because he has been directly affected by the unlawful conduct complained herein. His injuries are proximately related to the conduct of Defendants. Mr. Klayman also has standing under Rule 60 to challenge the Suspension Order and Judgment of September 15, 2022 issued by the District of Columbia Court of Appeals.

## IV. FACTS

13. On September 15, 2022, the District of Columbia Court of Appeals ("DCCA") suspended Mr. Klayman for a period of eighteen (18) months with a reinstatement provision (the "Suspension Order" or "Judgment") - notwithstanding the fact that Mr. Klayman had already been serving an unwarranted and unconstitutional "temporary suspension" for the twenty (20) prior months – stemming from his representation of Defendant Sataki back in 2010. This Suspension Order and Judgment was the direct and proximate result of fraud by Defendant Sataki and the ODC Defendants – Defendants ODC, Fox, Porter, Herman, and Smith – at every single level of this disciplinary proceeding that mandate action under Rule 60. This fraud was furthered by Defendants Tigar, Fitch, and Kaiser. Defendants were driven by an extrajudicial bias and animus based on both ideology, politics and gender and their singular and admitted goal to remove Mr. Klayman from the practice of law.

14. This instant action is therefore a continuation of *In re Klayman*, 20-BG-583 (D.C.C.A), as Mr. Klayman is simply seeking relief from judgment under Rule 60, and is therefore not a new action.

15. Notwithstanding the egregious fraud that has infected this proceeding that mandate vacatur under Rule 60, it is also important for the Court to understand that the completely frivolous and meritless nature of Defendant Sataki's Complaint.

16. *First,* Defendant Sataki had filed identical bar complaints in Florida and Pennsylvania in or around October of 2011, and both of these jurisdictions summarily dismissed the complaints as entirely frivolous and meritless.

17. *Second*, Mr. Klayman provided ODC with an opinion from one of the preeminent legal scholars and experts on the subject of legal ethics, the late Ronald Rotunda, that clearly showed (1) that Defendant Sataki's allegations were frivolous and meritless, and (2) that in any event, the extreme delay from ODC in instituting this matter – the Specification of Charges was filed on July 20, 2017, approximately seven years after the events in question – ODC was time barred from pursuing Defendant Sataki's Complaint against Mr. Klayman. Exhibit 1; *Opinion of Ronald Rotunda*.

***Facts Pertaining to Mr. Klayman's Representation of Defendant Sataki***

18. On November 2, 2010, exactly 12 years ago, a Complaint was filed against Mr. Klayman with the ODC, styled *In re: Klayman*, Bar Docket No. 2011-D028. (the "Sataki Complaint").

19. The Sataki Complaint was implemented as the result of a complaint prepared and filed by non-lawyers on by or on behalf, one of which was a convicted felon by the name of Sam Razavi.

20. Defendant Sataki did not identify who prepared and filed her operative complaint, but later it was disclosed that it was filed by Sam Razavi, her cousin, who uses many aliases and is a convicted felon over gambling fraud in Las Vegas, Nevada.

**21.** The Sataki Complaint was based on Mr. Klayman's representation of Defendant Sataki's interests in an alleged sexual harassment and workplace retaliation action against her former employer, Voice of America ("VOA Lawsuit") in case styled *Sataki v. Broadcasting Board of Governors, et al*, 1:10-cv-00534 (D.D.C). This was a lawsuit brought pursuant to *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388 (1971), against the governors of the Broadcasting Board of Governors ("BBG").

22. The scope of Mr. Klayman's services, performed along with Defendant Sataki's union representative and president, Mr. Tim Shamble ("Mr. Shamble") included, *inter alia*, attempted settlement discussions, the filing of an administrative EEO/VOA Office of Civil Rights ("OCR") complaint, lobbying congressmen and senators to intervene on Defendant Sataki's behalf, engaging in approved publicity by Defendant Sataki to try to coax a settlement, and filing the VOA Lawsuit in the U.S. District Court for the District of Columbia ("District Court") to preserve the "status-quo" while the EEO/OCR complaint proceeded administratively.

23. The VOA Lawsuit, which was also filed with Defendant Sataki's knowledge and consent, and which sought to ask the District Court to put Defendant Sataki to work at another VOA office in Los Angeles - away from her alleged harasser – was eventually improperly dismissed by the District Court, without even providing an evidentiary hearing.

24. Furthermore, the EEO/OCR administrative complaint was ultimately not successful, as after a thorough investigation, the OCR found that Defendant Sataki's allegations

of sexual harassment and workplace retaliation never actually occurred. Of course, Mr. Klayman did not know this at the time, and therefore believed her and agreed to represent her.

25. Prior to and during the course of Mr. Klayman's representation of Defendant Sataki, he developed a close friendship with her, within the bounds of the relevant rules of professional responsibility and ethics.

26. At the time, Mr. Klayman sympathized with Defendant Sataki's apparent plight, as she had claimed to be destitute and stuck in an untenable work situation. Mr. Klayman was himself going through a difficult time in his life, and therefore identified with Defendant Sataki's alleged problems. This motivated Mr. Klayman to work extremely diligently on Defendant Sataki's behalf, pro bono.

27. As a close friendship developed further during the course of the legal representation, Mr. Klayman took it upon himself to help Defendant Sataki, including moving her out to Los Angeles to escape her alleged harasser, paying for her apartment, and other expenses, at a personal cost of about $ 30,000, and even finding psychologists for her and paying for some of her psychological counseling, for which she was otherwise insured.

28. Defendant Sataki, however, began to exploit and take advantage of her close friendship with Mr. Klayman, at one point asking Mr. Klayman to purchase a car for her. Mr. Klayman declined to do so.

29. Specifically, as a "final straw," Defendant Sataki's requested that Mr. Klayman purchase a car for her and her other actions led Mr. Klayman to realize that he could not continue legal representation of Defendant Sataki. Mr. Klayman thus suggested that it would be best if Defendant Sataki found new counsel to represent her in her claims against VOA.

30. Mr. Klayman even referred Defendant Sataki to his personal friend, Gloria Allred, Esq., a famous, accomplished and highly successful women's rights legal advocate, as well as Tim Shea, Esq., legal specialist in VOA matters, who had come suggested by Mr. Shamble. Defendant Sataki however insisted that Mr. Klayman continue to represent her.

31. When Defendant Sataki's complaints against VOA did not yield immediate results, Defendant Sataki became more difficult, demanding, belligerent, frequently disrespectful, and hard to reach.

32. Due to this, Mr. Klayman suggested that they memorialize their attorney-client relationship with a contingent fee agreement, but no agreement was ever reached in this regard, meaning that at all times, Mr. Klayman represented Defendant Sataki *pro bono*.

33. Mr. Klayman and Mr. Shamble were unable to reach Defendant Sataki after this point, and in an abundance of caution, Mr. Klayman filed at his further expense on Defendant Sataki's behalf, an appeal to the U.S. Court of Appeals to the District of Columbia Circuit, regarding the District Court's dismissal of the VOA Lawsuit in order to ensure that Defendant Sataki's right of appeal was protected and not lost.

34. At the end of the day, Defendant Sataki was not able to obtain relief through either the EEO/OCR process or the District Court, but not due to lack of effort from Mr. Klayman, who worked extremely diligently on her behalf, even on a *pro bono* basis.

35. Ultimately, OCR, which did a thorough investigation of Defendant Sataki's sexual harassment and workplace retaliation claims, made the finding that this alleged sexual harassment and workplace retaliation never occurred, and therefore was simply made up by Defendant Sataki – the first in a series of proven false statements by Defendant Sataki.

***Facts Pertaining to Defendant Sataki's Complaint Against Mr. Klayman***

36. On November 2, 2010, exactly twelve years ago, Defendant Sataki filed and later supplemented with ODC a complaint against Mr. Klayman – as set forth previously - regarding the VOA lawsuit ("Sataki Complaint") pertaining to his other pro bono representation.

37. Again, of great import, Defendant Sataki filed her bar complaint in November 2010 which was later supplemented by non-lawyers, with identical corresponding complaints sent to The Florida Bar and the Pennsylvania Bar at that time, both of which were summarily dismissed about eleven years ago because they were not based upon fact or law, much less the clear and convincing evidence required to substantiate these types of claims.

38. Nevertheless, ODC sent Defendant Sataki a letter dated July 7, 2011 containing Mr. Klayman's response, with explicit instructions that "[i]f we do not hear from you promptly, we may assume that you are satisfied with the attorney's explanations."

39. Afterwards, Defendant Sataki abandoned the Sataki Complaint, as evidenced by ODC's own internal correspondence, admissions and policy.

40. On January 15, 2014, Defendant Smith sent an email to ODC investigators Chuck Anderson and Kevin O'Connell, stating, "I am trying to locate a complainant [Defendant Sataki] that has dropped off the map…She filed a complaint vs. Larry Klayman in 2011. Her only correspondence with us was the ethical complaint that she filed."

41. Then, Defendants, for their own unethical, unconstitutional, illegal, and tactical reasons, outrageously and incredibly resurrected Defendant Sataki's complaint seven (7) years later, waiting until July 20, 2017 to file the Specification of Charges in this case. During this time period, believing that the Complaints before ODC had also been dismissed, as they had been in Florida and Pennsylvania, Mr. Klayman understandably did not retain the files necessary to

defend himself. In addition, during this interim time period, relevant documents were discarded, witnesses moved, and memories faded.

42. A draft of the Specification of Charges was prepared even before Mr. Klayman was given an opportunity to file a supplemental response, which evidence ODC's punitive and biased mindset and improper, unethical, unconstitutional and illegal motivations, all in violation of accepted norms concerning statutes of limitations, laches, and other laws.

43. Before the Specification of Charges was filed on July 20, 2017, Mr. Klayman received a phone call from Defendant Smith where Defendant Smith informed him that ODC was likely be going to institute the Sataki Complaint. Mr. Klayman was shocked, as he believed that ODC had dismissed the Sataki Complaint, much like what The Florida Bar and Pennsylvania Bar had done since he had not heard from them in the intervening seven year period. Mr. Klayman had already discarded crucial documents pertaining to his representation of Defendant Sataki, as he believed the matter was behind him.

44. Defendant Smith was sympathetic to Mr. Klayman and said that pursuing the Sataki Complaint was "out of his hands," and therefore appeared to be doing the bidding of his superiors at ODC, which Mr. Klayman at the time believed to be Deputy Disciplinary Counsel, Defendant Herman. Mr. Klayman therefore set a meeting with Defendant Herman and Mr. Smith in order to discuss the Sataki Complaint.

45. On July 28, 2017, Mr. Klayman met with Defendant Herman and Defendant Smith in order to try to explain his position in a polite and civil manner. However, he was met with an extremely hostile and disrespectful demeanor by Defendant Herman, who clearly had no interest in resolving the issues. Defendant Herman abruptly and in a hostile voice refused to say

whether she had had contact and/or met with Ms. Sataki. In fact, she told Mr. Klayman that this was "none of his business."

46. Furthermore, Defendant Herman's brazenly and openly admitted her bias and animus against Mr. Klayman due to his political beliefs, activism, free speech, and gender, which explains her participation in her baseless prosecution against him, when she curtly and in a hostile manner, on more than one occasion, stated to Mr. Klayman, "I [we] don't like the way you practice law."

47. Furthermore, when Mr. Klayman advised Defendant Herman at the same meeting that The Florida Bar and the Pennsylvania Bar had summarily dismissed Ms. Sataki's claims, she on behalf of Defendants stated that "we could care less."

48. Pursuant to the District of Columbia's one-party consent laws, Mr. Klayman recorded this meeting with Defendant Herman. Seeing that he was not going to be able to get anywhere by speaking with Defendant Herman, Mr. Klayman then sought a meeting with Disciplinary Counsel, Defendant Fox, who was Defendant Herman's superior. Mr. Klayman believed at the time that Defendant Herman was solely behind the baseless resurrection of Defendant Sataki's Complaint, and that by speaking with Defendant Fox he would be able to resolve the issues.

49. On September 29, 2017, Mr. Klayman was finally able to meet with Defendant Fox, where Defendant Fox set the tone of the meeting by refusing to hear from Mr. Klayman why the Sataki complaint should not be instituted.

50. Then, in a subsequent meeting on May 11, 2018 to discuss the Sataki Complaint, which Mr. Klayman had asked for to disclose evidence of bias and misconduct by Deputy Bar

Counsel Herman Defendant Fox acted with extremely hostility towards Mr. Klayman and shouted that he had no interest in discussing anything.

51. Mr. Klayman was surprised to find that both Defendant Deputy Bar Counsel, Defendant Porter, and ODC's described investigator, Kevin O'Connell would be present in the meeting, which had not been disclosed previously.

52. From the outset, Defendant Fox immediately and belligerently stated that he was not going to hear anything about or discuss dismissal of the Specification of Charges

53. Mr. Klayman calmly responded that he would not be dictated to as to what he could discuss. This prompted Defendant Fox to stand up threateningly and scream "this meeting is over" and that Mr. Klayman "should leave [his] office."

54. When Mr. Klayman got up from his chair, he indicated that this gross prosecutorial misconduct would leave him no recourse but to resort to legal action.

55. Defendant Fox then charged at Mr. Klayman at the door of his office as Mr. Klayman was leaving, as if to physically assault him and screamed, "I welcome your complaint," adding in a hostile voice, "do you seriously believe that I would not welcome the opportunity through discovery to show how you practice law."

56. This more than confirmed to Mr. Klayman that each and every ODC Defendant, acting at the direction of Defendant Fox, harbored improper motivations towards Mr. Klayman and that they had decided that they were going to try to unlawfully attempt to remove Mr. Klayman from the practice of law, by whatever unprofessional, unethical, unconstitutional, and illegal means are used to "justify" these ends.

***Facts Pertaining to Defendants' Highly Politicized Motivations***

57. ODC had previously been run by Bar Disciplinary Counsel Wallace "Gene" Shipp prior to his retirement in 2017. During Mr. Shipp's tenure, ODC had been what it was supposed to be – a fair, unbiased, and neutral body. Once Defendant Fox took over, everything changed, and ODC became weaponized ad morphed into a highly politicized tool to remove conservative and Republican activist attorneys like Mr. Klayman from the practice of law.

58. This explains why Defendant Sataki's Complaint sat dormant and thus abandoned for seven years until Defendant Fox took over. It is clear that Defendant Fox ordered ODC and his deputies Herman and Porter, as well as Assistant Bar Disciplinary Counsel Clay Smith, to revive the abandoned Sataki Complaint in order to try to remove Mr. Klayman from the practice of law.

59. The ODC Defendants, since Defendant Fox arrived, have engaged in a pattern and practice of abusing and exceeding their position of authority, which is granted under state law, which authority is not to act outside the scope of their official duties and intentionally to violate the constitutional and other rights of bar members such as Mr. Klayman by selectively prosecuting them because of their political activism and free speech as well as other bases such as gender.

60. Mr. Klayman is a prominent conservative and non-partisan attorney and public interest activist who has brought lawsuits against Hillary Clinton, Barack Obama, George W. Bush, and other politicians and government officials. He conceived of and founded the prominent public interest watchdogs, Judicial Watch, Inc. and Freedom Watch, Inc., and is a former U.S. Department of Justice federal prosecutor, having been on the trial team which broke up the AT&T monopoly during the Reagan administration. In 2003-2004, he ran for the U.S. Senate in the Florida Republican Primary. Mr. Klayman is also the only lawyer to ever have a

court rule that a president, former President Bill Clinton, had committed a crime, when he illegally released the Privacy Act protected White House government file of a woman he had allegedly sexually abused and harassed in the Oval Office. Her name is Kathleen Willey. Mr. Klayman has also represented Juanita Broaddrick, Gennifer Flowers, Paula Jones, Dolly Kyle Browning, and other Bill Clinton female victims, who Hillary Clinton is alleged to have retaliated against and tried to destroy to advance her and her husband's political interests. Mr. Klayman is a supporter of and legal advocate for women's rights. At Freedom Watch, which he founded, he successfully enjoined the National Security Agency during the Obama administration over its unconstitutional mass surveillance and later played a prominent role in invalidating President Obama's illegal executive order granting amnesty to over 5 million illegal aliens. This latter case went all the way to the U.S. Supreme Court. In sum, Mr. Klayman has had a very successful career as a public interest legal advocate.

61. On the other hand, even a quick search of FEC records shows that Defendant Fox, as well as Defendant Herman both donated significant sums of monies to Hillary Clinton and Barack Obama as well as other liberal Democrats, many of whom Mr. Klayman brought suit against as a public interest advocate.

62. ODC, especially during the Trump years and thereafter in the wake of the 2020 presidential election in particular, filed, accepted and initiated ethics complaints against Trump White House Counsellor Kellyanne Conway[1] over remarks she made on cable news, against former Trump Attorney General William Barr[2] (this partisan complaint was incredibly filed by all four (4) prior presidents of the District of Columbia Bar as well as a former Senior Bar

[1] https://www.washingtonpost.com/politics/law-professors-file-misconduct-complaint-against-kellyanne-conway/2017/02/23/442b02c8-f9e3-11e6-bf01-d47f8cf9b643_story.html

[2] https://thehill.com/regulation/court-battles/508489-more-than-two-dozen-dc-bar-members-urge-disciplinary-probe-of-ag

Counsel) for withdrawing the indictment of General Mike Flynn and for remarks he made on Fox News, Senators Ted Cruz[3] and Josh Hawley[4] over their role in advocating for President Trump in the last election, and of course former U.S. Attorney Rudy Giuliani, who was temporarily suspended without even a hearing,[5] over his representation of President Trump, to name just a few. And, Defendant Fox himself personally charged former Justice Department attorney Jeffrey Clark with disciplinary action stemming from his relationship with Donald Trump. Exhibit 7. To the contrary, and as just one of many examples of selective prosecution, when an ethics complaint was filed against Defendants counsel, Mark MacDougall, for making false statements in court pleadings, and fellow leftist Democrat lawyer David Kendall of Williams & Connolly over his admitted involvement in the destruction of Hillary Clinton's 33,000 emails illegally retained on a private server, which complicity is not even in dispute, the ODC, under the "leadership" of Defendant Fox, turned a blind eye toward their ideological "soul brothers." The MacDougall complaint and the Kendall complaints thus were characteristically dismissed. Most notably and telling, the ODC summarily and quickly rejected the complaint filed by conservative lawyer and public interest advocate Ty Clevenger against Hillary Clinton. The ODC then sought to disbar Mr. Clevenger – that is until they drove him into submission due to the cost of defending himself, and he simply resigned.[6]

63. The fact that Mr. Klayman and numerous prominent Republican and conservative

---

[3] https://www.texasstandard.org/stories/lawyers-law-students-officially-file-grievances-seeking-to-disbar-senator-ted-cruz/

[4] https://thehill.com/homenews/state-watch/534783-attorneys-urge-missouri-supreme-court-to-probe-hawleys-actions

[5] https://www.law.com/newyorklawjournal/2021/03/03/nyc-bar-details-complaints-calling-for-full-attorney-discipline-investigation-of-giuliani/#:~:text=Under%20the%20New%20York%20state,censured%20or%20receive%20no%20punishment.

[6] Ty Clevenger, State bar prosecutors are flouting the law, protecting Hillary Clinton and her lawyers, LawFlog, available at: https://lawflog.com/?p=1389

activist attorneys, have become targeted for "legal extermination" in the District of Columbia has even been observed by Harvard law professor emeritus Alan Dershowitz's latest book, "Get Trump," which compared the state of affairs to the "kind of ridicule that suspected communists faced during the era of Sen. Joe McCarthy in the 1950s."[7] Professor Dershowitz stated:

> If you are perceived as enabling Trump in the in the [left-wing] communities of New York and Washington, D.C., your personal life will be affected; and judges are influenced by that....That's why there cannot be a trial of Trump either in Manhattan or in the District of Columbia, because no judge will have the courage to throw out the case and have their personal and family and professional lives ruined. We are living in an age of left-wing McCarthyism, and I went through the original McCarthyism. This is extraordinarily dangerous.

Specifically, in "Get Trump" Dershowitz opined:

> In addition to targeting Donald Trump himself, the "Get Trump" campaign is also out to get his lawyers and anyone associated with him. The targeting of his lawyers is especially troubling, since it implicates the Sixth Amendment right to effective assistance of counsel. Good lawyers are understandably afraid of becoming the subjects of criminal or bar investigation if they dare to defend Trump. Even I, who has never been suspected or accused of any misconduct during my representation of Trump in the Senate, have been subject to punishment, cancellation, and a bar complaint. My family, too, has been attacked. Several first-rate lawyers have told me that they don't want to be "Dershiwitzed" – that is, subjected to the kind of punishments to which I have been subjected. *Id*. at 8.
>
> In at least one respect, the current attacks on our fundamental rights by "Get Trump" zealots are even more dangerous than the past attacks on our fundamental rights by McCarthyites. McCarthyites were generally old men who represented America's past. McCarthyism lasted less than a decade and its effects were quickly overcome. *Id*. at 10.

64. The highly politicized nature of ODC lends itself to only one possible conclusion; that Defendants "packed" the Ad Hoc Hearing Committee with persons that were ideological foes to Mr. Klayman. This included Defendant Tigar – a proud and avowed communist, Exhibit

[7] Michael Katz, Dershowitz to Newsmax: Left-Wing McCarthyism Targets Trump Defenders, Newsmax, Mar. 24, 2023, available at https://www.newsmax.com/newsmax-tv/alan-dershowitz-left-wing-mccarthyism/2023/03/24/id/1113761/

2 – and Defendant Fitch, was openly deferential to Defendant Tigar and himself highly politicized and leftist.

65. Bob Woodward wrote in his book about the Supreme Court, titled *The Brethren,* that Defendant Tigar in his early career had been fired, at the urging of J. Edgar Hoover, from his High Court clerkship by Justice William Brennan for his subversive communist ties. Exhibit 2.

66. Defendant Tigar's book, *Mythologies of State and Monopoly Power*, a Marxist rant against capitalist law, relishes his time with Fidel and the Castro brothers. His proud thank you letters from Fidel and a photo with his revolutionary brother Ramon is even housed in the archives of the University of Texas School of Law. Exhibit 2.

67. Then after ensuring that Mr. Klayman stood no chance at the AHHC level, the Sataki Complaint went to the Board, whose president, Defendant Kaiser, has openly publicized his political beliefs, having penned articles for the leftist legal publication "Above the Law," extolling the virtues of Hillary Clinton and trashing Donald Trump.[8]

68. As conclusive evidence of the fact that the Defendants are driven by their political ideology and affiliations, the Report and Recommendation of the Board was hyper-fixated on and incredibly angered and offended by the fact that the lawsuit that Mr. Klayman filed on behalf of Defendant Sataki named Hillary Clinton as a Defendant, despite the fact that it was a *Bivens* Complaint against all of governors of the BBG, and also included a conservative and Mr. Klayman's personal friend, Blanquita Collum, as a Defendant. Thus, it was clear that Clinton was not included for political purposes, but out of necessity. This did not stop the Defendants from taking great umbrage, however.

[8] https://abovethelaw.com/2016/08/hillary-clinton-truthfulness-and-bias-in-white-collar-cases/; https://abovethelaw.com/2016/07/trump-and-tyranny/

69. Furthermore, as the as the final "nail in the coffin," confirming the Defendants' politically motivated bias and prejudice, the Court need not look any further than the completely disparate "selective prosecutorial" treatment afforded by the Defendants to one Kevin Clinesmith in handling *In Matter of Kevin E. Clinesmith*, 21-BG-018 (D.C. App.).

70. In that case, Kevin Clinesmith—the former senior FBI lawyer who dishonestly falsified a surveillance document which helped trigger the Trump-Russia investigation and who pled guilty to felony charges—was completely ignored by ODC, and only temporarily suspended for five months after he pled guilty, and only after ODC's "blind eye" was uncovered and subjected to negative publicity. Clinesmith also did not submit any affidavit under Rule 14(g) for five (5) months after he was suspended. Despite this, not only did the D.C. attorney disciplinary apparatus fast-track if not whitewash his case—clearly in order to minimize his temporary suspension period —the D.C. Court of Appeals let Clinesmith off with "time served" in just seven (7) months. And importantly, the Court imposed no reinstatement provision on Clinesmith, despite him literally being a convicted felon. Attached hereto as Exhibit 3 is an article detailing this cover-up and the D.C. Court of Appeals' opinion in *In Matter of Kevin E. Clinesmith*, 21-BG-018 (D.C. App.). Had Clinesmith been treated in an unbiased and non-preferential fashion by the D.C. Bar disciplinary apparatus, run by Defendant Fox at ODC, and Defendant Kaiser of the Board of Professional Responsibility, he would have surely been permanently disbarred as the convicted dishonest felon was convicted to be.

***Facts Pertaining to Fraudulent Misconduct***

71. At the disciplinary hearing in the Sataki Matter, the ODC Defendants and Defendant Sataki conspired and worked together in concert to suppress material evidence and suborned and provided perjurious testimony to the AHHC.

72. These fraudulent actions tainted and infected the entire disciplinary proceeding, as they were allowed to remain on the record due to the actions of Defendants Tigar, Fitch, and Kaiser. These fraudulent actions therefore directly and proximately caused the entire Suspension Order and Judgment, and therefore the only possible remedy is to "throw the baby out with the bathwater," or in other words, to vacate the Suspension Order and Judgment in its entirety.

73. This was furthered by Defendants Tigar and Fitch on the AHHC, as they repeatedly denied Mr. Klayman leave to conduct discovery, which allowed the ODC Defendants and Defendant Sataki to suppress material evidence and provide perjurious testimony, as Mr. Klayman did not have the benefit of discovery to uncover suppressed evidence and obtain the truth.

74. Then, when exculpatory material evidence was independently discovered by Mr. Klayman's legal team after the disciplinary hearing, the head of the Board on Professional Responsibility, Defendant Kaiser played his part by refusing to reopen the record or to even consider the newly discovered exculpatory evidence in order to ensure that the ODC Defendants and Defendant Sataki would not be held accountable for their illegal and unethical conduct.

75. The conduct set forth herein constitutes a fraud on the court, as it sets forth a deliberately planned and carefully executed scheme amongst the Defendants to defraud the attorney discipline process. Defendant Sataki and the ODC Defendants' role was to get the perjurious testimony onto the record, in addition to suppressing material evidence. Then, Defendants Tigar, Fitch, and Kaiser sprung into action and ensured that the record presented to the DCCA would include Defendant Sataki's perjurious testimony, and would not contain key exculpatory evidence that was suppressed by Defendants Sataki and the ODC Defendants.

76. Defendants Tigar and Fitch's role was to ensure that Mr. Klayman was denied even basic discovery - which would have allowed him to contemporaneously refute Defendant Sataki's perjurious statements as well as discovery the exculpatory evidence that was illegally suppressed by Defendant Sataki and the ODC Defendants.

77. After getting past the AHHC stage with the cooked record, Defendant Kaiser then stepped in when exculpatory material evidence was independently discovered by Mr. Klayman's legal team after the disciplinary hearing. As the head of the Board on Professional Responsibility, Defendant Kaiser played his part by refusing to reopen the record or to even consider the newly discovered exculpatory evidence in order to ensure that the ODC Defendants and Defendant Sataki would not be held accountable for their illegal and unethical conduct.

78. All of this was done with the understanding and agreement amongst all of the Defendants that any key witness testimony and conclusive evidence presented by Mr. Klayman would be ignored, minimized, or disregarded. In doing so, the Defendants ensured that record presented to the DCCA would be filled with uncorrected perjurious statements and devoid of exculpatory evidence, thereby forcing the DCCA's hand to simply adopt the Board's cooked, fatally flawed Report.

79. The scheme is set forth in detail herein.

80. *First*, Ms. Sataki gave the fraudulent testimony that she had not approved of engaging in publicity. On May 31, 2018, Ms. Sataki gave the following fraudulent testimony to the AHHC (Exhibit 4) :

> Mr. Klayman: And that we agreed we would get some positive publicity here to try to coerce VOA into a favorable settlement so you could be in LA, correct?
> Defendant Sataki: Correct.
> Mr. Klayman*:* And –
> Defendant Sataki: **But I didn't agree to do it. You explained all this to me.** Ex
>
> Chairman Fitch: Did he send you copies of some articles that he had written?

> Defendant Sataki: Yes, he did.
> Mr. Klayman: At that time you did not tell me, "Don't write any more."
> Defendant Sataki: **I did.**
> Mr. Klayman: There's nothing in writing that you presented to that effect at that time, did you?
> Defendant Sataki:. **We talked to each other. I explained to you on the phone why I don't want articles out there.**

81. Defendant Sataki further fraudulently testified that she did not approve of publicity because of how sexual harassment was perceived in the Persian community:

> Defendant Sataki: So sexual harassment, in the Persian community, is rape. It's the actual act of intercourse and rape. So to this day I have to answer all those questions
>
> ....
>
> That I want this to be handled as quiet as possible, so nobody finds out. And I did this complaint because I -- I still wanted to keep my image. My image was just this person that – I didn't want it to change and I didn't want too much talk regarding about my personal life. I wanted people to look at the Sataki that is covering the stories and not know about my private life. Because I was not open about my private life in front of the camera. People would ask me, I would never answer. I would always leave it without answer when they asked me about my private life. Exhibit 4.

82. However this conflicts with the testimony of numerous material witnesses who testified on Mr. Klayman's behalf, including Mr. Shamble, as set forth above, that Ms. Sataki personally participated in publicizing her case!

83. The record clearly showed that Defendant Sataki agreed to this publicity, with Mr. Klayman writing positive and complimentary articles and arranging for interviews with major publications, such as the Los Angeles Times. Indeed, a crucial piece of evidence is an email which Mr. Klayman sent to the LA Times, copying both Defendant Sataki and Mr. Shamble, attempting to arrange such an interview. Exhibit 5.

84. This was consistent with Defendant Sataki being provided contemporaneously with all the articles and publicity that Mr. Klayman, who along with Mr. Shamble, he had

generated for her. At no time did Defendant Sataki object and instead approved, and there is no contemporaneous written record of any objection.

85. In fact, Defendant Sataki personally engaged in the publicizing of her case by personally handing out copies of one the articles written by Mr. Klayman on Capitol Hill. Extensive efforts to lobby politicians were made, often with Defendant Sataki present, but always with her informed consent.

86. And, as the final "nail in the coffin," Mr. Klayman uncovered evidence that was fraudulently hidden by Ms. Sataki and ODC in September of 2019—after the AHHC hearing had concluded—that Ms. Sataki had even participated in making a widely aired and publicized public video broadcast on Persian television about her case, with intimate personal details about her personal life, discussing her sexual harassment and workplace retaliation complaint against VOA and others, which further undercuts and totally refutes any possible false claim that Ms. Sataki did not agree to publicize her case.[9] The video, which is in Ms. Sataki's native language Farsi, was translated by one of Mr. Klayman's witnesses, Keya Dash, as well as a respected Farsi certified translator who used to work for VOA. Exhibit 6. To be certain of and confirm the content, Mr. Klayman had the documentary translated by Mohammad Moslehi, a certified translator who did translations for VOA. Exhibit 6. Mr. Moslehi translates this "smoking gun" as follows:

> Whenever I am at my desk and I am not paying attention, he allows himself, to touch me under variety of pretexts.
> (displaying Elham [Sataki]'s photo) former broadcaster of VOA.
> Mr. Falahati, Asal has written this for us, Well: let us answer the first caller (by the name of - Translator) Hossain from Kerman. Hello, go ahead please.
> (displaying photo of Mehdi Falahati) broadcaster for the VOA network VOA: Voice of America
> Voice of America has been recognized as the worst entity of American

[9] https://www.youtube.com/watch?v=e3g5f61muZ4

government. Therefore, lots of such coteries and issues exist there. Everybody says that the atmosphere is of a security one. Nobody can talk with anybody. Everybody makes insinuations against one another. The environment is very dirty. This week is second evening of being online with the subject of presidential elections in Iran and it's outcome, with your phone calls, emails and online weblogs and websites that Elham [Sataki] will introduce to you.
Regarding Mr. Falahati: He repeatedly asked me to go out with him. I didn't want to do it. Mr. Falahati and I started the ONLINE show together and we were performing it together. Aside from other aspects, it was very unprofessional.
When two individuals appear on camera and conduct a show, going out on a date, since it can directly affect the show is not right. They may fight with each other and that will affect the show, and vice-versa. He was not the type of person that I would accept his offer, and say that, all right let's go on a date.
The problem was, he did not know how to take a no. After a while I reached to the point that I was always calling sick and did not go to work. Since I wanted to start working, and Mr. Falahati wanted to come to my desk and again ask me let's go have a coffee or have dinner. And this no, and saying no to him repeatedly had become exhausting for me, had made me very tired. I went to Suzanne who was our executive producer and told her the situation, that he (Mr. Falahati) does so. and I (Elham [Sataki]) don't know what to do at this point. Personally, I am not able to handle it.
The situation will go over the board of the status of going out for dinner, and he will come to my desk and while I am not paying attention, under various excuses touch me. Since I was afraid, I told her (Suzanne) that, can you handle it without anybody to know?? That day she told me that "Legally I cannot do it and you must formally file a complaint."
Mr. Falahati wanted to take revenge, since I complained and stated that the situation was so. As I was behind my desk, twice he came to my desk (audio censored) the dress that I had on and my bra-cord. I hollered at him (audio censored) he laughed and said "don't tell anybody." I was not feeling well. I was seeing psychiatrist. I was seeing psychologist. I was not feeling well. All the documents are available. Everything related (to this matter) exists. I was seeing doctor and the doctor was prescribing relaxing pills for me to take.
At this point, I am just saying, Mr. Falahati is a sick person that has not done so just with me, but the system of VOA has problem. Jamshid Chalangi testified for me. Look what happened? Mahmonir, another lady testified for me. She suffered a lot. Mr. Ali Sajjadi and Mr. Falahati were friends. At that time Mr. Sajjadi was very powerful there. They all got together. And even Suzanne who was my executive producer and was mad from this incident, she teamed up with them. And this caused the problem to be difficult for me, and no attorney was taking my case, because this case had become very big. And when the case became so big, then the Board of Governors had to defend itself, and defending itself caused the case to become against me. And they say that Elham left, Falahati stayed. When they fired me, I was not the only girl. There are a number of others.
Caption dispalying Falahati and [Sataki] with written scripts.
The law suit against Mehdi Falahati due to the VOA influence did not get to anywhere, and El ham Sattaki was fired from this network .. After a short period of time Jamshid Chalangi and Ms. Mahmonir Rahimi were fired from this network.

Display of Mehdi Falahati laughing loud.

87. Unsurprisingly, Ms. Sataki and ODC Defendants – which on information and belief knew about this video - did not disclose this to the AHHC and Mr. Klayman's defense team had to find this themselves. This clearly fraudulent conduct was obviously done in concert with the ODC Defendants, who must have known about this crucial evidence and chose not to disclose it in order to further their goal to attempt to remove Mr. Klayman from the practice of law. This clear fraud grossly prejudiced Mr. Klayman because it was not part of the record at the Hearing Committee or the Board level. That the D.C. Court of Appeals denied a motion to remand this matter back to the Board to open the record to review this video shows its inherent bias on this and other issues – a clear violation of Mr. Klayman's due process and other rights. Thus, Mr. Klayman was never even given a chance to use this clearly relevant evidence that completely undercut any possible assertion that Defendant Sataki did not agree to use publicity and herself publicize detailed personal details about her case—one of the key "violations" found by the D.C. Court of Appeals in suspending him for eighteen months.

88. Because Mr. Klayman knew that Defendant Sataki had a propensity for untruthfulness, he prior to the disciplinary hearing moved to take discovery and depositions of Defendant Sataki as well as her psychiatrist, Arlene Aviera ("Dr. Aviera") on February 15, 2018.

89. Even this simple request was tellingly vehemently opposed by the ODC Defendants, and then denied by the AHHC (Defendants Tigar and Fitch), despite discovery clearly being allowed and an integral part of the attorney discipline process, particularly in a case such as this one where ODC delayed seven years to even file a Specification of Charges, resulting in passage of time causing memories to fade, documents to be discarded and lost, and witnesses to become unavailable. *See* Board on Professional Responsibility Rules, Chapter 3.

90. Then, the ODC Defendants – on the first day of the hearing (!) – sought to and was allowed to introduce into evidence a slew of "new" emails into evidence that they clearly coached Defendant Sataki into perjuriously stating that she had just "discovered."

91. Even then, when Mr. Klayman renewed his request to take discovery, he was still denied by Defendants Tigar and Fitch. This allowed the ODC Defendants and Defendant Sataki to put perjurious testimony onto the record and suppress the exculpatory evidence of Defendant Sataki's video interview publicizing her case without being caught.

92. This is especially important as the AHHC had said prior to the hearing that Mr. Klayman would be able to renew his request for discovery at the hearing if necessary. Discovery was clearly necessary, as Mr. Klayman would have been able to (1) discover the fraudulently withheld exculpatory video evidence had he been able to depose Defendant Sataki, and (2) would have been able to elicit testimony from Dr. Aviera that Mr. Klayman had competently and diligently represented Defendant Sataki to the best of his abilities, as she had contemporaneous personal knowledge and records of the details of Mr. Klayman's representation of Defendant Sataki.

93. As set forth above, only after the disciplinary hearing, once the matter was before the Board, did Mr. Klayman's legal team independently discover and unearth Defendant Sataki's video interview publicizing her case – clearly exculpatory material evidence. However, despite being faced with this clear illegal, unethical and fraudulent conduct by the ODC Defendants and Defendant Sataki, Defendant Kaiser still without any bases, refused to open the record or even consider this new exculpatory evidence, thereby ensuring that the ODC Defendants and Defendant Sataki were allowed to suppress exculpatory material evidence and give perjurious testimony without repercussions.

94. *Second*, on May 31, 2018, Ms. Sataki gave further perjurious and fraudulent testimony, at the instruction of the ODC Defendants, that she never wanted to move to Los Angeles, and that somehow Mr. Klayman had made the decision for her and forced her to move out to Los Angeles – in order fraudulently and falsely create the impression that Mr. Klayman was controlling her:

> Ms. Sataki: Well, in the beginning when he – when I moved -- **he moved me to Los Angeles** and he paid for everything. Exhibit 4 at 83:17-19

95. However, this false and fraudulent testimony was also exposed by numerous other witnesses, including Mr. Shamble, as well as Ms. Sataki herself being forced to admit that it was false.

96. On May 31, 2018, Mr. Klayman was able to show that the decision to move to Los Angeles was collective, and part of a legal strategy to have her assigned there due to having a medical exemption:

> Mr. Klayman: And we decided that, if we could show that you had a medical reason why you had to be in Los Angeles, that we could qualify for a reasonable medical accommodation move to Los Angeles.
>
> Defendant Sataki: Yes.
>
> Mr. Klayman: And therefore we submitted documentation from Dr. Aviera, from the prior psychologist that you saw, and also from a doctor named Long, an internist, to Voice of America with various documentation arguing that you needed to be in Los Angeles because those were where your physicians were, that's where your family was, that's where your friends were, and besides, you could do your work out of the Persia News Network on Wilshire Boulevard at the federal building, which was run by Voice of America. Do you remember that?
>
> Defendant Sataki: Yes. Exhibit 4 at 351.

97. *Third*, Defendant Sataki, at the direction of the ODC Defendants, perpetuated the fraudulent notion that she had wanted Mr. Klayman to dismiss her cases, which was completely contradicted by her own actions where she (1) filed *pro se* a notice of appeal after the fact and (2) when ODC hunted her down years after the fact, she even asked them if they could still

prosecute her sexual harassment and workplace retaliation claims for her, despite the fact that the Office of Civil Rights had thoroughly investigated her claims and found them to be meritless:

> Mr: Klayman: That you wanted Bar Counsel to file a sexual harassment case for you. You asked them that within the last year, against VOA.
> Defendant Sataki: I asked if it's doable.
> Mr. Klayman: And you asked Bar Counsel to do it for you, correct?
> Defendant Sataki: I asked if it's doable.... Exhibit 4 at 489:3-10 (May 31, 2018).

98. The actions of Defendants Tigar, Fitch, and Kaiser, the ODC Defendants and Defendant Sataki, resulted in fraud on the court, with imperviousness and without and repercussions. This fraud on the court directly and proximately led to the Suspension Order and Judgment at the DCCA.

## FIRST CAUSE OF ACTION
***D.C. Superior Court Rule 60(d)***

99. Mr. Klayman repeats and re-alleges all of the previous allegations of the entirety of this Amended Complaint, including, but not limited to, the Introduction and the exhibits to this Amended Complaint, with the same force and effect, as if fully set forth herein again at length.

100. D.C. Superior Court Civil Rule 60(d) states that "[t]his rule does not limit a court's power to: (1) entertain an independent action to relieve a party from a judgment, order, or proceeding; or (2) set aside a judgment for fraud on the court."

101. The ODC Defendants and Defendant Sataki have committed a fraud on the court by willfully suppressing exculpatory evidence and suborning and committing perjury at the disciplinary hearing.

102. These fraudulent statements include:

> Mr. Klayman: And that we agreed we would get some positive publicity here to try to coerce VOA into a favorable settlement so you could be in LA, correct?
> Defendant Sataki: Correct.
> Mr. Klayman: And –
> Defendant Sataki: **But I didn't agree to do it. You explained all this to me.** Ex

Chairman Fitch: Did he send you copies of some articles that he had written?
Defendant Sataki: Yes, he did.
Mr. Klayman: At that time you did not tell me, "Don't write any more."
Defendant Sataki: **I did.**
Mr. Klayman: There's nothing in writing that you presented to that effect at that time, did you?
Defendant Sataki:. **We talked to each other. I explained to you on the phone why I don't want articles out there.**

Defendant Sataki: So sexual harassment, in the Persian community, is rape. It's the actual act of intercourse and rape. So to this day I have to answer all those questions

....

That I want this to be handled as quiet as possible, so nobody finds out. And I did this complaint because I -- I still wanted to keep my image. My image was just this person that – I didn't want it to change and I didn't want too much talk regarding about my personal life. I wanted people to look at the Sataki that is covering the stories and not know about my private life. Because I was not open about my private life in front of the camera. People would ask me, I would never answer. I would always leave it without answer when they asked me about my private life. Exhibit 4.

Ms. Sataki: Well, in the beginning when he – when I moved -- **he moved me to Los Angeles** and he paid for everything. Exhibit 3 at 83:17-19

103. Also included are fraudulent statements that Defendant Sataki wanted Mr. Klayman to drop and dismiss her cases.

104. Defendants Tigar and Fitch furthered this fraud on the court by refusing to allow Mr. Klayman leave to conduct discovery which clearly would have unearthed this exculpatory material evidence and prevented perjurious statements from being put on the record, which directly and proximately resulted in the September 15, 2022 Suspension Order and Judgment in its entirety.

105. Defendant Kaiser and the Board then furthered this fraud on the court by refusing to open the record and refusing to even consider the buried exculpatory evidence when it was independently discovered by Mr. Klayman's legal team, which directly and proximately resulted in the September 15, 2022 Suspension Order and Judgment in its entirety.

106. As a direct and proximate result of Defendants' fraud, misrepresentations and misconduct, including but not limited to perjury and subornation of perjury, Rule 60's requirement for relief from a judgment or order come into play.

107. Plaintiff prays that this Court issue a judgment finding that the Suspension Order was procured through Defendants' perjury, suborning of perjury, fraud on the court, and egregious prosecutorial misconduct.

**SECOND CAUSE OF ACTION**
***Civil Conspiracy***

108. Mr. Klayman repeats and re-alleges all of the previous allegations of the entirety of this Complaint, including, but not limited to, the Introduction and the exhibits to this Complaint, with the same force and effect, as if fully set forth herein again at length.

109. Each and every one of the Defendants conspired to enter into an agreement to participate in committing fraud on the court in the Sataki Matter.

110. The Defendants did, in fact, commit a fraud on the court. The ODC Defendants and Defendant Sataki buried and suppressed exculpatory evidence and suborned and committed perjury. Defendants Tigar, Fitch, and Kaiser then furthered this fraud by refusing to hold the ODC Defendants and Defendant Sataki accountable for their fraud, allowing for routine discovery under the circumstances of extreme delay in the prosecution which would have disclosed the fraud in full detail, and ensuring that the fraud remained on the record when presented to the DCCA, which then directly and proximately caused the issuance of the September 15, 2022 Suspension Order and Judgment.

111. As a direct and proximate result of this, Mr. Klayman has suffered an injury in the form of being suspended from the practice of law in the District of Columbia for eighteen (18) months, in addition to a completely unconstitutional twenty (20) month "temporary suspension."

with a reinstatement provision as well as the possibility of reciprocal discipline, however unwarranted, in other jurisdictions

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Klayman prays for the following relief:

(1) A judgment finding that the Suspension Order was procured through Defendants' perjury, suborning of perjury, fraud on the court, and egregious prosecutorial misconduct; and

(2) Any other relief that the Court may deem proper.

**DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury on all counts, as to all issues so triable.

DATED: November 16, 2023

Respectfully submitted,

/s/ Larry Klayman

Larry Klayman
7050 W. Palmetto Park Road
Boca Raton, FL 33433
Email: leklayman@gmail.com
Tel: 561-558-5336
*Plaintiff Pro Se*

# EXHIBIT 1

CHAPMAN UNIVERSITY | FOWLER SCHOOL OF LAW

One University Drive
Orange, California 92866
www.chapman.edu

Ronald D. Rotunda
*The Doy & Dee Henley Chair and Distinguished Professor of Jurisprudence*
Email: rrotunda@chapman.edu
(714) 628-2698 • Fax (714) 628-2576
http://www1.chapman.edu/~rrotunda/
www.ronaldrotunda.com

19 December 2016

Larry Klayman, Esq.
Klayman Law Firm
c/o 2020 Pennsylvania Ave., N.W.
#800
Washington, D.C. 20006

RE: Bar Complaint of Oct. 20, 2011
VIA: Email, leklayman@gmail.com

Dear Mr. Klayman:

You have asked me to evaluate the Office of Bar Counsel Complaint dated October 20, 2011. Despite the fact that it is dated about six years ago, you received it only recently. Perhaps that is because the Office of Bar Counsel (OBC) sent it to the wrong address. OBC may have sent it to 2000 Pennsylvania Ave. N.W., Suite 345, while your office is at 2020 Pennsylvania Ave, NW, Suite 345.

I have evaluated the OBC Complaint of Oct. 20, 2011, and discussed the matter with you. You should feel free to show this letter to the OBC if you wish.

A very surprising item about this complaint is that it was filed over five years ago about alleged events that occurred in December 2009 and shortly thereafter. The complainant, Elham Sataki, made similar complaints to the Pennsylvania Bar and the Florida Bar, both of which dismissed the complaint years ago. For some reason, the OBC sat on this complaint for years and now is resurrecting it.

Because of the passage of time — the reasons for this delay are unknown — relevant evidence cannot be found and memories fade.

> For example, you told me that you recall a phone voice mail from someone speaking in a belligerent tone who claimed to be speaking for Ms. Sataki. This person said that you should not contact her. You had been trying, unsuccessfully, to contact Ms. Sataki to see if she wanted to appeal, and you filed a notice of appeal

to protect her rights. The union representative, who was representing Ms. Sataki in her employment dispute, also was unsuccessful in contacting her. Shortly after that, Ms. Sataki did so and you and her Union Representative, Mr. Shamble, did not pursue the appeal. You have moved since then and you are unable to find this voice mail. The tone and substance of this voice mail is very relevant to the complaint, but it no longer exists (or, you cannot find it) because of the passage of time.

The caselaw shows that OBC is subject to laches. In *Florida Bar v. Rubin*, 362 So.2d 12 (Fla. Sup. Ct. 11978)(per curiam), the Florida supreme court threw out charges because the prosecutor because of the Bar's delay in violation of the Florida rules.[1] One can summarize this case as the Bar delaying finalization of two cases (where the Bar was disappointed with the recommended discipline) because it was confident it would secure a conviction in a third case still in the pipeline in the hope of securing greater overall discipline. The Court said,

> Whatever other objects the rule may seek to achieve, it obviously contemplates that *the Bar should not be free to withhold a referee's report which it finds too lenient until additional cases can be developed* against the affected attorney, in an effort to justify the more severe discipline which might be warranted by cumulative misconduct. The Bar's violation of the prompt filing requirement in this case, to allow a second grievance proceeding against Rubin to mature, is directly antithetical to the spirit and intent of the rule. In addition, it has inflicted upon Rubin the "agonizing ordeal" of having to live under a cloud of uncertainties, suspicions, and accusations for a period in excess of that which the rules were designed to tolerate.

*The Florida Bar v. Rubin*, 362 So. 2d 12, 15 (footnotes omitted)(emphasis added). As *Rubin* concluded, "The Bar has consistently demanded that attorneys turn 'square corners' in the conduct of their affairs. An accused attorney has a right to demand no less of the Bar when it musters its resources to prosecute for attorney misconduct." 362 So. 2d 12, 16.

*Rubin* is no judicial orphan. Later, *The Florida Bar v. Walter*, 784 So. 2d 1085, 1087 (Fla. Sup. Ct. 2001) ruled that a *seven-year interim* between the lawyer's alleged misconduct and the filing of the Bar's complaint, makes "it 'unjust or unfair' to require Walter [the lawyer] now to answer the Bar's charges in this matter. That the Bar may have diligently pursued Chesnoff's statement does not render this seven-year interim a "reasonable time," especially considering that

---

[1] "On January 6, 1978 fourteen months after the Bar received referee White's report and eight months after it had received referee Carey's the Bar filed both referees' reports with the Court." "Referee White's report, which recommended a public reprimand, was not filed with us until fourteen months after its receipt by the Bar. Rubin contends that this filing clearly was not prompt, and that the Bar's violation of the rule denies him due process" *The Florida Bar v. Rubin*, 362 So. 2d 12, 14 (Fla. 1978)(footnote omitted).

the delay is not attributable to Walter." The court ruled that the lawyer does not have "to defend against the Bar's charges after so many years have passed."[2]

See also, *In re Grigsby*, 815 N.W.2d 836 (Minn. 2012), concluding that a discipline prosecutor's failure to charge out a matter for an unreasonably long time violates the ethics rules. *Grigsby* involved a case where the lawyer did not even dispute the facts. and the lawyer's violations were "obvious," yet the court rejected the disciplinary hearing:

> Finally, it is also worth noting the procedural irregularities in this discipline matter. Grigsby was suspended for 60 days on April 16, 2009. Grigsby's single instance of misconduct resulting in this disciplinary proceeding took place sometime during April and May 2009, and the Assistant County Attorney informed the Director of it on June 3, 2009. *The facts of this case are simple and undisputed, Grigsby's violations are obvious*, and Grigsby complied with the Director's investigation. The Director *did not file a petition for disciplinary action until May 31, 2011, 727 days after notice of the misconduct*. Because Grigsby, understandably, did not seek readmission while under investigation for practicing law while suspended, he has effectively been suspended from the practice of law since April 16, 2009, or for over 3 years. The purpose of any disciplinary proceeding, as noted earlier, is to protect the public; *the delay here tends to weaken the Director's argument that protection of the public requires a reinstatement hearing* and we decline to do so notwithstanding the legitimate concerns discussed earlier.

*In re Disciplinary Action against Grigsby*, 815 N.W.2d 836, 846–47, 2012 WL 2814088 (Minn.), *reinstatement granted sub nom. In re Disciplinary Action Against Grigsby*, 822 N.W.2d 291, 2012 WL 5355573 (Minn. 2012)(emphasis added).

In evaluating Minnesota cases, William J. Wernz, , Minnesota Legal Ethics: A Treatise (6th ed. 2016) reviews the cases concludes that the Office of Bar Counsel is subject to a "Special Promptness Requirement?" Rule 3.2 of the Rules of Professional Conduct applies to Bar Counsel and that "general delay in investigation" could violate Rule 3.2.[3]

---

[2] Cited and quoted with approval in, *The Florida Bar v. Kane*, 202 So.3d 11, 19 (Fla. Sup. Ct. 2016):

> The Court has made clear that the Bar has an obligation to process disciplinary cases in a fair and just manner. *See Fla. Bar v. Rubin*, 362 So.2d 12, 16 (Fla.1978) ("The Bar has consistently demanded that attorneys turn 'square corners' in the conduct of their affairs. An accused attorney has a right to demand no less of the Bar when it musters its resources to prosecute for attorney misconduct.").

[3] Wernz, Minnesota Legal Ethics: A Treatise 779-80, § II(D) (2016).

Rule 3.2 ("Expediting Litigation"), Model Rules of Professional Conduct, corresponds to Rule 3.2 of the D.C. Rules of Professional Conduct. As Comment 1 to the D.C. Rules asks, "The question is whether a competent lawyer acting in good-faith would regard the course of action as having some substantial purpose other than delay."[4]

In this case, OBC should explain why any competent Bar Counsel, acting in good faith, would regard the delay of 6 years since the complaint was filed and 7 years since the alleged violation occurred would this delay "as having some substantial purpose other than delay." Why has OBC waited so long?

In Indiana, when the Bar Counsel did not act with reasonable promptness, the Court imposed a new rule making clear what states like Minnesota and Florida thought were already clear. Rule 23, Disciplinary Commission and Proceedings now provides, Section 10(h):

> *Limitation on time to complete investigation.* Unless the Supreme Court permits additional time, any investigation into a grievance *shall be completed and action on the grievance shall be taken within twelve (12) months from the date the grievance is received* (or the date a response is demanded to a Disciplinary Commission grievance). The purpose of the deadline is to enable the Supreme Court to promote a fair and efficient process and not to create substantive or procedural rights. Requests for additional time shall be submitted to the Supreme Court and shall briefly describe the circumstances necessitating the request. No response or objection shall be allowed. Delays caused by a respondent's noncooperation or requests for extensions of time, and periods during which the respondent is suspended from practice, shall not be counted toward the 12-month period. *If the Disciplinary Commission does not file a Disciplinary Complaint within this time, the grievance shall be deemed dismissed.*[5]

The Virgin Islands also recognizes laches applied to Bar Counsel. No "legal authority precludes this Court or the EGC from applying the common law doctrine of laches to a grievance. 'Laches, an equitable defense, is distinct from the statute of limitations, a creature of law,' and precludes an action if 'an omission to assert a right for an unreasonable and unexplained length of 'time and under circumstances prejudicial to the adverse party.' Thus, "[l]aches ... may be found even if the applicable statute of limitations has not yet run." *In Matter of Joseph*, 60 V.I. 540, 558–59, 2014 WL 547513, at *7 (V.I. Feb. 11, 2014)(internal citations omitted). Thus, the "laches defense may apply to attorney discipline proceedings in certain very narrowly defined circumstances, such as when the delay in instituting the disciplinary proceedings results in prejudice to the respondent." *Id.*

---

[4] http://www.dcbar.org/bar-resources/legal-ethics/amended-rules/rule3-02.cfm

[5] http://www.in.gov/judiciary/files/order-rules-2016-1103-adm-disc.pdf (last two emphases added).

That is what is occurring hear because memories have faded and some evidence cannot be found. The evidence collected by the Pennsylvania and Florida Bars — both of which dismissed the complaint — no longer exists. Perhaps the D.C. Bar has some evidence, but it has not given it to Mr. Klayman. One of the papers in the files the D.C. Bar refers to a draft complaint and an opinion from a lawyer who practices in the employment area, but neither the Bar Counsel nor the expert have reviewed all of the relevant files and documents of Ms. Sataki's case. Mr. Klayman has sent you a copy.

The Virgin Islands Supreme Court sets out a test that *presumes* prejudice in a case like this: "we shall only presume prejudice with respect to the laches defense when there is a substantial delay in the initiation of disciplinary proceedings." *In Matter of Joseph*, 60 V.I. 540, 559, 2014 WL 547513, at *7 (V.I. Feb. 11, 2014). Here there is a substantial delay.

See also, *id.*, *Joseph, id.*, citing, *In re Wade*, 814 P.2d 753, 764 (Ariz. 1991); *In re Siegel*, 708 N.E.2d 869, 871 (Ind. 1999) ("There may be factual situations in which the expiration of time destroys the fundamental fairness of the entire proceeding."); *Anne Arundel County Bar Ass'n, Inc. v. Collins*, 325 A.2d 724, 728 (Md. 1974) (laches applicable to attorney discipline proceedings if "prejudice or circumstances making it inequitable to grant the relief sought"). *Tennessee Bar Ass'n v. Berke*, 344 S.W.2d 567, 571–72 (Tenn. 1961) (dismissing disciplinary proceedings for laches when grievance filed nine years after alleged misconduct occurred with no explanation for the delay and respondent was not responsible for the delay). *In Matter of Joseph*, 60 V.I. 540, 559, 2014 WL 547513, at *7 (V.I. Feb. 11, 2014).

Similarly., in *Hayes v. Alabama State Bar*, 719 So. 2d 787, 791 (Ala. 1998), the State Bar suspended lawyers convicted of misdemeanors for "serious crimes" and charged them with additional rules infractions. The Supreme Court held, inter alia, that the State Bar's delay in pursuing remaining formal charges following resolution of criminal proceedings warranted dismissal.[6]

---

6 *Hayes v. Alabama State Bar*, 719 So. 2d 787, 791, 1998 WL 321956 (Ala. 1998)(footnote omitted)(emphasis added):

> In *Noojin* [*Noojin v. Alabama State Bar*, 577 So.2d 420 (Ala.1990),], this Court examined an attorney's contentions that the Alabama State Bar had erred in delaying disciplinary proceedings against him. It held that the culmination of a federal criminal matter was not "good cause" for *delaying disciplinary proceedings for nearly a year*, and it barred the Alabama State Bar from proceeding on the charges pending against the attorney. As in *Noojin*, we consider in the present case whether the Bar had "good cause" to defer or delay the disciplinary proceedings against the attorneys. Rule 14, Ala.R.Disc.P. The Bar asserts that it "stayed" the proceedings on the formal charges based on the attorneys' alleged attempts to obtain discovery for their criminal cases. Aside from this assertion, the Bar has not attempted to provide a reason for its continued delay in regard to the formal charges against the attorneys.[5] Therefore, if we accept the Bar's only explanation of "good

Let me now leave the subject of laches and turn to the actual complaint, filed in 2011. Ms. Sataki makes several complaints.

FIRST, she claims that Mr. Klayman was not competent to handle her case and thus violated RULE 1.1. Pennsylvania and Florida have already rejected that claim. In addition, Ms. Sataki has never filed any lawsuit claiming that there was malpractice or sexual harassment by Mr. Klayman. She also claims that he used incorrect procedures and failed to make deadlines. She does not indicate what deadlines he missed. He did tell me that he filed a notice of appeal to protect her rights when she did not bother to respond to his requests asking her if she wanted to appeal. Her union representative also could not get in contact with her. Eventually, she bothered to respond and ordered him and Mr. Shamble (her Union Representative) not to pursue appeals, so they complied. If an error was made below, the normal way we correct it is by appeal.

The OBC says that it has an opinion by a lawyer as to the alleged malpractice, but OBC has not disclosed it to Mr. Klayman so neither he nor anyone else could answer it. OBC also says that it has a complaint, which suggests OBC has prejudged the matter, by showing its complaint to someone who is not part of the Office of Bar Counsel.

SECOND, she claims Mr. Klayman violated RULE 1.3 by revealing information to the public that was not secret client information and not confidential client information. Mr. Klayman told me that when he wrote to talked about the case it was only after his client's prior permission. She and Mr. Shamble thought that publicity would help her case by encouraging the Voice of America to settle rather than suffer bad publicity.

THIRD, she claims that Mr. Klayman did not disclose the fee until several months after the case began, and thus violated RULE 1.5. Mr. Klayman tells me that he did disclose the fee when they first talked about the case. The fee was zero — he did it as a pro bono matter. Several months later, when the case got more difficult than either of them expected, he told the client that he would have charge a fee. Or, of course, she would retain another lawyer and he could transfer the files to that other lawyer. She chose not to hire a new lawyer and he proposed a contingent fee. She never signed a fee agreement because she was hard to contact and the case ended at her request. He never charged her any fee.

FOURTH, she claims a violation of RULE 1.6, by disclosing client confidences. Mr. Klayman has told me that he had her permission before he disclosed anything. She and her Union

---

> cause" for delay, there remains a period of over a year, from February 14, 1997, to now, during which the Bar has taken no action to proceed on the merits of the formal charges. Under our *Noojin* analysis, we find that this delay in proceeding on the remaining formal charges is excessive. Therefore, because of the inordinate delay on the part of the Bar in pursuing the remaining formal charges against the attorneys, those charges are dismissed.

Representative, Mr. Shamble, thought that publicity would help her case, and she was probably right — although not pursuing an appeal undercut her case.

FIFTH, she claims that Mr. Klayman violated RULE 1.7 because he used her case for his purposes. Leaving aside the rather vague nature of those charges, Mr. Klayman says that his only motivation was to help her as a friend because she was in trouble and had other problems. He would be willing to disclose these other problems to you if Ms. Sataki waives her attorney-client privilege. After all, we do not want a situation where the OBC seeks to discipline Mr. Klayman in this case because he used what the OBC later claims is information protected by Rule 1.6. Since Mr. Klayman will not be talking to Ms. Sataki about this case, the OBC should ask for this waiver.

Sixth, Ms. Sataki says Mr. Klayman violated RULE 3.3 because he was dishonest in telling people he was her lawyer when he was not her lawyer. Mr. Klayman has told me that he never told people he was her lawyer after she discharged him. He (and her union representative) tried to contact her unsuccessfully to ask her if he wanted to appeal. Her complaint[7] says that her brother told Mr. Klayman to terminate the representation, but the caller did not identify himself as her brother, Mr. Klayman would not recognize the brother's voice, and her brother did not represent that he was her agent with authority.[8]

I am troubled that the OBC has sat on this case for nearly six years and another one involving Mr. Klayman for nearly eight years. In my view, the complaint of Oct. 20, 2011 should be dismissed, particularly under these circumstances. The OBC has not even asserted that it learned something in the intervening years to justify reopening this old complaint.

Sincerely,

Ronald D. Rotunda
Doy & Dee Henley Chair and Distinguished Professor of Law

---

[7] I refer to the complaint as "her complaint" but I do not mean to imply that she wrote it. Mr. Klayman tells me that when he knew her, her English was not good enough to draft a complaint like this one.

[8] Mr. Klayman has met her brother once, but does not know him well enough to recognize her voice, and he has met her mother once. Both times, he met them at the residence of Ms. Sataki, because the mother and the brother invited him — they wanted to meet the lawyer who was representing their sister/daughter. Ms. Sataki claims that he showed up "unannounced." If she is telling the truth it is only because she did not talk to her brother or mother on this matter.

**RONALD D. ROTUNDA** May 2, 2014
Email: rrotunda@chapman.edu Home Page http://www1.chapman.edu/~rrotunda

**Office Address:**

Chapman University
Dale E. Fowler School of Law
Room 406
One University Drive
Orange, CA 92866-1005
☎: (714) 228-2698
Fax: (714) 228-2576

**Experience:**

| | |
|---|---|
| Since August, 2008 | DOY & DEE HENLEY CHAIR AND DISTINGUISHED PROFESSOR OF JURISPRUDENCE, CHAPMAN UNIVERSITY |
| June 17, 2009 – Jan. 31, 2013 | COMMISSIONER, Fair Political Practices Commission a regulatory body of the State of California, |
| 2006- August 2008 | UNIVERSITY PROFESSOR AND PROFESSOR OF LAW, George Mason University |
| 2002-2006 | THE GEORGE MASON UNIVERSITY FOUNDATION PROFESSOR OF LAW, George Mason University School of Law |
| Nov. to Dec. 2002 | Visiting Scholar, Katholieke Universiteit Leuven, Faculty of Law, Leuven, Belgium |
| May 2004 | Visiting Lecturer, The Institute for Law and Economics, Institut für Recht und Ökonomik, The University of Hamburg, Germany |
| June 2004-May 2005 | Special Counsel to Department of Defense, The Pentagon |
| December 2005 | Visiting Lecturer, The Institute for Law and Economics, Institut für Recht und Ökonomik, The University of Hamburg, Germany |
| 1993 - 2002 | THE ALBERT E. JENNER, JR. PROFESSOR OF LAW, University of Illinois College of Law |
| Since 2002 | THE ALBERT E. JENNER, JR. PROFESSOR OF LAW, EMERITUS, University of Illinois College of Law |
| Fall, 2001 | Visiting Professor, George Mason University School of Law |

| | |
|---|---|
| Spring & Fall 2000 | Cato Institute, Washington, D.C.; Senior Fellow in Constitutional Studies [Senior Fellow in Constitutional Studies, 2001-2009] |
| Spring, 1999 | Visiting Professor, holding the JOHN S. STONE ENDOWED CHAIR OF LAW, University of Alabama School of Law |
| August 1980 - 1992 | Professor of Law, University of Illinois College of Law |
| March 1986 | Fulbright Professor, Maracaibo and Caracas, Venezuela, under the auspices of the Embassy of the United States and the Catholic University Andres Bello |
| January – June, 1981 | Fulbright Research Scholar, Italy |
| Spring 1981 | Visiting Professor of Law, European University Institute, Florence, Italy |
| August 1977 – August, 1980 | Associate Professor of Law, University of Illinois College of Law |
| August 1974 – August 1977 | Assistant Professor of Law, University of Illinois College of Law |
| April 1973 - July 1974 | Assistant Counsel, U.S. Senate Select Committee on Presidential Campaign Activities |
| July 1971 - April, 1973 | Associate, Wilmer, Cutler & Pickering Washington, DC |
| August 1970 – July 1971 | Law Clerk to Judge Walter R. Mansfield, Second Circuit, New York, N.Y. |

**Education:**

**Legal:** HARVARD LAW SCHOOL (1967- 1970)
Harvard Law Review, volumes 82 & 83
J.D., 1970 Magna Cum Laude

**College:** HARVARD COLLEGE (1963- 1967)
A.B., 1967 Magna Cum Laude in Government

**Member:**

American Law Institute (since 1977); Life Fellow of the American Bar Foundation (since 1989); Life Fellow of the Illinois Bar Foundation (since 1991); The Board of Editors, The Corporation Law Review (1978-1985); New York Bar (since 1971); Washington, D.C. Bar and D.C. District Court Bar (since 1971); Illinois Bar (since 1975); 2nd Circuit Bar (since 1971); Central District of Illinois (since 1990); 7th Circuit (since 1990); U.S. Supreme Court Bar (since 1974); 4th Circuit, since 2009. Member: American Bar Association, Washington, D.C. Bar Association, Illinois State Bar

Association, Seventh Circuit Bar Association; The Multistate Professional Responsibility Examination Committee of the National Conference of Bar Examiners (1980-1987); AALS, Section on Professional Responsibility, Chairman Elect (1984-85), Chairman (1985-86); Who's Who In America (since 44th Ed.) and various other Who's Who; American Lawyer Media, L.P., National Board of Contributors (1990-2000).

**Scholarly Influence and Honors:**

Symposium, *Interpreting Legal Citations*, 29 JOURNAL OF LEGAL STUDIES (part 2) (U. Chicago Press, Jan. 2000), sought to determine the influence, productivity, and reputation of law professors. Under various measures, Professor Rotunda scored among the highest in the nation. *E.g.*, scholarly impact, most-cited law faculty in the United States, 17th (p. 470); reputation of judges, legal scholars, etc. on Internet, 34th (p. 331); scholar's non-scholarly reputation, 27th (p. 334); most influential legal treatises since 1978, 7th (p. 405).

In May 2000, *American Law Media*, publisher of *The American Lawyer*, the *National Law Journal*, and the *Legal Times,* picked Professor Rotunda as one of the ten most influential Illinois Lawyers. He was the only academic on the list. He was rated, in 2014, as one of "The 30 Most Influential Constitutional Law Professors" in the United States.

- 2012, Honored with, THE CHAPMAN UNIVERSITY EXCELLENCE IN SCHOLARLY/CREATIVE WORK AWARD, 2011-2012.
- Appointed UNIVERSITY PROFESSOR, 2006, George Mason University; Appointed 2008, DOY & DEE HENLEY CHAIR AND DISTINGUISHED PROFESSOR OF JURISPRUDENCE, Chapman University.
- The 2002-2003 *New Educational Quality Ranking* of U.S. Law Schools (EQR) ranks Professor Rotunda as the eleventh most cited of all law faculty in the United States. *See* http://www.leiterrankings.com/faculty/2002faculty_impact_cites.shtml
- Selected UNIVERSITY SCHOLAR for 1996-1999, University of Illinois.
- 1989, Ross and Helen Workman Research Award.
- 1984, David C. Baum Memorial Research Award.
- 1984, National Institute for Dispute Resolution Award.
- Fall, 1980, appointed Associate, in the Center for Advanced Study, University of Illinois.

## LIST OF PUBLICATIONS:

### BOOKS:

**PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY** (Foundation Press, Mineola, N.Y., 1976) (with Thomas D. Morgan).

CALIFORNIA SUPPLEMENT TO PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Mineola, N.Y., 1976) (with Thomas D. Morgan).

1978 SUPPLEMENT TO PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Mineola, N.Y., 1978) (with Thomas D. Morgan).

1979 PROBLEMS, CASES AND READINGS SUPPLEMENT TO PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Mineola, N.Y., 1979) (with Thomas D. Morgan).

1979 CALIFORNIA RULES SUPPLEMENT TO PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Mineola, N.Y., 1979) (with Thomas D. Morgan).

1979 STANDARDS SUPPLEMENT TO PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Mineola, N.Y., 1979) (with Thomas D. Morgan).

1980 CALIFORNIA RULES SUPPLEMENT TO PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Mineola, N.Y., 1980) (with Thomas D. Morgan).

1980 STANDARDS SUPPLEMENT TO PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Mineola, N.Y., 1980) (with Thomas D. Morgan).

**CONSTITUTIONAL LAW** (West Publishing Co., St. Paul, Minnesota, 1978) (a one volume treatise on Constitutional Law) (with John E. Nowak and J. Nelson Young).

1978 SUPPLEMENT TO CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1978) (with John E. Nowak and J. Nelson Young).

1979-1980 SUPPLEMENT TO CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1979) (with John E. Nowak and J. Nelson Young).

1982 SUPPLEMENT TO CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1982) (with John E. Nowak and J. Nelson Young).

**MODERN CONSTITUTIONAL LAW: CASES & NOTES** (West Publishing Co., St. Paul, Minnesota, 1981).

1981 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1981).

1982 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1982).

1983 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1983).

1984 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, MINNESOTA, 1984).

**PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY** (Foundation Press, Mineola, N.Y., 2d ed. 1981) (with Thomas D. Morgan).

1981 STANDARDS SUPPLEMENT TO PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Mineola, N.Y., 1981) (with Thomas D. Morgan).

1983 STANDARDS SUPPLEMENT TO PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Mineola, N.Y., 1983) (with Thomas D. Morgan).

**THE UNITED STATES FEDERAL SYSTEM: LEGAL INTEGRATION IN THE AMERICAN EXPERIENCE** (Giuffrè, Milan, 1982) (with Peter Hay).

**SIX JUSTICES ON CIVIL RIGHTS** (Oceana Publications, Inc., Dobbs Ferry, N.Y., 1983) (edited and with introduction).

**CONSTITUTIONAL LAW** (West Publishing Co., St. Paul, Minnesota, 2d ed. 1983) (with John E. Nowak and J. Nelson Young) (a one volume treatise on Constitutional Law).

**PROFESSIONAL RESPONSIBILITY** (West Publishing Co., 1984, Black Letter Series).

**PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY** (Foundation Press, Mineola, N.Y., 3d ed. 1984) (with Thomas D. Morgan).

1984 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Mineola, N.Y. 1984) (with Thomas D. Morgan).

1985 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Mineola, N.Y. 1985) (with Thomas D. Morgan).

1986 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Mineola, N.Y. 1986) (with Thomas D. Morgan).

1987 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Mineola, N.Y. 1987) (with Thomas D. Morgan).

**MODERN CONSTITUTIONAL LAW: CASES & NOTES** (West Publishing Co., St. Paul, Minnesota, 2d ed. 1985).

1985 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1985).

1986 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, MINNESOTA, 1986).

1987 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1987).

1988 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1988).

**THE POLITICS OF LANGUAGE: LIBERALISM AS WORD AND SYMBOL** (University of Iowa Press, 1986) (with an Introduction by Daniel Schorr).

**TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE** (West Publishing Co., St. Paul, Minnesota, 1986) (*three volume treatise*) (with John E. Nowak and J. Nelson Young).

1987 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW (West Publishing Co., 1987) (with John E. Nowak).

1988 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW (West Publishing Co., 1988) (with John E. Nowak).

1989 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW (West Publishing Co., 1989) (with John E. Nowak).

1990 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW (West Publishing Co., 1990) (with John E. Nowak).

1991 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW (West Publishing Co., 1991) (with John E. Nowak).

**CONSTITUTIONAL LAW** (West Publishing Co., St. Paul, Minnesota, 3d ed. 1986) (a one volume treatise on Constitutional Law) (with John E. Nowak and J. Nelson Young).

1988 POCKET PART TO CONSTITUTIONAL LAW (West Publishing Co., 1988) (with John E. Nowak).

**JOSEPH STORY'S COMMENTARIES ON THE CONSTITUTION** (Carolina Academic Press, Durham, N.C. 1987) (with introduction) (with John E. Nowak).

**CONSTITUTIONAL LAW: PRINCIPLES AND CASES** (West Publishing Co., St. Paul, Minnesota, 1987).

**PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY** (Foundation Press, Mineola, N.Y., 4th ed. 1987) (with Thomas D. Morgan).

1988 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Mineola, N.Y. 1988) (with Thomas D. Morgan).

1989 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Westbury, N.Y. 1989) (with Thomas D. Morgan).

1990 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Westbury, N.Y. 1990) (with Thomas D. Morgan).

**PROFESSIONAL RESPONSIBILITY** (West Publishing Co., St. Paul, Minnesota, 2d ed. 1988, Black Letter Series).

**MODERN CONSTITUTIONAL LAW: CASES AND NOTES** (West Publishing Co., St. Paul, Minnesota, 3d ed. 1989).

1989 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1989).

1990 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1990).

1991 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1991).

1992 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1992).

**PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY** (Foundation Press, Westbury, N.Y., 5th ed. 1991) (with Thomas D. Morgan).

1991 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Westbury, N.Y. 1991) (with Thomas D. Morgan).

1992 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Westbury, N.Y. 1992) (with Thomas D. Morgan).

1993 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Westbury, N.Y. 1993) (with Thomas D. Morgan).

1994 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Westbury, N.Y. 1994) (with Thomas D. Morgan).

1995 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Westbury, N.Y. 1995) (with Thomas D. Morgan).

**CONSTITUTIONAL LAW** (West Publishing Co., St. Paul, Minnesota, 4th ed. 1991) (a one volume treatise on Constitutional Law) (with John E. Nowak).

**PROFESSIONAL RESPONSIBILITY** (West Publishing Co., St. Paul, Minnesota, 3d ed. 1992, Black Letter Series).

**TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE** (West Publishing Co., St. Paul, Minnesota, 2d ed. 1992) (*four volume treatise*) (with John E. Nowak).

1993 POCKET PART TO CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1993) (with John E. Nowak).

1994 POCKET PART TO CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1994) (with John E. Nowak).

1995 POCKET PART TO CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1995) (with John E. Nowak).

1996 POCKET PART TO CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1996) (with John E. Nowak).

1997 POCKET PART TO CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1997) (with John E. Nowak).

1998 POCKET PART TO CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1998) (with John E. Nowak).

1999 POCKET PART TO CONSTITUTIONAL LAW (West Group, St. Paul, Minnesota, 1999) (with John E. Nowak).

**MODERN CONSTITUTIONAL LAW: CASES AND NOTES** (West Publishing Co., St. Paul, Minnesota, 4th ed. 1993).

1993 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1993).

1994 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1994).

1995 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1995).

1996 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1996).

**CONSTITUTIONAL LAW** (West Publishing Co., St. Paul, Minnesota, 5th ed. 1995) (a one volume treatise on Constitutional Law) (with John E. Nowak).

**PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY** (Foundation Press, Westbury, N.Y., 6th ed. 1995) (with Thomas D. Morgan).

1996 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Westbury, N.Y. 1996) (with Thomas D. Morgan).

1997 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Westbury, N.Y. 1997) (with Thomas D. Morgan).

1998 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Westbury, N.Y. 1998) (with Thomas D. Morgan).

1999 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y. 1999) (with Thomas D. Morgan).

2000 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y. 2000) (with Thomas D. Morgan).

**PROFESSIONAL RESPONSIBILITY** (West Publishing Co., St. Paul, Minnesota, 4th ed. 1995, Black Letter Series) (with computer disk).

**Treatise on Constitutional Law: Substance and Procedure** — EXPANDED CD ROM EDITION (West Publishing Co., St. Paul, Minnesota, 1995) (with John E. Nowak).

**MODERN CONSTITUTIONAL LAW: CASES AND NOTES** (West Publishing Co., St. Paul, Minnesota, 5th ed. 1997).

1997 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1997).

1998 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1998).

1999 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1999).

**TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE** (West Group, St. Paul, Minnesota, 3d ed. 1999) (*five volume treatise*) (with John E. Nowak).

2000 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE (West Group, St. Paul, Minnesota, 2000) (with John E. Nowak).

2001 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE (West Group, St. Paul, Minnesota, 2001) (with John E. Nowak).

2002 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE (West Group, St. Paul, Minnesota, 2002) (with John E. Nowak).

2003 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE (West Group, St. Paul, Minnesota, 2003) (with John E. Nowak).

2004 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE (West Group, St. Paul, Minnesota, 2004) (with John E. Nowak).

2005 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE (West Group, St. Paul, Minnesota, 2005) (with John E. Nowak).

2006 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE (West Group, St. Paul, Minnesota, 2006) (with John E. Nowak).

**헌법: 개인의 자유와 절차를** [AMERICAN CONSTITUTIONAL LAW: INDIVIDUAL LIBERTIES AND PROCEDURE; published in Korean] (Korean Constitutional Court, 1999) (with John E. Nowak).

**PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY** (Foundation Press, Westbury, NY, 7th ed. 2000) (with Thomas D. Morgan).

2001 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y. 2001) (with Thomas D. Morgan).

2002 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y. 2002) (with Thomas D. Morgan).

2003 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y. 2003) (with Thomas D. Morgan).

**LEGAL ETHICS: THE LAWYER'S DESKBOOK ON PROFESSIONAL RESPONSIBILITY** (ABA-West Group, St. Paul, Minn. 2000) (a Treatise on legal ethics, jointly published by the ABA and West Group, a division of Thomson Publishing).

**MODERN CONSTITUTIONAL LAW: CASES AND NOTES** (West Group, St. Paul, Minnesota, 6th ed. 2000).

2000 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Group, St. Paul, Minnesota, 6th ed. 2000).

2001 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Group, St. Paul, Minnesota, 6th ed. 2001).

2002 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Group, St. Paul, Minnesota, 6th ed. 2002).

**CONSTITUTIONAL LAW** (West Group, St. Paul, Minnesota, 6th ed. 2000) (a one volume treatise on Constitutional Law) (with John E. Nowak).

**PROFESSIONAL RESPONSIBILITY** (West Group, St. Paul, Minnesota, 5th ed. 2001, Black Letter Series).

**PROFESSIONAL RESPONSIBILITY: A STUDENT'S GUIDE** (ABA-West Group, St. Paul, Minnesota, 2001).

**LEGAL ETHICS: THE LAWYER'S DESKBOOK ON PROFESSIONAL RESPONSIBILITY** (ABA-West Group, St. Paul, Minn., 2nd ed. 2002) (a Treatise on legal ethics, jointly published by the ABA and West Group, a division of Thomson Publishing).

**PROFESSIONAL RESPONSIBILITY: A STUDENT'S GUIDE** (ABA-West Group, St. Paul, Minnesota, 2nd ed. 2002).

**PROFESSIONAL RESPONSIBILITY** (West Group, St. Paul, Minnesota, 6th ed. 2002, Black Letter Series).

**LEGAL ETHICS IN A NUTSHELL** (West Group, St. Paul, Minnesota, 1st ed. 2003, Nutshell Series) (with Michael I. Krauss).

**MODERN CONSTITUTIONAL LAW: CASES AND NOTES** (Thomson/West, St. Paul, Minnesota, 7th ed. 2003).

2003 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (Thomson/West, St. Paul, Minnesota, 2003).

2004 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (Thomson/West, St. Paul, Minnesota, 2004).

2005 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (Thomson/West, St. Paul, Minnesota, 2005).

2006 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (Thomson/West, St. Paul, Minnesota, 2006).

**PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY** (Foundation Press, New York, N.Y., 8th ed. 2003) (with Thomas D. Morgan).

2004 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y. 2004) (with Thomas D. Morgan).

2005 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y. 2005) (with Thomas D. Morgan).

**CONSTITUTIONAL LAW** (Thomson/West, St. Paul, Minnesota, 7th ed. 2004) (a one volume treatise on Constitutional Law) (with John E. Nowak).

**PROFESSIONAL RESPONSIBILITY** (Thomson/West, St. Paul, Minnesota, 7th ed. 2004, Black Letter Series).

**PRINCIPLES OF CONSTITUTIONAL LAW** (Thomson/West, St. Paul, Minnesota, 1st ed. 2004) (with John E. Nowak).

**LEGAL ETHICS: THE LAWYER'S DESKBOOK ON PROFESSIONAL RESPONSIBILITY** (ABA-Thomson/West, St. Paul, Minn., 3rd ed. 2005) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

**PROFESSIONAL RESPONSIBILITY: A STUDENT'S GUIDE** (ABA-Thomson/West, St. Paul, Minn., 3rd ed. 2005) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

**PRINCIPLES OF CONSTITUTIONAL LAW** (Thomson/West, St. Paul, Minnesota, 2nd ed. 2005) (with John E. Nowak).

**LEGAL ETHICS IN A NUTSHELL** (Thomson/West, St. Paul, Minnesota, 2nd ed. 2006, Nutshell Series) (with Michael I. Krauss).

**PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY** (Foundation Press, New York, N.Y., 9th ed. 2006) (with Thomas D. Morgan).

2006 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y. 2006) (with Thomas D. Morgan).

2007 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y. 2007) (with Thomas D. Morgan).

2008 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y. 2008) (with Thomas D. Morgan).

**LEGAL ETHICS: THE LAWYER'S DESKBOOK ON PROFESSIONAL RESPONSIBILITY** (ABA-Thomson/West, St. Paul, Minn., 4th ed. 2006) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

**PROFESSIONAL RESPONSIBILITY: A STUDENT'S GUIDE** (ABA-Thomson/West, St. Paul, Minn., 4th ed. 2006) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

**MODERN CONSTITUTIONAL LAW: CASES AND NOTES** (Thomson/West, St. Paul, Minnesota, 8th ed. 2007).

2007 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (Thomson/West, St. Paul, Minnesota, 2007).

2008 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (Thomson/West, St. Paul, Minnesota, 2008).

**TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE** (Thomson/West, St. Paul, Minnesota, 4th ed. 2007) (*first two volumes of six volume treatise*) (with John E. Nowak).

2007 Pocket PART TO TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE (Thomson/West, St. Paul, Minnesota, 2007) (with John E. Nowak).

**LEGAL ETHICS IN A NUTSHELL** (Thomson/West, St. Paul, Minnesota, 3rd ed. 2007, Nutshell Series).

**LEGAL ETHICS: THE LAWYER'S DESKBOOK ON PROFESSIONAL RESPONSIBILITY** (ABA-Thomson/West, St. Paul, Minn., 5th ed. 2007) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

**PROFESSIONAL RESPONSIBILITY: A STUDENT'S GUIDE** (ABA-Thomson/West, St. Paul, Minn., 5th ed. 2007) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

**언론의 자유와 미국 헌법, FREEDOM OF SPEECH AND THE AMERICAN CONSTITUTION** (Korean Studies Information Co. Ltd. Publishers, Korea, 2007) (translated into Korean by Professor Lee Boo-Ha, Yeungnam University College of Law and Political Science), coauthored with Professor John E. Nowak.

**PRINCIPLES OF CONSTITUTIONAL LAW** (Thomson/West, St. Paul, Minnesota, 3rd ed. 2007) (with John E. Nowak).

**TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE** (Thomson/West, St. Paul, Minnesota, 4th ed. 2008) *(last four volumes of six volume treatise)* (with John E. Nowak).

2008 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE (Thomson/West, St. Paul, Minnesota, 2008) (with John E. Nowak).

2009 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE (Thomson/West, St. Paul, Minnesota, 2009) (with John E. Nowak).

2010 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE (Thomson/West, St. Paul, Minnesota, 2010) (with John E. Nowak).

2011 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE (Thomson/West, St. Paul, Minnesota, 2011) (with John E. Nowak).

2012 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE (Thomson/West, St. Paul, Minnesota, 2012) (with John E. Nowak).

**PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY** (Foundation Press, New York, N.Y., 10th ed. 2008) (with Thomas D. Morgan).

2009 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y. 2009) (with Thomas D. Morgan).

2010 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y. 2010) (with Thomas D. Morgan).

2011 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y. 2011) (with Thomas D. Morgan).

**PROFESSIONAL RESPONSIBILITY** (Thomson/West, St. Paul, Minnesota, 8th ed. 2008, Black Letter Series).

**LEGAL ETHICS: THE LAWYER'S DESKBOOK ON PROFESSIONAL RESPONSIBILITY** (ABA-Thomson/West, St. Paul, Minn., 6th ed. 2008) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

**PROFESSIONAL RESPONSIBILITY: A STUDENT'S GUIDE** (ABA-Thomson/West, St. Paul, Minn., 6th ed. 2008) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

**MODERN CONSTITUTIONAL LAW: CASES AND NOTES** (West Thomson Reuters, St. Paul, Minnesota, 9th ed. 2009).

2009 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (Thomson/West, St. Paul,

Minnesota, 2009).

2010 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (Thomson/West, St. Paul, Minnesota, 2010).

2011 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (Thomson/West, St. Paul, Minnesota, 2011).

**LEGAL ETHICS: THE LAWYER'S DESKBOOK ON PROFESSIONAL RESPONSIBILITY** (ABA-Thomson/West, St. Paul, Minn., 7th ed. 2009) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

**PROFESSIONAL RESPONSIBILITY: A STUDENT'S GUIDE** (ABA-Thomson/West, St. Paul, Minn., 7th ed. 2009) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

**CONSTITUTIONAL LAW** (Thomson/West, St. Paul, Minnesota, 7th ed. 2010) (a one volume treatise on Constitutional Law) (with John E. Nowak).

**LEGAL ETHICS: THE LAWYER'S DESKBOOK ON PROFESSIONAL RESPONSIBILITY** (ABA-Thomson/West, St. Paul, Minn., 8th ed. 2010) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

**PROFESSIONAL RESPONSIBILITY: A STUDENT'S GUIDE** (ABA-Thomson/West, St. Paul, Minn., 8th ed. 2010) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

**PRINCIPLES OF CONSTITUTIONAL LAW** (West-Thomson/Reuters, St. Paul, Minnesota, 4th ed. 2010) (with John E. Nowak).

**PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY** (Foundation Press, New York, N.Y., 11th ed. 2011) (with Thomas D. Morgan & John S. Dzienkowski).

2012 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y. 2012) (with Thomas D. Morgan).

2013 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y. 2013) (with Thomas D. Morgan).

2014 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, West Academic, St. Paul, MN 2014) (with Thomas D. Morgan).

**LEGAL ETHICS: THE LAWYER'S DESKBOOK ON PROFESSIONAL RESPONSIBILITY** (ABA-Thomson/West, St. Paul, Minn., 9th ed. 2011) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

**PROFESSIONAL RESPONSIBILITY: A STUDENT'S GUIDE** (ABA-Thomson/West, St. Paul, Minn., 9th ed. 2011) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

**PROFESSIONAL RESPONSIBILITY** (West: A Thomson-Reuters Co., St. Paul, Minnesota, 9th ed. 2011, Black Letter Series).

**PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY: CONCISE EDITION** (Foundation Press, New York, N.Y., 11th ed. 2012) (with Thomas D. Morgan & John S. Dzienkowski).

**MODERN CONSTITUTIONAL LAW: CASES AND NOTES** (West Thomson Reuters, St. Paul, Minnesota, 10th ed. 2012).

2012 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (Thomson/West, St. Paul, Minnesota, 2012).

2013 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (Thomson/West, St. Paul, Minnesota, 2013).

**概論 アメリカの法曹倫理 第3版——事例解説 [INTRODUCTION TO AMERICAN LEGAL ETHICS]** (translated by Naoyuki Toyama) (Thomson Reuters, Japan UNI Agency, Inc. Tokyo, 2012).

**LEGAL ETHICS: THE LAWYER'S DESKBOOK ON PROFESSIONAL RESPONSIBILITY** (ABA-Thomson/West, St. Paul, Minn., 10th ed. 2012) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

**PROFESSIONAL RESPONSIBILITY: A STUDENT'S GUIDE** (ABA-Thomson/West, St. Paul, Minn., 10th ed. 2012) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

**TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE** (Thomson/West, St. Paul, Minnesota, 5th ed. 2012) (*first three volumes of six volume treatise*) (with John E. Nowak).

**LEGAL ETHICS IN A NUTSHELL** (Thomson/West, St. Paul, Minnesota, 4th ed. 2013, Nutshell Series).

**TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE** (Thomson/West, St. Paul, Minnesota, 5th ed. 2013) (*last three volumes of six volume treatise*) (with John E. Nowak).

2013 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE (Thomson/West, St. Paul, Minnesota, 2013) (with John E. Nowak).

2014 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE (Thomson/West, St. Paul, Minnesota, 2014) (with John E. Nowak).

**LEGAL ETHICS: THE LAWYER'S DESKBOOK ON PROFESSIONAL RESPONSIBILITY** (ABA-Thomson/West, St. Paul, Minn., 11th ed. 2013) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

**PROFESSIONAL RESPONSIBILITY: A STUDENT'S GUIDE** (ABA-Thomson/West, St. Paul, Minn., 11th ed. 2013) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

**ARTICLES:**

*The "Liberal" Label: Roosevelt's Capture of a Symbol*, 17 PUBLIC POLICY 377 (Harvard University Press, 1968).

*Reform of the Presidential Nominating Conventions*, 56 VIRGINIA LAW REVIEW 179 (1970) (with Reid Chambers).

*The Public Interest Appellant: Limitations on the Right of Competent Parties to Settle Litigation Out of Court*, 66 NORTHWESTERN UNIVERSITY LAW REVIEW 199 (1971).

*The Combination of Functions in Administrative Actions: An Examination of European Alternatives*, 40 FORDHAM LAW REVIEW 101 (1971).

*Star Gallery '74,* 2 ASTRONOMY MAGAZINE 57 (Feb. 1974) (Photographs of Mercury Transit of the Sun).

*Presidents and Ex-Presidents as Witnesses: A Brief Historical Footnote*, 1975 UNIVERSITY OF ILLINOIS LAW FORUM 1 (1975).

*Constitutional and Statutory Restrictions on Political Parties in the Wake of Cousins v. Wigoda*, 53 TEXAS LAW REVIEW 935 (1975).

*Sponsors of Real Estate Partnerships as Brokers and Investment Advisors*, 23 UNIVERSITY OF CALIFORNIA-LOS ANGELES LAW REVIEW 322 (1975) (with Robert C. Hacker).

*Book Review of Freedman's "Lawyers' Ethics in An Adversary System,"* 89 HARVARD LAW REVIEW 622 (1976).

*Congressional Power to Restrict the Jurisdiction of the Lower Federal Courts and the Problem of School Busing*, 64 GEORGETOWN UNIVERSITY LAW JOURNAL 839 (1976).

*Comment*, 27 HARVARD LAW BULLETIN 4 (No. 3, 1976).

*Conforming Stock Ownership Plans with the Securities Acts*, 45 GEORGE WASHINGTON UNIVERSITY LAW REVIEW 34 (1976) (with Robert C. Hacker).

*The Commercial Speech Doctrine in the Supreme Court*, 1976 UNIVERSITY OF ILLINOIS LAW FORUM 1080 (1976).

*Commercial Speech and the First Amendment*, 1 THE COLLEGIATE FORUM 8 (Fall 1977) (published by Dow Jones & Co., Inc.).

*The First Amendment Now Protects Commercial Speech*, 10 THE CENTER MAGAZINE: A PUBLICATION OF THE CENTER FOR THE STUDY OF DEMOCRATIC INSTITUTIONS 32 (May/June 1977).

*The Word "Profession" is Only a Label — And Not a Very Useful One*, 4 LEARNING AND THE LAW 16 (Summer 1977) (publication of the American Bar Association Section of Legal Education and Admissions to the Bar).

*The SEC's Ectoplasmic Theory of an Issuer as Applied to Educational and Charitable Institutions, Bank Trustees, and Other Exempt Issuers*, 65 CALIFORNIA LAW REVIEW 1181 (1977) (with Robert C. Hacker) (published by University of California-Berkeley Law School).

*Law, Lawyers and Managers*, in, THE ETHICS OF CORPORATE CONDUCT, pp. 127-45 (Clarence Walton, ed. 1977) (published by Prentice-Hall, Inc., Englewood Cliffs, N.J., for the American Assembly of Columbia University).

*When the Client Lies: Unhelpful Guidelines from the ABA*, 1 CORPORATION LAW REVIEW 34 (1978).

*SEC Registration of Private Investment Partnerships after Abrahamson v. Fleschner*, 78 COLUMBIA LAW REVIEW 1471 (1978) (with Robert C. Hacker).

*The Reliance of Counsel Defense in Securities Cases: Damage Actions versus Injunctive Actions*, 1 CORPORATION LAW REVIEW 159 (1978) (with Robert C. Hacker).

*Liability for the Misuse of Nonpublic, Material Inside Information: The Duty to Convey and the Duty to Inquire*, 1 CORPORATION LAW REVIEW 376 (1978) (with Robert C. Hacker).

*Running Out of Time: Can the E.R.A. Be Saved,* 64 AMERICAN BAR ASSOCIATION JOURNAL 1507 (1978).

*The Duty to Take Remedial Action*, 2 CORPORATION LAW REVIEW 159 (1979) (with Robert C. Hacker).

*Waiver of Attorney Client Privilege*, 2 CORPORATION LAW REVIEW 250 (1979) (with Robert C. Hacker).

*Attorney Conflicts of Interest*, 2 CORPORATION LAW REVIEW 345 (1979) (with Robert C. Hacker).

*Standing, Waiver, Laches, and Appealability in Attorney Disqualification Cases*, 3 CORPORATION LAW REVIEW 82 (1980) (with Robert C. Hacker).

*Short-Swing Profits, Section 16(b), and Nonstatutory Insiders*, 3 CORPORATION LAW REVIEW 252 (1980) (with Robert C. Hacker).

*Restrictions on Agency and Congressional Subpoenas Issued for an Improper Purpose*, 4 CORPORATION LAW REVIEW 74 (1981) (with Robert C. Hacker).

*The Extraterritorial Regulation of Foreign Business under the U.S. Securities Laws*, 59 NORTH CAROLINA LAW REVIEW 643 (1981) (with Robert C. Hacker), reprinted in 24 CORPORATE PRACTICE COMMENTATOR 233 (1982).

*Ethical Restraints on Communications with Adverse Expert Witnesses*, 5 CORPORATION LAW REVIEW 348 (1982) (with Robert C. Hacker).

*A Comment on the Creation and Resolution of a "Nonproblem": Dames & Moore v. Regan, the Foreign Affairs Power, and the Role of the Court*, 29 UNIVERSITY OF CALIFORNIA - LOS ANGELES LAW REVIEW 1129 (1982) (with John E. Nowak).

*Corporate Confidences and the Duty to Refrain from Insider Trading*, 6 CORPORATION LAW REVIEW 53 (1983) (with Robert C. Hacker).

*Representing the Corporate Client and the Proposed Rules of Professional Conduct*, 6 CORPORATION LAW REVIEW 269 (1983) (with Robert C. Hacker).

*Ethics*, USA Today, Feb. 15, 1983, at p. 10A.

*Teaching Ethics under the New Model Rules*, 14 SYLLABUS 1 (No. 3, Sept. 1983) (a publication of the American Bar Association Section on Legal Education and Admissions to the Bar).

*Usery in the Wake of Federal Energy Regulatory Commission v. Mississippi*, 1 CONSTITUTIONAL COMMENTARY 43 (1984).

*The Doctrine of Conditional Preemption and Other Limitations on Tenth Amendment Restrictions*, 132 UNIVERSITY OF PENNSYLVANIA LAW REVIEW 289 (1984).

*Ethics*, 12 STUDENT LAWYER 14 (May 1984).

*Debate Over Model Rules Moves to the States*, 130 CHICAGO LAW BULLETIN 3, 8 (June 12, 1984).

*The Notice of Withdrawal and the New Model Rules of Professional Conduct: Blowing the Whistle and Waiving the Red Flag*, 63 OREGON LAW REVIEW 455 (1984), reprinted in, 1985 CRIMINAL LAW REVIEW 533, and excerpted in 34 LAW REVIEW DIGEST 14 (Mar./Apr. 1985).

*Instruments for Legal Integration in the European Community — A Review* (with Peter Hay and Giorgio Gaja), in 1 INTEGRATION THROUGH LAW: EUROPE AND THE AMERICAN FEDERAL EXPERIENCE 113 (Mauro Cappelletti, Monica Seccombe & Joseph Weiler, Eds.) (Walter de Gruyter, Berlin, 1986).

*Conflict of Laws as a Technique for Legal Integration* (with Peter Hay and Ole Lando) in 1 INTEGRATION THROUGH LAW: EUROPE AND THE AMERICAN FEDERAL EXPERIENCE 161 (M. Cappelletti, M. Seccombe, & J. Weiler, eds.) (Walter de Gruyter, Berlin, 1986).

*The Doctrine of the Inner Political Check, the Dormant Commerce Clause, and Federal Preemption*, 53 TRANSPORTATION PRACTITIONERS JOURNAL 263 (1986).

*The Role of Law Reviews: The Extreme Centrist Position*, 62 INDIANA LAW JOURNAL 1 (1986).

*Intergovernmental Tax Immunity and Tax Free Municipals After Garcia*, 57 U. COLORADO LAW REVIEW 849 (1986).

*Sales and Use Tax Credits, Discrimination against Interstate Commerce, and the Useless Multiple Taxation Concept*, 20 UNIVERSITY OF CALIFORNIA-DAVIS LAW REVIEW 273 (1987) (with John E. Nowak).

*Ethical Problems in Federal Agency Hiring of Private Attorneys*, 1 GEORGETOWN JOURNAL OF LEGAL ETHICS 85 (1987).

*Bicentennial Lessons from the Constitutional Convention of 1787*, 21 SUFFOLK UNIVERSITY LAW REVIEW 589 (1987) (the Twentieth Donahue Lecture).

*Remembering Judge Walter R. Mansfield*, 45 BROOKLYN LAW REVIEW 1 (1987).

*Professionals, Pragmatists or Predators,* Part I, 75 ILLINOIS BAR JOURNAL 420, Part II, 482, Part III, 540 (1987).

*Life Under the Articles of Confederation*, 75 ILLINOIS BAR JOURNAL 544 (1987).

*Lawyers and Professionalism: A Commentary on the Report of the American Bar Association Commission on Professionalism*, 18 LOYOLA UNIVERSITY OF CHICAGO LAW JOURNAL 1149 (1987) (the Baker-McKenzie Foundation Lecture).

*The Constitutional Future of the Bill of Rights: A Closer Look at Commercial Speech and State Aid to Religiously Affiliated Schools*, 65 NORTH CAROLINA LAW REVIEW 917 (1987).

*Bork's Firing of Cox: What Really Happened*, WALL STREET JOURNAL, Sept. 9, 1987, p. 32.

*An Essay on the Constitutional Parameters of Federal Impeachment*, 76 KENTUCKY LAW REVIEW 707 (1988).

*Contract Rights, Property Rights and Constitutional Restrictions on Federal Limitations of Private Claims Against Foreign Governments*, in, LEGAL ESSAYS IN HONOR OF JOHN E. CRIBBET, pp 151-68 (Peter Hay & Michael Hoeflich, eds., U. of Ill. Press, 1988).

*Learning the Law of Lawyering,* 136 UNIVERSITY OF PENNSYLVANIA LAW REVIEW 1761 (1988).

*Original Intent, The View of the Framers, and the Role of the Ratifiers*, 41 VANDERBILT LAW REVIEW 507 (1988).

*The Confirmation Process for Supreme Court Justices in the Modern Era*, 37 EMORY LAW JOURNAL 559 (1988).

*Sheathing the Sword of Federal Preemption*, 5 CONSTITUTIONAL COMMENTARY 311 (1988).

*Is Lawyer Professionalism Declining or Advancing* (3-Part Series) 134 CHICAGO DAILY LAW BULLETIN, Mar. 5, 1988 at 2, 14 (*Part I*); Mar. 16, 1988 at 2, 14 (*Part II*); Mar. 17, 1988 at 2, 10 (*Part III*).

*Challenging the Ethics Myths*, 10 LEGAL TIMES (OF WASHINGTON, D.C.) 16-17 (Mar. 21, 1988), reprinted in, 99 FULTON COUNTY DAILY REPORT 4 (Apr. 13, 1988) (Georgia), 4 TEXAS LAWYER 20-21 (April 18, 1988), 1 MANHATTAN LAWYER, 12, 33 (Mar. 29 - Apr. 4, 1988), 14 CONNECTICUT LAW TRIBUNE 10-11 (Aug. 15, 1988).

*The Litigator's Professional Responsibility*, 77 ILLINOIS BAR JOURNAL 192 (1988), reprinted in, 25 TRIAL MAGAZINE 98 (March 1989), and in, 30 LAW OFFICE ECONOMICS AND MANAGEMENT 61 (1989).

*Race to Courthouse — Or Walk?*, 11 LEGAL TIMES (OF WASHINGTON, D.C.) 14 (Aug. 15, 1988), reprinted in, 99 FULTON COUNTY DAILY REPORT 2 (Aug. 11, 1988) (Georgia), 1 MANHATTAN LAWYER 12 (Aug. 16-22, 1988).

*State Bars Reluctant to Hear Any Evil*, 11 LEGAL TIMES (OF WASHINGTON, D.C.) 14 (Dec. 12, 1988), reprinted in, 99 FULTON COUNTY DAILY REPORT 8 (Dec. 12, 1988) (Georgia), THE RECORDER OF SAN FRANCISCO 4 (Dec. 22, 1988).

*The Court: A Decade of Stability and Change*, 11 NATIONAL LAW JOURNAL 34-36 (Sept. 26, 1988).

*Client Fraud: Blowing the Whistle, Other Options*, 24 TRIAL MAGAZINE 92 (Nov. 1988).

*The Lawyer's Duty To Report Another Lawyer's Unethical Violations in the Wake of Himmel*, 1988 UNIVERSITY OF ILLINOIS LAW REVIEW 977 (1988).

*Runyon v. McCrary and the Mosaic of State Action*, 67 WASHINGTON UNIVERSITY LAW QUARTERLY 47 (1989).

*Interpreting an Unwritten Constitution*, 12 HARVARD JOURNAL OF LAW & PUBLIC POLICY 15 (1989).

*Line-Item Veto: Best Budget Fix?*, 11 LEGAL TIMES (OF WASHINGTON, D.C.) 15 (Mar. 27, 1989), reprinted in, *e.g.*, 100 FULTON COUNTY (ATLANTA) DAILY REPORT 8 (Mar. 23, 1989) (Georgia), 2 MANHATTAN LAWYER 12 (Apr. 4 - Apr. 10, 1989).

*Impeaching Federal Judges: Where Are We and Where Are We Going?*, 72 JUDICATURE: THE JOURNAL OF THE AMERICAN JUDICATURE SOCIETY 359 (1989) (transcript of edited remarks).

*Cautionary Lessons from American Securities Arbitration: Litigation versus Arbitration*, 5 ARBITRATION INTERNATIONAL 199 (London Court of International Arbitration, Issue 2, 1989).

*The Impairments Clause and the Corporation: A Comment on Professors Butler's and Ribstein's Thesis*, 55 BROOKLYN LAW REVIEW 809 (1989) (Symposium).

*Eschewing Bright Lines*, 25 TRIAL MAGAZINE 52 (Dec. 1989).

*Meanwhile, Back in Mother Russia*, LEGAL TIMES (OF WASHINGTON, D.C.), Oct. 2, 1989, at 35 (with Peter B. Maggs).

*A Tribute to Eugene F. Scoles*, 1989 ILLINOIS LAW REVIEW 835 (1989).

*The Case Against Special Prosecutors*, WALL STREET JOURNAL, Jan. 15, 1990, at p. A8.

*Jurisprudent: ABA Model Rules on Client Secrets No Help*, 13 CHICAGO LAWYER 12, 56 (Feb. 1990).

*The New Illinois Rules of Professional Conduct: A Brief Introduction and Criticism*, 78 ILLINOIS BAR JOURNAL 386 (1990).

*Beholden to None, Justices Often Cut Their Own Paths*, LOS ANGELES TIMES, July 27, 1990, at p. B7.

*Predicting the Views of Supreme Court Nominees*, 26 TRIAL MAGAZINE 42 (Nov. 1990).

*Judicial Conference — Second Circuit: RICO and the Proposed Restatement of the Law Governing Lawyers* (Sept. 7, 1990), 136 FEDERAL RULES DECISIONS 233, 266-71 (1991).

*War Dissenters Reflect Freedom's Power*, 13 LEGAL TIMES (OF WASHINGTON, D.C.) 24 (Feb. 4, 1991).

*Joseph Story: A Man for All Seasons*, 1990 JOURNAL OF SUPREME COURT HISTORY: YEARBOOK OF THE SUPREME COURT HISTORICAL SOCIETY 17 (1990) (with John E. Nowak).

*When Rough Justice Rides Roughshod*, 13 LEGAL TIMES (of Washington, D.C.) 26 (April 1, 1991), reprinted in, 102 FULTON COUNTY (ATLANTA) DAILY REPORT 8 (Mar. 29, 1991), 32 BROWARD REVIEW (Fort Lauderdale, Florida) 11 (April 1, 1991), 37 PALM BEACH (FLORIDA) REVIEW 11 (April 1, 1991), 65 MIAMI REVIEW 11 (April 1, 1991), 77 NEW JERSEY LAW JOURNAL 9, 24 (April 4, 1991), 65 THE RECORDER 4, 5 (April 4, 1991).

*Nici o constitutie . . .*, 18 LUMEA AZI 4 (May 2, 1991) (published in Romanian).

*Public Executions: Should the Imposition of the Death Sentence Be Televised?*, 4 ILLINOIS QUARTERLY 36 (July 1991) (panel discussion).

*One Potato, Two Potato, Three Potato, Four*, 14 LEGAL TIMES (OF WASHINGTON, D.C.) 23 (Aug. 12, 1991) (reprinted in various legal newspapers).

*Abuse of Ethics Rule Hinders Prosecutors*, CHICAGO SUN-TIMES, Aug. 24, 1991, at p. 12, col. 1-2.

*Commercial Speech and the Platonic Ideal: Libre expression et libre enterprise*, in, FREEDOM OF EXPRESSION AND THE CHARTER 319 (David Schneiderman, ed. Carswell, Canada 1991), a collection of papers presented at the Edmonton, Alberta Conference on the Canadian Constitution, of the Centre for Constitutional Studies/Centre d'études constitutionnelles.

*Thomas' Ethics and the Court*, 13 LEGAL TIMES (OF WASHINGTON, D.C.) 20 (Aug. 26, 1991).

*A Red Herring Confirmation Issue*, THE INDIANAPOLIS STAR, Sept. 10, 1991, at p. A7, col. 1-3.

*Celebrating the Bicentennial of the Bill of Rights,* 79 ILLINOIS BAR JOURNAL 608 (1991).

*Exporting the American Bill of Rights: The Lesson from Romania*, 1991 UNIVERSITY OF ILLINOIS LAW REVIEW 1065 (1991).

*The Welfare State and the Constitution*, in THE ENCYCLOPEDIA OF THE AMERICAN CONSTITUTION 571 (Macmillan Pub. Co., Inc., K. Karst & L. Levy, Eds., Supplement I, 1992).

*The Veto Power*, in THE OXFORD COMPANION TO THE SUPREME COURT OF THE UNITED STATES 896 (Oxford University Press, Kermit L. Hall, ed. 1992).

*Legal Ethics*, 45 SOUTHWESTERN LAW JOURNAL [Southern Methodist University] 2035 (1992).

*The Best Response to Speech We Don't Like Is More Speech*, CHICAGO SUN-TIMES, May 16, 1992, at p.14, col. 1-6.

*Foreword: The Role of the Modern Supreme Court*, 26 U. RICHMOND LAW REVIEW 433 (1992).

*Simon Greenleaf on Desuetude and Judge-Made Law: An Unpublished Letter to Francis Lieber*, 10 CONSTITUTIONAL COMMENTARY 93 (1993) (with Michael H. Hoeflich).

*Roe v. Wade: Reading It Right,* 15 LEGAL TIMES [OF WASHINGTON, D.C.] 36, 40 (Jan. 25, 1993) (reprinted in various publications, *e.g.*, TEXAS LAWYER. Feb. 8, 1993, at 16-17).

*No Impediment to Term Limits*, THE WASHINGTON POST, Feb. 13, 1993, at A31, col. 1.

*The Civil Rights Act of 1991: A Brief Introductory Analysis of the Congressional Response to Judicial Interpretation*, 68 NOTRE DAME LAW REVIEW 923 (1993) (Symposium).

*A Brief Comment on Politically Incorrect Speech in the Wake of R.A.V.*, 47 SOUTHERN METHODIST UNIVERSITY LAW REVIEW 9 (1993).

*Juggling for Power Over NAFTA: A Simple Cure for a Big Problem*, 16 LEGAL TIMES (OF WASHINGTON, D.C.) 23 (July 19, 1993).

*Free Trade's Political Alchemy,* 9 TEXAS LAWYER 10 (July 26, 1993).

*Roadblock to Mexico,* THE WASHINGTON POST, Sept. 21, 1993, at A19, col. 6.

*Impeachment Showdown: Congress vs. Judges,* 16 LEGAL TIMES (OF WASHINGTON, D.C.) 37 (Nov. 1, 1993) (reprinted, *e.g.,* in 19 THE CONNECTICUT LAW TRIBUNE 24, Nov. 8, 1993).

*The Case Against Permanent Disbarment,* 5 THE PROFESSIONAL LAWYER 22 (A.B.A., No. 2, Feb. 1994).

*Paula Jones Day in Court,* 17 LEGAL TIMES (OF WASHINGTON, D.C.) 24, 27 (May 30, 1994), *reprinted, e.g.,* 10 TEXAS LAWYER 24, 27 (June 13, 1994).

*Is the President Above the Law?*, CHICAGO TRIBUNE, June 1, 1994, § 1, at 21, col. 3 - 4.

*"Richard" Case Defies the Law As Well As the Logic,* CHICAGO TRIBUNE, July 17, 1994, § 4, at 3, col. 4.

*Setting Timer on Congressional Terms,* 17 LEGAL TIMES (OF WASHINGTON, D.C.) S31, S33 (Oct. 3, 1994).

*A Commentary on the Constitutionality of Term Limits*, in THE POLITICS AND LAW OF TERM LIMITS 141 (Edward H. Crane & Roger Pilon, eds., Cato Institute 1994).

*The Constitution Lets States Impose Term Limits,* WALL STREET JOURNAL, Nov. 30, 1994, at A21, col. 3-6 (Midwest ed.).

*Can You Say That?,* 30 TRIAL MAGAZINE 18 (December 1994).

*Rolls Royce and the Case Law,* LAKE MICHIGAN LADY, at 34-36 (Issue No. 37, 1994).

*Rethinking Term Limits for Federal Legislators in Light of the Structure of the Constitution*, 73 OREGON LAW REVIEW 561 (1994).

*Racist Speech and Attorney Discipline,* 6 THE PROFESSIONAL LAWYER 1 (A.B.A., No. 6, 1995).

*Returning Art to the People: No Subsidies and No Strings*, 17 LEGAL TIMES (OF WASHINGTON, D.C.) 43 (Mar. 6, 1995).

*Term Limits and Lessons from Our Past,* HEARTLAND POLICY STUDY, No. 66 (HEARTLAND INSTITUTE, June 28, 1995).

*Cases Refine Definition of Federal Powers,* 17 NATIONAL LAW JOURNAL C9, C12 (July 31, 1995).

*Computerized Highways and the Search for Privacy in the Case Law: A Comment,* 11 SANTA CLARA COMPUTER AND HIGH TECHNOLOGY LAW JOURNAL 119 (1995) (part of a Conference and Symposium on Intelligent Vehicle Highway Systems).

*Fixing the War Powers Act,* THE HERITAGE LECTURES, No. 529 (The Heritage Foundation, 1995).

*What Next? Outlawing Lawyer Jokes?,* WALL STREET JOURNAL, Aug. 8, 1995, at A12, col. 3-5 (Midwest ed.).

*Innovations Disguised as Traditions: An Historical Review of the Supreme Court Nominations Process*, 1995 UNIVERSITY OF ILLINOIS LAW REVIEW 123 (1995).

*Flat Taxes: A Progressive Way to Go*, 17 LEGAL TIMES (OF WASHINGTON, D.C.) 20 (Nov. 27, 1995).

*Embattled Clintons Should Note Watergate Lessons*, NEWSDAY, Feb. 28, 1996, A32.

*Rotunda on Travel: A Wet Toast to Limp Bacon, Loose Clothing*, 36 ILLINOIS STATE BAR NEWS 4 (No. 16, Mar 1, 1996).

*The Aftermath of Thornton*, 13 CONSTITUTIONAL COMMENTARY 201 (1996).

*A Czech Window on Ethics*, 18 NATIONAL LAW JOURNAL, at A15 (July 22, 1996).

*Legal Ethics, the Czech Republic, and the Rule of Law*, 7 THE PROFESSIONAL LAWYER 1 (A.B.A., No. 8, 1996).

*Sister Act: Conflicts of Interest with Sister Corporations*, in, LEGAL ETHICS: THE CORE ISSUES (1996) (Hofstra University School of Law Conference on Legal Ethics), 1 JOURNAL OF THE INSTITUTE FOR THE STUDY OF LEGAL ETHICS 215 (1996).

*The Warren Court and Freedom of the Press,* in THE WARREN COURT: A 25 YEAR RETROSPECTIVE 85 (Bernard Schwartz, ed. Oxford University Press 1996).

*Judgeships Trapped in a Political Snare?*, WASHINGTON TIMES, Oct. 29, 1996, at A15, col. 1-6.

*Nová pravidla profesního jednání advokátu v Ceské republice (v komparaci s kodexy USA a EU)* [The New Rules of Professional Conduct for Advocates in the Czech Republic], 5 EMP: EVROPSKÉ A MEZINÁRODNÍ PRÁVO 58 (Císlo 3-4, 1996) (published in Czech and English).

*Dealing with the Media: Ethical, Constitutional, and Practical Parameters*, 84 ILLINOIS BAR JOURNAL 614 (December 1996).

*An Essay on Term Limits and a Call for a Constitutional Convention*, 80 MARQUETTE UNIVERSITY LAW REVIEW 227 (1996) (with Stephen J. Safranek).

*Heiple's Burdens*, CHICAGO TRIBUNE, January 29, 1997, at § 1, p. 11, col. 4 [reprinted in, BELLEVILLE NEWS-DEMOCRAT, February 2, 1997, at § A, p. 4A, col. 4-6].

*When Duty Calls, Courts Can Be Flexible,* WASHINGTON POST, January 29, 1997, at p. A21, col. 2-3.

*Professionalism, Legal Advertising, and Free Speech In the Wake of Florida Bar v. Went For It, Inc.*, 49 ARKANSAS LAW REVIEW 703 (1997) (Symposium), reprinted in, 12 LAWYERS' LIABILITY REVIEW 2 (No. 10, Oct. 1998) (part I), 12 LAWYERS' LIABILITY REVIEW 2 (No. 11, Nov. 1998) (part II), 12 LAWYERS' LIABILITY REVIEW 2 (No. 12, Oct. 1998) (part III).

*Conflict Problems When Representing Members of Corporate Families*, 72 NOTRE DAME LAW REVIEW 655 (1997).

*Judges as Ambulance Chasers*, 8 THE PROFESSIONAL LAWYER 14 (A.B.A., No. 8, 1997).

*West Virginia Provides Model for Legal Discipline Across State Lines*, 7 LEGAL OPINION LETTER 1 (Washington Legal Foundation, No. 15, May 16, 1997).

*The Influence of the American Law Institute's Proposed Restatement of the Law Governing Lawyers*, 1 PROFESSIONAL RESPONSIBILITY, LEGAL ETHICS, AND LEGAL EDUCATION NEWS 1, 4 (Federalist Society, No. 2, 1997).

*Handed a Lesser Veto*, 20 LEGAL TIMES (OF WASHINGTON, D.C.) 27, 28 (May 26, 1997).

*Lips Unlocked: Attorney-Client Privilege and the Government Lawyer*, 20 LEGAL TIMES (OF WASHINGTON, D.C.) 21-22, 28 (June 30, 1997).

*The War Powers Act in Perspective*, 2 MICHIGAN LAW & POLICY REVIEW 1 (1997).

*The True Significance of Clinton vs. Jones*, CHICAGO TRIBUNE, July 8, 1997, at 12, col. 1-6.

*Can a President Be Imprisoned?*, 20 LEGAL TIMES (OF WASHINGTON, D.C.) 22-23, 28 (July 21, 1997).

*The Americans with Disabilities Act, Bar Examinations, and the Constitution: A Balancing Act*, 66 THE BAR EXAMINER 6 (No. 3, August, 1997).

*Permanent Disbarment: A Market Oriented Proposal*, 9 THE PROFESSIONAL LAWYER 2 (ABA, No. 9, Nov. 1997) (with Mary Devlin).

*White House Counsel and the Attorney Client Privilege*, 1 PROFESSIONAL RESPONSIBILITY, LEGAL ETHICS, AND LEGAL EDUCATION NEWS 1 (Federalist Society, No. 3, 1997).

*When Witnesses Are Told What to Say,* WASHINGTON POST, January 13, 1998, at A15, col. 2-4 (with Lester Brickman).

*Eastern European Diary: Constitution-Building in the Former Soviet Union*, 1 THE GREEN BAG, 2d SERIES 163 (Winter 1998).

*The Chemical Weapons Convention: Political and Constitutional Issues*, 15 CONSTITUTIONAL COMMENTARY 131 (1998).

*Reporting Sensational Trials: Free Press, a Responsible Press, and Cameras in the Courts*, 3 COMMUNICATIONS LAW AND POLICY 295 (No. 2, Spring, 1998).

*Gauging the Impact of the Proposed Restatement of the Law Governing Lawyers*, 9 THE PROFESSIONAL LAWYER 2 (ABA, No.2, 1998).

*Is the Flat Tax Dead?,* CHICAGO TRIBUNE, April 15, 1998, at § 1, p. 17, col. 1-3.

*Epilogue,* in PRIME TIME LAW: FICTIONAL TV LAWYERS AND THEIR IMPACT ON AMERICA — FROM *PERRY MASON* AND *L.A. LAW* TO *LAW & ORDER* AND *ALLY MCBEAL* 265 (Robert M. Jarvis & Paul R. Joseph, eds., Carolina Academic Press, 1998).

*New Respectability, New Freedom*, 144 CHICAGO DAILY LAW BULLETIN 25, 35 (April 25, 1998).

*Resurrecting Federalism Under the New Tenth and Fourteenth Amendments*, 29 TEXAS TECH LAW REVIEW 953 (1998).

*Competitive Bidding Would End 'Pay-to-Play,'* 20 NATIONAL LAW JOURNAL A23 (June 29, 1998).

*Remarks on School Choice*, in Marshall J. Breger & David M. Gordis, eds., VOUCHERS FOR SCHOOL CHOICE: CHALLENGE OR OPPORTUNITY? — AN AMERICAN JEWISH REAPPRAISAL 82 (Wilstein Institute of Jewish Policy Studies, 1998).

*The Power of Congress Under Section 5 of the Fourteenth Amendment after City of Boerne v. Flores*, 32 INDIANA LAW REVIEW 163 (1998).

*Innovative Legal Billing, Alternatives to Billable Hours, and Ethical Hurdles,* published in, LEGAL ETHICS: ACCESS TO JUSTICE (1998) (Hofstra University School of Law Conference on Legal Ethics), 2 JOURNAL OF THE INSTITUTE FOR THE STUDY OF LEGAL ETHICS 1701 (1999).

*The Legal Profession and the Public Image of Lawyers*, 23 THE JOURNAL OF THE LEGAL PROFESSION 51 (1999).

*Moving from Billable Hours to Fixed Fees: Task-Based Billing and Legal Ethics*, 47 UNIVERSITY OF KANSAS LAW REVIEW 819 (1999).

*Multidisciplinary Practice: An Idea Whose Time Has Come,* 3 PROFESSIONAL RESPONSIBILITY, LEGAL ETHICS, AND LEGAL EDUCATION NEWS 1 (Federalist Society, No. 2, 1999).

*Subsidized Speech for the Rich*, CHICAGO TRIBUNE, Dec. 12, 1999, at § 1, p.23.

*Presidential Pardon for Elian?*, WASHINGTON TIMES, Dec. 28, 1999, at A17.

*Independent Counsel and the Charges of Leaking: A Brief Case Study*, 68 FORDHAM LAW REVIEW 869 (1999).

*Let Nothing You Display: Making Room for Religion in Public Forums*, LEGAL TIMES (OF WASHINGTON, D.C.), Jan. 3, 2000, at pp. 43, 45.

*Another Clinton Victim: The Integrity of the Federal Courts*, WALL STREET JOURNAL, March 20, 2000, at p. A35, reprinted in, volume 6, WHITEWATER: IMPEACHMENT AFTERMATH, ELECTION 2000 (Dow Jones & Co., 2001), at 145.

*Teaching Legal Ethics a Quarter of a Century After Watergate*, 51 HASTINGS LAW JOURNAL 661 (2000).

*The Long Gavel: In Class Actions, State Judges Are Trumping Other Jurisdictions' Laws*, LEGAL TIMES (of Washington, D.C.), May 15, 2000, at 67, 69.

*Making Work for Lawyers*, THE SCRIPPS HOWARD NEWS SERVICE (distributed to over 400 subscriber newspapers), Friday, July 7, 2000.

*Rated V for Violence*, LEGAL TIMES (of Washington, D.C.), August 14, 2000, at p. 68.

*The FTC Report on Hollywood Entertainment*, 1 FREE SPEECH & ELECTION LAW GROUP NEWS (Federalist Society, Sept. 15, 2000), http://www.fed-soc.org/Publications/practicegroupnewsletters/PG%20Links/rotunda.htm

*Constitutional Problems with Enforcing the Biological Weapons Convention*, CATO FOREIGN POLICY BRIEFING (No. 61, September 28, 2000), http://www.cato.org/pubs/fpbriefs/fpb-061es.html .

*The Bar and the Legal Academy*, in THE RULE OF LAW IN THE WAKE OF CLINTON 207-29 (Roger Pilon, ed. Cato Institute 2000).

*Should States Sue the Entertainment Industry as They Did Big Tobacco?*, 16 INSIGHT ON THE NEWS 41, 43 (Oct. 30, 2000) (debate with Charlie Condon, the Attorney General of South Carolina).

*The Benefits of School Vouchers*, NATIONAL LAW JOURNAL, Oct. 23, 2000, at A17.

*How the Electoral College Works, and Why It Works Well*, KNIGHT-RIDDER NEWSPAPER CHAIN (distributed to over 400 subscriber newspapers), Friday, Nov. 15, 2000; *e.g.*, *Electoral College Works Well*, THE PRESS OF ATLANTIC CITY, Nov. 15, 2000, at p. A13, 2000 (Westlaw) WLNR 7545816.

*The Equal-Protection Clause: A Field Day for Misleading Statistics,* in NATIONAL REVIEW ON LINE, Nov. 15, 2000, http://www.nationalreview.com/comment/comment111500f.shtml .

*Simply Unconstitutional: How Hand Counting Violates Due Process*, in NATIONAL REVIEW ON LINE, Nov. 16, 2000, http://www.nationalreview.com/comment/comment111600f.shtml

*Let Legislature Decide*, USA TODAY, November 21, 2000, at 16A.

*What it Takes to Win: Using the Psychic Hotline to Decide Contested Races*, CHICAGO TRIBUNE, November 26, 2000, at § 1, p. 19.

*Don't Blame Movies*, WASHINGTON POST, Dec. 1, 2000, at A35.

*From the Supremes to Seminole*, in NATIONAL REVIEW ON LINE, Dec. 5, 2000, http://www.nationalreview.com/comment/comment120500a.shtml

*Changing the Election Law, Again*, in NATIONAL REVIEW ON LINE, Dec. 9, 2000, http://www.nationalreview.com/comment/comment120800c.shtml

*Rubbish about Recusal*, WALL STREET JOURNAL, December 13, 2000, at A26.

*The Partisanship Myth*, THE CHRISTIAN SCIENCE MONITOR, December 15, 2000, at 11.

*Court Correctly Overrules Granholm*, DETROIT NEWS, Jan. 30, 2001, at p. 11A.

*A Few Modest Proposals to Reform the Law Governing Federal Judicial Salaries*, 12 THE PROFESSIONAL LAWYER 1 (A.B.A., Fall 2000).

*The New States' Rights, the New Federalism, the New Commerce Clause, and the Proposed New Abdication*, 25 OKLAHOMA CITY UNIVERSITY LAW REVIEW 869 (2000).

*Judicial Comments on Pending Cases: The Ethical Restrictions and the Sanctions – A Case Study of the Microsoft Litigation*, 2001 UNIVERSITY OF ILLINOIS LAW REVIEW 611 (2001).

*Lawyer Advertising and the Philosophical Origins of the Commercial Speech Doctrine,* 36 UNIVERSITY OF RICHMOND LAW REVIEW 91 (2002) (Allen Chair Symposium of 2001).

*No POWs: Unlawful Combatants, American Law, and the Geneva Convention*, NATIONAL REVIEW ONLINE, Jan. 29, 2002, http://www.nationalreview.com/comment/comment-rotunda012902.shtml .

*The Role of Ideology in Confirming Federal Court Judges*, 15 GEORGETOWN JOURNAL OF LEGAL ETHICS 127 (2001).

*The Commerce Clause, the Political Question Doctrine, and Morrison*, 18 CONSTITUTIONAL COMMENTARY 319 (2001).

*ABA-Recommended Nominees Deserve Hearings*, CHICAGO SUN-TIMES, May 5, 2002, at 37.

*Monitoring the Conversations of Prisoners*, 13 THE PROFESSIONAL LAWYER 1 (ABA, No. 3, 2002).

*City's O'Hare Strategy Flouts Constitution,* CHICAGO DAILY LAW BULLETIN, June 14, 2002, at p. 5.

*Federalizing the Windy City,* NATIONAL REVIEW ONLINE, June 18, 2002, http://www.nationalreview.com/comment/comment-rotunda061802.asp

*The Eleventh Amendment, Garrett, and Protection for Civil Rights*, 53 ALABAMA LAW REVIEW 1183 (2002).

*Statement before the Senate Committee Hearings on the Judicial Nomination Process*, 50 DRAKE LAW REVIEW 523 (2002).

*Judicial Campaigns in the Shadow of Republican Party v. White*, 14 THE PROFESSIONAL LAWYER 2 (ABA, No. 1, 2002).

*Judicial Elections, Campaign Financing, and Free Speech*, 2 ELECTION LAW JOURNAL 79 (No.1, 2003).

*The Implications of the New Commerce Clause Jurisprudence: An Evolutionary or Revolutionary Court?,* 55 ARKANSAS LAW REVIEW 795 (2003).

*Pravo na svobody slova v voennoe vremiz v knostitutsii SShA: istoki i evoliutsiia*, PRAVO I ZAKONODATEL'STVO, 2003, No. 2, c. 63-65; *The Right of Freedom of Speech in Wartime*

*in the Constitution of the USA: Sources And Evolution*, LAW AND LEGISLATION, 2003, No. 2, pp. 63-65.

*Before Changing the Law, Look at SBC's Record and Credibility*, CHAMPAIGN NEWS-GAZETTE, April 13, 2003, at B1, B4.

*Yet Another Article on Bush v. Gore*, 64 OHIO STATE LAW JOURNAL 283 (2003).

*SBC's Secessionist Gambit Deserved to Fail*, CHICAGO TRIBUNE, June 15, 2003, at p. C9.

*A Preliminary Empirical Inquiry into the Connection between Judicial Decision Making and Campaign Contributions to Judicial Candidates*, 14 THE PROFESSIONAL LAWYER 16 (ABA, No. 2, 2003).

*Senate Rules to Keep Filibusters*, CHICAGO SUN-TIMES, July 4, 2003, at p. 29.

*The Perceived Connection between Judicial Decision Making and Judicial Campaign Contributions: Some Preliminary Data*, THE REPUBLICAN LAWYER (July, 2003), http://www.rnla.org/rotunda.doc

*Book Review: Democracy by Decree*, 23 CATO JOURNAL: AN INTERDISCIPLINARY JOURNAL OF PUBLIC POLICY ANALYSIS 155 (No. 1, Spring-Summer 2003).

*Appearances Can Be Deceiving: Should the Law Worry About Campaign Money Looking Dirty When the Facts Show That the System's Clean?*, THE LEGAL TIMES, Sept. 15, 2003, at p. 84.

*Found Money: IOLTA, Brown v. Legal Foundation of Washington, and the Taking of Property without the Payment of Compensation*, 2002-2003 CATO SUPREME COURT REVIEW 245 (2003).

*SBC Tries Time-Worn Corporate Power Grab*, CHICAGO SUN-TIMES, Nov. 22, 2003, p. 16.

*Media Accountability in Light of the First Amendment*, 21 SOCIAL PHILOSOPHY & POLICY 269 (Cambridge University Press, No. 2, 2004), *reprinted in*, ELLEN FRANKEL PAUL, FRED D. MILLER JR., & JEFFREY PAUL, eds., FREEDOM OF SPEECH (Cambridge U. Press 2004).

*Duck Hunting Benchmarks*, THE WASHINGTON TIMES, March 28, 2004, at B4.

*Election-Year Hunting: Should Scalia Recuse Himself from Cheney-Related Cases?*, NATIONAL REVIEW ONLINE, March 30, 2004, http://nationalreview.com/comment/rotunda200403300900.asp

*To Hasten Iraq Democracy, Put Wells in People's Hands*, ATLANTA JOURNAL-CONSTITUTION, May 14, 2004, at A19.

*Judicial Impartiality and Judicial Campaign Contributions: Evaluating the Data*, 5 ENGAGE: THE JOURNAL OF THE FEDERALIST SOCIETY'S PRACTICE GROUPS 122 (Issue 1, April 2004).

*Due Process and the Role of Legal Counsel in the War on Terror*, 5 ENGAGE: THE JOURNAL OF THE FEDERALIST SOCIETY'S PRACTICE GROUPS 131 (Issue 2, October 2004).

*The Political Question Doctrine in the United States,* in GRENZEN AAN DE RECHTSPRAAK? POLITICAL QUESTION, ACTE DE GOUVERNEMENT EN RECHTERLIJK INTERVENTIONISME 1-38, vol. 9, Publikaties Van De Staatsrechtkring Staatsrechtsconferenties (P.P.P. Bouvend'Eert, P.M. van den Eijndem, & C.A.J.M. Kortmann, eds.) (Kluwer, 2004).

*Is There Hope for Iraq's Post-Occupation Government?*, 13 COSMOS: JOURNAL OF THE COSMOS CLUB OF WASHINGTON, D.C. 65 (2004).

*Iraq on the Way to Its New Constitution*, 8 THE GREEN BAG, 2D SERIES 163 (Autumn 2004).

*Symposium*, IRAQ AND ITS NEW CONSTITUTION 23, 53, 76 (Bilkent University & Foreign Policy Institute, Ankara, 2004).

*Veto Power*, in THE OXFORD COMPANION TO THE SUPREME COURT OF THE UNITED STATES 1047 (Oxford U. Press, 2nd ed. 2005).

*A Shaky Ethics Charge*, WASHINGTON POST, September 6, 2005, at p. A25.

*The Privileges and Immunities Clause*, in THE HERITAGE GUIDE TO THE CONSTITUTION, p. 269 (Regnery Publishing, Inc. Washington, DC 2005) (member of Editorial Advisory Board).

*Opinion Letter on Judicial Ethics*, 6 ENGAGE: THE JOURNAL OF THE FEDERALIST SOCIETY'S PRACTICE GROUPS 122 (Issue 2, October 2005).

*Alleged Conflicts of Interest Because of the "Appearance of Impropriety,"* 33 HOFSTRA L. REV. 1141 (2005).

*Frische Datteln für die Häftlinge*, SUEDDEUTSCHE ZEITUNG (Germany), January 2, 2006, at p. 2.

*Guantanamo, Another Story*, The Republican Lawyer (January 15, 2006), http://www.rnla.org/Newsletter/ViewArticle.asp?ArticleID=179

*Click for Collected Wisdom*, THE LEGAL TIMES, May 8, 2006, at 46.

*The Propriety of a Judge's Failure to Recuse When Being Considered for Another Position*, 19 GEORGETOWN JOURNAL OF LEGAL ETHICS 1187 (2006).

*There's No Future in the Past of Campaign Finance: The Latest Decision Displays A Badly Fractured Court*, NATIONAL REVIEW ONLINE, June 28, 2006,

http://article.nationalreview.com/?q=NDE1MjZhZWNiMWIyNDhlMzI5MzE4YjFkYmQxNzc4ZGY .

*CMS Information Policy Under Medicare "Part D" Creates 1st Amendment Problems*, 21 LEGAL BACKGROUNDER (Washington Legal Foundation, No. 21, July 7, 2006).

*Judicial Ethics, the Appearance of Impropriety, and the Proposed New ABA Judicial Code* (The Howard Lichtenstein Lecture in Legal Ethics), 34 HOFSTRA LAW REVIEW 1337 (2006).

*The Courts Need This Watchdog*, WASHINGTON POST, Dec. 21, 2006, at A29.

*The Detainee Cases of 2004 and 2006 and their Aftermath*, 57 SYRACUSE LAW REVIEW 1 (2006).

*The Case for a Libby Pardon*, WALL STREET JOURNAL, March 7, 2007, at A17.

*Income Mobility and Income Tax Revenue Since the Tax Cuts*, THE REPUBLICAN LAWYER (April 2007), http://www.rnla.org/Newsletter/ViewArticle.asp?ArticleID=232 .

*Remembering Father Robert F. Drinan, S.J.*, 20 GEORGETOWN JOURNAL OF LEGAL ETHICS 203 (2007).

*Holding Enemy Combatants in the Wake of Hamdan*, 8 ENGAGE: THE JOURNAL OF THE FEDERALIST SOCIETY'S PRACTICE GROUPS 52 (Issue 3, June 2007).

*Teaching Professional Responsibility and Ethics*, 51 ST. LOUIS UNIVERSITY LAW JOURNAL 1223 (2007).

*Rudy Thinks FAST*, THE AMERICAN SPECTATOR, January 25, 2008, http://www.spectator.org/dsp_article.asp?art_id=12633

*Age Has Not Withered Him*, THE LEGAL TIMES, July 7, 2008, at 46.

*Teaching Professional Responsibility and Ethics*, in P. L. Jayanthi Reddy, ed., BENCH AND BAR ETHICS 3 (Amicus Books, Icfai University Press, Hyderabad, India 2007-2008).

*Foreword*, in Paul Benjamin Linton, ABORTION UNDER STATE CONSTITUTIONS: A STATE-BY-STATE ANALYSIS xix –xxi (Carolina Academic Press, Durham, N.C., 2008).

*Impact*, in Sandarshi Gunawardena & Karen Rosenblum, DIVERSITY AT MASON 14 (George Mason U. 2008).

*Simplify, Simply: A Mantra for Transcendentalists and Tax Reformers Alike*, LOS ANGELES DAILY JOURNAL, Oct. 1, 2008, at p. 6.

*Dormant Commerce Clause*, 2 ENCYCLOPEDIA OF THE SUPREME COURT OF THE UNITED STATES (Ed., David S. Tanenhaus) (Detroit: Macmillan Reference USA, 2009), at pp. 52-54.

*A Modern Day Bleak House: The Legal Inheritance of Anna Nicole Smith*, THE AMERICAN SPECTATOR, March 2009, at 32-36.

*Some Strings Attached: Is the Stimulus Law Constitutional?*, CHICAGO TRIBUNE, March 15, 2009, at 29.

*The Right of Free Speech, Regardless Of What Is Spoken*, THE PANTHER (Chapman University Newspaper), at p. 13 (March 23, 2009).

*Was Madoff Good for the Economy?*, CHICAGO TRIBUNE, April 3, 2009, at 49.

*The Orange Grove: U.S. Imports of Lawsuits Rising*, ORANGE COUNTY REGISTER, June 30, 2009.

*Kenneth W. Starr: A Biography*, THE YALE BIOGRAPHICAL DICTIONARY OF AMERICAN LAW 510 (Roger K. Newman, ed., Yale U. Press, 2009).

*An Unconstitutional Nobel*, THE WASHINGTON POST, Oct. 16, 2009, at A23 (with J. Peter Pham).

*Judicial Transparency, Judicial Ethics, and a Judicial Solution: An Inspector General for the Courts*, 41 LOYOLA U. CHICAGO L.J. 301 (2010).

*Judicial Disqualification in the Aftermath of Caperton v. A.T. Massey Coal Co.*, 60 SYRACUSE LAW REVIEW 247 (2010).

*Campaign Disclosure Can Go too Far*, SACRAMENTO BEE, February 6, 2010, at p. 11A.

*The Efforts to Disbar Bush Lawyers*, in NATIONAL REVIEW ON LINE, March 4, 2010, http://bench.nationalreview.com/post/?q=ZjhiMTk2MGY0ZjFiOTczZjg4ODhhODI5MDQwMzczYWU=

*Repealing the First Amendment*, WASHINGTON EXAMINER, April 14, 2010, http://www.washingtonexaminer.com/opinion/columns/OpEd-Contributor/Repealing-the-First-Amendment-90851704.html#ixzz0l6TO2qIK

*What Can Congress Make You Do?*, ORANGE COUNTY REGISTER, May 23, 2010, at p. C2, http://www.ocregister.com/articles/congress-75386-ocprint-buy-insurance.html

*Birthright Citizenship Benefits the Country*, CHICAGO TRIBUNE, Sept. 16, 2010, at p. 21, http://www.chicagotribune.com/news/opinion/ct-oped-0916-birthright-20100916,0,4594378.story

*What Are D.C. Police Doing Enforcing Shariah Law?*, PAJAMAS MEDIA, Sept. 16, 2010, http://pajamasmedia.com/blog/what-are-d-c-police-doing-enforcing-sharia-law/?singlepage=true

*A New Look at the Federal Suit against Arizona's Immigration Law*, PAJAMAS MEDIA, Oct. 5, 2010, http://pajamasmedia.com/blog/a-new-look-at-the-federal-suit-against-arizonas-immigration-law/?singlepage=true

*The Point of No Return*, WASHINGTON TIMES, Oct. 10, 2010, at p. B3.

*Can Congress Ban People from Threatening to Burn The Quran?*, ATLANTA JOURNAL-CONSTITUTION, Oct. 14, 2010, at p. 21A.

*Congressional Silence Hurts Immigrants*, THE PANTHER (Chapman University Newspaper), at p. 11 (October 25, 2010).

*Justice O'Connor's Robo Call Apology*, AOL NEWS, Oct. 28, 2010, http://www.aolnews.com/discuss/opinion-justice-oconnors-robo-call-apology-isnt-enough/19693741#gcpDiscussPageUrlAnchor .

*What's Wrong with Oklahoma's Shariah Amendment?*, AOL NEWS, Nov. 30, 2010, http://www.aolnews.com/opinion/article/opinion-whats-wrong-with-oklahomas-shariah-amendment/19737155

*Judicial Disqualification When a Solicitor General Moves to the Bench*, 11 ENGAGE: THE JOURNAL OF THE FEDERALIST SOCIETY'S PRACTICE GROUPS 94 (Issue 3, Nov. 2010), http://www.fed-soc.org/publications/pubid.2067/pub_detail.asp

*Eat Your Spinach, Says Nanny State*, 33 NATIONAL LAW JOURNAL 39 (#19, Jan. 10, 2011), http://www.law.com/jsp/nlj/PubArticleNLJ.jsp?id=1202477337422&Each_your_spinach_says_nanny_state

*Trying to Codify Caperton*, 42 MCGEORGE LAW REVIEW 95 (2010)(Judicial Ethics Symposium).

*Equal Employment Opportunities for Female Prison Guards*, NATIONAL LAW JOURNAL, Feb. 7, 2011, http://www.law.com/jsp/nlj/PubArticleNLJ.jsp?id=1202480379005&rss=nlj&slreturn=1&hbxlogin=1

*Stern v. Marshall, and the Power of Bankruptcy Courts to Issue Final Orders on All Compulsory Counterclaims*, 23 BNA BANKRUPTCY LAW REPORTER 230 (Feb. 24, 2011)

*Resolving Client Conflicts by Hiring "Conflicts Counsel,"* 62 HASTINGS LAW JOURNAL 677 (2011).

*We Do Declare: Libya and the United States Constitution,* NATIONAL REVIEW ONLINE, March 24, 2011, http://www.nationalreview.com/articles/262940/we-do-declare-kathryn-jean-lopez?page=7 .

*Constitutionalizing Judicial Ethics: Judicial Elections after Republican Party v. White, Caperton, and Citizens United*, 64 U. ARKANSAS LAW REV. 1 (2011)(Hartman-Hotz Distinguished Lecture).

*Transparența Judiciară, Etica Judiciară și o Soluție Judiciară,* REVISTA FORUMUL JUDECĂTORILOR 16 (No. 2, 2011).

*The Intellectual Forebears of Citizens United*, 16 NEXUS 113 ((2010-2011).

*Are Capitalists Happier*?, REUTERS, Aug. 12, 2011, http://blogs.reuters.com/great-debate/2011/08/12/are-capitalists-happier/ (co-authored with Vernon Smith, 2002 Nobel Laureate in Economics, & Bart Wilson), *reprinted in, e.g.,* THE DAILY STAR (Dhaka, Bangladesh), Aug. 15, 2011; ETHIOPIAN REVIEW, Aug. 12, 2011.

*Lawyers: Why We Are Different and Why We Are the Same: Creating Structural Incentives in Large Law Firms to Promote Ethical Behavior – In-House Ethics Counsel, Bill Padding, and In-House Ethics Training,* 44 AKRON LAW REV. 679 (2011)(Miller-Becker Professional Responsibility Distinguished Lecture Series), reprinted in, 61 DEFENSE LAW JOURNAL (Aug. 2012).

*Does ObamaCare, As Written, Prevent Congress From Repealing It?*, FOXNEWS.COM (Oct. 28, 2011, http://www.foxnews.com/opinion/2011/10/27/does-obamacare-prevent-congress-from-repealing-it/

*Perry Is Right on Immigration*, NATIONAL REVIEW ONLINE, http://www.nationalreview.com/corner/281735/perry-right-immigration-ronald-d-rotunda (Oct. 31, 2011).

*Kagan's Recusal from ObamaCare,* WASHINGTON TIMES, Dec. 15, 2011, http://www.washingtontimes.com/news/2011/dec/15/kagan-must-recuse-from-obamacare-case/ .

*Evidence Mounts against Justice Kagan for Recusal in ObamaCare Suit*, FOXNEWS.COM (Jan. 26, 2012), http://www.foxnews.com/opinion/2012/01/26/evidence-mounts-against-justice-kagan-for-recusal-in-obamacare-suit/

*Kagan Should Recuse from ObamaCare Case*, WASHINGTON EXAMINER, Feb. 14, 2012, http://washingtonexaminer.com/kagan-should-recuse-from-obamacare-case/article/269386

*Supreme Court Justice Elena Kagan and the Obamacare Constitutional Challenge*, JUDICIAL WATCH SPECIAL REPORT, March 2012.

*Obamacare vs. Conscientious Beliefs*, ORANGE COUNTY REGISTER, March 28, 2012, http://www.ocregister.com/opinion/government-346533-religious-federal.html

*Lessons of Watergate*, 54 ORANGE COUNTY LAWYER 19 (April 2012).

*Prosecutorial and Judicial Misconduct*, NATIONAL LAW JOURNAL, p. 42 (April 30, 2012)(with Alan Dershowitz), *reprinted in*, THE JERUSALEM POST, May 13, 2012.

*The Wrong Legal "Help" for NY's Poor*, NEW YORK POST, June 1, 2012.

*ObamaCare Legal Battles Not Over*, ORANGE COUNTY REGISTER, Sept. 27, 2012, at p. 9, http://www.ocregister.com/opinion/ipab-372820-congress-proposal.html

*Obama Tax-raising Against JFK precedent: Hiking Rates Will Lose Money*, WASHINGTON TIMES, Dec. 13, 2012, http://www.washingtontimes.com/news/2012/dec/12/obama-tax-raising-against-jfk-precedent/

*Geithner's "Story of Inflation,"* ORANGE COUNTY REGISTER, Jan. 5, 2013, http://www.ocregister.com/opinion/inflation-382532-comic-geithner.html

*Blaming Hollywood for Gun Violence Doesn't Work*, WASHINGTON TIMES, Feb. 20, 2013, http://www.washingtontimes.com/news/2013/feb/20/blaming-hollywood-for-gun-violence-doesnt-work/

*Exporting American Freedoms*, in MODEL, RESOURCE, OR OUTLIER? WHAT EFFECT HAS THE U.S. CONSTITUTION HAD ON THE RECENTLY ADOPTED CONSTITUTIONS OF OTHER NATIONS?, at 12 (Heritage Foundation, May 17, 2013), http://www.heritage.org/research/lecture/2013/05/model-resource-or-outlier-what-effect-has-the-us-constitution-had-on-the-recently-adopted-constitutions-of-other-nations

'*What* did he know, and when did he know it?', WASHINGTON TIMES, June 5, 2013, http://www.washingtontimes.com/news/2013/jun/5/what-did-he-know-and-when-did-he-know-it/?utm_source=RSS_Feed&utm_medium=RSS

*Egypt's Constitutional Do-Over: This Time Around, Take a Closer Look at America's Bill of Rights*, WALL STREET JOURNAL, JULY 17, 2013, at p. A13, http://online.wsj.com/article/SB10001424127887323740804578601383340547860.html?mod=WSJ_Opinion_LEFTTopOpinion#articleTabs%3Darticle

*On the Health-Care Mandate, Obama Reaches Beyond the Law*, WASHINGTON POST, July 18, 2013, http://www.washingtonpost.com/opinions/on-the-health-care-mandate-obama-reaches-beyond-the-law/2013/07/18/d442aefc-efb4-11e2-a1f9-ea873b7e0424_story.html

*The Boston Strangler, the Classroom and Me*, WALL STREET JOURNAL, JULY 26, 2013, http://online.wsj.com/article/SB10001424127887324783204578623714232084132.html?KEYWORDS=rotunda

*Generous Pensions Give New Meaning to 'If It's too Good to Be True,'* FORBES MAGAZINE, Sept. 27, 2013, http://www.forbes.com/sites/realspin/2013/09/27/generous-pensions-give-new-meaning-to-if-its-too-good-to-be-true/

*Applying the Revised ABA Model Rules in the Age of the Internet: The Problem of Metadata*, 52 HOFSTRA LAW REVIEW 175 (2013).

*On Deep Background 41 Years Later*: *Roe v. Wade*, CHICAGO TRIBUNE, Jan. 22, 2014.

*Congress Cannot Stop the Exporting of American Oil*, THE HILL: THE HILL'S FORUM FOR LAWMAKERS AND POLICY PROFESSIONALS, Jan. 27, 2014.

*Congress and Lois Lerner in Contempt,* DAILY CALLER, April 10, 2014.

*Using the State to Bully Dissidents*, VERDICT: LEGAL ANALYSIS AND COMMENTARY FROM JUSTIA, April 24, 2014.

*Endangering Jurors in a Terror Trial*, WALL STREET JOURNAL, May 2, 2014, at p. A13.

## Other Activities:

March-April, 1984, Expert Witness for State of Nebraska on Legal Ethics at the Impeachment Trial of Nebraska Attorney General Paul L. Douglas (tried before the State Supreme Court; the first impeachment trial in nearly a century).

July 1985, Assistant Chief Counsel, State of Alaska, Senate Impeachment Inquiry of Governor William Sheffield, (presented before the Alaskan Senate).

Speaker at various ABA sponsored conferences on Legal Ethics; Speaker at AALS workshop on Legal Ethics; Speaker on ABA videotape series, "Dilemmas in Legal Ethics."

Interviewed at various times on Radio and Television shows, such as MacNeil/Lehrer News Hour, Firing Line, CNN News, CNN Burden of Proof, ABC's Nightline, National Public Radio, News Hour with Jim Lehrer, Fox News, etc.

1985--1986, Reporter for Illinois Judicial Conference, Committee on Judicial Ethics.

1981-1986, Radio commentator (weekly comments on legal issues in the news), WILL-AM Public Radio.

1986-87, Reporter of Illinois State Bar Association Committee on Professionalism.

1987-2000, Member of Consultant Group of American Law Institute's RESTATEMENT OF THE LAW GOVERNING LAWYERS.

1986-1994, Consultant, Administrative Conference of the United States (on various issues relating to conflicts of interest and legal ethics).

1989-1992, Member, Bar Admissions Committee of the Association of American Law Schools.

1990-1991, Member, Joint Illinois State Bar Association & Chicago Bar Association Committee on Professional Conduct.

1991-1997, Member, American Bar Association Standing Committee on Professional Discipline.

CHAIR, Subcommittee on Model Rules Review (1992-1997). [The subcommittee that I chaired drafted the MODEL RULES FOR LAWYER DISCIPLINARY ENFORCEMENT that the ABA House of Delegates approved on August 11, 1993.]

1992, Member, Illinois State Bar Association [ISBA] Special Committee on Professionalism; CHAIR, Subcommittee on Celebration of the Legal Profession.

Spring 1993, Constitutional Law Adviser, SUPREME NATIONAL COUNCIL OF CAMBODIA. I traveled to Cambodia and worked with officials of UNTAC (the United Nations Transitional Authority in Cambodia) and Cambodian political leaders, who were

charged with drafting a new Constitution to govern that nation after the United Nations troop withdrawal.

1994-1997, LIAISON, ABA Standing Committee on Ethics and Professional Responsibility.

1994-1996, Member, Illinois State Bar Association [ISBA] Standing Committee on the Attorney Registration and Disciplinary Commission.

Winter 1996, Constitutional Law Adviser, SUPREME CONSTITUTIONAL COURT OF MOLDOVA.

Under the auspices of the United States Agency for International Development, I consulted with the six-member Supreme Constitutional Court of Moldova in connection with that Court's efforts to create an independent judiciary. The Court came into existence on January 1, 1996.

Spring 1996, Consultant, CHAMBER OF ADVOCATES, of the CZECH REPUBLIC.

Under the auspices of the United States Agency for International Development, I spent the month of May 1996, in Prague, drafting Rules of Professional Responsibility for all lawyers in the Czech Republic. I also drafted the first Bar Examination on Professional Responsibility, and consulted with the Czech Supreme Court in connection with the Court's proposed Rules of Judicial Ethics and the efforts of the Court to create an independent judiciary.

Consulted with (and traveled to) various counties on constitutional and judicial issues (*e.g.*, Romania, Moldova, Ukraine, Cambodia) in connection with their move to democracy.

1997-1999, Special Counsel, Office of Independent Counsel (Whitewater Investigation).

Lecturer on issues relating to Constitutional Law, Federalism, Nation-Building, and the Legal Profession, throughout the United States as well as Canada, Cambodia, Czech Republic, England, Italy, Mexico, Moldova, Romania, Scotland, Turkey, Ukraine, and Venezuela.

1998-2002, Member, ADVISORY COUNCIL TO ETHICS 2000, the ABA Commission considering revisions to the ABA Model Rules of Professional Conduct.

2000-2002, Member, ADVISORY BOARD TO THE INTERNATIONAL BROTHERHOOD OF TEAMSTERS (This Board was charged with removing any remaining vestiges of organized crime to influence the Union, its officers, or its members.) This Board was part of "Project RISE" ("Respect, Integrity, Strength, Ethics").

2001-2008, Member, Editorial Board, CATO SUPREME COURT REVIEW.

2005-2006, Member of the Task Force on Judicial Functions of the Commission on Virginia Courts in the 21st Century: To Benefit All, to Exclude None

July, 2007, Riga, Latvia, International Judicial Conference hosted by the United States Embassy, the Supreme Court of Latvia, and the Latvian Ministry of Justice. I was one of the main speakers along with Justice Samuel Alito, the President of Latvia, the Prime Minister of Latvia, the Chief Justice of Latvia, and the Minister of Justice of Latvia

Since 1994, Member, Publications Board of the ABA Center for Professional Responsibility; vice chair, 1997-2001.

Since 1996, Member, Executive Committee of the Professional Responsibility, Legal Ethics & Legal Education Practice Group of the Federalist Society; Chair-elect, 1999; Chair, 2000

Since 2003, Member, Advisory Board, the Center for Judicial Process, an interdisciplinary research center (an interdisciplinary research center connected to Albany Law School studying courts and judges)

Since 2012, *Distinguished International Research Fellow* at the World Engagement Institute, a non-profit, multidisciplinary and academically-based non-governmental organization with the mission to facilitate professional global engagement for international development and poverty reduction, http://www.weinstitute.org/fellows.html

Since 2014, *Associate Editor* of the Editorial Board, THE INTERNATIONAL JOURNAL OF SUSTAINABLE HUMAN SECURITY (IJSHS), a peer-reviewed publication of the World Engagement Institute (WEI)

Since 2014, Member, Board of Directors of the Harvard Law School Association of Orange County

Since 2014, Member, Editorial Board of THE JOURNAL OF LEGAL EDUCATION (2014 to 2016).

# EXHIBIT 2

The #1 *New York Times* Bestseller

# THE BRETHREN

INSIDE THE SUPREME COURT



BOB WOODWARD
SCOTT ARMSTRONG

"Explosive. . . . The most controversial book on the Supreme Court yet written."
—*Los Angeles Times Book Review*

documentation for a rebuttal. Douglas called his close friend, Clark Clifford, a former Secretary of Defense under President Johnson. "Nixon has sicked his gorillas on me," he told him. It was the work of Nixon and Mitchell, and Ford was the front man. Douglas knew the administration was willing to play politics with the Court and that it had used "friendly persuasion" to get Fortas off the bench. He asked Clifford to lead the defense. Clifford declined. He reasoned that he was too closely identified with the Democratic Party; the whole thing would look too much like a political brawl. Douglas finally engaged Simon Rifkind, a onetime classmate at Columbia Law School. Rifkind was also a Democrat, but had served as a federal judge for years.

The attacks and investigations preoccupied Douglas. He was determined to outlast the Nixon presidency. But since there was no forum for him as a Supreme Court Justice to defend himself, he declined public comment. He turned inward and brooded, calling friends late at night. If they succeeded in impeaching and convicting him, what would be left of all the values and freedoms he had fought for all his life? How could the Court remain independent? His "side," already damaged by the departure of Warren and Fortas, would be irreparably weakened. The liberals were in trouble. Black, old and slowing up, had good and bad days. His memory problems cropped up at unpredictable times. Even worse, as Black aged he was becoming more conservative. He was no longer a certain liberal vote.

Marshall was weak—a correct vote, a follower, but no leader, no fighter. He was not one to speak up articulately or forcefully. That left Brennan. "Bill's not a troublemaker," Douglas told an associate. Brennan was indeed a true friend, another correct vote, but really a man of the center, an organizer for the moderate-liberal position. Brennan was too willing to compromise. When things got tough, Douglas felt, Brennan did not stand up for his principles. In 1966, Brennan hired a University of California at Berkeley law graduate, Michael Tigar, as a clerk. Tigar had been a leading radical activist. When conservative columnists attacked Brennan, it became a political issue. Brennan fired Tigar the week he arrived to start work. As Douglas saw it, Brennan sacrificed the clerk to protect his

personal position and his relationships with the moderate and conservative Justices. Douglas called it "scandalous," a "shocking cave-in."

During the impeachment investigation, friends and advisers from the old days would come to have lunch with Douglas, to help develop strategy and to offer suggestions. Douglas was often near tears of outrage. He felt powerless. Always suspicious, he was sure that the investigators would resort to any tactic, no matter how low or even illegal. He was more than ever convinced that his phone was tapped, that his office and perhaps even the conference room were bugged. (Even before Nixon's arrival, he had persuaded Earl Warren to have the conference room checked for listening devices. None was found.)

"Let's take a walk in the hall," Douglas told a friend who had come to discuss strategy. Many times during that year, Douglas came to Brennan's chambers and asked him to walk in the halls to discuss something privately. "I've got to go meet Bill out in the hall," Brennan would say to his clerks, his eyes twinkling. None of the other Justices seemed to take the investigation seriously enough, Douglas thought. Everyone seemed unconcerned.

Nixon wasn't sure that impeachment of Douglas was a very good idea. The evidence was thin, and Burger had signaled him that the attack was not good for the Court. Also, the President was more concerned with foreign affairs, particularly with the military escalation in Southeast Asia.

Later, when Nixon called Mitchell and said Ford should be told to "turn it off," Mitchell indicated that it would be difficult, since he himself had supplied Ford with some ammunition.* But he could put some distance between the administration and the impeachment move in a speech he was about to give to the Bar Association of the District of Columbia.

Mitchell's draft, condemning "irresponsible and malicious" criticism of the Court, was sent to Nixon, who forwarded it to Burger. Burger found it perfectly appropriate. When Burger tried to call

* See William Safire, *Before the Fall: An Inside View of the Pre-Watergate White House*.


CUBA'78

REPUBLICA DE CUBA
PRESIDENTE DEL CONSEJO DE ESTADO Y DEL GOBIERNO

Ciudad de la Habana,
6 de diciembre de 1979

Sr. Michael Tigar
Washington, D.C.

Muy estimado amigo Tigar:

Me siento verdaderamente apenado con usted. Hubiese deseado escribirle de inmediato para expresarle mi más profundo agradecimiento por su gesto amistoso y sincero de enviar a nuestro país un magnífico ejemplar Santa Gertrudis. Puedo asegurarle que múltiples obligaciones y responsabilidades han ocupado mi atención y todo mi tiempo durante estos meses, lo que impidió expresarle de manera personal mi mayor reconocimiento ¿Podré pedirle aún la generosidad de que nos disculpe por esta demora involuntaria?

Como ya conocerá, el toro "Phoenix", que nos envió, llegó a Cuba con buenas condiciones, después de varios largos e inevitables períodos de cuarentena. Su estado de salud es satisfactorio, se adapta favorablemente, y pensamos que pronto estará en condiciones de entrar en producción. Creo que será un aporte de gran valor al desarrollo de nuestra masa de Santa Gertrudis, que cuidamos con esmero, y padre de animales de gran calidad. Estoy informado de todo el esfuerzo y las preocupaciones que le ocasionó el hacer llegar a nuestro país a este semental tan selecto. Por eso, aunque su obsequio es valiosísimo, todavía más valioso y más importante es para nosotros su gesto de amistad y de simpatía. Créame que me siento en una deuda de profunda y sincera gratitud hacia usted.

Habría deseado saludarle personalmente, junto a otros distinguidos amigos, en mi reciente visita a Nueva York, pero, como sabe, las circunstancias no fueron entonces las más propicias. Confío en que hallaremos la oportunidad para sostener este encuentro. Quizás sea en su propio país. ¿Y por qué no en Cuba?

Reciba el más cordial saludo de su amigo,

Fidel Castro

Fidel Castro Ruz

REPUBLICA DE CUBA
PRESIDENTE DEL CONSEJO DE ESTADO Y DEL GOBIERNO

Sr. Michel Tigar
Esq. 1308 18 St. N.W.
Washington, D.C.
EE.UU.

# 'Free speech' advocate works to silence Larry Klayman

**Exclusive: Jack Cashill exposes radical ideology of lawyer pushing punishment**



By Jack Cashill

Published January 1, 2020 at 5:38pm

In July of 2019, a hearing committee of the District of Columbia Bar Board of Professional Responsibility made a recommendation that Judicial Watch founder Larry Klayman be suspended, a recommendation now under appeal, from the practice of law in the district for 33 months.

The three-person committee strangely and inexplicably included only two attorneys, both of whom are of the left, and one of whom, Michael Tigar, is proudly far left.

How far left? Consider the following review on the jacket of Tigar's most recent book: "'An incisive, unsparing, creative, brilliant critique of capitalist law and its dire human consequences.' – BERNARDINE DOHRN, co-editor with Bill Ayers, Race Discourse: Against White Supremacy."

In the book, "Mythologies of State and Monopoly Power," Tigar emphasizes the Marxist notion that "the law is not what is says but what it does." Not liking the "dire human consequences" of the law as it exists, Tigar is not above twisting the law to his own ends.

Klayman suspects that Tigar, something of a superstar in Marxist circles, was recruited by the committee chairman, Anthony Fitch to sit on the committee with him. The two appeared chummy throughout the proceeding, and Fitch seemed downright deferential.

Throughout the proceeding, Tigar could barely conceal his disdain for the conservative, pro-capitalist, pro-Israel, pro-Trump activist Klayman.

In testifying as to why he founded Judicial Watch, Klayman explained his objections to the fact that federal judges were often chosen on the basis of political contributions by their law firms, labor unions or corporations.

As a result, said Klayman, "the best and the brightest" do not always make their way onto the bench. At this, Tigar grew visibly angry and shot back that his son, Jon Tigar, also a graduate of Berkeley Law School, was a federal judge.

President Barack Obama had appointed young Tigar to the federal bench in San Francisco. Klayman said he did not mean to impugn Tigar's son, but Judge Tigar deserved impugning. Tigar is the same federal judge who willy-nilly enjoined President Trump's asylum policy for illegal immigrants.

In its article on Klayman's recommended suspension, the Washington Post observed, that the "conservative" Klayman "is a notably combative litigant whose no-holds-barred tactics and robust use of the Freedom of Information Act have made him a dreaded – and sometimes loathed – inquisitor."

The Post also noted that Klayman writes for "WorldNetDaily, a right-wing news aggregator site." As to the left-wing politics of Fitch and Tigar, the Post predictably made no mention at all and failed to take seriously Klayman's claim that "It was a very politicized hearing committee."

The case itself has little to do with politics. It involves Klayman's pro-bono defense of a female Persian broadcaster at Voice of America. When she did not get the result she wanted, she turned on Klayman.

Both the Florida and Pennsylvania Bars dismissed identical complaints six years earlier. Following Trump's election, the head of the D.C. Bar Disciplinary Counsel resurrected the complaint six years after the woman had abandoned it.

Klayman believes that it was his high-profile legal advocacy on Trump's behalf that awakened legal radicals to the political potential of what is now a 10-year-old case.

"For Tigar, I am a conservative scalp," says Klayman, who is still able to practice law in D.C. during the appeal, "and one that he obviously harbors an animus toward, particularly given my support of Trump."

The 78-year-old Tigar has been an unapologetic disciple of the hard left from his student days. In his memoir, he boasts of his fond feelings for the brothers Castro and his attendance at the notorious Soviet-sponsored World Festival of Youth and Students in Helsinki in 1962.



Michael Tigar with Ramon Castro, the oldest of the Castro brothers, in 1978.

Tigar's radicalism alarmed even liberal Supreme Court Chief Justice Earl Warren. According to Tigar, in 1965 Warren ordered Justice William Brennan to fire Tigar, then clerking for Brennan, and Brennan did just that.

Tigar has not mellowed as he has grown older.
In fact, he has turned as the larger progressive movement has from defending free speech to suppressing it.

"Of all the remarkable developments of the past decade," argues British author Frank Furedi, "none has been more sinister than the West's gradual surrender of mankind's most important values: the twin ideals of freedom of speech and expression."

In Washington, that "surrender" has been imposed almost exclusively on the political right. Enforcing it are attorneys like Tigar and Fitch, the Democrats in Congress, federal judges of the Jon Tigar mold, and the intel agencies, all with the indispensable support of an increasingly leftist media.

The same Michael Tigar who supported the free speech movement while a law student at Berkeley in the 1960s is now working actively to silence Larry Klayman. It is hard to interpret Tigar's behavior otherwise.

# EXHIBIT 3

RealClear Investigations



# DC Bar Restores Convicted FBI Russiagate Forger to 'Good Standing' Amid Irregularities and Leniency

By Paul Sperry, RealClearInvestigations
December 16, 2021

DC Bar

A former senior FBI lawyer who falsified a surveillance document in the Trump-Russia investigation has been restored as a member in "good standing" by the District of Columbia Bar Association even though he has yet to finish serving out his probation as a convicted felon, according to disciplinary records obtained by RealClearInvestigations.



Kevin Clinesmith, convicted ex-FBI lawyer: Allowed to negotiate a light sentence.

**YouTube/Fox News**

The move is the latest in a series of exceptions the bar has made for Kevin Clinesmith, who pleaded guilty in August 2020 to doctoring an email used to justify a surveillance warrant targeting former Trump campaign adviser Carter Page.

Clinesmith was sentenced to 12 months probation last January. But the D.C. Bar did not seek his disbarment, as is customary after lawyers are convicted of serious crimes involving the administration of justice. In this case, it did not even initiate disciplinary proceedings against him until February of this year — five months after he pleaded guilty and four days after RealClearInvestigations first reported he had not been disciplined. After the negative publicity, the bar temporarily suspended Clinesmith pending a review and

hearing. Then in September, the court that oversees the bar and imposes sanctions agreed with its recommendation to let Clinesmith off suspension with time served; the bar, in turn, restored his status to "active member" in "good standing."

Before quietly making that decision, however, records indicate the bar did not check with his probation officer to see if he had violated the terms of his sentence or if he had completed the community service requirement of volunteering 400 hours.

To fulfill the terms of his probation, Clinesmith volunteered at Street Sense Media in Washington but stopped working at the nonprofit group last summer, which has not been previously reported. "I can confirm he was a volunteer here," Street Sense editorial director Eric Falquero told RCI, without elaborating about how many hours he worked. Clinesmith had helped edit and research articles for the weekly newspaper, which coaches the homeless on how to "sleep on the streets" and calls for a "universal living wage" and prison reform.

From the records, it also appears bar officials did not consult with the FBI's Inspection Division, which has been debriefing Clinesmith to determine if he was involved in any other surveillance abuses tied to Foreign Intelligence Surveillance Act warrants, in addition to the one used against Page. Clinesmith's cooperation was one of the conditions of the plea deal he struck with Special Counsel John Durham. If he fails to fully cooperate, including turning over any relevant materials or records in his possession, he could be subject to perjury or obstruction charges.

Clinesmith — who was assigned to some of the FBI's most sensitive and high-profile investigations — may still be in Durham's sights regarding others areas of his wide-ranging probe.



John Durham, Trump-Russia special counsel: He may still have Clinesmith in his sights.

**Department of Justice via AP**

The scope of his mandate as special counsel is broader than commonly understood: In addition to examining the legal justification for the FBI's "Russiagate" probe, it also includes examining the bureau's handling of the inquiry into Hillary Clinton's use of an unsecured email server, which she set up in her basement to send and receive classified information, and her destruction of more than 30,000 subpoenaed emails she generated while running the State Department. As assistant FBI general counsel in the bureau's national security branch, Clinesmith played an instrumental role in that investigation, which was widely criticized by FBI and Justice Department veterans, along with ethics watchdogs, as fraught with suspicious irregularities.

Clinesmith also worked on former Special Counsel Robert Mueller's probe into the 2016 Trump campaign as the key attorney linking his office to the FBI. He was the only headquarters lawyer assigned to Mueller. Durham's investigators are said to be looking into the Mueller team's actions as well.

The D.C. Bar's treatment of Clinesmith, a registered Democrat who sent anti-Trump rants to FBI colleagues after the Republican was elected, has raised questions from the start. Normally the bar automatically suspends the license of members who plead guilty to a felony. But in Clinesmith's case, it delayed suspending him on even an interim basis for several months and only acted after RCI revealed the break Clinesmith was given, records confirm.



It then allowed him to negotiate his fate, which is rarely done in any misconduct investigation, let alone one



Hamilton "Phil" Fox: Disciplinary counsel who handled Clinesmith is a major donor to Democrats.
**Facebook/D.C. Bar**

involving a serious crime, according to a review of past cases. It also overlooked violations of its own rules: Clinesmith apparently broke the bar's rule requiring reporting his guilty plea "promptly" to the court — within 10 days of entering it — and failed to do so for five months, reveal transcripts of a July disciplinary hearing obtained by RCI.

"I did not see evidence that you informed the court," Rebecca Smith, the chairwoman of the D.C. Bar panel conducting the hearing, admonished Clinesmith.

"[T]hat was frankly just an error," Clinesmith's lawyer stepped in to explain.

Smith also scolded the bar's Office of Disciplinary Counsel for the "delay" in reporting the offense, since it negotiated the deal with Clinesmith, pointing out: "Disciplinary counsel did not report the plea to the court and initiate a disciplinary proceeding." Bill Ross, the assistant disciplinary counsel who represented the office at the hearing, argued Clinesmith shouldn't be held responsible and blamed the oversight on the COVID pandemic.

The Democrat-controlled panel, known as the Board on Professional Responsibility, nonetheless gave Clinesmith a pass, rubberstamping the light sentence he negotiated with the bar's chief prosecutor, Disciplinary Counsel Hamilton "Phil" Fox, while admitting it was "unusual." Federal Election Commission records show Fox, a former Watergate prosecutor, is a major donor to Democrats, including former President Obama. All three members of the board also are Democratic donors, FEC data reveal.

While the D.C. Bar delayed taking any action against Clinesmith, the Michigan Bar, where he is also licensed, automatically suspended him the day he pleaded guilty. And on Sept. 30, records show, the Michigan Bar's attorney discipline board suspended Clinesmith for two years, from the date of his guilty plea through Aug. 19, 2022, and fined him $1,037.

"[T]he panel found that respondent engaged in conduct that was prejudicial to the proper administration of justice [and] exposed the legal profession or the courts to obloquy, contempt, censure or reproach," the board ruled against Clinesmith, adding that his misconduct "was contrary to justice, ethics, honesty or good morals; violated the standards or rules of professional conduct adopted by the Supreme Court; and violated a criminal law of the United States."

Normally, bars arrange what's called "reciprocal discipline" for unethical attorneys licensed in their jurisdictions. But this was not done in the case of Clinesmith. The D.C. Bar decided to go much easier on the former FBI attorney, further raising suspicions the anti-Trump felon was given favorable treatment.

In making the bar's case not to strip Clinesmith of his license or effectively punish him going forward, Fox disregarded key findings by Durham about Clinesmith's intent to deceive the FISA court as a government attorney who held a position of trust.

Clinesmith confessed to creating a false document by changing the wording in a June 2017 CIA email to state Page was "not a source" for the CIA when in fact the agency had told Clinesmith and the FBI on multiple occasions Page had been providing information about Russia to it for years — a revelation that, if disclosed to the Foreign Intelligence Surveillance Court, would have undercut the FBI's case for electronically monitoring



Carter Page: FBI lawyer Clinesmith

undercut the FBI's case for electronically monitoring Page as a supposed Russian agent and something that Durham noted Clinesmith understood all too well.

Bar records show Fox simply took Clinesmith's word that he believed the change in wording was accurate and that in making it, he mistakenly took a "shortcut" to save time and had no intent to deceive the court or the case agents preparing the application for the warrant.

Carter Page: FBI lawyer Clinesmith misled the surveillance court when he falsified a document to say Page was "not a source" who had helped the CIA, when in fact he was.
FNC

Durham demonstrated that Clinesmith certainly did intend to mislead the FISA court. "By his own words, it appears that the defendant falsified the email in order to conceal [Page's] former status as a source and to avoid making an embarrassing disclosure to the FISC," the special prosecutor asserted in his 20-page memo to the sentencing judge, in which he urged a prison term of up to six months for Clinesmith. "Such a disclosure would have drawn a strong and hostile response from the FISC for not disclosing it sooner [in earlier warrant applications]."

As proof of Clinesmith's intent to deceive, Durham cited an internal message Clinesmith sent the FBI agent preparing the application, who relied on Clinesmith to tell him what the CIA said about Page. "At least we don't have to have a terrible footnote" explaining that Page was a source for the CIA in the application, Clinesmith wrote.

The FBI lawyer also removed the initial email he sent to the CIA inquiring about Page's status as a source before forwarding the CIA email to another FBI agent, blinding him to the context of the exchange about Page.

Durham also noted that Clinesmith repeatedly changed his story after the Justice Department's watchdog first confronted him with the altered email during an internal 2019 investigation. What's more, he falsely claimed his CIA contact told him in phone calls that Page was not a source, conversations the contact swore never happened.

Fox also maintained that Clinesmith had no personal motive in forging the document. But Durham cited virulently anti-Trump political messages Clinesmith sent to other FBI employees after Trump won in 2016 – including a battle cry to "fight" Trump and his policies – and argued that his clear political bias may have led to his criminal misconduct.

"It is plausible that his strong political views and/or personal dislike of [Trump] made him more willing to engage in the fraudulent and unethical conduct to which he has pled guilty," Durham told U.S. District Judge Jeb Boasberg.



Boasberg, a Democrat appointed by President Obama, spared Clinesmith jail time and let him serve out his probation from home. Fox and the D.C. Bar sided with Boasberg, who accepted Clinesmith's claim he did not intentionally deceive the FISA court, which Boasberg happens to preside over, and even offered an excuse for his criminal conduct.

"My view of the evidence is that Mr. Clinesmith likely believed that what he said about Mr. Page was true," Boasberg said. "By altering the email, he was saving himself some work and taking an inappropriate shortcut."

Fox echoed the judge's reasoning in essentially letting Clinesmith off the hook. (The deal they struck, which the U.S. District Court of Appeals that oversees the bar



James E. "Jeb" Boasberg: Obama appointee spared Clinesmith jail time.
**DC District Court**

approved in September, called for a one-year suspension, but the suspension began retroactively in August 2020, which made it meaningless.) Boasberg opined that Clinesmith had "already suffered" punishment by losing his FBI job and $150,000 salary.

But, Boasberg assumed, wrongly as it turned out, that Clinesmith also faced possible disbarment. "And who knows where his earnings go now," the judge sympathized. "He may be disbarred or suspended from the practice of law."

Anticipating such a punishment, Boasberg waived a recommended fine of up to $10,000, arguing that Clinesmith couldn't afford it. He also waived the regular drug testing usually required during probation, while returning Clinesmith's passport. And he gave his blessing to Clinesmith's request to serve out his probation as a volunteer journalist, before wishing him well: "Mr. Clinesmith, best of luck to you."

Fox did not respond to requests for comment. But he argued in a petition to the board that his deal with Clinesmith was "not unduly lenient," because it was comparable to sanctions imposed in similar cases. However, none of the cases he cited involved the FBI, Justice Department or FISA court. One case involved a lawyer who made false statements to obtain construction permits, while another made false statements to help a client become a naturalized citizen – a far cry from falsifying evidence to spy on an American citizen.

Durham noted that in providing the legal support for a warrant application to the secret FISA court, Clinesmith had "a heightened duty of candor," since FISA targets do not have legal representation before the court.

He argued Clinesmith's offense was "a very serious crime with significant repercussions" and suggested it made him unfit to practice law.

"An attorney – particularly an attorney in the FBI's Office of General Counsel – is the last person that FBI agents or this court should expect to create a false document," Durham said.

The warrant Clinesmith helped obtain has since been deemed invalid and the surveillance of Page illegal. Never charged with a crime, Page is now suing the FBI and Justice Department for $75 million for violating his constitutional rights against improper searches and seizures.





Rudolph Giuliani, Trump lawyer: Facing bar discipline, even though he's not charged with a crime.



Michael Sussmann, ex-Hillary Clinton lawyer: Not facing bar discipline, despite being charged with a crime.
**perkinscoie.com**

**PBS**

Explaining the D.C. Bar's disciplinary process in a 2019 interview with Washington Lawyer magazine, Fox said that "the lawyer has the burden of proving they are fit to practice again. Have they accepted responsibility for their conduct?" His office's website said a core function is to "deter attorneys from engaging in misconduct."

In the same interview, Fox maintained that he tries to insulate his investigative decisions from political bias. "I try to make sure our office is not used as a political tool," he said. "We don't want to be a political tool for the Democrats or Republicans."

Bar records from the Clinesmith case show Fox suggested the now-discredited Trump-Russia "collusion" investigation was "a legitimate and highly important investigation."

One longstanding member of the D.C. Bar with direct knowledge of Clinesmith's case before the bar suspects its predominantly Democratic board went soft on him due to partisan politics. "The District of Columbia is a very liberal bar," he said. "Basically, they went light on the him because he's also a Democrat who hated Trump."

Meanwhile, the D.C. Bar has not initiated disciplinary proceedings against Michael Sussmann, another Washington attorney charged by Durham. Records show Sussmann remains an "active member" of the bar in "good standing," which also has not been previously reported. The former Hillary Clinton campaign lawyer, who recently resigned from Washington-based Perkins Coie LLP, is accused of lying to federal investigators about his client while passing off a report falsely linking Trump to the Kremlin.

While Sussmann has pleaded not guilty and has yet to face trial, criminal grand jury indictments usually prompt disciplinary proceedings and interim suspensions.

Paul Kamenar of the National Legal and Policy Center, a government ethics watchdog, has called for the disbarment of both Clinesmith and Sussmann. He noted that the D.C. Court of Appeals must automatically disbar an attorney who commits a crime of moral turpitude, which includes crimes involving the "administration of justice."

"Clinesmith pled guilty to a felony. The only appropriate sanction for committing a serious felony that also interfered with the proper administration of justice and constituted misrepresentation, fraud and moral turpitude, is disbarment," he said. "Anything less would minimize the seriousness of the misconduct" and fail to deter other offenders.

Disciplinary Counsel Fox appears to go tougher on Republican bar members. For example, he recently opened a formal investigation of former Trump attorney Rudy Giuliani, who records show Fox put under "temporary disciplinary suspension" pending the outcome of the ethics probe, which is separate from the one being conducted by the New York bar. In July, the New York Bar also suspended the former GOP mayor on an interim basis.

Giuliani has not been convicted of a crime or even charged with one.

*This and all other original articles created by RealClearInvestigations may be republished for*

*free with attribution. (These terms do not apply to outside articles linked on the site.)*

*We provide our stories for free but they are expensive to produce. Help us continue to publish distinctive journalism by making a contribution today to RealClearInvestigations.*

**Support RealClearInvestigations →**

# In re Clinesmith

District of Columbia Court of Appeals

September 2, 2021, Decided

No. 21-BG-18

**Reporter**
2021 D.C. App. LEXIS 253 *; 258 A.3d 161; 2021 WL 4074424

IN RE KEVIN E. CLINESMITH, RESPONDENT. A Suspended Member of the Bar of the District of Columbia Court of Appeals (Bar Registration No. 984265).

**Notice:** THIS OPINION IS SUBJECT TO FORMAL REVISION BEFORE PUBLICATION IN THE ATLANTIC AND MARYLAND REPORTERS. USERS ARE REQUESTED TO NOTIFY THE CLERK OF THE COURT OF ANY FORMAL ERRORS SO THAT CORRECTIONS MAY BE MADE BEFORE THE BOUND VOLUMES GO TO PRESS.

**Prior History:** **[*1]** (DDN 305-19).

**Judges:** Before GLICKMAN and DEAHL, Associate Judges, and NEBEKER, Senior Judge.

## Opinion

On Report and Recommendation of the Board on Professional Responsibility Hearing Committee Number Four Approving Petition for Negotiated Discipline

PER CURIAM: This decision is non-precedential. Please refer to D.C. Bar R. XI, § 12.1(d) regarding the appropriate citation of this opinion.

In this disciplinary matter, Hearing Committee Number Four (the Committee) recommends approval of an amended petition for negotiated attorney discipline. *See* D.C. Bar R. XI, § 12.1(c). The amended petition is based on Respondent's guilty plea to one count of making a false statement in violation of 18 U.S.C. § 1001(a)(3) for his actions in modifying a document while employed by the Federal Bureau of Investigation (FBI) as Assistant General Counsel in the National Security and Cyber Law Branch of the FBI's Office of General Counsel. The Committee determined this was a serious crime in violation of D.C. Bar R. XI, § 10(d), but not one involving moral turpitude, either per se or on the specific facts. The Committee concluded that Respondent's misconduct violated Rule 8.4(b) and (c) of the District of Columbia Rules of Professional Conduct. The Committee determined that the negotiated discipline of a one-year suspension nunc pro tunc to August 25, 2020—the date he self-reported his conviction **[*2]** to Disciplinary Counsel—was not unduly lenient.

Having reviewed the Committee's recommendation in accordance with our procedures in uncontested disciplinary cases, *see* D.C. Bar R. XI, § 12.1(d), we agree this case is appropriate for negotiated discipline and the proposed sanction is not unduly lenient or inconsistent with dispositions imposed for comparable professional misconduct. Accordingly, it is

ORDERED that Respondent Kevin E. Clinesmith is hereby suspended from the practice of law in the District of Columbia for one year nunc pro tunc to August 25, 2020.

*So ordered.*

---

End of Document

# EXHIBIT 4

Page 489

MR. KLAYMAN: Ok.
BY MR. KLAYMAN:
Q. That you wanted Bar Counsel to file a sexual harassment case for you. You asked them that within the last year, against VOA.
A. I asked if it's doable.
Q. And you asked Bar Counsel to do it for you, correct?
A. I asked if it's doable.
I asked, once this is over, can I take -- once I prove --
THE WITNESS: Can I say exactly what I -- I don't know.
Is it just yes or no, or I can say what I asked?
I asked, once this is over, and so we can prove and show why I couldn't have him as my attorney any more, that he was not capable to work as my attorney any more because he had more interest, so, then is there any way that I can pick the VOA case up, because then we can show that I didn't fail to apply. It was that I had

Page 490

this problem that I had to resolve before I go back to VOA.
BY MR. KLAYMAN:
Q. What did Bar Counsel tell you?
A. He said he doesn't know. He can't advise me on that.
Q. So you think that this case right now that you're here on today is going to somehow revive your sexual harassment claim against VOA?
A. No, I don't think that. It was just asking I asked. That's not why I'm here.
Q. You also told Bar Counsel that you wanted to pursue the case now because you wanted to be able to say to future employers, or explain to them, why your career had not gone as well as you had wanted, correct?
A. Correct.
Q. So basically you want, as you testified yesterday, revenge against me and Mr. Falahati to explain why you're unhappy with your professional and personal life?
A. No, I did not say that.

Page 491

I said, when I was in a bad state of mind, in a hole eight years ago, I was so angry and hurt for what Mr. Klayman did and before.
So, in that state of mind, I was going to take my life and then everybody would find out what happened.
Because, to this day, I haven't been able to tell anyone that -- anyone what Mr. Klayman did to me and why I couldn't have him represent me any more.
To this day, everybody's asking me, "Did you wrongly accuse your coworker for sexual harassment? How come that he's still working there and you're not?" People are still wondering why.
But I cannot go and say that my own attorney that's representing me for a sexual harassment case is suddenly falling in love with me and cannot at all, as you said yourself, several times, that "a car cannot run on empty fuel" and you cannot represent me because you're too in love with me and you're feelings are coming

Page 492

in the middle of this.
I can't say that, because it's -- I always think what people are going to think and say that, "So, her own lawyer now?"
So therefore, I wanted this to be resolved here.
BY MR. KLAYMAN:
Q. Over the lunch break you talked about your testimony, not with Mr. Smith, but with some other people, didn't you?
A. Over what?
Q. Over our lunch today, you talked about your testimony, not with Mr. Smith, but with some other people.
You talked with Sam?
A. No, I didn't.
Q. You talked with Kathleen?
A. No, I didn't.
Q. Now, assuming what you say is correct, you're aware that I advised you --
A. I didn't. That is correct.
Q. That's your opinion.

Page 349

sir.
Q. And we decided not to use -- you decided not to use that psychologist, and then I found the name of another psychologist through a former client of mine, Alice Elise.
Do you remember that?
A. I don't remember.
Q. You did meet Alice, though? You remember her?
A. I remember my two -- at that point I was very sick, so, I remember that I saw a few doctors, yes.
Q. Yes. And I took you to see -- I got the name of a psychologist from Alice, you remember that, and then that psychologist, because she was representing Alice -- because Alice had been a sexual harassment victim, as well, I had represented her -- represented that someone else could perhaps help, you and that person was Arlene Aviera.
Do you remember that?
A. Yes.

Page 350

Q. And then I took you to Arlene Aviera?
A. Yes.
Q. I believe that we sat down with Arlene, we'll call her Arlene, and you explained your situation and started crying and sobbing again?
A. Yes.
Q. You remember that?
A. Yes.
Q. And I asked Arlene in front of you, "Can you please help Elham."
Do you remember that?
A. Yes.
Q. And I said, "If she can't pay the fees, Dr. Aviera, don't worry about it, I'll pay them."
A. Yes.
Q. You then began to see Dr. Aviera?
A. I'm sorry, what?
Q. You then set up a schedule to be counseled by Dr. Aviera?
A. Yes.
Q. And I was not present during those counseling sessions. That was with you and Dr.

Page 351

Aviera?
A. You "were" present or "not present"?
Q. Not.
A. Not, yes.
Q. And in and around this time period we had discussions with Tim Shamble, your union represent, president for the AFL-CIO, Voice of America, as to what we now could do to get you back to work in Los Angeles at the Persia News Network.
A. Yes.
Q. And we decided that, if we could show that you had a medical reason why you had to be in Los Angeles, that we could qualify for a reasonable medical accommodation move to Los Angeles.
A. Yes.
Q. And therefore we submitted documentation from Dr. Aviera, from the prior psychologist that you saw, and also from a doctor named Long, an internist, to Voice of America with various documentation arguing that you needed to

Page 352

be in Los Angeles because those were where your physicians were, that's where your family was, that's where your friends were, and besides, you could do your work out of the Persia News Network on Wilshire Boulevard at the federal building, which was run by Voice of America.
Do you remember that?
A. Yes.
Q. One of the reasons why there is a Persia News Network division in Los Angeles is because Los Angeles has a very big Persian population, correct?
A. Correct.
Q. You're aware of that, there's over one million Persians, or Iranians, however you want to say it?
A. Yes.
Q. Los Angeles. And sometimes people joke about it, they call Los Angeles "Tehrangeles" rather than Los Angeles, because it's so heavily populated.
A. Correct.

Page 82

helped me to send -- to send her an email. I'm trying to remember her name now. She's always on TV with this kind of cases.
I can't remember her name now.
Q. Ok. So, at this dinner that you --
A. Gloria Allred.
Q. Ok. So at this dinner that you had with Mr. Klayman, you discussed your case but you did not hire him at that time?
A. Right.
MR. KLAYMAN: Leading, objection, leading. You gave her testimony.
CHAIRMAN FITCH: I would be careful of that, Mr. Smith.
BY MR. SMITH:
Q. Did there come a time that you did hire Mr. Klayman to be your lawyer in this matter?
A. I think it was sometime in the beginning of 2010, I want to say in January that we talked about this and I started seriously working on, yes, me hiring him.
In February I sent an email to Mr.

Page 83

Shamble with information about Mr. Klayman, that he's going to be representing me.
Q. Did you have a fee agreement with Mr. Klayman?
A. I'm sorry?
Q. Did you have a fee agreement or arrangement with Mr. Klayman?
A. Well, we talked about that, at the end, whatever it is, that it's going to be 40 percent goes to him.
Q. Ok, were --
A. Which he later changed it to 50 percent.
Q. Were there any other arrangements you had with respect to the representation, financial arrangements?
A. Well, in the beginning when he -- when I moved -- he moved me to Los Angeles and he paid for everything.
Q. Ok. Was that part of the representation agreement?
A. Well, that's what he said, that he --

Page 84

because I told him that I can't afford moving to LA, and he said he's going to pay for everything, but then he gets his money back when he gets his 40 percent. All that's going to be included there, on top of that.
Q. Did you ever have a writing from Mr. Klayman reflecting the terms of this attorney/client relationship?
A. I don't understand the question.
Q. Did Mr. Klayman give you a written agreement, representation agreement?
A. I don't believe so. I don't know. I really don't know.
I know we had emails going back and forth later regarding this, but I don't remember that now. I don't know.
In my mind I don't remember.
Q. Let me ask you to look at what has been marked in Bar Counsel's book of exhibits as Exhibit Number 1. It is the blue book before you. I'll come over.

Page 85

CHAIRMAN FITCH: What exhibit number?
MR. SMITH: Bar Exhibit Number 1. For the record it is an Office of Bar Counsel complaint form dated November 2nd, 2010.
(Witness peruses document.)
BY MR. SMITH:
Q. Have you had a chance to look at this?
A. Yes.
Q. Did you mail this correspondence to the Office of Disciplinary Counsel at or about --
MR. SUJAT: A leading question. I object, your Honor.
MR. SMITH: I'm laying a foundation to introduce the document.
CHAIRMAN FITCH: Overruled.
BY MR. SMITH:
Q. Did you mail this letter to the Office of Bar Counsel on or about November 2nd, 2010?
A. Yes.
Q. Was this your handwriting on the second page of this document?
A. No.

Page 397

because people in administrative agencies and judges tend to react to cases that are known and are out there for the public to know about."
BY MR. KLAYMAN:
Q. I told you that, right?
A. You told me that and I responded that I don't want it to be --
CHAIRMAN FITCH: Ma'am --
THE WITNESS: Yes?
CHAIRMAN FITCH: I asked did he tell you that.
THE WITNESS: Yes, he told me that.
CHAIRMAN FITCH: You said yes.
THE WITNESS: Yes, he told me that.
BY MR. KLAYMAN:
Q. And we talked about that in the presence of Mr. Shamble as well, correct?
A. Correct.
Q. And that we agreed we would get some positive publicity here to try to coerce VOA into a favorable settlement so you could be in LA, correct?

Page 398

A. Correct.
Q. And --
A. But I didn't agree to do it. You explained all this to me.
CHAIRMAN FITCH: Ok, that's his only question.
THE WITNESS: Ok. Sorry. I'm sorry.
BY MR. KLAYMAN:
Q. You are aware that, and you testified to this yesterday, that I believed that you had agreed to that and I wrote articles that were very favorable to you.
You're aware of that?
A. Yes.
Q. And I sent you copies of them at the time.
A. Yes.
Q. Emailed them to you.
A. Yes, you did.
Q. And there's nothing in writing that ever tells me at the time that you didn't want me to do that, correct?

Page 399

A. Not correct.
Q. The only time that comes up --
CHAIRMAN FITCH: Wait a minute. The problem with the question is "at that time" is unclear.
Are you talking about before you filed the superior court complaint on March 1, if that's when it was filed?
MR. KLAYMAN: Yes.
CHAIRMAN FITCH: Or are you talking about --
MR. KLAYMAN: Yes, around the time period of these filings of these complaints.
CHAIRMAN FITCH: Ok. And your question is...
BY MR. KLAYMAN:
Q. That I sent you copies of some of the columns I had written that were very favorable to you and you did not tell me that you didn't like them or I shouldn't have done it.
CHAIRMAN FITCH: Well, that's a compound question.

Page 400

Did he send you copies of some articles that he had written?
THE WITNESS: Yes, he did.
CHAIRMAN FITCH: Ok. Go ahead.
BY MR. KLAYMAN:
Q. At that time you did not tell me, "Don't write any more."
A. I did.
Q. There's nothing in writing that you presented to that effect at that time, did you?
A. We talked to each other. I explained to you on the phone why I don't want articles out there.
Q. But you are aware that I copied you on an email to Los Angeles Times where I was trying to get an interview for you?
You're aware of that, I copied you on that email with Mr. Shamble?
A. I don't remember it, but, yes. If you say so, then that's correct.
Q. Turn to Exhibit D, in the beginning of your counsel's -- not your counsel's, but Bar

Page 86

Q. Whose handwriting is that?
A. The person who helped me writing this.
Q. Who is that person?
A. I don't remember now.
Q. Before you sent this letter in --
CHAIRMAN FITCH: What was the answer of that question?
MR. SMITH: She does not remember.
THE WITNESS: I don't remember who helped me writing it.
BY MR. SMITH:
Q. Before you mailed this letter in, did you read what was written here?
A. Yes.
Q. Did you talk to the person who was writing this to tell them what was going on in your case?
A. Yes.
Q. And you agree with everything that's written down in here?
A. Yes.
Q. In the first sentence of the letter it

Page 87

says, "He does not represent me and he keeps calling me and texting me."
Would you tell the hearing committee briefly what you're referring to there.
A. Well, I asked him, I told him that I don't want to -- I don't want him to represent me any more, but after I -- after I asked him not to represent me any more, I don't want him to represent me any more, he wouldn't stop calling, texting and emailing me. He would still calling, texting, emailing me regarding the case, or regarding other things.
Q. I'd like to go back to the representation when you first hired Mr. Klayman to represent you in the matter.
What discussions did you have with Mr. Klayman about how he was going to pursue your case against Voice of America?
A. Well, there was -- he told me that he's going to try to settle with them and talk to them.
You know, I mean, it was so much legal stuff that he would tell me that "I'm going to

Page 88

talk to this person and talk to that person," and, you know, it was letters that he was sending in.
Q. Have you ever had any legal training? Have you ever had any legal training in the law?
A. No.
Q. Did you understand any of the legal terms or conversations that Mr. Klayman was telling you about how he was proceeding with your case?
CHAIRMAN FITCH: I'm going to strike that question. No foundation yet for that.
There is no foundation for -- there hadn't been a discussion.
MR. SMITH: Ok.
BY MR. SMITH:
Q. What did you tell Mr. Klayman about how you wanted to proceed in this case?
A. Well, because it was a sexual harassment case, and because of the community and my background, I wanted it to be very quietly handled. I even, the first time when I went to my executive producer and I told my executive

Page 89

producer what my co-host did to me, I asked him to keep it off the record, because I didn't want anybody to know. I just needed help.
Because just -- the way it is, the sexual harassment is just something that it's not fun to be out there and everybody find out about it, so.
Q. Tell me about your community and how they perceive, in the context of what you were saying -- what is the --
A. Well, regarding the sexual harassment case, to this day they're still asking me "Was I raped by Mr. Falahati"? "How was I raped by Mr. Falahati?" "Where was I raped by Mr. Falahati?" "What did he do?"
So sexual harassment, in the Persian community, is rape. It's the actual act of intercourse and rape.
So to this day I have to answer all those questions.
Q. So describe for the committee the conversation you had with Mr. Klayman about these

Page 90

concerns.
A. That I want this to be handled as quiet as possible, so nobody finds out. And I did this complaint because I -- I still wanted to keep my image. My image was just this person that -- I didn't want it to change and I didn't want too much talk regarding about my personal life. I wanted people to look at the Sataki that is covering the stories and not know about my private life.
Because I was not open about my private life in front of the camera. People would ask me, I would never answer. I would always leave it without answer when they asked me about my private life.
Q. Did Mr. Klayman respond to you when you said that you wanted to proceed with the case quietly?
A. Yes. He did. I mean, that's what he was supposed to do in the beginning, yes.
Q. He --
A. But then it changed later.

Page 91

Q. How did it change?
A. He started writing articles, and so it came out in the internet regarding the case.
Q. Did you ever have conversations with Mr. Klayman about publicizing your case?
A. I did. I asked him not to do it, but then later I -- when he explained to me how much it's going to help my case -- because he was going back and forth with the people, the VOA management and the stuff that he said that, "It's going to take, say, no-brainer. It's very easy. It's only going to take two weeks," or whatever, and it's going to be easy, a task, like you said to me, he said how easy it's going to be to transfer me from DC to LA and work out of the LA office.
All of those stuff that I listen to him because he's the attorney, he knows best, and none of that happened.
So then he -- I mean, the complaint from the person, the person -- the sexual harassment person, my boss, his boss and all that, it went up to Board of Governors and suing

Page 92

everybody, and the case got so big that all this he said that it's just in my benefit.
So, I started listening to him.
May I add something?
Q. Please.
CHAIRMAN FITCH: Wait a minute. With respect to what?
MR. SMITH: To the last question I would imagine.
CHAIRMAN FITCH: Do you have something to add to your last answer?
THE WITNESS: Yes.
CHAIRMAN FITCH: That relates to that question?
THE WITNESS: Yes.
CHAIRMAN FITCH: Go ahead.
THE WITNESS: That the reason that I didn't want this to get so huge and so public is just the Persian community and how they react to it.
Just to give you an example, after that it got so public and everybody found out, they

Page 93

opened Facebook pages, fake Facebook pages under my name with pornographic pictures in it, which, together, with Mr. Klayman, we went to FBI to shut it down. But in there they were threatening me, threatening my life and all that.
So that was one of the reasons that I didn't -- I wanted to keep this case so private, because I didn't want all this to get so huge and so big and hit everywhere.
MR. KLAYMAN: Objection, your Honor. A lot of that was hearsay. No foundation.
MR. SMITH: So, just --
CHAIRMAN FITCH: Wait a minute. Mr. Klayman raises a perfectly good question. I'm trying to decide how to deal with this.
Give us a moment.
(Off-the-record discussion amongst hearing committee members.)
CHAIRMAN FITCH: I think that we are going to strike that answer as hearsay. That's too far removed.
If you want to ask a different question

# EXHIBIT 5

verizon

Print

Subject LA Times
From: Larry Klayman <leklayman@gmail.com>
Sent: Jun 10, 2010 01:53:38 PM
To: tshamble@verizon.net
CC: elliesataki@yahoo.com, mahmonirrahimi@gmail.com, jamshideh@gmail.com

Tim:

Please call Paul Richter of the LA Times, DC Bureau. He is the top Iran reporter for the newspaper.

His number is 202 824 8300 and his email address is paul.richter@latimes.com.

If we can get one national story, this can help move things along.

Thanks

Larry

# EXHIBIT 6

Gmail

Oliver Peer <oliver.peerfw@gmail.com>

# Fwd: Sataki Documentary

**Larry Klayman** <klaymanlaw@gmail.com> Mon, Oct 12, 2020 at 9:35 AM
To: Oliver Peer <oliver.peerfw@gmail.com>

---------- Forwarded message ---------
From: **Keya Dash** <keyadash@gmail.com>
Date: Sat, Aug 24, 2019 at 6:20 AM
Subject: Re: Sataki Documentary
To: Larry Klayman <leklayman@gmail.com>

Hi Larry,

It jumps right into some clips in Ellie's voice referring to VOA. They are kind of disjointed. The format is like an interview but you don't hear the questions, you only hear the answers. She never names you or refers to you. The only time she talks about lawyers she says no lawyer would take her case. It could be there are more parts that aren't included in this edit. Clearly this is heavily edited. I think the intended audience is the general Iranian public.

Following are the things she says.

She says when she's behind her desk and not posting attention she's getting harrassed. She says VOA is known to be the worst American government agencies, that the people there protect each other and they is a dirty setting.

She says that the show on VOA that she shared with Falahati was created by both of them but he often tried to make her go out with him which she didn't want to do. To go out with him would have been unprofessional because they were doing the show together and the relationship would affect the show. What if they'd argued one day and it was obvious to viewers they were going out?

The problem is that he didn't know how to accept no for an answer. She says she stopped showing up to work because each time he'd say tonight let's have coffee or tonight let's have dinner. She was exhausted for having to say no to him.

She says she complained to Susan, their executive producer, she told Susan that she doesn't know what more to do at this point, that he's taking liberties with her when she's behind the desk not paying attention. She asked Susan to privately handle the issue and Susan said that she couldn't, that Ellie needed to file a public complaint.

Two times, Fallahati came to her when she was behind the desk not paying attention and, she says the clothes that she was wearing and her bra strap--and then everything is bleeped out. She says she yelled at him--and it's bleeped again. She then says "unfortunately..."--and an echo effect is used before the sentence can be continued.

After a clip of her holding her head in her hand with music playing, she then resumes talking, dug that she laughed that no one saw, that she was seeing a psychiatrist, that she was not feeling good, and that that is all documented. She was going to a doctor and taking mood stabilizers.

Fallahati is a sick man and he didn't only harass Ellie. The system in VOA has problems. James d Chalangi supported her story, and he beared witness as to what happened. Another lady named Mahmunir also beared witness in her favor and incurred problems. Mr. Sajadi and Mr. Falahati were friends and at the time Sajadi had a lot of authority there. They were holding each other's hands (a Persian expression meaning helping each other, conspiring, working together in an effort) and Susan fell into their team.

No attorney would accept her case because her case had gotten very big. When the case for very big, when the issue became the board of governors, the board had to cover for itself. In defending themselves, they said Elham left and Fallahati stayed. As for Fallahati, she wasn't the only girl and there are a number of others.

I'm sorry for the delay. I've been traveling and didn't see the email.

Best,

App.0119

Keya

Thank you,

**Keya Dash**
+1 (703) 963-7531
+1 (703) 962-1707
+1 (703) 962-1726
keyadash@gmail.com

Sent from my iPhone

On Aug 21, 2019, at 1:40 PM, Larry Klayman <leklayman@gmail.com> wrote:

> This is the video. Thanks Keya
>
> ---------- Forwarded message ---------
> From: **Barbara Nichols** <ban@bogoradrichards.com>
> Date: Wed, Aug 21, 2019 at 10:25 AM
> Subject: Sataki Documentary
> To: Larry Klayman <leklayman@gmail.com>
>
> Larry,
>
> The YouTube video at the link below is some kind of documentary about Ms. Sataki's case which was uploaded 11/5/2016, around the time you were gathering files and providing them to Bar Counsel. From the comments, I can see that she is discussing her case and from what I can tell she never mentions you but who knows. We were just wondering if you had a friend who could watch this and let us know what this is saying and if anything she said might be a "smoking gun" since the video is not in English.
>
> https://www.youtube.com/watch?v=e3g5f61muZ4
>
> <image002.png>
>
> [Quoted text hidden]

Whenever I am at my desk and I am not paying attention, he allows himself, to touch me under variety of pretexts.

(displaying Elham Sattaki's photo)
former broadcaster of VOA

Mr. Falahati, Asal has written this for us,
Well: let us answer the first caller (by the name of - Translator) Hossein from Kerman. Hello, go ahead please.

(displaying photo of Mehdi Falahati)
broadcaster for the VOA network
VOA: Voice of America

Voice of America has been recognized as the worst entity of American government. Therefore, lots of such coteries and issues exist there. Everybody says that the atmosphere is of a security one. Nobody can talk with anybody. Everybody makes insinuations against one another. The environment is very dirty.
This week is second evening of being online with the subject of presidential elections in Iran and it's outcome, with your phone calls, emails and online weblogs and websites that Elham Sattaki will introduce to you.

Regarding Mr. Falahati: He repeatedly asked me to go out with him. I didn't want to do it. Mr. Falahati and I started the ONLINE show together and we were performing it together. Aside from other aspects, it was very unprofessional.

When two individuals appear on camera and conduct a show, going out on a date, since it can directly affect the show is not right. They may fight with each other and that will affect the show, and vice-versa. He was not the type of person that I would accept his offer, and say that, all right let's go on a date.

The problem was, he did not know how to take a no. After a while I reached to the point that I was always calling sick and did not go to work. Since I wanted to start working, and Mr. Falahati wanted to come to my desk and again ask me let's go have a coffee or have dinner. And this no, and saying no to him repeatedly had become exhausting for me, had made me very tired. I went to Suzanne who was our executive producer and told her the situation, that he (Mr. Falahati) does so. and I (Elham Sattaki) don't know what to do at this point. Personally, I am not able to handle it.

The situation will go over the board of the status of going out for dinner, and he will come to my desk and while I am not paying attention, under various excuses touch me. Since I was afraid, I told her (Suzanne) that, can you handle it without anybody to know?? That day she told me that "Legally I cannot do it and you must formally file a complaint."

Mr. Falahati wanted to take revenge, since I complained and stated that the situation was so. As I was behind my desk, twice he came to my desk (audio censored) the dress that I had on and my bra-cord. I hollered at him (audio censored) he laughed and said "don't tell anybody." I was not feeling well.
I was seeing psychiatrist. I was seeing psychologist. I was not feeling well. All the documents are available. Everything related (to this matter) exists. I was seeing doctor and the doctor was prescribing relaxing pills for me to take.

At this point, I am just saying, Mr. Falahati is a sick person that has not done so just with me, but the system of VOA has problem. Jamshid Chalangi testified for me. Look what happened? Mahmonir, another lady testified for me. She suffered a lot. Mr. Ali Sajjadi and Mr. Falahati were friends. At that time Mr. Sajjadi was very powerful there. They all got together. And even Suzanne who was my executive producer and was mad from this incident, she teamed up with them. And this caused the problem to be difficult for me, and no attorney was taking my case, because this case had become very big. And when the case became so big, then the Board of Governors had to defend itself, and defending itself caused the case to become against me. And they say that Elham left, Falahati stayed. When they fired me, I was not the only girl. There are a number of others.

Caption dispalying Falahati and Sattaki with written scripts.

The law suit against Mehdi Falahati due to the VOA influence did not get to anywhere, and Elham Sattaki was fired from this network..
After a short period of time Jamshid Chalangi and Ms. Mahmonir Rahimi were fired from this network.

Display of Mehdi Falahati laughing loud.

Certified to be a true translation from the Farsi video and audio original

Mohammad T Moslehi

BEVERLY CANDO
MY COMMISSION EXPIRES
NOTARY PUBLIC
NOVEMBER 27, 2022
MONTGOMERY COUNTY, MD

State of MD County of Montgomery
Subscribed and sworn before me on 9/12/2019
(Date)
(Notary Signature)

# EXHIBIT 7

USA TODAY

POLITICS

# Jeffrey Clark, ex-Trump DOJ official, faces disciplinary charges for election misstatements



Erin Mansfield
USA TODAY

Published 12:24 p.m. ET July 22, 2022 | **Updated 1:44 p.m. ET July 22, 2022**

Former Justice Department lawyer Jeffrey Clark, a central player in Donald Trump's effort to overturn the 2020 presidential election, faces disciplinary proceedings from the District of Columbia's chief investigator of attorney misconduct.

Hamilton P. Fox, III, the disciplinary counsel for the District of Columbia Bar, has charged Clark with attempting to engage in dishonest conduct and "conduct that would seriously interfere with the administration of justice," according to a copy of July 19 filing.

Fox said Clark was served Friday morning. Clark's attorney did not immediately respond to a request for comment.

Rachel Semmel, a spokesperson for the conservative Center for Renewing America, where Clark is a senior fellow, said Clark was "one of the only lawyers at the DOJ who had the interests of the American people at heart."

The charges center around a letter Clark drafted that urged officials in Georgia to convene a special session in the state legislature relating to the 2020 election. Clark sought to get deputy attorney general Jeffrey Rosen and colleague Richard Donoghue to sign the letter, according to the filing.

That letter, called a proof of concept letter, claimed the Department of Justice had "identified significant concerns that may have impacted the outcome of the election in multiple states, including the state of Georgia," according to the filing.

In truth, the Justice Department was not aware of any election fraud allegations in Georgia that would have affected the results of the presidential election, the filing said.

Feds search home of Jeffrey Clark, ex-DOJ official at center of Trump's effort to overturn election

After then-Attorney General William Barr resigned from his position, Trump sought to install Clark as acting attorney general, an idea that many Department of Justice employees opposed. At one point, according to the filing, Clark sought in a private meeting to get Donoghue to sign the letter, and in the same meeting offered Donoghue a position as his deputy. Donoghue refused.

An environmental lawyer in the Department of Justice's Civil Division, Clark briefly oversaw the division during the final days of the Trump administration because of a vacancy. Lawmakers on the House committee investigating the Jan. 6, 2021 attack on the U.S. Capitol say Clark repeatedly attempted to use his position to try to overturn the 2020 election and "interrupt the peaceful transfer of power."

The Jan. 6 committee also aired testimony from three former top Justice officials, including Rosen, about Clark's efforts surrounding the proof of concept letter.

During a recorded video interview with the Jan. 6 committee, Clark declined to answer questions.

Asked about the letter intended for Georgia officials, Clark invoked his Fifth Amendment protection against self incrimination.

"Fifth," he said.

In June, federal authorities searched Clark's suburban Virginia home.

*Contributing: Kevin Johnson*

Jan. 6 committee subpoenas former DOJ official Jeffrey Clark, accused of attempting to overturn 2020 election

# EXHIBIT 4

**IN THE CIRCUIT COURT FIFTEENTH JUDICIAL CIRCUIT**
**IN AND FOR PALM BEACH COUNTY, FLORIDA**

LARRY KLAYMAN
7050 W. Palmetto Park Rd
Boca Raton, FL, 33433

Plaintiff,

v.

ELHAM SATAKI
4141 Crisp Canyon Road #317
Sherman Oaks, CA, 91403

Defendant.

**Case No: 502022CA010491XXXXMB**

**AMENDED COMPLAINT**

Plaintiff Larry Klayman ("Mr. Klayman") hereby brings this action against Defendant Elham Sataki ("Sataki") for fraud.

## I. JURISDICTION AND VENUE

1. Venue is proper in Palm Beach County, Florida, as Mr. Klayman is a citizen of Florida and also resides in this circuit. Mr. Klayman has been severely damaged by the conduct of the Defendant Sataki in this judicial circuit, as he is licensed attorney in Florida and practices primarily in this circuit. The acts and practices as alleged herein are designed to severely harm Mr. Klayman personally and, in his trade, and profession.

2. This is an action for damages in excess of $30,000.

## II. PARTIES

3. Plaintiff Larry Klayman is citizen of Florida and a private and public interest attorney and advocate, author, columnist and syndicated radio talk show host ("Special Prosecutor with Larry Klayman" on Radio America) who practices and broadcasts in this district and nationally. In 2003-2004, Mr. Klayman was a candidate for the U.S. Senate in Florida. He began the

practice of law with the litigation law firm of Blackwell, Walker, Gray, Flick & Hoehl in Miami, Florida and has practiced privately and in a public interest capacity in Florida ever since.

4. Defendant Sataki is a citizen of California.

## III. FACTS

### BACKGROUND FACTS

5. In or about fall of 2010, Mr. Klayman and Defendant Sataki met in Washington D.C. Mr. Klayman asked Defendant Sataki out in a personal capacity, and she accepted.

6. At the time, Defendant Sataki was working as a reporter for the Persian News Network Division ("PNN") of Voice of America ("VOA"), whose headquarters was in Washington D.C.

7. On their dinner date at Clydes in Georgetown, Defendant Sataki broke down in tears sobbing, grabbing Mr. Klayman's hand from across the table. She claimed to have been sexually harassed by a co-host at VOA's PNN and then retaliated against by mostly Iranian managers who had different views about Iran's leaders, as they were pro-regime. Sobbing and evoking sympathy from Mr. Klayman, Defendant Sataki explained that she was destitute. Mr. Klayman offered to help her out of friendship as she continued to sob.

8. They met again and Defendant Sataki told Mr. Klayman how her union president and representative at VOA, Mr. Tim Shamble ("Mr. Shamble") had also been trying to resolve the situation.

9. Mr. Klayman had had prior experience in bringing sexual harassment and workplace retaliation cases over his long then 32-year long legal career. In addition, he had considerable experience in administrative law and litigating against the government, so he agreed to represent Defendant Sataki, *pro bono*, out of friendship.

10. Mr. Klayman met with Defendant Sataki and Mr. Shamble in order to work together as a team in order to try to resolve the situation at VOA. The agreed goal was to try to settle matters amicably with VOA, and to achieve Defendant Sataki's expressly stated desire to be detailed out of the DC headquarters to Defendant Sataki's home in Los Angeles, where her friends and family were. This would take her away from the alleged harasser, Mehdi Falahati ("Mr. Falahati"), and her managers, who had been very critical of her work performance quite apart from her sexual harassment and retaliation claims.

11. When amicable settlement failed, Mr. Klayman, Defendant Sataki, and Mr. Shamble collectively decided to use—as is routine and acceptable strategic practice in matters such as this where the is a political and intransigent government component—public relations and lobbying with influential Senators and Congressmen to have them intervene and coax a settlement.

12. Defendant Sataki agreed to this publicity, with Mr. Klayman writing positive and complimentary articles and arranging for interviews with major publications, such as the Los Angeles Times. Indeed, a crucial piece of evidence is an email which Mr. Klayman sent to the LA Times, copying both Defendant Sataki and Mr. Shamble, attempting to arrange such an interview. Exhibit 1.

13. This was consistent with Defendant Sataki being provided contemporaneously with all the articles and publicity that Mr. Klayman, who along with Mr. Shamble, he had generated for her. At no time did Defendant Sataki object and instead approved, and there is no contemporaneous written record of any objection.

14. In fact, Defendant Sataki personally engaged in the publicizing of her case by personally handing out copies of one the articles written by Mr. Klayman on Capitol Hill.

Extensive efforts to lobby politicians were made, often with Defendant Sataki present, but always with her informed consent.

15. When these efforts proved unsuccessful, it was decided by Defendant Sataki, Mr. Klayman and Mr. Shamble that hard-hitting legal action would be required with the aim of "convincing" VOA and its decision-maker governors at the Board of Governors ("BBG") to settle.

16. Accordingly, not only was an Office of Civil Rights ("OCR") complaint filed, so was a *Bivens* action against all the individual governors on the BBG. It was agreed on by all three that holding the governors personally responsible and at risk might strategically convince them to be reasonable and settle.

17. This *Bivens* case had unfortunately come to be assigned to a judge who Mr. Klayman had had great difficulty with in the past for other clients, the Honorable Colleen Kollar-Kotelly ("Judge Kotelly"), who is known to be highly partisan and to the far left, and who has displayed an animus and bias against Mr. Klayman in the past, likely as a result of his conservative and libertarian public interest advocacy For this reason, with Defendant Sataki's informed knowledge, Mr. Klayman moved to have the case transferred to another judge in the DC federal court, but this was not granted.

18. Ultimately, as Mr. Klayman had feared, Judge Kotelly callously ruled against Defendant Sataki and her order showed serious factual and legal errors – indeed, about 14 pages of which he later included in a motion to disqualify the judge.

19. In this period, after Judge Kotelly's ruling against Defendant Sataki, Mr. Klayman and Mr. Shamble tried repeatedly to communicate with Defendant Sataki, to advise her that only the first round of her case was lost – to put her back to work in LA at VOA—but that she could

now move forward not just to seek a permanent injunction in the *Bivens* case, but also file a Title VII complaint in federal court once as the OCR of VOA had ruled against her with regard to her employment claims of sexual harassment and workplace retaliation by her managers, now that administrative remedies had been exhausted.

20. In this regard, Mr. Shamble sent communications to Defendant Sataki asking that she contact Mr. Klayman or himself, assuring her that none of her rights had been forfeited or lost. However, Defendant Sataki did not respond, but instead, apparently with the aid of non-lawyers who were giving her bad advice, incredulously communicated with VOA that she wanted to drop all of her civil cases. The communications were not in Ms. Sataki's broken English, so it also appeared that they were not generatd by her and thus did not come from her.

21. The letters which Defendant Sataki claims to have sent to Mr. Klayman in this regard were either not sent to Mr. Klayman or were sent to wrong addresses and thus he did not receive them from her.

22. Ultimately, Mr. Klayman was not able to achieve the desired outcome in the courts for Defendant Sataki. Unsatisfied with this, Defendant Sataki vindictively filed meritless identical bar complaints in the District of Columbia, Florida, and Pennsylvania against Mr. Klayman.

23. Importantly, both The Florida Bar and the Pennsylvania Bar summarily dismissed these complaints by Defendant Sataki as meritless.

24. The District of Columbia Office of Disciplinary Counsel ("ODC") received a complaint from Ms. Sataki in or around November of 2010, and then forwarded Mr. Klayman's response thereto to Ms. Sataki on or about July 7, 2011, where they sought Defendant Sataki's response on or before July 15, 2011. In that letter, ODC expressly stated that "if we do not hear

from you promptly, we may assume that you are satisfied with the attorney's explanations." Exhibit 2.

25. Mr. Klayman believed that this matter had been resolved—like it had been in Florida and Pennsylvania—and that Defendant Sataki was satisfied with his responses because he did not hear from ODC for an incredible more than six (6) years until July 20, 2017 when a Specification of Charges pertaining to his representation of Defendant Sataki was filed by ODC.

26. Mr. Klayman later discovered that Defendant Sataki had indeed abandoned her complaint against Mr. Klayman, yet it was ODC who would not let the matter die. In 2014 ODC literally used a private investigator to hunt down Defendant Sataki to convince her to pursue her complaint against Mr. Klayman, which they were apparently successful in doing. Exhibit 3.

27. During this interim six (6) year period, Mr. Klayman had very reasonably believed that this matter had been closed, and therefore discarded records pertaining to his representation of Ms. Sataki. He was shocked to be served with the specification of charges in 2017, which ultimately resulted in a hearing before a highly biased and politicized Ad Hoc Hearing Committee ("AHHC") in the summer of 2018, which committee included a communist, Michael Tigar, and another highly partisan hearing chairman Anthony Fitch. It was at this hearing that Ms. Sataki—in concert with ODC, who obviously coached her to do so—repeatedly gave fraudulent testimony that directly resulted in ultimately a fatally flawed Report and Recommendation by the Board on Professional Responsibility ("Board") which was simply then "rubber stamped" by the District of Columbia Court of Appeals, resulting in a September 15, 2022 order of 18-month suspension with a reinstatement provision in the District of Columbia. *In re Klayman*, 20-BG-583 (D.C.C.A.). These fraudulent statements are set forth in detail below.

**FACTS PERTAINING DIRECTLY TO DEFENDANT SATAKI'S FRAUD**

28. *First*, Ms. Sataki gave the fraudulent testimony that she had not approved of engaging in publicity. On May 31, 2018, Ms. Sataki gave the following fraudulent testimony to the AHHC (Exhibit 4) :

> Mr. Klayman: And that we agreed we would get some positive publicity here to try to coerce VOA into a favorable settlement so you could be in LA, correct?
> Defendant Sataki: Correct.
> Mr. Klayman: And –
> Defendant Sataki: **But I didn't agree to do it. You explained all this to me.** Ex
>
> Chairman Fitch: Did he send you copies of some articles that he had written?
> Defendant Sataki: Yes, he did.
> Mr. Klayman: At that time you did not tell me, "Don't write any more."
> Defendant Sataki: **I did.**
> Mr. Klayman: There's nothing in writing that you presented to that effect at that time, did you?
> Defendant Sataki:. **We talked to each other. I explained to you on the phone why I don't want articles out there.**

29. Defendant Sataki further fraudulently testified that she did not approve of publicity because of how sexual harassment was perceived in the Persian community:

> Defendant Sataki: So sexual harassment, in the Persian community, is rape. It's the actual act of intercourse and rape. So to this day I have to answer all those questions
>
> ....
>
> That I want this to be handled as quiet as possible, so nobody finds out. And I did this complaint because I -- I still wanted to keep my image. My image was just this person that – I didn't want it to change and I didn't want too much talk regarding about my personal life. I wanted people to look at the Sataki that is covering the stories and not know about my private life. Because I was not open about my private life in front of the camera. People would ask me, I would never answer. I would always leave it without answer when they asked me about my private life. Exhibit 4.

30. However, as set forth above, this conflicts with the testimony of numerous material witnesses who testified on Mr. Klayman's behalf, including Mr. Shamble, as set forth above, that Ms. Sataki personally participated in publicizing her case!

31. And, as the final "nail in the coffin," Mr. Klayman uncovered evidence that was fraudulently hidden by Ms. Sataki and ODC in September of 2019—after the AHHC hearing had concluded—that Ms. Sataki had even participated in making a widely aired and publicized public video broadcast on Persian television about her case, with intimate personal details about her personal life, discussing her sexual harassment and workplace retaliation complaint against Voice of America ("VOA") and others, which further undercuts and totally refutes any possible false claim that Ms. Sataki did not agree to publicize her case.[1] The video, which is in Ms. Sataki's native language Farsi, was translated by one of Mr. Klayman's witnesses, Keya Dash, as well as a respected Farsi certified translator who used to work for VOA. Exhibit 5. To be certain of and confirm the content, Mr. Klayman had the documentary translated by Mohammad Moslehi, a certified translator who did translations for VOA. Exhibit 5. Mr. Moslehi translates this "smoking gun" as follows:

> Whenever I am at my desk and I am not paying attention, he allows himself, to touch me under variety of pretexts.
> (displaying Elham [Sataki]'s photo) former broadcaster of VOA.
> Mr. Falahati, Asal has written this for us, Well: let us answer the first caller (by the name of - Translator) Hossain from Kerman. Hello, go ahead please.
> (displaying photo of Mehdi Falahati) broadcaster for the VOA network VOA: Voice of America
> Voice of America has been recognized as the worst entity of American government. Therefore, lots of such coteries and issues exist there. Everybody says that the atmosphere is of a security one. Nobody can talk with anybody. Everybody makes insinuations against one another. The environment is very dirty.
> This week is second evening of being online with the subject of presidential elections in Iran and it's outcome, with your phone calls, emails and online weblogs and websites that Elham [Sataki] will introduce to you.
> Regarding Mr. Falahati: He repeatedly asked me to go out with him. I didn't want to do it. Mr. Falahati and I started the ONLINE show together and we were performing it together. Aside from other aspects, it was very unprofessional.
> When two individuals appear on camera and conduct a show, going out on a date, since it can directly affect the show is not right. They may fight with each other

[1] https://www.youtube.com/watch?v=e3g5f61muZ4

and that will affect the show, and vice-versa. He was not the type of person that I would accept his offer, and say that, all right let's go on a date.

The problem was, he did not know how to take a no. After a while I reached to the point that I was always calling sick and did not go to work. Since I wanted to start working, and Mr. Falahati wanted to come to my desk and again ask me let's go have a coffee or have dinner·. And this no, and saying no to him repeatedly had become exhausting for me, had made me very tired. I went to Suzanne who was our executive producer and told her the situation, that he (Mr. Falahati) does so. and I (Elham [Sataki]) don't know what to do at this point. Personally, I am not able to handle it.

The situation will go over the board of the status of going out for dinner, and he will come to my desk and while I am not paying attention, under various excuses touch me. Since I was afraid, I told her (Suzanne) that, can you handle it without anybody to know?? That day she told me that "Legally I cannot do it and you must formally file a complaint."

Mr. Falahati wanted to take revenge, since I complained and stated that the situation was so. As I was behind my desk, twice he came to my desk (audio censored) the dress that I had on and my bra-cord. I hollered at him (audio censored) he laughed and said "don't tell anybody." I was not feeling well. I was seeing psychiatrist. I was seeing psychologist. I was not feeling well. All the documents are available. Everything related (to this matter) exists. I was seeing doctor and the doctor was prescribing relaxing pills for me to take.

At this point, I am just saying, Mr. Falahati is a sick person that has not done so just with me, but the system of VOA has problem. Jamshid Chalangi testified for me. Look what happened? Mahmonir, another lady testified for me. She suffered a lot. Mr. Ali Sajjadi and Mr. Falahati were friends. At that time Mr. Sajjadi was very powerful there. They all got together. And even Suzanne who was my executive producer and was mad from this incident, she teamed up with them. And this caused the problem to be difficult for me, and no attorney was taking my case, because this case had become very big. And when the case became so big, then the Board of Governors had to defend itself, and defending itself caused the case to become against me. And they say that Elham left, Falahati stayed. When they fired me, I was not the only girl. There are a number of others.

Caption dispalying Falahati and [Sataki] with written scripts.

The law suit against Mehdi Falahati due to the VOA influence did not get to anywhere, and El ham Sattaki was fired from this network .. After a short period of time Jamshid Chalangi and Ms. Mahmonir Rahimi were fired from this network.

Display of Mehdi Falahati laughing loud.

32. Unsurprisingly, Ms. Sataki did not disclose this to the AHHC and Mr. Klayman's defense team had to find this themselves. This clearly fraudulent conduct was obviously done in concert with ODC, who must have known about this crucial evidence and chose not to disclose

it. This clear fraud grossly prejudiced Mr. Klayman because it was not part of the record at the Hearing Committee or the Board level, and the D.C. Court of Appeals refused a motion to remand this matter back to the Board to open the record to review this video shows its inherent bias on this and other issues – a clear violation of Mr. Klayman's due process and other rights. Thus, Mr. Klayman was never even given a chance to use this clearly relevant evidence that completely undercut any possible assertion that Defendant Sataki did not agree to use publicity and herself publicize detailed personal details about her case—one of the key "violations" found by the D.C. Court of Appeals in suspending him for eighteen months.

33. *Second*, on May 31, 2018, Ms. Sataki gave the fraudulent testimony that she never wanted to move to Los Angeles, and that somehow Mr. Klayman had made the decision for her and forced her to move out to Los Angeles – in order fraudulently and falsely create the impression that Mr. Klayman was controlling her:

> Ms. Sataki: Well, in the beginning when he – when I moved -- **he moved me to Los Angeles** and he paid for everything. Exhibit 4 at 83:17-19

34. However, this false and fraudulent testimony was also exposed by numerous other witnesses, including Mr. Shamble, as well as Ms. Sataki herself being forced to admit that it was false.

35. On May 31, 2018, Mr. Klayman was able to show that the decision to move to Los Angeles was collective, and part of a legal strategy to have her assigned there due to having a medical exemption:

> Mr. Klayman: And we decided that, if we could show that you had a medical reason why you had to be in Los Angeles, that we could qualify for a reasonable medical accommodation move to Los Angeles.
>
> Defendant Sataki: Yes.

> Mr. Klayman: And therefore we submitted documentation from Dr. Aviera, from the prior psychologist that you saw, and also from a doctor named Long, an internist, to Voice of America with various documentation arguing that you needed to be in Los Angeles because those were where your physicians were, that's where your family was, that's where your friends were, and besides, you could do your work out of the Persia News Network on Wilshire Boulevard at the federal building, which was run by Voice of America. Do you remember that?
>
> Defendant Sataki: Yes. Exhibit 4 at 351.

36. *Third*, Defendant Sataki perpetuated the fraudulent notion that she had wanted Mr. Klayman to dismiss her cases, which was completely contradicted by her own actions where she (1) filed *pro se* a notice of appeal after the fact and (2) when ODC hunted her down years after the fact, she even asked them if they could still prosecute her sexual harassment claims for her, despite the fact that the Office of Civil Rights had thoroughly investigated her claims and found them to be meritless:

> Mr: Klayman: That you wanted Bar Counsel to file a sexual harassment case for you. You asked them that within the last year, against VOA.
> Defendant Sataki: I asked if it's doable.
> Mr. Klayman: And you asked Bar Counsel to do it for you, correct?
> Defendant Sataki: I asked if it's doable.... Exhibit 4 at 489:3-10 (May 31, 2018).

37. Even though the fraudulent nature of some of these fraudulent statements were uncovered at the Hearing Committee level, the damage had already been done, particularly given this highly biased nature of the AHHC who were looking for any possible reason to rule against Mr. Klayman.

38. Thus, the fraudulent statements that form the basis for this Complaint came from Defendants Sataki at a hearing in 2018, approximately eight (8) years after she had filed bar complaints against Mr. Klayman.

39. Furthermore, Ms. Sataki widely publicized the complaint that she filed against Mr. Klayman.

40. Under *State v. Rutherford*, 863 So. 2d 445 (Fla. Dist. Ct. App. 2004), which oversees the Court, which held that if a complainant in a bar proceeding publicizes her case, he or she loses any possible claim to immunity, Ms. Sataki also loses any possible immunity.

**FACTS PERTAINING TO DEFENDANT SATAKI AVAILING HERSELF TO FLORIDA**

41. At all material times, Defendant Sataki was aware that Mr. Klayman practiced law largely out of Florida. This explained why she filed an identical bar complaint with The Florida Bar, which again, it summarily dismissed as meritless.

42. Furthermore, both ODC and Defendant Sataki – undeniably working together in concert – made it abundantly clear that their goal was to harm Mr. Klayman in Florida with The Florida Bar. This came through in an admission from ODC attorney Myles Lynk, where he stated that they wished to obtain reciprocal discipline against Mr. Klayman. Exhibit 6.

43. Indeed, as shown in the attached legal opinion of one of the preeminent legal ethics experts, Ronald Rotunda, Mr. Klayman did not commit any ethical violations. Exhibit 7.

## IV. CAUSES OF ACTION

**FIRST CAUSE OF ACTION**
***Fraud***

44. Mr. Klayman hereby realleges the factual allegations contained in the preceding section of this Complaint.

45. Defendants Sataki made numerous false statements of material fact to AHHC Hearing concerning Mr. Klayman, including but not limited to that (1) she had not approved of the use of publicity in her case, (2) she did not want to move to Los Angeles, and (3) that she wanted Mr. Klayman to drop her legal claims.

46. Defendant Sataki made these statements before the AHHC between May 30, 2018 and June 27, 2018.

47. Defendant Sataki knew that these statements were false because they are misrepresentations of her own personal experiences—thus, she necessarily knew that they were false.

48. As a direct and proximate result of Defendant Sataki's fraudulent actions, Mr. Klayman was suspended by the D.C. Court of Appeals for eighteen (18) months in a September 15, 2022 order, with a reinstatement provision, notwithstanding Mr. Klayman having been "temporarily" suspended by the same court for the twenty (20) months prior.

49. The AHHC claimed it was justified in relying on Defendant Sataki's fraudulent statements, as she was under oath at the Hearing, and at the time, had no idea that she was willing to perjure herself and lie under oath in order to intentionally harm Mr. Klayman in concert with ODC.

50. Mr. Klayman has thus been severely damaged by Defendant Sataki's fraud, causing an eighteen (18) month suspension not only in the District of Columbia, but also because ODC is now seeking to weaponize the D.C. Court of Appeals' order rendered on the back of Defendant Sataki's fraudulent statements to pursue reciprocal discipline in every other jurisdiction where Mr. Klayman practices, including in Florida which is his primary legal forum, where Mr. Klayman will be forced to spend significant time and resources to defend against phony "reciprocal discipline." Furthermore, Mr. Klayman has already been forced to expend significant time and resources defending this meritless disciplinary proceeding over the course of twelve years due to Defendant Sataki's fraudulent statements, as this matter would have been dismissed early on if not for her fraudulent testimony. Mr. Klayman's reputation has been

severely damaged, and his future earning potential in Florida, the District of Columbia, and everywhere else he practices has been severely harmed. Altogether, Defendant Sataki's fraudulent statements have severely damaged Mr. Klayman, his colleagues, and his family both financially, and as a result of severe harm done to Mr. Klayman's reputation.

## V. PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment against Defendant Sataki as follows:

(a) For general (non-economic), special (economic), actual and compensatory damages in an amount to be determined by the jury.

(b) Plaintiff will move for punitive damages at the appropriate time;

(c) For such further relief as this Court deems necessary, just and proper.

## DEMAND FOR TRIAL BY JURY

Mr. Klayman demands a trial by jury on all counts as to all issues so triable.

**Dated**: March 28, 2025

Respectfully Submitted

*/s/ Larry Klayman*

Larry Klayman, Esq.
KLAYMAN LAW GROUP, P.A.
Florida Bar No. 0246220
7050 W. Palmetto Park Rd
Boca Raton, FL, 33433
Tel: 561-558-5536
Email: leklayman@gmail.com

*Pro Se*

# EXHIBIT 1

verizon

Print

Subject LA Times
From: Larry Klayman <leklayman@gmail.com>
Sent: Jun 10, 2010 01:53:38 PM
To: tshamble@verizon.net
CC: elliesataki@yahoo.com, mahmonirrahimi@gmail.com, jamshideh@gmail.com

Tim:

Please call Paul Richter of the LA Times, DC Bureau. He is the top Iran reporter for the newspaper.

His number is 202 824 8300 and his email address is paul.richter@latimes.com.

If we can get one national story, this can help move things along.

Thanks

Larry

# EXHIBIT 2

R Supp Ex 6

# OFFICE OF BAR COUNSEL

July 7, 2011

Wallace E. Shipp, Jr
*Bar Counsel*

Elizabeth A. Herman
*Deputy Bar Counsel*

*Senior Assistant Bar Counsel*
Judith Hetherton
[illegible] Porter

[illegible]
William Ross
H. Clay Smith, III
Traci M. Tait

*Senior Staff Attorney*
Lawrence K. Bloom
Dolores Dorsainvil
Joseph C. Perry
Mary-Helen Perry

**CONFIDENTIAL**

Ms. Elham Sataki
16110 Ventura Boulevard
Encino, California 91436

Re: Klayman/Sataki
Bar Docket No. 2011-D028
Response due: July 15, 2011

Dear Ms. Sataki:

Enclosed is a copy of the attorney's answer to your complaint in the above-referenced matter.

If you disagree with any of the statements made by the attorney, or if you have any additional evidence, please provide us with your written reply on or before July 15, 2011.

If we do not hear from you promptly, we may assume that you are satisfied with the attorney's explanations. If you have a question or need assistance in preparing your response, please call the undersigned at (202) 638-1501. Please refer to the above docket number in all correspondence and telephone calls.

Sincerely,

H. Clay Smith
Assistant Bar Counsel

Enclosure

HCS:act

# EXHIBIT 3

**Clay Smith**

**From:** Kevin O'Connell
**Sent:** Thursday, January 16, 2014 9:47 AM
**To:** Clay Smith; Chuck Anderson
**Subject:** RE: Project

Stand by.....

**From:** Clay Smith
**Sent:** Wednesday, January 15, 2014 3:10 PM
**To:** Chuck Anderson; Kevin O'Connell
**Subject:** Project

Gentlemen:

I am trying to locate a complainant that has dropped off the map.

Ms. Elham Sataki
16110 Ventura Blvd.
Encino, CA 91436
(818) 800-1441

She filed a complaint vs. Larry Klayman in 2011. Her only correspondence with us was the ethical complaint that she filed. My letter to her dated 7/7/11 was not responded to, but was not returned by the USPS either. I recently tried to contact her by telephone, but her number above is not in service. I'll appreciate your efforts to locate her and to provide some reliable contact information.

Thanks,

H. Clay Smith, III
Assistant Bar Counsel
Office of Bar Counsel
515 5th Street, N.W.
Room 117, Bldg. A
Washington, D.C. 20001

(202) 638-1501

ALL-STATE LEGAL® 10

helped me to send -- to send her an email. I'm trying to remember her name now. She's always on TV with this kind of cases.

I can't remember her name now.

Q. Ok. So, at this dinner that you --

A. Gloria Allred.

Q. Ok. So at this dinner that you had with Mr. Klayman, you discussed your case but you did not hire him at that time?

A. Right.

MR. KLAYMAN: Leading, objection, leading. You gave her testimony.

CHAIRMAN FITCH: I would be careful of that, Mr. Smith.

BY MR. SMITH:

Q. Did there come a time that you did hire Mr. Klayman to be your lawyer in this matter?

A. I think it was sometime in the beginning of 2010, I want to say in January that we talked about this and I started seriously working on, yes, me hiring him.

In February I sent an email to Mr.



Shamble with information about Mr. Klayman, that he's going to be representing me.

Q. Did you have a fee agreement with Mr. Klayman?

A. I'm sorry?

Q. Did you have a fee agreement or arrangement with Mr. Klayman?

A. Well, we talked about that, at the end, whatever it is, that it's going to be 40 percent goes to him.

Q. Ok, were --

A. Which he later changed it to 50 percent.

Q. Were there any other arrangements you had with respect to the representation, financial arrangements?

A. Well, in the beginning when he -- when I moved -- he moved me to Los Angeles and he paid for everything.

Q. Ok. Was that part of the representation agreement?

A. Well, that's what he said, that he --



because I told him that I can't afford moving to LA, and he said he's going to pay for everything, but then he gets his money back when he gets his 40 percent. All that's going to be included there, on top of that.

Q. Did you ever have a writing from Mr. Klayman reflecting the terms of this attorney/client relationship?

A. I don't understand the question.

Q. Did Mr. Klayman give you a written agreement, representation agreement?

A. I don't believe so. I don't know. I really don't know.

I know we had emails going back and forth later regarding this, but I don't remember that now. I don't know.

In my mind I don't remember.

Q. Let me ask you to look at what has been marked in Bar Counsel's book of exhibits as Exhibit Number 1. It is the blue book before you. I'll come over.



CHAIRMAN FITCH: What exhibit number?

MR. SMITH: Bar Exhibit Number 1. For the record it is an Office of Bar Counsel complaint form dated November 2nd, 2010.

(Witness peruses document.)

BY MR. SMITH:

Q. Have you had a chance to look at this?

A. Yes.

Q. Did you mail this correspondence to the Office of Disciplinary Counsel at or about --

MR. SUJAT: A leading question. I object, your Honor.

MR. SMITH: I'm laying a foundation to introduce the document.

CHAIRMAN FITCH: Overruled.

BY MR. SMITH:

Q. Did you mail this letter to the Office of Bar Counsel on or about November 2nd, 2010?

A. Yes.

Q. Was this your handwriting on the second page of this document?

A. No.

Page 397

because people in administrative agencies and judges tend to react to cases that are known and are out there for the public to know about."
BY MR. KLAYMAN:
Q. I told you that, right?
A. You told me that and I responded that I don't want it to be --
CHAIRMAN FITCH: Ma'am --
THE WITNESS: Yes?
CHAIRMAN FITCH: I asked did he tell you that.
THE WITNESS: Yes, he told me that.
CHAIRMAN FITCH: You said yes.
THE WITNESS: Yes, he told me that.
BY MR. KLAYMAN:
Q. And we talked about that in the presence of Mr. Shamble as well, correct?
A. Correct.
Q. And that we agreed we would get some positive publicity here to try to coerce VOA into a favorable settlement so you could be in LA, correct?

Page 398

A. Correct.
Q. And --
A. But I didn't agree to do it. You explained all this to me.
CHAIRMAN FITCH: Ok, that's his only question.
THE WITNESS: Ok. Sorry. I'm sorry.
BY MR. KLAYMAN:
Q. You are aware that, and you testified to this yesterday, that I believed that you had agreed to that and I wrote articles that were very favorable to you.
You're aware of that?
A. Yes.
Q. And I sent you copies of them at the time.
A. Yes.
Q. Emailed them to you.
A. Yes, you did.
Q. And there's nothing in writing that ever tells me at the time that you didn't want me to do that, correct?

Page 399

A. Not correct.
Q. The only time that comes up --
CHAIRMAN FITCH: Wait a minute. The problem with the question is "at that time" is unclear.
Are you talking about before you filed the superior court complaint on March 1, if that's when it was filed?
MR. KLAYMAN: Yes.
CHAIRMAN FITCH: Or are you talking about --
MR. KLAYMAN: Yes, around the time period of these filings of these complaints.
CHAIRMAN FITCH: Ok. And your question is...
BY MR. KLAYMAN:
Q. That I sent you copies of some of the columns I had written that were very favorable to you and you did not tell me that you didn't like them or I shouldn't have done it.
CHAIRMAN FITCH: Well, that's a compound question.

Page 400

Did he send you copies of some articles that he had written?
THE WITNESS: Yes, he did.
CHAIRMAN FITCH: Ok. Go ahead.
BY MR. KLAYMAN:
Q. At that time you did not tell me, "Don't write any more."
A. I did.
Q. There's nothing in writing that you presented to that effect at that time, did you?
A. We talked to each other. I explained to you on the phone why I don't want articles out there.
Q. But you are aware that I copied you on an email to Los Angeles Times where I was trying to get an interview for you?
You're aware of that, I copied you on that email with Mr. Shamble?
A. I don't remember it, but, yes. If you say so, then that's correct.
Q. Turn to Exhibit D, in the beginning of your counsel's -- not your counsel's, but Bar

Page 86

Q. Whose handwriting is that?
A. The person who helped me writing this.
Q. Who is that person?
A. I don't remember now.
Q. Before you sent this letter in --
CHAIRMAN FITCH: What was the answer of that question?
MR. SMITH: She does not remember.
THE WITNESS: I don't remember who helped me writing it.
BY MR. SMITH:
Q. Before you mailed this letter in, did you read what was written here?
A. Yes.
Q. Did you talk to the person who was writing this to tell them what was going on in your case?
A. Yes.
Q. And you agree with everything that's written down in here?
A. Yes.
Q. In the first sentence of the letter it

Page 87

says, "He does not represent me and he keeps calling me and texting me."
Would you tell the hearing committee briefly what you're referring to there.
A. Well, I asked him, I told him that I don't want to -- I don't want him to represent me any more, but after I -- after I asked him not to represent me any more, I don't want him to represent me any more, he wouldn't stop calling, texting and emailing me. He would still calling, texting, emailing me regarding the case, or regarding other things.
Q. I'd like to go back to the representation when you first hired Mr. Klayman to represent you in the matter.
What discussions did you have with Mr. Klayman about how he was going to pursue your case against Voice of America?
A. Well, there was -- he told me that he's going to try to settle with them and talk to them.
You know, I mean, it was so much legal stuff that he would tell me that "I'm going to

Page 88

talk to this person and talk to that person," and, you know, it was letters that he was sending in.
Q. Have you ever had any legal training? Have you ever had any legal training in the law?
A. No.
Q. Did you understand any of the legal terms or conversations that Mr. Klayman was telling you about how he was proceeding with your case?
CHAIRMAN FITCH: I'm going to strike that question. No foundation yet for that.
There is no foundation for -- there hadn't been a discussion.
MR. SMITH: Ok.
BY MR. SMITH:
Q. What did you tell Mr. Klayman about how you wanted to proceed in this case?
A. Well, because it was a sexual harassment case, and because of the community and my background, I wanted it to be very quietly handled. I even, the first time when I went to my executive producer and I told my executive

Page 89

producer what my co-host did to me, I asked him to keep it off the record, because I didn't want anybody to know. I just needed help.
Because just -- the way it is, the sexual harassment is just something that it's not fun to be out there and everybody find out about it, so.
Q. Tell me about your community and how they perceive, in the context of what you were saying -- what is the --
A. Well, regarding the sexual harassment case, to this day they're still asking me "Was I raped by Mr. Falahati"? "How was I raped by Mr. Falahati?" "Where was I raped by Mr. Falahati?" "What did he do?"
So sexual harassment, in the Persian community, is rape. It's the actual act of intercourse and rape.
So to this day I have to answer all those questions.
Q. So describe for the committee the conversation you had with Mr. Klayman about these

Page 90

concerns.

A. That I want this to be handled as quiet as possible, so nobody finds out. And I did this complaint because I -- I still wanted to keep my image. My image was just this person that -- I didn't want it to change and I didn't want too much talk regarding about my personal life. I wanted people to look at the Sataki that is covering the stories and not know about my private life.

Because I was not open about my private life in front of the camera. People would ask me, I would never answer. I would always leave it without answer when they asked me about my private life.

Q. Did Mr. Klayman respond to you when you said that you wanted to proceed with the case quietly?

A. Yes. He did. I mean, that's what he was supposed to do in the beginning, yes.

Q. He --

A. But then it changed later.

Page 91

Q. How did it change?

A. He started writing articles, and so it came out in the internet regarding the case.

Q. Did you ever have conversations with Mr. Klayman about publicizing your case?

A. I did. I asked him not to do it, but then later I -- when he explained to me how much it's going to help my case -- because he was going back and forth with the people, the VOA management and the stuff that he said that, "It's going to take, say, no-brainer. It's very easy. It's only going to take two weeks," or whatever, and it's going to be easy, a task, like you said to me, he said how easy it's going to be to transfer me from DC to LA and work out of the LA office.

All of those stuff that I listen to him because he's the attorney, he knows best, and none of that happened.

So then he -- I mean, the complaint from the person, the person -- the sexual harassment person, my boss, his boss and all that, it went up to Board of Governors and suing

Page 92

everybody, and the case got so big that all this he said that it's just in my benefit.

So, I started listening to him.

May I add something?

Q. Please.

CHAIRMAN FITCH: Wait a minute. With respect to what?

MR. SMITH: To the last question I would imagine.

CHAIRMAN FITCH: Do you have something to add to your last answer?

THE WITNESS: Yes.

CHAIRMAN FITCH: That relates to that question?

THE WITNESS: Yes.

CHAIRMAN FITCH: Go ahead.

THE WITNESS: That the reason that I didn't want this to get so huge and so public is just the Persian community and how they react to it.

Just to give you an example, after that it got so public and everybody found out, they

Page 93

opened Facebook pages, fake Facebook pages under my name with pornographic pictures in it, which, together, with Mr. Klayman, we went to FBI to shut it down. But in there they were threatening me, threatening my life and all that.

So that was one of the reasons that I didn't -- I wanted to keep this case so private, because I didn't want all this to get so huge and so big and hit everywhere.

MR. KLAYMAN: Objection, your Honor. A lot of that was hearsay. No foundation.

MR. SMITH: So, just --

CHAIRMAN FITCH: Wait a minute. Mr. Klayman raises a perfectly good question. I'm trying to decide how to deal with this.

Give us a moment.

(Off-the-record discussion amongst hearing committee members.)

CHAIRMAN FITCH: I think that we are going to strike that answer as hearsay. That's too far removed.

If you want to ask a different question

# EXHIBIT 5

Gmail

Oliver Peer <oliver.peerfw@gmail.com>

# Fwd: Sataki Documentary

**Larry Klayman** <klaymanlaw@gmail.com> Mon, Oct 12, 2020 at 9:35 AM
To: Oliver Peer <oliver.peerfw@gmail.com>

---------- Forwarded message ---------
From: **Keya Dash** <keyadash@gmail.com>
Date: Sat, Aug 24, 2019 at 6:20 AM
Subject: Re: Sataki Documentary
To: Larry Klayman <leklayman@gmail.com>

Hi Larry,

It jumps right into some clips in Ellie's voice referring to VOA. They are kind of disjointed. The format is like an interview but you don't hear the questions, you only hear the answers. She never names you or refers to you. The only time she talks about lawyers she says no lawyer would take her case. It could be there are more parts that aren't included in this edit. Clearly this is heavily edited. I think the intended audience is the general Iranian public.

Following are the things she says.

She says when she's behind her desk and not posting attention she's getting harrassed. She says VOA is known to be the worst American government agencies, that the people there protect each other and they is a dirty setting.

She says that the show on VOA that she shared with Falahati was created by both of them but he often tried to make her go out with him which she didn't want to do. To go out with him would have been unprofessional because they were doing the show together and the relationship would affect the show. What if they'd argued one day and it was obvious to viewers they were going out?

The problem is that he didn't know how to accept no for an answer. She says she stopped showing up to work because each time he'd say tonight let's have coffee or tonight let's have dinner. She was exhausted for having to say no to him.

She says she complained to Susan, their executive producer, she told Susan that she doesn't know what more to do at this point, that he's taking liberties with her when she's behind the desk not paying attention. She asked Susan to privately handle the issue and Susan said that she couldn't, that Ellie needed to file a public complaint.

Two times, Fallahati came to her when she was behind the desk not paying attention and, she says the clothes that she was wearing and her bra strap--and then everything is bleeped out. She says she yelled at him--and it's bleeped again. She then says "unfortunately..."--and an echo effect is used before the sentence can be continued.

After a clip of her holding her head in her hand with music playing, she then resumes talking, dug that she laughed that no one saw, that she was seeing a psychiatrist, that she was not feeling good, and that that is all documented. She was going to a doctor and taking mood stabilizers.

Fallahati is a sick man and he didn't only harass Ellie. The system in VOA has problems. James d Chalangi supported her story, and he beared witness as to what happened. Another lady named Mahmunir also beared witness in her favor and incurred problems. Mr. Sajadi and Mr. Falahati were friends and at the time Sajadi had a lot of authority there. They were holding each other's hands (a Persian expression meaning helping each other, conspiring, working together in an effort) and Susan fell into their team.

No attorney would accept her case because her case had gotten very big. When the case for very big, when the issue became the board of governors, the board had to cover for itself. In defending themselves, they said Elham left and Fallahati stayed. As for Fallahati, she wasn't the only girl and there are a number of others.

I'm sorry for the delay. I've been traveling and didn't see the email.

Best,

Keya

Thank you,

**Keya Dash**
+1 (703) 963-7531
+1 (703) 962-1707
+1 (703) 962-1726
keyadash@gmail.com

Sent from my iPhone

On Aug 21, 2019, at 1:40 PM, Larry Klayman <leklayman@gmail.com> wrote:

This is the video. Thanks Keya

---------- Forwarded message ---------
From: **Barbara Nichols** <ban@bogoradrichards.com>
Date: Wed, Aug 21, 2019 at 10:25 AM
Subject: Sataki Documentary
To: Larry Klayman <leklayman@gmail.com>

Larry,

The YouTube video at the link below is some kind of documentary about Ms. Sataki's case which was uploaded 11/5/2016, around the time you were gathering files and providing them to Bar Counsel. From the comments, I can see that she is discussing her case and from what I can tell she never mentions you but who knows. We were just wondering if you had a friend who could watch this and let us know what this is saying and if anything she said might be a "smoking gun" since the video is not in English.

https://www.youtube.com/watch?v=e3g5f61muZ4

<image002.png>

[Quoted text hidden]

Whenever I am at my desk and I am not paying attention, he allows himself, to touch me under variety of pretexts.

(displaying Elham Sattaki's photo)
former broadcaster of VOA

Mr. Falahati, Asal has written this for us,
Well: let us answer the first caller (by the name of - Translator) Hossein from Kerman. Hello, go ahead please.

(displaying photo of Mehdi Falahati)
broadcaster for the VOA network
VOA: Voice of America

Voice of Amèrica has been recognized as the worst entity of American government. Therefore, lots of such coteries and issues exist there. Everybody says that the atmosphere is of a security one. Nobody can talk with anybody. Everybody makes insinuations against one another. The environment is very dirty.
This week is second evening of being online with the subject of presidential elections in Iran and it's outcome, with your phone calls, emails and online weblogs and websites that Elham Sattaki will introduce to you.

Regarding Mr. Falahati: He repeatedly asked me to go out with him. I didn't want to do it. Mr. Falahati and I started the ONLINE show together and we were performing it together. Aside from other aspects, it was very unprofessional.

When two individuals appear on camera and conduct a show, going out on a date, since it can directly affect the show is not right. They may fight with each other and that will affect the show, and vice-versa. He was not the type of person that I would accept his offer, and say that, all right let's go on a date.

The problem was, he did not know how to take a no. After a while I reached to the point that I was always calling sick and did not go to work. Since I wanted to start working, and Mr. Falahati wanted to come to my desk and again ask me let's go have a coffee or have dinner. And this no, and saying no to him repeatedly had become exhausting for me, had made me very tired. I went to Suzanne who was our executive producer and told her the situation, that he (Mr. Falahati) does so. and I (Elham Sattaki) don't know what to do at this point. Personally, I am not able to handle it.

The situation will go over the board of the status of going out for dinner, and he will come to my desk and while I am not paying attention, under various excuses touch me. Since I was afraid, I told her (Suzanne) that, can you handle it without anybody to know?? That day she told me that "Legally I cannot do it and you must formally file a complaint."

Mr. Falahati wanted to take revenge, since I complained and stated that the situation was so. As I was behind my desk, twice he came to my desk (audio censored) the dress that I had on and my bra-cord. I hollered at him (audio censored) he laughed and said "don't tell anybody." I was not feeling well.
I was seeing psychiatrist. I was seeing psychologist. I was not feeling well. All the documents are available. Everything related (to this matter) exists. I was seeing doctor and the doctor was prescribing relaxing pills for me to take.

At this point, I am just saying, Mr. Falahati is a sick person that has not done so just with me, but the system of VOA has problem. Jamshid Chalangi testified for me. Look what happened? Mahmonir, another lady testified for me. She suffered a lot. Mr. Ali Sajjadi and Mr. Falahati were friends. At that time Mr. Sajjadi was very powerful there. They all got together. And even Suzanne who was my executive producer and was mad from this incident, she teamed up with them. And this caused the problem to be difficult for me, and no attorney was taking my case, because this case had become very big. And when the case became so big, then the Board of Governors had to defend itself, and defending itself caused the case to become against me. And they say that Elham left, Falahati stayed. When they fired me, I was not the only girl. There are a number of others.

Caption dispalying Falahati and Sattaki with written scripts.

The law suit against Mehdi Falahati due to the VOA influence did not get to anywhere, and Elham Sattaki was fired from this network..
After a short period of time Jamshid Chalangi and Ms. Mahmonir Rahimi were fired from this network.

Display of Mehdi Falahati laughing loud.

Certified to be a true translation from the Farsi video and audio original

[signature]

Mohammad T Moslehi

BEVERLY CANDO
MY COMMISSION EXPIRES
NOTARY
PUBLIC
NOVEMBER 27, 2022
MONTGOMERY COUNTY, MD

State of MD County of Montgomery
Subscribed and sworn before me on 9/12/2019
(Date)
[signature]
(Notary Signature)

# EXHIBIT 6

**DCCA No. 20-BG-0583**

**DISTRICT OF COLUMBIA**
**COURT OF APPEALS**

| | |
|---|---|
| **In the Matter of** | **Board Docket No. 17-BD-063** |
| **LARRY E. KLAYMAN** | **Disciplinary Docket No. 2011-D028** |
| **Respondent,** | |
| **A Suspended Member of the Bar of the District of Columbia Court of Appeals.** | |
| **Bar Number: 334581** | |
| **Date of Admission: December 22, 1980** | |

**Disciplinary Counsel's Response in Opposition to Respondent's Motion to Reset Oral Argument for September Calendar**

Now comes Disciplinary Counsel to urge the Court to deny Respondent Larry E. Klayman's motion to reset the oral argument in this matter to the September calendar. Respondent has offered no good cause or substantive reason whatsoever for such a postponement. To the contrary, this matter has been set for oral argument since the Court's Notice of Calendaring of April 27, 2022, which scheduled the oral argument to June 16, 2022, at 9:30 AM. In addition, because of the ongoing pandemic the Court has, pursuant to its order of May 21, 2020, successfully held oral arguments via Zoom beginning on or around May 26, 2020.

Respondent's counsel fails to provide good cause for postponement of the scheduled oral argument date. D.C. App. R. 34(b) provides: "If counsel . . . cannot, for good cause, appear on the scheduled argument date, a motion for postponement must be promptly filed. *Proceedings in any trial court, whether federal, state, or local, will not ordinarily be deemed good cause for postponing argument*" (emphasis added). Respondent's counsel has not claimed to be unavailable on June 16, 2022, to attend the remote video conference.

Respondent's arguments claiming violations of due process and other constitutional rights are meritless. They have also been raised in Respondent's briefs that are currently before the Court. These arguments do not preclude oral arguments from being heard via remote video conference. The Court, having considered the rights of all Respondents in disciplinary proceedings and for the protection of all participants throughout the COVID-19 pandemic, has already determined that it is appropriate for disciplinary hearings to proceed via remote video conference. *See* DCCA Court Operations Order (Apr. 28, 2022). Oral arguments by video or teleconference are more than sufficient to satisfy a Respondent's right to a meaningful opportunity to be heard. *Cf. In re Sibley*, 990 A.2d 483, 493-94 (D.C. 2010) (suggesting that attorney's due process rights were satisfied by his ability to make post-hearing submissions after he declined to appear at his

disciplinary proceeding in Florida, and that such rights also would have been satisfied had he attempted to participate in the hearing by telephone).

Finally, Respondent states that because his District of Columbia Bar license has been suspended pending the outcome of this proceeding, there is no reason to procced expeditiously with the oral argument in this case. In fact, the opposite is true. Because of Respondent's multiple serious violations of the D. C. Rules of Professional Conduct, Disciplinary Counsel is seeking Respondent's formal suspension with a fitness requirement for reinstatement. This issue should be resolved, not just because of its impact in the District of Columbia, but because reciprocal discipline in the State of Florida where Respondent is also admitted to practice depends, as it does in many other states, on a final adjudication being made in a disciplinary proceeding in the other jurisdiction. *See* Rule 3-4.6(a), Rules Regulating the Florida Bar.

This matter has been set for oral argument. We urge the Court to keep to the schedule it has announced. There are no valid grounds or good cause for the delay Respondent is seeking. Disciplinary Counsel respectfully requests that the motion be denied.

Respectfully submitted,

*Hamilton P. Fox, III*

Hamilton P. Fox, III
Disciplinary Counsel

*Myles V. Lynk*

Myles V. Lynk
Senior Assistant Disciplinary Counsel

OFFICE OF DISCIPLINARY COUNSEL
515 5th Street, N.W.
Bldg. A., Suite 117
Washington, D.C. 20001
(202) 638-1501

**CERTIFICATE OF SERVICE**

I certify that on June 6, 2022 the foregoing *Disciplinary Counsel's Response in Opposition to Respondent's Motion to Reset Oral Argument for September Calendar,* was delivered to the District of Columbia Court of Appeals via e-filing system to the Board on Professional Responsibility and to Larry E. Klayman c/o Melissa Isaak at melissa@protectingmen.com.

*Myles V. Lynk*

Myles V. Lynk
Senior Assistant Disciplinary Counsel

# EXHIBIT 7

CHAPMAN UNIVERSITY | FOWLER SCHOOL OF LAW

One University Drive
Orange, California 92866
www.chapman.edu

Ronald D. Rotunda
*The Doy & Dee Henley Chair and*
*Distinguished Professor of Jurisprudence*
Email: rrotunda@chapman.edu
(714) 628-2698 • Fax (714) 628-2576
http://www1.chapman.edu/~rrotunda/
www.ronaldrotunda.com

19 December 2016

Larry Klayman, Esq.
Klayman Law Firm
c/o 2020 Pennsylvania Ave., N.W.
#800
Washington, D.C. 20006

RE: Bar Complaint of Oct. 20, 2011
VIA: Email, leklayman@gmail.com

Dear Mr. Klayman:

You have asked me to evaluate the Office of Bar Counsel Complaint dated October 20, 2011. Despite the fact that it is dated about six years ago, you received it only recently. Perhaps that is because the Office of Bar Counsel (OBC) sent it to the wrong address. OBC may have sent it to 2000 Pennsylvania Ave. N.W., Suite 345, while your office is at 2020 Pennsylvania Ave, NW, Suite 345.

I have evaluated the OBC Complaint of Oct. 20, 2011, and discussed the matter with you. You should feel free to show this letter to the OBC if you wish.

A very surprising item about this complaint is that it was filed over five years ago about alleged events that occurred in December 2009 and shortly thereafter. The complainant, Elham Sataki, made similar complaints to the Pennsylvania Bar and the Florida Bar, both of which dismissed the complaint years ago. For some reason, the OBC sat on this complaint for years and now is resurrecting it.

Because of the passage of time — the reasons for this delay are unknown — relevant evidence cannot be found and memories fade.

> For example, you told me that you recall a phone voice mail from someone speaking in a belligerent tone who claimed to be speaking for Ms. Sataki. This person said that you should not contact her. You had been trying, unsuccessfully, to contact Ms. Sataki to see if she wanted to appeal, and you filed a notice of appeal

to protect her rights. The union representative, who was representing Ms. Sataki in her employment dispute, also was unsuccessful in contacting her. Shortly after that, Ms. Sataki did so and you and her Union Representative, Mr. Shamble, did not pursue the appeal. You have moved since then and you are unable to find this voice mail. The tone and substance of this voice mail is very relevant to the complaint, but it no longer exists (or, you cannot find it) because of the passage of time.

The caselaw shows that OBC is subject to laches. In *Florida Bar v. Rubin*, 362 So.2d 12 (Fla. Sup. Ct. 11978)(per curiam), the Florida supreme court threw out charges because the prosecutor because of the Bar's delay in violation of the Florida rules.[1] One can summarize this case as the Bar delaying finalization of two cases (where the Bar was disappointed with the recommended discipline) because it was confident it would secure a conviction in a third case still in the pipeline in the hope of securing greater overall discipline. The Court said,

> Whatever other objects the rule may seek to achieve, it obviously contemplates that *the Bar should not be free to withhold a referee's report which it finds too lenient until additional cases can be developed* against the affected attorney, in an effort to justify the more severe discipline which might be warranted by cumulative misconduct. The Bar's violation of the prompt filing requirement in this case, to allow a second grievance proceeding against Rubin to mature, is directly antithetical to the spirit and intent of the rule. In addition, it has inflicted upon Rubin the "agonizing ordeal" of having to live under a cloud of uncertainties, suspicions, and accusations for a period in excess of that which the rules were designed to tolerate.

*The Florida Bar v. Rubin*, 362 So. 2d 12, 15 (footnotes omitted)(emphasis added). As *Rubin* concluded, "The Bar has consistently demanded that attorneys turn 'square corners' in the conduct of their affairs. An accused attorney has a right to demand no less of the Bar when it musters its resources to prosecute for attorney misconduct." 362 So. 2d 12, 16.

*Rubin* is no judicial orphan. Later, *The Florida Bar v. Walter*, 784 So. 2d 1085, 1087 (Fla. Sup. Ct. 2001) ruled that a *seven-year interim* between the lawyer's alleged misconduct and the filing of the Bar's complaint, makes "it 'unjust or unfair' to require Walter [the lawyer] now to answer the Bar's charges in this matter. That the Bar may have diligently pursued Chesnoff's statement does not render this seven-year interim a "reasonable time," especially considering that

---

[1] "On January 6, 1978 fourteen months after the Bar received referee White's report and eight months after it had received referee Carey's the Bar filed both referees' reports with the Court." "Referee White's report, which recommended a public reprimand, was not filed with us until fourteen months after its receipt by the Bar. Rubin contends that this filing clearly was not prompt, and that the Bar's violation of the rule denies him due process" *The Florida Bar v. Rubin*, 362 So. 2d 12, 14 (Fla. 1978)(footnote omitted).

the delay is not attributable to Walter." The court ruled that the lawyer does not have "to defend against the Bar's charges after so many years have passed."[2]

See also, *In re Grigsby*, 815 N.W.2d 836 (Minn. 2012), concluding that a discipline prosecutor's failure to charge out a matter for an unreasonably long time violates the ethics rules. *Grigsby* involved a case where the lawyer did not even dispute the facts, and the lawyer's violations were "obvious," yet the court rejected the disciplinary hearing:

> Finally, it is also worth noting the procedural irregularities in this discipline matter. Grigsby was suspended for 60 days on April 16, 2009. Grigsby's single instance of misconduct resulting in this disciplinary proceeding took place sometime during April and May 2009, and the Assistant County Attorney informed the Director of it on June 3, 2009. *The facts of this case are simple and undisputed, Grigsby's violations are obvious*, and Grigsby complied with the Director's investigation. The Director *did not file a petition for disciplinary action until May 31, 2011, 727 days after notice of the misconduct*. Because Grigsby, understandably, did not seek readmission while under investigation for practicing law while suspended, he has effectively been suspended from the practice of law since April 16, 2009, or for over 3 years. The purpose of any disciplinary proceeding, as noted earlier, is to protect the public; *the delay here tends to weaken the Director's argument that protection of the public requires a reinstatement hearing* and we decline to do so notwithstanding the legitimate concerns discussed earlier.

*In re Disciplinary Action against Grigsby*, 815 N.W.2d 836, 846–47, 2012 WL 2814088 (Minn.), *reinstatement granted sub nom. In re Disciplinary Action Against Grigsby*, 822 N.W.2d 291, 2012 WL 5355573 (Minn. 2012)(emphasis added).

In evaluating Minnesota cases, William J. Wernz, Minnesota Legal Ethics: A Treatise (6th ed. 2016) reviews the cases concludes that the Office of Bar Counsel is subject to a "Special Promptness Requirement?" Rule 3.2 of the Rules of Professional Conduct applies to Bar Counsel and that "general delay in investigation" could violate Rule 3.2.[3]

---

2 Cited and quoted with approval in, *The Florida Bar v. Kane*, 202 So.3d 11, 19 (Fla. Sup. Ct. 2016):

> The Court has made clear that the Bar has an obligation to process disciplinary cases in a fair and just manner. *See Fla. Bar v. Rubin*, 362 So.2d 12, 16 (Fla.1978) ("The Bar has consistently demanded that attorneys turn 'square corners' in the conduct of their affairs. An accused attorney has a right to demand no less of the Bar when it musters its resources to prosecute for attorney misconduct.").

3 Wernz, Minnesota Legal Ethics; A Treatise 779-80, § II(D) (2016).

Rule 3.2 ("Expediting Litigation"), Model Rules of Professional Conduct, corresponds to Rule 3.2 of the D.C. Rules of Professional Conduct. As Comment 1 to the D.C. Rules asks, "The question is whether a competent lawyer acting in good-faith would regard the course of action as having some substantial purpose other than delay."[4]

In this case, OBC should explain why any competent Bar Counsel, acting in good faith, would regard the delay of 6 years since the complaint was filed and 7 years since the alleged violation occurred would this delay "as having some substantial purpose other than delay." Why has OBC waited so long?

In Indiana, when the Bar Counsel did not act with reasonable promptness, the Court imposed a new rule making clear what states like Minnesota and Florida thought were already clear. Rule 23, Disciplinary Commission and Proceedings now provides, Section 10(h):

> *Limitation on time to complete investigation.* Unless the Supreme Court permits additional time, any investigation into a grievance *shall be completed and action on the grievance shall be taken within twelve (12) months from the date the grievance is received* (or the date a response is demanded to a Disciplinary Commission grievance). The purpose of the deadline is to enable the Supreme Court to promote a fair and efficient process and not to create substantive or procedural rights. Requests for additional time shall be submitted to the Supreme Court and shall briefly describe the circumstances necessitating the request. No response or objection shall be allowed. Delays caused by a respondent's noncooperation or requests for extensions of time, and periods during which the respondent is suspended from practice, shall not be counted toward the 12-month period. *If the Disciplinary Commission does not file a Disciplinary Complaint within this time, the grievance shall be deemed dismissed.*[5]

The Virgin Islands also recognizes laches applied to Bar Counsel. No "legal authority precludes this Court or the EGC from applying the common law doctrine of laches to a grievance. 'Laches, an equitable defense, is distinct from the statute of limitations, a creature of law,' and precludes an action if 'an omission to assert a right for an unreasonable and unexplained length of 'time and under circumstances prejudicial to the adverse party.' Thus, "[l]aches ... may be found even if the applicable statute of limitations has not yet run." *In Matter of Joseph*, 60 V.I. 540, 558–59, 2014 WL 547513, at *7 (V.I. Feb. 11, 2014)(internal citations omitted). Thus, the "laches defense may apply to attorney discipline proceedings in certain very narrowly defined circumstances, such as when the delay in instituting the disciplinary proceedings results in prejudice to the respondent." *Id.*

---

[4] http://www.dcbar.org/bar-resources/legal-ethics/amended-rules/rule3-02.cfm

[5] http://www.in.gov/judiciary/files/order-rules-2016-1103-adm-disc.pdf (last two emphases added).

That is what is occurring hear because memories have faded and some evidence cannot be found. The evidence collected by the Pennsylvania and Florida Bars — both of which dismissed the complaint — no longer exists. Perhaps the D.C. Bar has some evidence, but it has not given it to Mr. Klayman. One of the papers in the files the D.C. Bar refers to a draft complaint and an opinion from a lawyer who practices in the employment area, but neither the Bar Counsel nor the expert have reviewed all of the relevant files and documents of Ms. Sataki's case. Mr. Klayman has sent you a copy.

The Virgin Islands Supreme Court sets out a test that *presumes* prejudice in a case like this: "we shall only presume prejudice with respect to the laches defense when there is a substantial delay in the initiation of disciplinary proceedings." *In Matter of Joseph*, 60 V.I. 540, 559; 2014 WL 547513, at *7 (V.I. Feb. 11, 2014). Here there is a substantial delay.

See also, *id.*, *Joseph*, *id.*, citing, *In re Wade*, 814 P.2d 753, 764 (Ariz. 1991); *In re Siegel*, 708 N.E.2d 869, 871 (Ind. 1999) ("There may be factual situations in which the expiration of time destroys the fundamental fairness of the entire proceeding."); *Anne Arundel County Bar Ass'n, Inc. v. Collins*, 325 A.2d 724, 728 (Md. 1974) (laches applicable to attorney discipline proceedings if "prejudice or circumstances making it inequitable to grant the relief sought"). *Tennessee Bar Ass'n v. Berke*, 344 S.W.2d 567, 571–72 (Tenn. 1961) (dismissing disciplinary proceedings for laches when grievance filed nine years after alleged misconduct occurred with no explanation for the delay and respondent was not responsible for the delay). *In Matter of Joseph*, 60 V.I. 540, 559, 2014 WL 547513, at *7 (V.I. Feb. 11, 2014).

Similarly., in *Hayes v. Alabama State Bar*, 719 So. 2d 787, 791 (Ala. 1998), the State Bar suspended lawyers convicted of misdemeanors for "serious crimes" and charged them with additional rules infractions. The Supreme Court held, inter alia, that the State Bar's delay in pursuing remaining formal charges following resolution of criminal proceedings warranted dismissal.[6]

---

[6] *Hayes v. Alabama State Bar*, 719 So. 2d 787, 791, 1998 WL 321956 (Ala. 1998)(footnote omitted)(emphasis added):

> In *Noojin* [*Noojin v. Alabama State Bar*, 577 So.2d 420 (Ala.1990),], this Court examined an attorney's contentions that the Alabama State Bar had erred in delaying disciplinary proceedings against him. It held that the culmination of a federal criminal matter was not "good cause" for *delaying disciplinary proceedings for nearly a year*, and it barred the Alabama State Bar from proceeding on the charges pending against the attorney. As in *Noojin*, we consider in the present case whether the Bar had "good cause" to defer or delay the disciplinary proceedings against the attorneys. Rule 14, Ala.R.Disc.P. The Bar asserts that it "stayed" the proceedings on the formal charges based on the attorneys' alleged attempts to obtain discovery for their criminal cases. Aside from this assertion, the Bar has not attempted to provide a reason for its continued delay in regard to the formal charges against the attorneys.[5] Therefore, if we accept the Bar's only explanation of "good

Let me now leave the subject of laches and turn to the actual complaint, filed in 2011. Ms. Sataki makes several complaints.

FIRST, she claims that Mr. Klayman was not competent to handle her case and thus violated RULE 1.1. Pennsylvania and Florida have already rejected that claim. In addition, Ms. Sataki has never filed any lawsuit claiming that there was malpractice or sexual harassment by Mr. Klayman. She also claims that he used incorrect procedures and failed to make deadlines. She does not indicate what deadlines he missed. He did tell me that he filed a notice of appeal to protect her rights when she did not bother to respond to his requests asking her if she wanted to appeal. Her union representative also could not get in contact with her. Eventually, she bothered to respond and ordered him and Mr. Shamble (her Union Representative) not to pursue appeals, so they complied. If an error was made below, the normal way we correct it is by appeal.

The OBC says that it has an opinion by a lawyer as to the alleged malpractice, but OBC has not disclosed it to Mr. Klayman so neither he nor anyone else could answer it. OBC also says that it has a complaint, which suggests OBC has prejudged the matter, by showing its complaint to someone who is not part of the Office of Bar Counsel.

SECOND, she claims Mr. Klayman violated RULE 1.3 by revealing information to the public that was not secret client information and not confidential client information. Mr. Klayman told me that when he wrote to talked about the case it was only after his client's prior permission. She and Mr. Shamble thought that publicity would help her case by encouraging the Voice of America to settle rather than suffer bad publicity.

THIRD, she claims that Mr. Klayman did not disclose the fee until several months after the case began, and thus violated RULE 1.5. Mr. Klayman tells me that he did disclose the fee when they first talked about the case. The fee was zero — he did it as a pro bono matter. Several months later, when the case got more difficult than either of them expected, he told the client that he would have charge a fee. Or, of course, she would retain another lawyer and he could transfer the files to that other lawyer. She chose not to hire a new lawyer and he proposed a contingent fee. She never signed a fee agreement because she was hard to contact and the case ended at her request. He never charged her any fee.

FOURTH, she claims a violation of RULE 1.6, by disclosing client confidences. Mr. Klayman has told me that he had her permission before he disclosed anything. She and her Union

---

cause" for delay, there remains a period of over a year, from February 14, 1997, to now, during which the Bar has taken no action to proceed on the merits of the formal charges. Under our *Noojin* analysis, we find that this delay in proceeding on the remaining formal charges is excessive. Therefore, because of the inordinate delay on the part of the Bar in pursuing the remaining formal charges against the attorneys, those charges are dismissed.

Representative, Mr. Shamble, thought that publicity would help her case, and she was probably right — although not pursuing an appeal undercut her case.

FIFTH, she claims that Mr. Klayman violated RULE 1.7 because he used her case for his purposes. Leaving aside the rather vague nature of those charges, Mr. Klayman says that his only motivation was to help her as a friend because she was in trouble and had other problems. He would be willing to disclose these other problems to you if Ms. Sataki waives her attorney-client privilege. After all, we do not want a situation where the OBC seeks to discipline Mr. Klayman in this case because he used what the OBC later claims is information protected by Rule 1.6. Since Mr. Klayman will not be talking to Ms. Sataki about this case, the OBC should ask for this waiver.

Sixth, Ms. Sataki says Mr. Klayman violated RULE 3.3 because he was dishonest in telling people he was her lawyer when he was not her lawyer. Mr. Klayman has told me that he never told people he was her lawyer after she discharged him. He (and her union representative) tried to contact her unsuccessfully to ask her if he wanted to appeal. Her complaint[7] says that her brother told Mr. Klayman to terminate the representation, but the caller did not identify himself as her brother, Mr. Klayman would not recognize the brother's voice, and her brother did not represent that he was her agent with authority.[8]

I am troubled that the OBC has sat on this case for nearly six years and another one involving Mr. Klayman for nearly eight years. In my view, the complaint of Oct. 20, 2011 should be dismissed, particularly under these circumstances. The OBC has not even asserted that it learned something in the intervening years to justify reopening this old complaint.

Sincerely,

Ronald D. Rotunda
Doy & Dee Henley Chair and Distinguished Professor of Law

---

[7] I refer to the complaint as "her complaint" but I do not mean to imply that she wrote it. Mr. Klayman tells me that when he knew her, her English was not good enough to draft a complaint like this one.

[8] Mr. Klayman has met her brother once, but does not know him well enough to recognize her voice, and he has met her mother once. Both times, he met them at the residence of Ms. Sataki, because the mother and the brother invited him — they wanted to meet the lawyer who was representing their sister/daughter. Ms. Sataki claims that he showed up "unannounced." If she is telling the truth it is only because she did not talk to her brother or mother on this matter.

**RONALD D. ROTUNDA**
Email: rrotunda@chapman.edu

May 2, 2014
Home Page http://www1.chapman.edu/~rrotunda

**Office Address:**

Chapman University
Dale E. Fowler School of Law
Room 406
One University Drive
Orange, CA 92866-1005
☎: (714) 228-2698
Fax: (714) 228-2576

**Experience:**

| | |
|---|---|
| Since August, 2008 | DOY & DEE HENLEY CHAIR AND DISTINGUISHED PROFESSOR OF JURISPRUDENCE, CHAPMAN UNIVERSITY |
| June 17, 2009 – Jan. 31, 2013 | COMMISSIONER, Fair Political Practices Commission a regulatory body of the State of California, |
| 2006- August 2008 | UNIVERSITY PROFESSOR AND PROFESSOR OF LAW, George Mason University |
| 2002-2006 | THE GEORGE MASON UNIVERSITY FOUNDATION PROFESSOR OF LAW, George Mason University School of Law |
| Nov. to Dec. 2002 | Visiting Scholar, Katholieke Universiteit Leuven, Faculty of Law, Leuven, Belgium |
| May 2004 | Visiting Lecturer, The Institute for Law and Economics, Institut für Recht und Ökonomik, The University of Hamburg, Germany |
| June 2004-May 2005 | Special Counsel to Department of Defense, The Pentagon |
| December 2005 | Visiting Lecturer, The Institute for Law and Economics, Institut für Recht und Ökonomik, The University of Hamburg, Germany |
| 1993 - 2002 | THE ALBERT E. JENNER, JR. PROFESSOR OF LAW, University of Illinois College of Law |
| Since 2002 | THE ALBERT E. JENNER, JR. PROFESSOR OF LAW, EMERITUS, University of Illinois College of Law |
| Fall, 2001 | Visiting Professor, George Mason University School of Law |

| | |
|---|---|
| Spring & Fall 2000 | Cato Institute, Washington, D.C.; Senior Fellow in Constitutional Studies [Senior Fellow in Constitutional Studies, 2001-2009] |
| Spring, 1999 | Visiting Professor, holding the JOHN S. STONE ENDOWED CHAIR OF LAW, University of Alabama School of Law |
| August 1980 - 1992 | Professor of Law, University of Illinois College of Law |
| March 1986 | Fulbright Professor, Maracaibo and Caracas, Venezuela, under the auspices of the Embassy of the United States and the Catholic University Andres Bello |
| January – June, 1981 | Fulbright Research Scholar, Italy |
| Spring 1981 | Visiting Professor of Law, European University Institute, Florence, Italy |
| August 1977 – August, 1980 | Associate Professor of Law, University of Illinois College of Law |
| August 1974 – August 1977 | Assistant Professor of Law, University of Illinois College of Law |
| April 1973 - July 1974 | Assistant Counsel, U.S. Senate Select Committee on Presidential Campaign Activities |
| July 1971 - April, 1973 | Associate, Wilmer, Cutler & Pickering Washington, DC |
| August 1970 – July 1971 | Law Clerk to Judge Walter R. Mansfield, Second Circuit, New York, N.Y. |

**Education:**

**Legal:** HARVARD LAW SCHOOL (1967- 1970)
Harvard Law Review, volumes 82 & 83
J.D., 1970 Magna Cum Laude

**College:** HARVARD COLLEGE (1963- 1967)
A.B., 1967 Magna Cum Laude in Government

**Member:**

American Law Institute (since 1977); Life Fellow of the American Bar Foundation (since 1989); Life Fellow of the Illinois Bar Foundation (since 1991); The Board of Editors, The Corporation Law Review (1978-1985); New York Bar (since 1971); Washington, D.C. Bar and D.C. District Court Bar (since 1971); Illinois Bar (since 1975); 2nd Circuit Bar (since 1971); Central District of Illinois (since 1990); 7th Circuit (since 1990); U.S. Supreme Court Bar (since 1974); 4th Circuit, since 2009. Member: American Bar Association, Washington, D.C. Bar Association, Illinois State Bar

Association, Seventh Circuit Bar Association; The Multistate Professional Responsibility Examination Committee of the National Conference of Bar Examiners (1980-1987); AALS, Section on Professional Responsibility, Chairman Elect (1984-85), Chairman (1985-86); Who's Who In America (since 44th Ed.) and various other Who's Who; American Lawyer Media, L.P., National Board of Contributors (1990-2000).

**Scholarly Influence and Honors:**

Symposium, *Interpreting Legal Citations*, 29 JOURNAL OF LEGAL STUDIES (part 2) (U. Chicago Press, Jan. 2000), sought to determine the influence, productivity, and reputation of law professors. Under various measures, Professor Rotunda scored among the highest in the nation. *E.g.*, scholarly impact, most-cited law faculty in the United States, 17th (p. 470); reputation of judges, legal scholars, etc. on Internet, 34th (p. 331); scholar's non-scholarly reputation, 27th (p. 334); most influential legal treatises since 1978, 7th (p. 405).

In May 2000, *American Law Media*, publisher of *The American Lawyer*, the *National Law Journal*, and the *Legal Times,* picked Professor Rotunda as one of the ten most influential Illinois Lawyers. He was the only academic on the list. He was rated, in 2014, as one of "The 30 Most Influential Constitutional Law Professors" in the United States.

- 2012, Honored with, THE CHAPMAN UNIVERSITY EXCELLENCE IN SCHOLARLY/CREATIVE WORK AWARD, 2011-2012.
- Appointed UNIVERSITY PROFESSOR, 2006, George Mason University; Appointed 2008, DOY & DEE HENLEY CHAIR AND DISTINGUISHED PROFESSOR OF JURISPRUDENCE, Chapman University.
- The 2002-2003 *New Educational Quality Ranking* of U.S. Law Schools (EQR) ranks Professor Rotunda as the eleventh most cited of all law faculty in the United States. *See* http://www.leiterrankings.com/faculty/2002faculty_impact_cites.shtml
- Selected UNIVERSITY SCHOLAR for 1996-1999, University of Illinois.
- 1989, Ross and Helen Workman Research Award.
- 1984, David C. Baum Memorial Research Award.
- 1984, National Institute for Dispute Resolution Award.
- Fall, 1980, appointed Associate, in the Center for Advanced Study, University of Illinois.

## List of Publications:

## Books:

**Problems and Materials on Professional Responsibility** (Foundation Press, Mineola, N.Y., 1976) (with Thomas D. Morgan).

California Supplement to Problems and Materials on Professional Responsibility (Foundation Press, Mineola, N.Y., 1976) (with Thomas D. Morgan).

1978 Supplement to Problems and Materials on Professional Responsibility (Foundation Press, Mineola, N.Y., 1978) (with Thomas D. Morgan).

1979 Problems, Cases and Readings Supplement to Problems and Materials on Professional Responsibility (Foundation Press, Mineola, N.Y., 1979) (with Thomas D. Morgan).

1979 California Rules Supplement to Problems and Materials on Professional Responsibility (Foundation Press, Mineola, N.Y., 1979) (with Thomas D. Morgan).

1979 Standards Supplement to Problems and Materials on Professional Responsibility (Foundation Press, Mineola, N.Y., 1979) (with Thomas D. Morgan).

1980 California Rules Supplement to Problems and Materials on Professional Responsibility (Foundation Press, Mineola, N.Y., 1980) (with Thomas D. Morgan).

1980 Standards Supplement to Problems and Materials on Professional Responsibility (Foundation Press, Mineola, N.Y., 1980) (with Thomas D. Morgan).

**Constitutional Law** (West Publishing Co., St. Paul, Minnesota, 1978) (a one volume treatise on Constitutional Law) (with John E. Nowak and J. Nelson Young).

1978 Supplement to Constitutional Law (West Publishing Co., St. Paul, Minnesota, 1978) (with John E. Nowak and J. Nelson Young).

1979-1980 Supplement to Constitutional Law (West Publishing Co., St. Paul, Minnesota, 1979) (with John E. Nowak and J. Nelson Young).

1982 Supplement to Constitutional Law (West Publishing Co., St. Paul, Minnesota, 1982) (with John E. Nowak and J. Nelson Young).

**MODERN CONSTITUTIONAL LAW: CASES & NOTES** (West Publishing Co., St. Paul, Minnesota, 1981).

1981 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1981).

1982 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1982).

1983 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1983).

1984 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, MINNESOTA, 1984).

**PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY** (Foundation Press, Mineola, N.Y., 2d ed. 1981) (with Thomas D. Morgan).

1981 STANDARDS SUPPLEMENT TO PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Mineola, N.Y., 1981) (with Thomas D. Morgan).

1983 STANDARDS SUPPLEMENT TO PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Mineola, N.Y., 1983) (with Thomas D. Morgan).

**THE UNITED STATES FEDERAL SYSTEM: LEGAL INTEGRATION IN THE AMERICAN EXPERIENCE** (Giuffrè, Milan, 1982) (with Peter Hay).

**SIX JUSTICES ON CIVIL RIGHTS** (Oceana Publications, Inc., Dobbs Ferry, N.Y., 1983) (edited and with introduction).

**CONSTITUTIONAL LAW** (West Publishing Co., St. Paul, Minnesota, 2d ed. 1983) (with John E. Nowak and J. Nelson Young) (a one volume treatise on Constitutional Law).

**PROFESSIONAL RESPONSIBILITY** (West Publishing Co., 1984, Black Letter Series).

**PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY** (Foundation Press, Mineola, N.Y., 3d ed. 1984) (with Thomas D. Morgan).

1984 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Mineola, N.Y. 1984) (with Thomas D. Morgan).

1985 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Mineola, N.Y. 1985) (with Thomas D. Morgan).

1986 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Mineola, N.Y. 1986) (with Thomas D. Morgan).

1987 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Mineola, N.Y. 1987) (with Thomas D. Morgan).

**MODERN CONSTITUTIONAL LAW: CASES & NOTES** (West Publishing Co., St. Paul, Minnesota, 2d ed. 1985).

1985 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1985).

1986 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, MINNESOTA, 1986).

1987 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1987).

1988 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1988).

**THE POLITICS OF LANGUAGE: LIBERALISM AS WORD AND SYMBOL** (University of Iowa Press, 1986) (with an Introduction by Daniel Schorr).

**TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE** (West Publishing Co., St. Paul, Minnesota, 1986) (*three volume treatise*) (with John E. Nowak and J. Nelson Young).

1987 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW (West Publishing Co., 1987) (with John E. Nowak).

1988 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW (West Publishing Co., 1988) (with John E. Nowak).

1989 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW (West Publishing Co., 1989) (with John E. Nowak).

1990 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW (West Publishing Co., 1990) (with John E. Nowak).

1991 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW (West Publishing Co., 1991) (with John E. Nowak).

**CONSTITUTIONAL LAW** (West Publishing Co., St. Paul, Minnesota, 3d ed. 1986) (a one volume treatise on Constitutional Law) (with John E. Nowak and J. Nelson Young).

1988 POCKET PART TO CONSTITUTIONAL LAW (West Publishing Co., 1988) (with John E. Nowak).

**JOSEPH STORY'S COMMENTARIES ON THE CONSTITUTION** (Carolina Academic Press, Durham, N.C. 1987) (with introduction) (with John E. Nowak).

**CONSTITUTIONAL LAW: PRINCIPLES AND CASES** (West Publishing Co., St. Paul, Minnesota, 1987).

**PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY** (Foundation Press, Mineola, N.Y., 4th ed. 1987) (with Thomas D. Morgan).

1988 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Mineola, N.Y. 1988) (with Thomas D. Morgan).

1989 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Westbury, N.Y. 1989) (with Thomas D. Morgan).

1990 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Westbury, N.Y. 1990) (with Thomas D. Morgan).

**PROFESSIONAL RESPONSIBILITY** (West Publishing Co., St. Paul, Minnesota, 2d ed. 1988, Black Letter Series).

**MODERN CONSTITUTIONAL LAW: CASES AND NOTES** (West Publishing Co., St. Paul, Minnesota, 3d ed. 1989).

1989 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1989).

1990 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1990).

1991 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1991).

1992 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1992).

**PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY** (Foundation Press, Westbury, N.Y., 5th ed. 1991) (with Thomas D. Morgan).

1991 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Westbury, N.Y. 1991) (with Thomas D. Morgan).

1992 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Westbury, N.Y. 1992) (with Thomas D. Morgan).

1993 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Westbury, N.Y. 1993) (with Thomas D. Morgan).

1994 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Westbury, N.Y. 1994) (with Thomas D. Morgan).

1995 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Westbury, N.Y. 1995) (with Thomas D. Morgan).

**CONSTITUTIONAL LAW** (West Publishing Co., St. Paul, Minnesota, 4th ed. 1991) (a one volume treatise on Constitutional Law) (with John E. Nowak).

**PROFESSIONAL RESPONSIBILITY** (West Publishing Co., St. Paul, Minnesota, 3d ed. 1992, Black Letter Series).

**TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE** (West Publishing Co., St. Paul, Minnesota, 2d ed. 1992) (*four volume treatise*) (with John E. Nowak).

1993 POCKET PART TO CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1993) (with John E. Nowak).

1994 POCKET PART TO CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1994) (with John E. Nowak).

1995 POCKET PART TO CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1995) (with John E. Nowak).

1996 POCKET PART TO CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1996) (with John E. Nowak).

1997 POCKET PART TO CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1997) (with John E. Nowak).

1998 POCKET PART TO CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1998) (with John E. Nowak).

1999 POCKET PART TO CONSTITUTIONAL LAW (West Group, St. Paul, Minnesota, 1999) (with John E. Nowak).

**MODERN CONSTITUTIONAL LAW: CASES AND NOTES** (West Publishing Co., St. Paul, Minnesota, 4th ed. 1993).

1993 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1993).

1994 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1994).

1995 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1995).

1996 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1996).

**CONSTITUTIONAL LAW** (West Publishing Co., St. Paul, Minnesota, 5th ed. 1995) (a one volume treatise on Constitutional Law) (with John E. Nowak).

**PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY** (Foundation Press, Westbury, N.Y., 6th ed. 1995) (with Thomas D. Morgan).

1996 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Westbury, N.Y. 1996) (with Thomas D. Morgan).

1997 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Westbury, N.Y. 1997) (with Thomas D. Morgan).

1998 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Westbury, N.Y. 1998) (with Thomas D. Morgan).

1999 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y. 1999) (with Thomas D. Morgan).

2000 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y. 2000) (with Thomas D. Morgan).

**PROFESSIONAL RESPONSIBILITY** (West Publishing Co., St. Paul, Minnesota, 4th ed. 1995, Black Letter Series) (with computer disk).

**Treatise on Constitutional Law: Substance and Procedure** — EXPANDED CD ROM EDITION (West Publishing Co., St. Paul, Minnesota, 1995) (with John E. Nowak).

**MODERN CONSTITUTIONAL LAW: CASES AND NOTES** (West Publishing Co., St. Paul, Minnesota, 5th ed. 1997).

1997 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1997).

1998 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1998).

1999 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1999).

**TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE** (West Group, St. Paul, Minnesota, 3d ed. 1999) (*five volume treatise*) (with John E. Nowak).

2000 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE (West Group, St. Paul, Minnesota, 2000) (with John E. Nowak).

2001 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE (West Group, St. Paul, Minnesota, 2001) (with John E. Nowak).

2002 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE (West Group, St. Paul, Minnesota, 2002) (with John E. Nowak).

2003 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE (West Group, St. Paul, Minnesota, 2003) (with John E. Nowak).

2004 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE (West Group, St. Paul, Minnesota, 2004) (with John E. Nowak).

2005 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE (West Group, St. Paul, Minnesota, 2005) (with John E. Nowak).

2006 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE (West Group, St. Paul, Minnesota, 2006) (with John E. Nowak).

**헌법: 개인의 자유와 절차를** [AMERICAN CONSTITUTIONAL LAW: INDIVIDUAL LIBERTIES AND PROCEDURE; published in Korean] (Korean Constitutional Court, 1999) (with John E. Nowak).

**PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY** (Foundation Press, Westbury, NY, 7th ed. 2000) (with Thomas D. Morgan).

2001 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y. 2001) (with Thomas D. Morgan).

2002 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y. 2002) (with Thomas D. Morgan).

2003 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y. 2003) (with Thomas D. Morgan).

LEGAL ETHICS: THE LAWYER'S DESKBOOK ON PROFESSIONAL RESPONSIBILITY (ABA-West Group, St. Paul, Minn. 2000) (a Treatise on legal ethics, jointly published by the ABA and West Group, a division of Thomson Publishing).

MODERN CONSTITUTIONAL LAW: CASES AND NOTES (West Group, St. Paul, Minnesota, 6th ed. 2000).

2000 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Group, St. Paul, Minnesota, 6th ed. 2000).

2001 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Group, St. Paul, Minnesota, 6th ed. 2001).

2002 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Group, St. Paul, Minnesota, 6th ed. 2002).

CONSTITUTIONAL LAW (West Group, St. Paul, Minnesota, 6th ed. 2000) (a one volume treatise on Constitutional Law) (with John E. Nowak).

PROFESSIONAL RESPONSIBILITY (West Group, St. Paul, Minnesota, 5th ed. 2001, Black Letter Series).

PROFESSIONAL RESPONSIBILITY: A STUDENT'S GUIDE (ABA-West Group, St. Paul, Minnesota, 2001).

LEGAL ETHICS: THE LAWYER'S DESKBOOK ON PROFESSIONAL RESPONSIBILITY (ABA-West Group, St. Paul, Minn., 2nd ed. 2002) (a Treatise on legal ethics, jointly published by the ABA and West Group, a division of Thomson Publishing).

PROFESSIONAL RESPONSIBILITY: A STUDENT'S GUIDE (ABA-West Group, St. Paul, Minnesota, 2nd ed. 2002).

PROFESSIONAL RESPONSIBILITY (West Group, St. Paul, Minnesota, 6th ed. 2002, Black Letter Series).

LEGAL ETHICS IN A NUTSHELL (West Group, St. Paul, Minnesota, 1st ed. 2003, Nutshell Series) (with Michael I. Krauss).

MODERN CONSTITUTIONAL LAW: CASES AND NOTES (Thomson/West, St. Paul, Minnesota, 7th ed. 2003).

2003 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (Thomson/West, St. Paul, Minnesota, 2003).

2004 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (Thomson/West, St. Paul, Minnesota, 2004).

2005 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (Thomson/West, St. Paul, Minnesota, 2005).

2006 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (Thomson/West, St. Paul, Minnesota, 2006).

**PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY** (Foundation Press, New York, N.Y., 8th ed. 2003) (with Thomas D. Morgan).

2004 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y. 2004) (with Thomas D. Morgan).

2005 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y. 2005) (with Thomas D. Morgan).

**CONSTITUTIONAL LAW** (Thomson/West, St. Paul, Minnesota, 7th ed. 2004) (a one volume treatise on Constitutional Law) (with John E. Nowak).

**PROFESSIONAL RESPONSIBILITY** (Thomson/West, St. Paul, Minnesota, 7th ed. 2004, Black Letter Series).

**PRINCIPLES OF CONSTITUTIONAL LAW** (Thomson/West, St. Paul, Minnesota, 1st ed. 2004) (with John E. Nowak).

**LEGAL ETHICS: THE LAWYER'S DESKBOOK ON PROFESSIONAL RESPONSIBILITY** (ABA-Thomson/West, St. Paul, Minn., 3rd ed. 2005) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

**PROFESSIONAL RESPONSIBILITY: A STUDENT'S GUIDE** (ABA-Thomson/West, St. Paul, Minn., 3rd ed. 2005) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

**PRINCIPLES OF CONSTITUTIONAL LAW** (Thomson/West, St. Paul, Minnesota, 2nd ed. 2005) (with John E. Nowak).

**LEGAL ETHICS IN A NUTSHELL** (Thomson/West, St. Paul, Minnesota, 2nd ed. 2006, Nutshell Series) (with Michael I. Krauss).

**PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY** (Foundation Press, New York, N.Y., 9th ed. 2006) (with Thomas D. Morgan).

2006 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y. 2006) (with Thomas D. Morgan).

2007 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y. 2007) (with Thomas D. Morgan).

2008 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y. 2008) (with Thomas D. Morgan).

**LEGAL ETHICS: THE LAWYER'S DESKBOOK ON PROFESSIONAL RESPONSIBILITY** (ABA-Thomson/West, St. Paul, Minn., 4th ed. 2006) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

**PROFESSIONAL RESPONSIBILITY: A STUDENT'S GUIDE** (ABA-Thomson/West, St. Paul, Minn., 4th ed. 2006) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

**MODERN CONSTITUTIONAL LAW: CASES AND NOTES** (Thomson/West, St. Paul, Minnesota, 8th ed. 2007).

2007 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (Thomson/West, St. Paul, Minnesota, 2007).

2008 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (Thomson/West, St. Paul, Minnesota, 2008).

**TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE** (Thomson/West, St. Paul, Minnesota, 4th ed. 2007) *(first two volumes of six volume treatise)* (with John E. Nowak).

2007 Pocket PART TO TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE (Thomson/West, St. Paul, Minnesota, 2007) (with John E. Nowak).

**LEGAL ETHICS IN A NUTSHELL** (Thomson/West, St. Paul, Minnesota, 3rd ed. 2007, Nutshell Series).

**LEGAL ETHICS: THE LAWYER'S DESKBOOK ON PROFESSIONAL RESPONSIBILITY** (ABA-Thomson/West, St. Paul, Minn., 5th ed. 2007) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

**PROFESSIONAL RESPONSIBILITY: A STUDENT'S GUIDE** (ABA-Thomson/West, St. Paul, Minn., 5th ed. 2007) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

언론의 자유와 미국 헌법, **FREEDOM OF SPEECH AND THE AMERICAN CONSTITUTION** (Korean Studies Information Co. Ltd. Publishers, Korea, 2007) (translated into Korean by Professor Lee Boo-Ha, Yeungnam University College of Law and Political Science), coauthored with Professor John E. Nowak.

**PRINCIPLES OF CONSTITUTIONAL LAW** (Thomson/West, St. Paul, Minnesota, 3rd ed. 2007) (with John E. Nowak).

**TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE** (Thomson/West, St. Paul, Minnesota, 4th ed. 2008) *(last four volumes of six volume treatise)* (with John E. Nowak).

2008 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE (Thomson/West, St. Paul, Minnesota, 2008) (with John E. Nowak).

2009 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE (Thomson/West, St. Paul, Minnesota, 2009) (with John E. Nowak).

2010 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE (Thomson/West, St. Paul, Minnesota, 2010) (with John E. Nowak).

2011 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE (Thomson/West, St. Paul, Minnesota, 2011) (with John E. Nowak).

2012 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE (Thomson/West, St. Paul, Minnesota, 2012) (with John E. Nowak).

**PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY** (Foundation Press, New York, N.Y., 10th ed. 2008) (with Thomas D. Morgan).

2009 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y. 2009) (with Thomas D. Morgan).

2010 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y. 2010) (with Thomas D. Morgan).

2011 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y. 2011) (with Thomas D. Morgan).

**PROFESSIONAL RESPONSIBILITY** (Thomson/West, St. Paul, Minnesota, 8th ed. 2008, Black Letter Series).

**LEGAL ETHICS: THE LAWYER'S DESKBOOK ON PROFESSIONAL RESPONSIBILITY** (ABA-Thomson/West, St. Paul, Minn., 6th ed. 2008) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

**PROFESSIONAL RESPONSIBILITY: A STUDENT'S GUIDE** (ABA-Thomson/West, St. Paul, Minn., 6th ed. 2008) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

**MODERN CONSTITUTIONAL LAW: CASES AND NOTES** (West Thomson Reuters, St. Paul, Minnesota, 9th ed. 2009).

2009 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (Thomson/West, St. Paul,

Minnesota, 2009).

2010 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (Thomson/West, St. Paul, Minnesota, 2010).

2011 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (Thomson/West, St. Paul, Minnesota, 2011).

**LEGAL ETHICS: THE LAWYER'S DESKBOOK ON PROFESSIONAL RESPONSIBILITY** (ABA-Thomson/West, St. Paul, Minn., 7th ed. 2009) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

**PROFESSIONAL RESPONSIBILITY: A STUDENT'S GUIDE** (ABA-Thomson/West, St. Paul, Minn., 7th ed. 2009) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

**CONSTITUTIONAL LAW** (Thomson/West, St. Paul, Minnesota, 7th ed. 2010) (a one volume treatise on Constitutional Law) (with John E. Nowak).

**LEGAL ETHICS: THE LAWYER'S DESKBOOK ON PROFESSIONAL RESPONSIBILITY** (ABA-Thomson/West, St. Paul, Minn., 8th ed. 2010) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

**PROFESSIONAL RESPONSIBILITY: A STUDENT'S GUIDE** (ABA-Thomson/West, St. Paul, Minn., 8th ed. 2010) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

**PRINCIPLES OF CONSTITUTIONAL LAW** (West-Thomson/Reuters, St. Paul, Minnesota, 4th ed. 2010) (with John E. Nowak).

**PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY** (Foundation Press, New York, N.Y., 11th ed. 2011) (with Thomas D. Morgan & John S. Dzienkowski).

2012 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y. 2012) (with Thomas D. Morgan).

2013 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y. 2013) (with Thomas D. Morgan).

2014 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, West Academic, St. Paul, MN 2014) (with Thomas D. Morgan).

**LEGAL ETHICS: THE LAWYER'S DESKBOOK ON PROFESSIONAL RESPONSIBILITY** (ABA-Thomson/West, St. Paul, Minn., 9th ed. 2011) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

**PROFESSIONAL RESPONSIBILITY: A STUDENT'S GUIDE** (ABA-Thomson/West, St. Paul, Minn., 9th ed. 2011) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

**PROFESSIONAL RESPONSIBILITY** (West: A Thomson-Reuters Co., St. Paul, Minnesota, 9th ed. 2011, Black Letter Series).

**PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY: CONCISE EDITION** (Foundation Press, New York, N.Y., 11th ed. 2012) (with Thomas D. Morgan & John S. Dzienkowski).

**MODERN CONSTITUTIONAL LAW: CASES AND NOTES** (West Thomson Reuters, St. Paul, Minnesota, 10th ed. 2012).

2012 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (Thomson/West, St. Paul, Minnesota, 2012).

2013 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (Thomson/West, St. Paul, Minnesota, 2013).

**概論 アメリカの法曹倫理 第3版——事例解説 [INTRODUCTION TO AMERICAN LEGAL ETHICS]** (translated by Naoyuki Toyama) (Thomson Reuters, Japan UNI Agency, Inc. Tokyo, 2012).

**LEGAL ETHICS: THE LAWYER'S DESKBOOK ON PROFESSIONAL RESPONSIBILITY** (ABA-Thomson/West, St. Paul, Minn., 10th ed. 2012) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

**PROFESSIONAL RESPONSIBILITY: A STUDENT'S GUIDE** (ABA-Thomson/West, St. Paul, Minn., 10th ed. 2012) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

**TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE** (Thomson/West, St. Paul, Minnesota, 5th ed. 2012) *(first three volumes of six volume treatise)* (with John E. Nowak).

**LEGAL ETHICS IN A NUTSHELL** (Thomson/West, St. Paul, Minnesota, 4th ed. 2013, Nutshell Series).

**TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE** (Thomson/West, St. Paul, Minnesota, 5th ed. 2013) *(last three volumes of six volume treatise)* (with John E. Nowak).

2013 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE (Thomson/West, St. Paul, Minnesota, 2013) (with John E. Nowak).

2014 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE (Thomson/West, St. Paul, Minnesota, 2014) (with John E. Nowak).

**LEGAL ETHICS: THE LAWYER'S DESKBOOK ON PROFESSIONAL RESPONSIBILITY** (ABA-Thomson/West, St. Paul, Minn., 11th ed. 2013) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

**PROFESSIONAL RESPONSIBILITY: A STUDENT'S GUIDE** (ABA-Thomson/West, St. Paul, Minn., 11th ed. 2013) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

**ARTICLES:**

*The "Liberal" Label: Roosevelt's Capture of a Symbol*, 17 PUBLIC POLICY 377 (Harvard University Press, 1968).

*Reform of the Presidential Nominating Conventions*, 56 VIRGINIA LAW REVIEW 179 (1970) (with Reid Chambers).

*The Public Interest Appellant: Limitations on the Right of Competent Parties to Settle Litigation Out of Court*, 66 NORTHWESTERN UNIVERSITY LAW REVIEW 199 (1971).

*The Combination of Functions in Administrative Actions: An Examination of European Alternatives*, 40 FORDHAM LAW REVIEW 101 (1971).

*Star Gallery '74,* 2 ASTRONOMY MAGAZINE 57 (Feb. 1974) (Photographs of Mercury Transit of the Sun).

*Presidents and Ex-Presidents as Witnesses: A Brief Historical Footnote*, 1975 UNIVERSITY OF ILLINOIS LAW FORUM 1 (1975).

*Constitutional and Statutory Restrictions on Political Parties in the Wake of Cousins v. Wigoda*, 53 TEXAS LAW REVIEW 935 (1975).

*Sponsors of Real Estate Partnerships as Brokers and Investment Advisors*, 23 UNIVERSITY OF CALIFORNIA-LOS ANGELES LAW REVIEW 322 (1975) (with Robert C. Hacker).

*Book Review of Freedman's "Lawyers' Ethics in An Adversary System,"* 89 HARVARD LAW REVIEW 622 (1976).

*Congressional Power to Restrict the Jurisdiction of the Lower Federal Courts and the Problem of School Busing*, 64 GEORGETOWN UNIVERSITY LAW JOURNAL 839 (1976).

*Comment*, 27 HARVARD LAW BULLETIN 4 (No. 3, 1976).

*Conforming Stock Ownership Plans with the Securities Acts*, 45 GEORGE WASHINGTON UNIVERSITY LAW REVIEW 34 (1976) (with Robert C. Hacker).

*The Commercial Speech Doctrine in the Supreme Court*, 1976 UNIVERSITY OF ILLINOIS LAW FORUM 1080 (1976).

*Commercial Speech and the First Amendment*, 1 THE COLLEGIATE FORUM 8 (Fall 1977) (published by Dow Jones & Co., Inc.).

*The First Amendment Now Protects Commercial Speech*, 10 THE CENTER MAGAZINE: A PUBLICATION OF THE CENTER FOR THE STUDY OF DEMOCRATIC INSTITUTIONS 32 (May/June 1977).

*The Word "Profession" is Only a Label — And Not a Very Useful One*, 4 LEARNING AND THE LAW 16 (Summer 1977) (publication of the American Bar Association Section of Legal Education and Admissions to the Bar).

*The SEC's Ectoplasmic Theory of an Issuer as Applied to Educational and Charitable Institutions, Bank Trustees, and Other Exempt Issuers*, 65 CALIFORNIA LAW REVIEW 1181 (1977) (with Robert C. Hacker) (published by University of California-Berkeley Law School).

*Law, Lawyers and Managers*, in, THE ETHICS OF CORPORATE CONDUCT, pp. 127-45 (Clarence Walton, ed. 1977) (published by Prentice-Hall, Inc., Englewood Cliffs, N.J., for the American Assembly of Columbia University).

*When the Client Lies: Unhelpful Guidelines from the ABA*, 1 CORPORATION LAW REVIEW 34 (1978).

*SEC Registration of Private Investment Partnerships after Abrahamson v. Fleschner*, 78 COLUMBIA LAW REVIEW 1471 (1978) (with Robert C. Hacker).

*The Reliance of Counsel Defense in Securities Cases: Damage Actions versus Injunctive Actions*, 1 CORPORATION LAW REVIEW 159 (1978) (with Robert C. Hacker).

*Liability for the Misuse of Nonpublic, Material Inside Information: The Duty to Convey and the Duty to Inquire*, 1 CORPORATION LAW REVIEW 376 (1978) (with Robert C. Hacker).

*Running Out of Time: Can the E.R.A. Be Saved,* 64 AMERICAN BAR ASSOCIATION JOURNAL 1507 (1978).

*The Duty to Take Remedial Action*, 2 CORPORATION LAW REVIEW 159 (1979) (with Robert C. Hacker).

*Waiver of Attorney Client Privilege*, 2 CORPORATION LAW REVIEW 250 (1979) (with Robert C. Hacker).

*Attorney Conflicts of Interest*, 2 CORPORATION LAW REVIEW 345 (1979) (with Robert C. Hacker).

*Standing, Waiver, Laches, and Appealability in Attorney Disqualification Cases*, 3 CORPORATION LAW REVIEW 82 (1980) (with Robert C. Hacker).

*Short-Swing Profits, Section 16(b), and Nonstatutory Insiders*, 3 CORPORATION LAW REVIEW 252 (1980) (with Robert C. Hacker).

*Restrictions on Agency and Congressional Subpoenas Issued for an Improper Purpose*, 4 CORPORATION LAW REVIEW 74 (1981) (with Robert C. Hacker).

*The Extraterritorial Regulation of Foreign Business under the U.S. Securities Laws*, 59 NORTH CAROLINA LAW REVIEW 643 (1981) (with Robert C. Hacker), reprinted in 24 CORPORATE PRACTICE COMMENTATOR 233 (1982).

*Ethical Restraints on Communications with Adverse Expert Witnesses*, 5 CORPORATION LAW REVIEW 348 (1982) (with Robert C. Hacker).

*A Comment on the Creation and Resolution of a "Nonproblem": Dames & Moore v. Regan, the Foreign Affairs Power, and the Role of the Court*, 29 UNIVERSITY OF CALIFORNIA - LOS ANGELES LAW REVIEW 1129 (1982) (with John E. Nowak).

*Corporate Confidences and the Duty to Refrain from Insider Trading*, 6 CORPORATION LAW REVIEW 53 (1983) (with Robert C. Hacker).

*Representing the Corporate Client and the Proposed Rules of Professional Conduct*, 6 CORPORATION LAW REVIEW 269 (1983) (with Robert C. Hacker).

*Ethics*, USA Today, Feb. 15, 1983, at p. 10A.

*Teaching Ethics under the New Model Rules*, 14 SYLLABUS 1 (No. 3, Sept. 1983) (a publication of the American Bar Association Section on Legal Education and Admissions to the Bar).

*Usery in the Wake of Federal Energy Regulatory Commission v. Mississippi*, 1 CONSTITUTIONAL COMMENTARY 43 (1984).

*The Doctrine of Conditional Preemption and Other Limitations on Tenth Amendment Restrictions*, 132 UNIVERSITY OF PENNSYLVANIA LAW REVIEW 289 (1984).

*Ethics*, 12 STUDENT LAWYER 14 (May 1984).

*Debate Over Model Rules Moves to the States*, 130 CHICAGO LAW BULLETIN 3, 8 (June 12, 1984).

*The Notice of Withdrawal and the New Model Rules of Professional Conduct: Blowing the Whistle and Waiving the Red Flag*, 63 OREGON LAW REVIEW 455 (1984), reprinted in, 1985 CRIMINAL LAW REVIEW 533, and excerpted in 34 LAW REVIEW DIGEST 14 (Mar./Apr. 1985).

*Instruments for Legal Integration in the European Community — A Review* (with Peter Hay and Giorgio Gaja), in 1 INTEGRATION THROUGH LAW: EUROPE AND THE AMERICAN FEDERAL EXPERIENCE 113 (Mauro Cappelletti, Monica Seccombe & Joseph Weiler, Eds.) (Walter de Gruyter, Berlin, 1986).

*Conflict of Laws as a Technique for Legal Integration* (with Peter Hay and Ole Lando) in 1 INTEGRATION THROUGH LAW: EUROPE AND THE AMERICAN FEDERAL EXPERIENCE 161 (M. Cappelletti, M. Seccombe, & J. Weiler, eds.) (Walter de Gruyter, Berlin, 1986).

*The Doctrine of the Inner Political Check, the Dormant Commerce Clause, and Federal Preemption*, 53 TRANSPORTATION PRACTITIONERS JOURNAL 263 (1986).

*The Role of Law Reviews: The Extreme Centrist Position*, 62 INDIANA LAW JOURNAL 1 (1986).

*Intergovernmental Tax Immunity and Tax Free Municipals After Garcia*, 57 U. COLORADO LAW REVIEW 849 (1986).

*Sales and Use Tax Credits, Discrimination against Interstate Commerce, and the Useless Multiple Taxation Concept*, 20 UNIVERSITY OF CALIFORNIA-DAVIS LAW REVIEW 273 (1987) (with John E. Nowak).

*Ethical Problems in Federal Agency Hiring of Private Attorneys*, 1 GEORGETOWN JOURNAL OF LEGAL ETHICS 85 (1987).

*Bicentennial Lessons from the Constitutional Convention of 1787*, 21 SUFFOLK UNIVERSITY LAW REVIEW 589 (1987) (the Twentieth Donahue Lecture).

*Remembering Judge Walter R. Mansfield*, 45 BROOKLYN LAW REVIEW 1 (1987).

*Professionals, Pragmatists or Predators,* Part I, 75 ILLINOIS BAR JOURNAL 420, Part II, 482, Part III, 540 (1987).

*Life Under the Articles of Confederation*, 75 ILLINOIS BAR JOURNAL 544 (1987).

*Lawyers and Professionalism: A Commentary on the Report of the American Bar Association Commission on Professionalism*, 18 LOYOLA UNIVERSITY OF CHICAGO LAW JOURNAL 1149 (1987) (the Baker-McKenzie Foundation Lecture).

*The Constitutional Future of the Bill of Rights: A Closer Look at Commercial Speech and State Aid to Religiously Affiliated Schools*, 65 NORTH CAROLINA LAW REVIEW 917 (1987).

*Bork's Firing of Cox: What Really Happened*, WALL STREET JOURNAL, Sept. 9, 1987, p. 32.

*An Essay on the Constitutional Parameters of Federal Impeachment*, 76 KENTUCKY LAW REVIEW 707 (1988).

*Contract Rights, Property Rights and Constitutional Restrictions on Federal Limitations of Private Claims Against Foreign Governments*, in, LEGAL ESSAYS IN HONOR OF JOHN E. CRIBBET, pp 151-68 (Peter Hay & Michael Hoeflich, eds., U. of Ill. Press, 1988).

*Learning the Law of Lawyering,* 136 UNIVERSITY OF PENNSYLVANIA LAW REVIEW 1761 (1988).

*Original Intent, The View of the Framers, and the Role of the Ratifiers*, 41 VANDERBILT LAW REVIEW 507 (1988).

*The Confirmation Process for Supreme Court Justices in the Modern Era*, 37 EMORY LAW JOURNAL 559 (1988).

*Sheathing the Sword of Federal Preemption*, 5 CONSTITUTIONAL COMMENTARY 311 (1988).

*Is Lawyer Professionalism Declining or Advancing* (3-Part Series) 134 CHICAGO DAILY LAW BULLETIN, Mar. 5, 1988 at 2, 14 (*Part I*); Mar. 16, 1988 at 2, 14 (*Part II*); Mar. 17, 1988 at 2, 10 (*Part III*).

*Challenging the Ethics Myths*, 10 LEGAL TIMES (OF WASHINGTON, D.C.) 16-17 (Mar. 21, 1988), reprinted in, 99 FULTON COUNTY DAILY REPORT 4 (Apr. 13, 1988) (Georgia), 4 TEXAS LAWYER 20-21 (April 18, 1988), 1 MANHATTAN LAWYER, 12, 33 (Mar. 29 - Apr. 4, 1988), 14 CONNECTICUT LAW TRIBUNE 10-11 (Aug. 15, 1988).

*The Litigator's Professional Responsibility*, 77 ILLINOIS BAR JOURNAL 192 (1988), reprinted in, 25 TRIAL MAGAZINE 98 (March 1989), and in, 30 LAW OFFICE ECONOMICS AND MANAGEMENT 61 (1989).

*Race to Courthouse — Or Walk?*, 11 LEGAL TIMES (OF WASHINGTON, D.C.) 14 (Aug. 15, 1988), reprinted in, 99 FULTON COUNTY DAILY REPORT 2 (Aug. 11, 1988) (Georgia), 1 MANHATTAN LAWYER 12 (Aug. 16-22, 1988).

*State Bars Reluctant to Hear Any Evil*, 11 LEGAL TIMES (OF WASHINGTON, D.C.) 14 (Dec. 12, 1988), reprinted in, 99 FULTON COUNTY DAILY REPORT 8 (Dec. 12, 1988) (Georgia), THE RECORDER OF SAN FRANCISCO 4 (Dec. 22, 1988).

*The Court: A Decade of Stability and Change*, 11 NATIONAL LAW JOURNAL 34-36 (Sept. 26, 1988).

*Client Fraud: Blowing the Whistle, Other Options*, 24 TRIAL MAGAZINE 92 (Nov. 1988).

*The Lawyer's Duty To Report Another Lawyer's Unethical Violations in the Wake of Himmel*, 1988 UNIVERSITY OF ILLINOIS LAW REVIEW 977 (1988).

*Runyon v. McCrary and the Mosaic of State Action*, 67 WASHINGTON UNIVERSITY LAW QUARTERLY 47 (1989).

*Interpreting an Unwritten Constitution*, 12 HARVARD JOURNAL OF LAW & PUBLIC POLICY 15 (1989).

*Line-Item Veto: Best Budget Fix?*, 11 LEGAL TIMES (OF WASHINGTON, D.C.) 15 (Mar. 27, 1989), reprinted in, *e.g.*, 100 FULTON COUNTY (ATLANTA) DAILY REPORT 8 (Mar. 23, 1989) (Georgia), 2 MANHATTAN LAWYER 12 (Apr. 4 - Apr. 10, 1989).

*Impeaching Federal Judges: Where Are We and Where Are We Going?*, 72 JUDICATURE: THE JOURNAL OF THE AMERICAN JUDICATURE SOCIETY 359 (1989) (transcript of edited remarks).

*Cautionary Lessons from American Securities Arbitration: Litigation versus Arbitration*, 5 ARBITRATION INTERNATIONAL 199 (London Court of International Arbitration, Issue 2, 1989).

*The Impairments Clause and the Corporation: A Comment on Professors Butler's and Ribstein's Thesis*, 55 BROOKLYN LAW REVIEW 809 (1989) (Symposium).

*Eschewing Bright Lines*, 25 TRIAL MAGAZINE 52 (Dec. 1989).

*Meanwhile, Back in Mother Russia*, LEGAL TIMES (OF WASHINGTON, D.C.), Oct. 2, 1989, at 35 (with Peter B. Maggs).

*A Tribute to Eugene F. Scoles*, 1989 ILLINOIS LAW REVIEW 835 (1989).

*The Case Against Special Prosecutors*, WALL STREET JOURNAL, Jan. 15, 1990, at p. A8.

*Jurisprudent: ABA Model Rules on Client Secrets No Help*, 13 CHICAGO LAWYER 12, 56 (Feb. 1990).

*The New Illinois Rules of Professional Conduct: A Brief Introduction and Criticism*, 78 ILLINOIS BAR JOURNAL 386 (1990).

*Beholden to None, Justices Often Cut Their Own Paths*, LOS ANGELES TIMES, July 27, 1990, at p. B7.

*Predicting the Views of Supreme Court Nominees*, 26 TRIAL MAGAZINE 42 (Nov. 1990).

*Judicial Conference — Second Circuit: RICO and the Proposed Restatement of the Law Governing Lawyers* (Sept. 7, 1990), 136 FEDERAL RULES DECISIONS 233, 266-71 (1991).

*War Dissenters Reflect Freedom's Power*, 13 LEGAL TIMES (OF WASHINGTON, D.C.) 24 (Feb. 4, 1991).

*Joseph Story: A Man for All Seasons*, 1990 JOURNAL OF SUPREME COURT HISTORY: YEARBOOK OF THE SUPREME COURT HISTORICAL SOCIETY 17 (1990) (with John E. Nowak).

*When Rough Justice Rides Roughshod*, 13 LEGAL TIMES (of Washington, D.C.) 26 (April 1, 1991), reprinted in, 102 FULTON COUNTY (ATLANTA) DAILY REPORT 8 (Mar. 29, 1991), 32 BROWARD REVIEW (Fort Lauderdale, Florida) 11 (April 1, 1991), 37 PALM BEACH (FLORIDA) REVIEW 11 (April 1, 1991), 65 MIAMI REVIEW 11 (April 1, 1991), 77 NEW JERSEY LAW JOURNAL 9, 24 (April 4, 1991), 65 THE RECORDER 4, 5 (April 4, 1991).

*Nici o constitutie . . .*, 18 LUMEA AZI 4 (May 2, 1991) (published in Romanian).

*Public Executions: Should the Imposition of the Death Sentence Be Televised?*, 4 ILLINOIS QUARTERLY 36 (July 1991) (panel discussion).

*One Potato, Two Potato, Three Potato, Four*, 14 LEGAL TIMES (OF WASHINGTON, D.C.) 23 (Aug. 12, 1991) (reprinted in various legal newspapers).

*Abuse of Ethics Rule Hinders Prosecutors*, CHICAGO SUN-TIMES, Aug. 24, 1991, at p. 12, col. 1-2.

*Commercial Speech and the Platonic Ideal: Libre expression et libre enterprise*, in, FREEDOM OF EXPRESSION AND THE CHARTER 319 (David Schneiderman, ed. Carswell, Canada 1991), a collection of papers presented at the Edmonton, Alberta Conference on the Canadian Constitution, of the Centre for Constitutional Studies/Centre d'études constitutionnelles.

*Thomas' Ethics and the Court*, 13 LEGAL TIMES (OF WASHINGTON, D.C.) 20 (Aug. 26, 1991).

*A Red Herring Confirmation Issue*, THE INDIANAPOLIS STAR, Sept. 10, 1991, at p. A7, col. 1-3.

*Celebrating the Bicentennial of the Bill of Rights,* 79 ILLINOIS BAR JOURNAL 608 (1991).

*Exporting the American Bill of Rights: The Lesson from Romania*, 1991 UNIVERSITY OF ILLINOIS LAW REVIEW 1065 (1991).

*The Welfare State and the Constitution*, in THE ENCYCLOPEDIA OF THE AMERICAN CONSTITUTION 571 (Macmillan Pub. Co., Inc., K. Karst & L. Levy, Eds., Supplement I, 1992).

*The Veto Power*, in THE OXFORD COMPANION TO THE SUPREME COURT OF THE UNITED STATES 896 (Oxford University Press, Kermit L. Hall, ed. 1992).

*Legal Ethics*, 45 SOUTHWESTERN LAW JOURNAL [Southern Methodist University] 2035 (1992).

*The Best Response to Speech We Don't Like Is More Speech*, CHICAGO SUN-TIMES, May 16, 1992, at p.14, col. 1-6.

*Foreword: The Role of the Modern Supreme Court*, 26 U. RICHMOND LAW REVIEW 433 (1992).

*Simon Greenleaf on Desuetude and Judge-Made Law: An Unpublished Letter to Francis Lieber*, 10 CONSTITUTIONAL COMMENTARY 93 (1993) (with Michael H. Hoeflich).

*Roe v. Wade: Reading It Right,* 15 LEGAL TIMES [OF WASHINGTON, D.C.] 36, 40 (Jan. 25, 1993) (reprinted in various publications, *e.g.*, TEXAS LAWYER. Feb. 8, 1993, at 16-17).

*No Impediment to Term Limits*, THE WASHINGTON POST, Feb. 13, 1993, at A31, col. 1.

*The Civil Rights Act of 1991: A Brief Introductory Analysis of the Congressional Response to Judicial Interpretation*, 68 NOTRE DAME LAW REVIEW 923 (1993) (Symposium).

*A Brief Comment on Politically Incorrect Speech in the Wake of R.A.V.*, 47 SOUTHERN METHODIST UNIVERSITY LAW REVIEW 9 (1993).

*Juggling for Power Over NAFTA: A Simple Cure for a Big Problem*, 16 LEGAL TIMES (OF WASHINGTON, D.C.) 23 (July 19, 1993).

*Free Trade's Political Alchemy,* 9 TEXAS LAWYER 10 (July 26, 1993).

*Roadblock to Mexico,* THE WASHINGTON POST, Sept. 21, 1993, at A19, col. 6.

*Impeachment Showdown: Congress vs. Judges,* 16 LEGAL TIMES (OF WASHINGTON, D.C.) 37 (Nov. 1, 1993) (reprinted, *e.g.,* in 19 THE CONNECTICUT LAW TRIBUNE 24, Nov. 8, 1993).

*The Case Against Permanent Disbarment,* 5 THE PROFESSIONAL LAWYER 22 (A.B.A., No. 2, Feb. 1994).

*Paula Jones Day in Court,* 17 LEGAL TIMES (OF WASHINGTON, D.C.) 24, 27 (May 30, 1994), *reprinted, e.g.,* 10 TEXAS LAWYER 24, 27 (June 13, 1994).

*Is the President Above the Law?*, CHICAGO TRIBUNE, June 1, 1994, § 1, at 21, col. 3 - 4.

*"Richard" Case Defies the Law As Well As the Logic,* CHICAGO TRIBUNE, July 17, 1994, § 4, at 3, col. 4.

*Setting Timer on Congressional Terms,* 17 LEGAL TIMES (OF WASHINGTON, D.C.) S31, S33 (Oct. 3, 1994).

*A Commentary on the Constitutionality of Term Limits*, in THE POLITICS AND LAW OF TERM LIMITS 141 (Edward H. Crane & Roger Pilon, eds., Cato Institute 1994).

*The Constitution Lets States Impose Term Limits,* WALL STREET JOURNAL, Nov. 30, 1994, at A21, col. 3-6 (Midwest ed.).

*Can You Say That?,* 30 TRIAL MAGAZINE 18 (December 1994).

*Rolls Royce and the Case Law,* LAKE MICHIGAN LADY, at 34-36 (Issue No. 37, 1994).

*Rethinking Term Limits for Federal Legislators in Light of the Structure of the Constitution*, 73 OREGON LAW REVIEW 561 (1994).

*Racist Speech and Attorney Discipline,* 6 THE PROFESSIONAL LAWYER 1 (A.B.A., No. 6, 1995).

*Returning Art to the People: No Subsidies and No Strings*, 17 LEGAL TIMES (OF WASHINGTON, D.C.) 43 (Mar. 6, 1995).

*Term Limits and Lessons from Our Past,* HEARTLAND POLICY STUDY, No. 66 (HEARTLAND INSTITUTE, June 28, 1995).

*Cases Refine Definition of Federal Powers,* 17 NATIONAL LAW JOURNAL C9, C12 (July 31, 1995).

*Computerized Highways and the Search for Privacy in the Case Law: A Comment,* 11 SANTA CLARA COMPUTER AND HIGH TECHNOLOGY LAW JOURNAL 119 (1995) (part of a Conference and Symposium on Intelligent Vehicle Highway Systems).

*Fixing the War Powers Act,* THE HERITAGE LECTURES, No. 529 (The Heritage Foundation, 1995).

*What Next? Outlawing Lawyer Jokes?,* WALL STREET JOURNAL, Aug. 8, 1995, at A12, col. 3-5 (Midwest ed.).

*Innovations Disguised as Traditions: An Historical Review of the Supreme Court Nominations Process*, 1995 UNIVERSITY OF ILLINOIS LAW REVIEW 123 (1995).

*Flat Taxes: A Progressive Way to Go*, 17 LEGAL TIMES (OF WASHINGTON, D.C.) 20 (Nov. 27, 1995).

*Embattled Clintons Should Note Watergate Lessons*, NEWSDAY, Feb. 28, 1996, A32.

*Rotunda on Travel: A Wet Toast to Limp Bacon, Loose Clothing*, 36 ILLINOIS STATE BAR NEWS 4 (No. 16, Mar 1, 1996).

*The Aftermath of Thornton*, 13 CONSTITUTIONAL COMMENTARY 201 (1996).

*A Czech Window on Ethics*, 18 NATIONAL LAW JOURNAL, at A15 (July 22, 1996).

*Legal Ethics, the Czech Republic, and the Rule of Law*, 7 THE PROFESSIONAL LAWYER 1 (A.B.A., No. 8, 1996).

*Sister Act: Conflicts of Interest with Sister Corporations*, in, LEGAL ETHICS: THE CORE ISSUES (1996) (Hofstra University School of Law Conference on Legal Ethics), 1 JOURNAL OF THE INSTITUTE FOR THE STUDY OF LEGAL ETHICS 215 (1996).

*The Warren Court and Freedom of the Press,* in THE WARREN COURT: A 25 YEAR RETROSPECTIVE 85 (Bernard Schwartz, ed. Oxford University Press 1996).

*Judgeships Trapped in a Political Snare?*, WASHINGTON TIMES, Oct. 29, 1996, at A15, col. 1-6.

*Nová pravidla profesního jednání advokátu v Ceské republice (v komparaci s kodexy USA a EU)* [The New Rules of Professional Conduct for Advocates in the Czech Republic], 5 EMP: EVROPSKÉ A MEZINÁRODNÍ PRÁVO 58 (Císlo 3-4, 1996) (published in Czech and English).

*Dealing with the Media: Ethical, Constitutional, and Practical Parameters*, 84 ILLINOIS BAR JOURNAL 614 (December 1996).

*An Essay on Term Limits and a Call for a Constitutional Convention*, 80 MARQUETTE UNIVERSITY LAW REVIEW 227 (1996) (with Stephen J. Safranek).

*Heiple's Burdens*, CHICAGO TRIBUNE, January 29, 1997, at § 1, p. 11, col. 4 [reprinted in, BELLEVILLE NEWS-DEMOCRAT, February 2, 1997, at § A, p. 4A, col. 4-6].

*When Duty Calls, Courts Can Be Flexible,* WASHINGTON POST, January 29, 1997, at p. A21, col. 2-3.

*Professionalism, Legal Advertising, and Free Speech In the Wake of Florida Bar v. Went For It, Inc.*, 49 ARKANSAS LAW REVIEW 703 (1997) (Symposium), reprinted in, 12 LAWYERS' LIABILITY REVIEW 2 (No. 10, Oct. 1998) (part I), 12 LAWYERS' LIABILITY REVIEW 2 (No. 11, Nov. 1998) (part II), 12 LAWYERS' LIABILITY REVIEW 2 (No. 12, Oct. 1998) (part III).

*Conflict Problems When Representing Members of Corporate Families*, 72 NOTRE DAME LAW REVIEW 655 (1997).

*Judges as Ambulance Chasers*, 8 THE PROFESSIONAL LAWYER 14 (A.B.A., No. 8, 1997).

*West Virginia Provides Model for Legal Discipline Across State Lines*, 7 LEGAL OPINION LETTER 1 (Washington Legal Foundation, No. 15, May 16, 1997).

*The Influence of the American Law Institute's Proposed Restatement of the Law Governing Lawyers*, 1 PROFESSIONAL RESPONSIBILITY, LEGAL ETHICS, AND LEGAL EDUCATION NEWS 1, 4 (Federalist Society, No. 2, 1997).

*Handed a Lesser Veto*, 20 LEGAL TIMES (OF WASHINGTON, D.C.) 27, 28 (May 26, 1997).

*Lips Unlocked: Attorney-Client Privilege and the Government Lawyer*, 20 LEGAL TIMES (OF WASHINGTON, D.C.) 21-22, 28 (June 30, 1997).

*The War Powers Act in Perspective*, 2 MICHIGAN LAW & POLICY REVIEW 1 (1997).

*The True Significance of Clinton vs. Jones*, CHICAGO TRIBUNE, July 8, 1997, at 12, col. 1-6.

*Can a President Be Imprisoned?*, 20 LEGAL TIMES (OF WASHINGTON, D.C.) 22-23, 28 (July 21, 1997).

*The Americans with Disabilities Act, Bar Examinations, and the Constitution: A Balancing Act*, 66 THE BAR EXAMINER 6 (No. 3, August, 1997).

*Permanent Disbarment: A Market Oriented Proposal*, 9 THE PROFESSIONAL LAWYER 2 (ABA, No. 9, Nov. 1997) (with Mary Devlin).

*White House Counsel and the Attorney Client Privilege*, 1 PROFESSIONAL RESPONSIBILITY, LEGAL ETHICS, AND LEGAL EDUCATION NEWS 1 (Federalist Society, No. 3, 1997).

*When Witnesses Are Told What to Say,* WASHINGTON POST, January 13, 1998, at A15, col. 2-4 (with Lester Brickman).

*Eastern European Diary: Constitution-Building in the Former Soviet Union*, 1 THE GREEN BAG, 2d SERIES 163 (Winter 1998).

*The Chemical Weapons Convention: Political and Constitutional Issues*, 15 CONSTITUTIONAL COMMENTARY 131 (1998).

*Reporting Sensational Trials: Free Press, a Responsible Press, and Cameras in the Courts*, 3 COMMUNICATIONS LAW AND POLICY 295 (No. 2, Spring, 1998).

*Gauging the Impact of the Proposed Restatement of the Law Governing Lawyers*, 9 THE PROFESSIONAL LAWYER 2 (ABA, No.2, 1998).

*Is the Flat Tax Dead?,* CHICAGO TRIBUNE, April 15, 1998, at § 1, p. 17, col. 1-3.

*Epilogue,* in PRIME TIME LAW: FICTIONAL TV LAWYERS AND THEIR IMPACT ON AMERICA — FROM *PERRY MASON* AND *L.A. LAW* TO *LAW & ORDER* AND *ALLY MCBEAL* 265 (Robert M. Jarvis & Paul R. Joseph, eds., Carolina Academic Press, 1998).

*New Respectability, New Freedom*, 144 CHICAGO DAILY LAW BULLETIN 25, 35 (April 25, 1998).

*Resurrecting Federalism Under the New Tenth and Fourteenth Amendments*, 29 TEXAS TECH LAW REVIEW 953 (1998).

*Competitive Bidding Would End 'Pay-to-Play,'* 20 NATIONAL LAW JOURNAL A23 (June 29, 1998).

*Remarks on School Choice*, in Marshall J. Breger & David M. Gordis, eds., VOUCHERS FOR SCHOOL CHOICE: CHALLENGE OR OPPORTUNITY? — AN AMERICAN JEWISH REAPPRAISAL 82 (Wilstein Institute of Jewish Policy Studies, 1998).

*The Power of Congress Under Section 5 of the Fourteenth Amendment after City of Boerne v. Flores*, 32 INDIANA LAW REVIEW 163 (1998).

*Innovative Legal Billing, Alternatives to Billable Hours, and Ethical Hurdles,* published in, LEGAL ETHICS: ACCESS TO JUSTICE (1998) (Hofstra University School of Law Conference on Legal Ethics), 2 JOURNAL OF THE INSTITUTE FOR THE STUDY OF LEGAL ETHICS 1701 (1999).

*The Legal Profession and the Public Image of Lawyers*, 23 THE JOURNAL OF THE LEGAL PROFESSION 51 (1999).

*Moving from Billable Hours to Fixed Fees: Task-Based Billing and Legal Ethics*, 47 UNIVERSITY OF KANSAS LAW REVIEW 819 (1999).

*Multidisciplinary Practice: An Idea Whose Time Has Come,* 3 PROFESSIONAL RESPONSIBILITY, LEGAL ETHICS, AND LEGAL EDUCATION NEWS 1 (Federalist Society, No. 2, 1999).

*Subsidized Speech for the Rich*, CHICAGO TRIBUNE, Dec. 12, 1999, at § 1, p.23.

*Presidential Pardon for Elian?*, WASHINGTON TIMES, Dec. 28, 1999, at A17.

*Independent Counsel and the Charges of Leaking: A Brief Case Study*, 68 FORDHAM LAW REVIEW 869 (1999).

*Let Nothing You Display: Making Room for Religion in Public Forums*, LEGAL TIMES (OF WASHINGTON, D.C.), Jan. 3, 2000, at pp. 43, 45.

*Another Clinton Victim: The Integrity of the Federal Courts*, WALL STREET JOURNAL, March 20, 2000, at p. A35, reprinted in, volume 6, WHITEWATER: IMPEACHMENT AFTERMATH, ELECTION 2000 (Dow Jones & Co., 2001), at 145.

*Teaching Legal Ethics a Quarter of a Century After Watergate*, 51 HASTINGS LAW JOURNAL 661 (2000).

*The Long Gavel: In Class Actions, State Judges Are Trumping Other Jurisdictions' Laws*, LEGAL TIMES (of Washington, D.C.), May 15, 2000, at 67, 69.

*Making Work for Lawyers*, THE SCRIPPS HOWARD NEWS SERVICE (distributed to over 400 subscriber newspapers), Friday, July 7, 2000.

*Rated V for Violence*, LEGAL TIMES (of Washington, D.C.), August 14, 2000, at p. 68.

*The FTC Report on Hollywood Entertainment*, 1 FREE SPEECH & ELECTION LAW GROUP NEWS (Federalist Society, Sept. 15, 2000), http://www.fed-soc.org/Publications/practicegroupnewsletters/PG%20Links/rotunda.htm

*Constitutional Problems with Enforcing the Biological Weapons Convention*, CATO FOREIGN POLICY BRIEFING (No. 61, September 28, 2000), http://www.cato.org/pubs/fpbriefs/fpb-061es.html .

*The Bar and the Legal Academy*, in THE RULE OF LAW IN THE WAKE OF CLINTON 207-29 (Roger Pilon, ed. Cato Institute 2000).

*Should States Sue the Entertainment Industry as They Did Big Tobacco?*, 16 INSIGHT ON THE NEWS 41, 43 (Oct. 30, 2000) (debate with Charlie Condon, the Attorney General of South Carolina).

*The Benefits of School Vouchers*, NATIONAL LAW JOURNAL, Oct. 23, 2000, at A17.

*How the Electoral College Works, and Why It Works Well*, KNIGHT-RIDDER NEWSPAPER CHAIN (distributed to over 400 subscriber newspapers), Friday, Nov. 15, 2000; *e.g.*, *Electoral College Works Well*, THE PRESS OF ATLANTIC CITY, Nov. 15, 2000, at p. A13, 2000 (Westlaw) WLNR 7545816.

*The Equal-Protection Clause: A Field Day for Misleading Statistics,* in NATIONAL REVIEW ON LINE, Nov. 15, 2000, http://www.nationalreview.com/comment/comment111500f.shtml .

*Simply Unconstitutional: How Hand Counting Violates Due Process*, in NATIONAL REVIEW ON LINE, Nov. 16, 2000, http://www.nationalreview.com/comment/comment111600f.shtml

*Let Legislature Decide*, USA TODAY, November 21, 2000, at 16A.

*What it Takes to Win: Using the Psychic Hotline to Decide Contested Races*, CHICAGO TRIBUNE, November 26, 2000, at § 1, p. 19.

*Don't Blame Movies*, WASHINGTON POST, Dec. 1, 2000, at A35.

*From the Supremes to Seminole*, in NATIONAL REVIEW ON LINE, Dec. 5, 2000, http://www.nationalreview.com/comment/comment120500a.shtml

*Changing the Election Law, Again*, in NATIONAL REVIEW ON LINE, Dec. 9, 2000, http://www.nationalreview.com/comment/comment120800c.shtml

*Rubbish about Recusal*, WALL STREET JOURNAL, December 13, 2000, at A26.

*The Partisanship Myth*, THE CHRISTIAN SCIENCE MONITOR, December 15, 2000, at 11.

*Court Correctly Overrules Granholm*, DETROIT NEWS, Jan. 30, 2001, at p. 11A.

*A Few Modest Proposals to Reform the Law Governing Federal Judicial Salaries*, 12 THE PROFESSIONAL LAWYER 1 (A.B.A., Fall 2000).

*The New States' Rights, the New Federalism, the New Commerce Clause, and the Proposed New Abdication*, 25 OKLAHOMA CITY UNIVERSITY LAW REVIEW 869 (2000).

*Judicial Comments on Pending Cases: The Ethical Restrictions and the Sanctions – A Case Study of the Microsoft Litigation*, 2001 UNIVERSITY OF ILLINOIS LAW REVIEW 611 (2001).

*Lawyer Advertising and the Philosophical Origins of the Commercial Speech Doctrine,* 36 UNIVERSITY OF RICHMOND LAW REVIEW 91 (2002) (Allen Chair Symposium of 2001).

*No POWs: Unlawful Combatants, American Law, and the Geneva Convention*, NATIONAL REVIEW ONLINE, Jan. 29, 2002, http://www.nationalreview.com/comment/comment-rotunda012902.shtml .

*The Role of Ideology in Confirming Federal Court Judges*, 15 GEORGETOWN JOURNAL OF LEGAL ETHICS 127 (2001).

*The Commerce Clause, the Political Question Doctrine, and Morrison*, 18 CONSTITUTIONAL COMMENTARY 319 (2001).

*ABA-Recommended Nominees Deserve Hearings*, CHICAGO SUN-TIMES, May 5, 2002, at 37.

*Monitoring the Conversations of Prisoners*, 13 THE PROFESSIONAL LAWYER 1 (ABA, No. 3, 2002).

*City's O'Hare Strategy Flouts Constitution,* CHICAGO DAILY LAW BULLETIN, June 14, 2002, at p. 5.

*Federalizing the Windy City,* NATIONAL REVIEW ONLINE, June 18, 2002, http://www.nationalreview.com/comment/comment-rotunda061802.asp

*The Eleventh Amendment, Garrett, and Protection for Civil Rights*, 53 ALABAMA LAW REVIEW 1183 (2002).

*Statement before the Senate Committee Hearings on the Judicial Nomination Process*, 50 DRAKE LAW REVIEW 523 (2002).

*Judicial Campaigns in the Shadow of Republican Party v. White*, 14 THE PROFESSIONAL LAWYER 2 (ABA, No. 1, 2002).

*Judicial Elections, Campaign Financing, and Free Speech*, 2 ELECTION LAW JOURNAL 79 (No.1, 2003).

*The Implications of the New Commerce Clause Jurisprudence: An Evolutionary or Revolutionary Court?,* 55 ARKANSAS LAW REVIEW 795 (2003).

*Pravo na svobody slova v voennoe vremiz v knostitutsii SShA: istoki i evoliutsiia*, PRAVO I ZAKONODATEL'STVO, 2003, No. 2, c. 63-65; *The Right of Freedom of Speech in Wartime*

*in the Constitution of the USA: Sources And Evolution*, LAW AND LEGISLATION, 2003, No. 2, pp. 63-65.

*Before Changing the Law, Look at SBC's Record and Credibility*, CHAMPAIGN NEWS-GAZETTE, April 13, 2003, at B1, B4.

*Yet Another Article on Bush v. Gore*, 64 OHIO STATE LAW JOURNAL 283 (2003).

*SBC's Secessionist Gambit Deserved to Fail*, CHICAGO TRIBUNE, June 15, 2003, at p. C9.

*A Preliminary Empirical Inquiry into the Connection between Judicial Decision Making and Campaign Contributions to Judicial Candidates*, 14 THE PROFESSIONAL LAWYER 16 (ABA, No. 2, 2003).

*Senate Rules to Keep Filibusters*, CHICAGO SUN-TIMES, July 4, 2003, at p. 29.

*The Perceived Connection between Judicial Decision Making and Judicial Campaign Contributions: Some Preliminary Data*, THE REPUBLICAN LAWYER (July, 2003), http://www.rnla.org/rotunda.doc

*Book Review: Democracy by Decree*, 23 CATO JOURNAL: AN INTERDISCIPLINARY JOURNAL OF PUBLIC POLICY ANALYSIS 155 (No. 1, Spring-Summer 2003).

*Appearances Can Be Deceiving: Should the Law Worry About Campaign Money Looking Dirty When the Facts Show That the System's Clean?*, THE LEGAL TIMES, Sept. 15, 2003, at p. 84.

*Found Money: IOLTA, Brown v. Legal Foundation of Washington, and the Taking of Property without the Payment of Compensation*, 2002-2003 CATO SUPREME COURT REVIEW 245 (2003).

*SBC Tries Time-Worn Corporate Power Grab*, CHICAGO SUN-TIMES, Nov. 22, 2003, p. 16.

*Media Accountability in Light of the First Amendment*, 21 SOCIAL PHILOSOPHY & POLICY 269 (Cambridge University Press, No. 2, 2004), *reprinted in*, ELLEN FRANKEL PAUL, FRED D. MILLER JR., & JEFFREY PAUL, eds., FREEDOM OF SPEECH (Cambridge U. Press 2004).

*Duck Hunting Benchmarks*, THE WASHINGTON TIMES, March 28, 2004, at B4.

*Election-Year Hunting: Should Scalia Recuse Himself from Cheney-Related Cases?*, NATIONAL REVIEW ONLINE, March 30, 2004, http://nationalreview.com/comment/rotunda200403300900.asp

*To Hasten Iraq Democracy, Put Wells in People's Hands*, ATLANTA JOURNAL-CONSTITUTION, May 14, 2004, at A19.

*Judicial Impartiality and Judicial Campaign Contributions: Evaluating the Data*, 5 ENGAGE: THE JOURNAL OF THE FEDERALIST SOCIETY'S PRACTICE GROUPS 122 (Issue 1, April 2004).

*Due Process and the Role of Legal Counsel in the War on Terror*, 5 ENGAGE: THE JOURNAL OF THE FEDERALIST SOCIETY'S PRACTICE GROUPS 131 (Issue 2, October 2004).

*The Political Question Doctrine in the United States,* in GRENZEN AAN DE RECHTSPRAAK? POLITICAL QUESTION, ACTE DE GOUVERNEMENT EN RECHTERLIJK INTERVENTIONISME 1-38, vol. 9, Publikaties Van De Staatsrechtkring Staatsrechtsconferenties (P.P.P. Bouvend'Eert, P.M. van den Eijndem, & C.A.J.M. Kortmann, eds.) (Kluwer, 2004).

*Is There Hope for Iraq's Post-Occupation Government?*, 13 COSMOS: JOURNAL OF THE COSMOS CLUB OF WASHINGTON, D.C. 65 (2004).

*Iraq on the Way to Its New Constitution*, 8 THE GREEN BAG, 2D SERIES 163 (Autumn 2004).

*Symposium*, IRAQ AND ITS NEW CONSTITUTION 23, 53, 76 (Bilkent University & Foreign Policy Institute, Ankara, 2004).

*Veto Power*, in THE OXFORD COMPANION TO THE SUPREME COURT OF THE UNITED STATES 1047 (Oxford U. Press, 2nd ed. 2005).

*A Shaky Ethics Charge*, WASHINGTON POST, September 6, 2005, at p. A25.

*The Privileges and Immunities Clause*, in THE HERITAGE GUIDE TO THE CONSTITUTION, p. 269 (Regnery Publishing, Inc. Washington, DC 2005) (member of Editorial Advisory Board).

*Opinion Letter on Judicial Ethics*, 6 ENGAGE: THE JOURNAL OF THE FEDERALIST SOCIETY'S PRACTICE GROUPS 122 (Issue 2, October 2005).

*Alleged Conflicts of Interest Because of the "Appearance of Impropriety,"* 33 HOFSTRA L. REV. 1141 (2005).

*Frische Datteln für die Häftlinge*, SUEDDEUTSCHE ZEITUNG (Germany), January 2, 2006, at p. 2.

*Guantanamo, Another Story,* The Republican Lawyer (January 15, 2006), http://www.rnla.org/Newsletter/ViewArticle.asp?ArticleID=179

*Click for Collected Wisdom*, THE LEGAL TIMES, May 8, 2006, at 46.

*The Propriety of a Judge's Failure to Recuse When Being Considered for Another Position*, 19 GEORGETOWN JOURNAL OF LEGAL ETHICS 1187 (2006).

*There's No Future in the Past of Campaign Finance: The Latest Decision Displays A Badly Fractured Court*, NATIONAL REVIEW ONLINE, June 28, 2006,

http://article.nationalreview.com/?q=NDE1MjZhZWNiMWIyNDhlMzI5MzE4YjFkYmQxNzc4ZGY .

*CMS Information Policy Under Medicare "Part D" Creates 1st Amendment Problems*, 21 LEGAL BACKGROUNDER (Washington Legal Foundation, No. 21, July 7, 2006).

*Judicial Ethics, the Appearance of Impropriety, and the Proposed New ABA Judicial Code* (The Howard Lichtenstein Lecture in Legal Ethics), 34 HOFSTRA LAW REVIEW 1337 (2006).

*The Courts Need This Watchdog*, WASHINGTON POST, Dec. 21, 2006, at A29.

*The Detainee Cases of 2004 and 2006 and their Aftermath*, 57 SYRACUSE LAW REVIEW 1 (2006).

*The Case for a Libby Pardon*, WALL STREET JOURNAL, March 7, 2007, at A17.

*Income Mobility and Income Tax Revenue Since the Tax Cuts*, THE REPUBLICAN LAWYER (April 2007), http://www.rnla.org/Newsletter/ViewArticle.asp?ArticleID=232 .

*Remembering Father Robert F. Drinan, S.J.*, 20 GEORGETOWN JOURNAL OF LEGAL ETHICS 203 (2007).

*Holding Enemy Combatants in the Wake of Hamdan*, 8 ENGAGE: THE JOURNAL OF THE FEDERALIST SOCIETY'S PRACTICE GROUPS 52 (Issue 3, June 2007).

*Teaching Professional Responsibility and Ethics*, 51 ST. LOUIS UNIVERSITY LAW JOURNAL 1223 (2007).

*Rudy Thinks FAST*, THE AMERICAN SPECTATOR, January 25, 2008, http://www.spectator.org/dsp_article.asp?art_id=12633

*Age Has Not Withered Him*, THE LEGAL TIMES, July 7, 2008, at 46.

*Teaching Professional Responsibility and Ethics*, in P. L. Jayanthi Reddy, ed., BENCH AND BAR ETHICS 3 (Amicus Books, Icfai University Press, Hyderabad, India 2007-2008).

*Foreword*, in Paul Benjamin Linton, ABORTION UNDER STATE CONSTITUTIONS: A STATE-BY-STATE ANALYSIS xix –xxi (Carolina Academic Press, Durham, N.C., 2008).

*Impact*, in Sandarshi Gunawardena & Karen Rosenblum, DIVERSITY AT MASON 14 (George Mason U. 2008).

*Simplify, Simply: A Mantra for Transcendentalists and Tax Reformers Alike*, LOS ANGELES DAILY JOURNAL, Oct. 1, 2008, at p. 6.

*Dormant Commerce Clause*, 2 ENCYCLOPEDIA OF THE SUPREME COURT OF THE UNITED STATES (Ed., David S. Tanenhaus) (Detroit: Macmillan Reference USA, 2009), at pp. 52-54.

*A Modern Day Bleak House: The Legal Inheritance of Anna Nicole Smith*, THE AMERICAN SPECTATOR, March 2009, at 32-36.

*Some Strings Attached: Is the Stimulus Law Constitutional?*, CHICAGO TRIBUNE, March 15, 2009, at 29.

*The Right of Free Speech, Regardless Of What Is Spoken*, THE PANTHER (Chapman University Newspaper), at p. 13 (March 23, 2009).

*Was Madoff Good for the Economy?*, CHICAGO TRIBUNE, April 3, 2009, at 49.

*The Orange Grove: U.S. Imports of Lawsuits Rising*, ORANGE COUNTY REGISTER, June 30, 2009.

*Kenneth W. Starr: A Biography*, THE YALE BIOGRAPHICAL DICTIONARY OF AMERICAN LAW 510 (Roger K. Newman, ed., Yale U. Press, 2009).

*An Unconstitutional Nobel*, THE WASHINGTON POST, Oct. 16, 2009, at A23 (with J. Peter Pham).

*Judicial Transparency, Judicial Ethics, and a Judicial Solution: An Inspector General for the Courts*, 41 LOYOLA U. CHICAGO L.J. 301 (2010).

*Judicial Disqualification in the Aftermath of Caperton v. A.T. Massey Coal Co.*, 60 SYRACUSE LAW REVIEW 247 (2010).

*Campaign Disclosure Can Go too Far*, SACRAMENTO BEE, February 6, 2010, at p. 11A.

*The Efforts to Disbar Bush Lawyers*, in NATIONAL REVIEW ON LINE, March 4, 2010, http://bench.nationalreview.com/post/?q=ZjhiMTk2MGY0ZjFiOTczZjg4ODhhODI5MDQwMzczYWU=

*Repealing the First Amendment*, WASHINGTON EXAMINER, April 14, 2010, http://www.washingtonexaminer.com/opinion/columns/OpEd-Contributor/Repealing-the-First-Amendment-90851704.html#ixzz0l6TO2qIK

*What Can Congress Make You Do?*, ORANGE COUNTY REGISTER, May 23, 2010, at p. C2, http://www.ocregister.com/articles/congress-75386-ocprint-buy-insurance.html

*Birthright Citizenship Benefits the Country*, CHICAGO TRIBUNE, Sept. 16, 2010, at p. 21, http://www.chicagotribune.com/news/opinion/ct-oped-0916-birthright-20100916,0,4594378.story

*What Are D.C. Police Doing Enforcing Shariah Law?*, PAJAMAS MEDIA, Sept. 16, 2010, http://pajamasmedia.com/blog/what-are-d-c-police-doing-enforcing-sharia-law/?singlepage=true

*A New Look at the Federal Suit against Arizona's Immigration Law*, PAJAMAS MEDIA, Oct. 5, 2010, http://pajamasmedia.com/blog/a-new-look-at-the-federal-suit-against-arizonas-immigration-law/?singlepage=true

*The Point of No Return*, WASHINGTON TIMES, Oct. 10, 2010, at p. B3.

*Can Congress Ban People from Threatening to Burn The Quran?*, ATLANTA JOURNAL-CONSTITUTION, Oct. 14, 2010, at p. 21A.

*Congressional Silence Hurts Immigrants*, THE PANTHER (Chapman University Newspaper), at p. 11 (October 25, 2010).

*Justice O'Connor's Robo Call Apology*, AOL NEWS, Oct. 28, 2010, http://www.aolnews.com/discuss/opinion-justice-oconnors-robo-call-apology-isnt-enough/19693741#gcpDiscussPageUrlAnchor .

*What's Wrong with Oklahoma's Shariah Amendment?*, AOL NEWS, Nov. 30, 2010, http://www.aolnews.com/opinion/article/opinion-whats-wrong-with-oklahomas-shariah-amendment/19737155

*Judicial Disqualification When a Solicitor General Moves to the Bench*, 11 ENGAGE: THE JOURNAL OF THE FEDERALIST SOCIETY'S PRACTICE GROUPS 94 (Issue 3, Nov. 2010), http://www.fed-soc.org/publications/pubid.2067/pub_detail.asp

*Eat Your Spinach, Says Nanny State*, 33 NATIONAL LAW JOURNAL 39 (#19, Jan. 10, 2011), http://www.law.com/jsp/nlj/PubArticleNLJ.jsp?id=1202477337422&Each_your_spinach_says_nanny_state

*Trying to Codify Caperton*, 42 MCGEORGE LAW REVIEW 95 (2010)(Judicial Ethics Symposium).

*Equal Employment Opportunities for Female Prison Guards*, NATIONAL LAW JOURNAL, Feb. 7, 2011, http://www.law.com/jsp/nlj/PubArticleNLJ.jsp?id=1202480379005&rss=nlj&slreturn=1&hbxlogin=1

*Stern v. Marshall, and the Power of Bankruptcy Courts to Issue Final Orders on All Compulsory Counterclaims*, 23 BNA BANKRUPTCY LAW REPORTER 230 (Feb. 24, 2011)

*Resolving Client Conflicts by Hiring "Conflicts Counsel,"* 62 HASTINGS LAW JOURNAL 677 (2011).

*We Do Declare: Libya and the United States Constitution,* NATIONAL REVIEW ONLINE, March 24, 2011, http://www.nationalreview.com/articles/262940/we-do-declare-kathryn-jean-lopez?page=7 .

*Constitutionalizing Judicial Ethics: Judicial Elections after Republican Party v. White, Caperton, and Citizens United*, 64 U. ARKANSAS LAW REV. 1 (2011)(Hartman-Hotz Distinguished Lecture).

*Transparenţa Judiciară, Etica Judiciară şi o Soluţie Judiciară,* REVISTA FORUMUL JUDECĂTORILOR 16 (No. 2, 2011).

*The Intellectual Forebears of Citizens United*, 16 NEXUS 113 ((2010-2011).

*Are Capitalists Happier*?, REUTERS, Aug. 12, 2011, http://blogs.reuters.com/great-debate/2011/08/12/are-capitalists-happier/ (co-authored with Vernon Smith, 2002 Nobel Laureate in Economics, & Bart Wilson), *reprinted in, e.g.,* THE DAILY STAR (Dhaka, Bangladesh), Aug. 15, 2011; ETHIOPIAN REVIEW, Aug. 12, 2011.

*Lawyers: Why We Are Different and Why We Are the Same: Creating Structural Incentives in Large Law Firms to Promote Ethical Behavior – In-House Ethics Counsel, Bill Padding, and In-House Ethics Training,* 44 AKRON LAW REV. 679 (2011)(Miller-Becker Professional Responsibility Distinguished Lecture Series), reprinted in, 61 DEFENSE LAW JOURNAL (Aug. 2012).

*Does ObamaCare, As Written, Prevent Congress From Repealing It?*, FOXNEWS.COM (Oct. 28, 2011, http://www.foxnews.com/opinion/2011/10/27/does-obamacare-prevent-congress-from-repealing-it/

*Perry Is Right on Immigration*, NATIONAL REVIEW ONLINE, http://www.nationalreview.com/corner/281735/perry-right-immigration-ronald-d-rotunda (Oct. 31, 2011).

*Kagan's Recusal from ObamaCare,* WASHINGTON TIMES, Dec. 15, 2011, http://www.washingtontimes.com/news/2011/dec/15/kagan-must-recuse-from-obamacare-case/ .

*Evidence Mounts against Justice Kagan for Recusal in ObamaCare Suit*, FOXNEWS.COM (Jan. 26, 2012), http://www.foxnews.com/opinion/2012/01/26/evidence-mounts-against-justice-kagan-for-recusal-in-obamacare-suit/

*Kagan Should Recuse from ObamaCare Case*, WASHINGTON EXAMINER, Feb. 14, 2012, http://washingtonexaminer.com/kagan-should-recuse-from-obamacare-case/article/269386

*Supreme Court Justice Elena Kagan and the Obamacare Constitutional Challenge*, JUDICIAL WATCH SPECIAL REPORT, March 2012.

*Obamacare vs. Conscientious Beliefs*, ORANGE COUNTY REGISTER, March 28, 2012, http://www.ocregister.com/opinion/government-346533-religious-federal.html

*Lessons of Watergate*, 54 ORANGE COUNTY LAWYER 19 (April 2012).

*Prosecutorial and Judicial Misconduct*, NATIONAL LAW JOURNAL, p. 42 (April 30, 2012)(with Alan Dershowitz), *reprinted in*, THE JERUSALEM POST, May 13, 2012.

*The Wrong Legal "Help" for NY's Poor*, NEW YORK POST, June 1, 2012.

*ObamaCare Legal Battles Not Over*, ORANGE COUNTY REGISTER, Sept. 27, 2012, at p. 9, http://www.ocregister.com/opinion/ipab-372820-congress-proposal.html

*Obama Tax-raising Against JFK precedent: Hiking Rates Will Lose Money*, WASHINGTON TIMES, Dec. 13, 2012, http://www.washingtontimes.com/news/2012/dec/12/obama-tax-raising-against-jfk-precedent/

*Geithner's "Story of Inflation,"* ORANGE COUNTY REGISTER, Jan. 5, 2013, http://www.ocregister.com/opinion/inflation-382532-comic-geithner.html

*Blaming Hollywood for Gun Violence Doesn't Work*, WASHINGTON TIMES, Feb. 20, 2013, http://www.washingtontimes.com/news/2013/feb/20/blaming-hollywood-for-gun-violence-doesnt-work/

*Exporting American Freedoms*, in MODEL, RESOURCE, OR OUTLIER? WHAT EFFECT HAS THE U.S. CONSTITUTION HAD ON THE RECENTLY ADOPTED CONSTITUTIONS OF OTHER NATIONS?, at 12 (Heritage Foundation, May 17, 2013), http://www.heritage.org/research/lecture/2013/05/model-resource-or-outlier-what-effect-has-the-us-constitution-had-on-the-recently-adopted-constitutions-of-other-nations

'*What* did he know, and when did he know it?', WASHINGTON TIMES, June 5, 2013, http://www.washingtontimes.com/news/2013/jun/5/what-did-he-know-and-when-did-he-know-it/?utm_source=RSS_Feed&utm_medium=RSS

*Egypt's Constitutional Do-Over: This Time Around, Take a Closer Look at America's Bill of Rights*, WALL STREET JOURNAL, JULY 17, 2013, at p. A13, http://online.wsj.com/article/SB10001424127887323740804578601383340547860.html?mod=WSJ_Opinion_LEFTTopOpinion#articleTabs%3Darticle

*On the Health-Care Mandate, Obama Reaches Beyond the Law*, WASHINGTON POST, July 18, 2013, http://www.washingtonpost.com/opinions/on-the-health-care-mandate-obama-reaches-beyond-the-law/2013/07/18/d442aefc-efb4-11e2-a1f9-ea873b7e0424_story.html

*The Boston Strangler, the Classroom and Me*, WALL STREET JOURNAL, JULY 26, 2013, http://online.wsj.com/article/SB10001424127887324783204578623714232084132.html?KEYWORDS=rotunda

*Generous Pensions Give New Meaning to 'If It's too Good to Be True,'* FORBES MAGAZINE, Sept. 27, 2013, http://www.forbes.com/sites/realspin/2013/09/27/generous-pensions-give-new-meaning-to-if-its-too-good-to-be-true/

*Applying the Revised ABA Model Rules in the Age of the Internet: The Problem of Metadata*, 52 HOFSTRA LAW REVIEW 175 (2013).

*On Deep Background 41 Years Later: Roe v. Wade*, CHICAGO TRIBUNE, Jan. 22, 2014.

*Congress Cannot Stop the Exporting of American Oil*, THE HILL: THE HILL'S FORUM FOR LAWMAKERS AND POLICY PROFESSIONALS, Jan. 27, 2014.

*Congress and Lois Lerner in Contempt*, DAILY CALLER, April 10, 2014.

*Using the State to Bully Dissidents*, VERDICT: LEGAL ANALYSIS AND COMMENTARY FROM JUSTIA, April 24, 2014.

*Endangering Jurors in a Terror Trial*, WALL STREET JOURNAL, May 2, 2014, at p. A13.

**Other Activities:**

March-April, 1984, Expert Witness for State of Nebraska on Legal Ethics at the Impeachment Trial of Nebraska Attorney General Paul L. Douglas (tried before the State Supreme Court; the first impeachment trial in nearly a century).

July 1985, Assistant Chief Counsel, State of Alaska, Senate Impeachment Inquiry of Governor William Sheffield, (presented before the Alaskan Senate).

Speaker at various ABA sponsored conferences on Legal Ethics; Speaker at AALS workshop on Legal Ethics; Speaker on ABA videotape series, "Dilemmas in Legal Ethics."

Interviewed at various times on Radio and Television shows, such as MacNeil/Lehrer News Hour, Firing Line, CNN News, CNN Burden of Proof, ABC's Nightline, National Public Radio, News Hour with Jim Lehrer, Fox News, etc.

1985--1986, Reporter for Illinois Judicial Conference, Committee on Judicial Ethics.

1981-1986, Radio commentator (weekly comments on legal issues in the news), WILL-AM Public Radio.

1986-87, Reporter of Illinois State Bar Association Committee on Professionalism.

1987-2000, Member of Consultant Group of American Law Institute's RESTATEMENT OF THE LAW GOVERNING LAWYERS.

1986-1994, Consultant, Administrative Conference of the United States (on various issues relating to conflicts of interest and legal ethics).

1989-1992, Member, Bar Admissions Committee of the Association of American Law Schools.

1990-1991, Member, Joint Illinois State Bar Association & Chicago Bar Association Committee on Professional Conduct.

1991-1997, Member, American Bar Association Standing Committee on Professional Discipline.

CHAIR, Subcommittee on Model Rules Review (1992-1997). [The subcommittee that I chaired drafted the MODEL RULES FOR LAWYER DISCIPLINARY ENFORCEMENT that the ABA House of Delegates approved on August 11, 1993.]

1992, Member, Illinois State Bar Association [ISBA] Special Committee on Professionalism; CHAIR, Subcommittee on Celebration of the Legal Profession.

Spring 1993, Constitutional Law Adviser, SUPREME NATIONAL COUNCIL OF CAMBODIA. I traveled to Cambodia and worked with officials of UNTAC (the United Nations Transitional Authority in Cambodia) and Cambodian political leaders, who were

charged with drafting a new Constitution to govern that nation after the United Nations troop withdrawal.

1994-1997, LIAISON, ABA Standing Committee on Ethics and Professional Responsibility.

1994-1996, Member, Illinois State Bar Association [ISBA] Standing Committee on the Attorney Registration and Disciplinary Commission.

Winter 1996, Constitutional Law Adviser, SUPREME CONSTITUTIONAL COURT OF MOLDOVA.

Under the auspices of the United States Agency for International Development, I consulted with the six-member Supreme Constitutional Court of Moldova in connection with that Court's efforts to create an independent judiciary. The Court came into existence on January 1, 1996.

Spring 1996, Consultant, CHAMBER OF ADVOCATES, of the CZECH REPUBLIC.

Under the auspices of the United States Agency for International Development, I spent the month of May 1996, in Prague, drafting Rules of Professional Responsibility for all lawyers in the Czech Republic. I also drafted the first Bar Examination on Professional Responsibility, and consulted with the Czech Supreme Court in connection with the Court's proposed Rules of Judicial Ethics and the efforts of the Court to create an independent judiciary.

Consulted with (and traveled to) various counties on constitutional and judicial issues (*e.g.*, Romania, Moldova, Ukraine, Cambodia) in connection with their move to democracy.

1997-1999, Special Counsel, Office of Independent Counsel (Whitewater Investigation).

Lecturer on issues relating to Constitutional Law, Federalism, Nation-Building, and the Legal Profession, throughout the United States as well as Canada, Cambodia, Czech Republic, England, Italy, Mexico, Moldova, Romania, Scotland, Turkey, Ukraine, and Venezuela.

1998-2002, Member, ADVISORY COUNCIL TO ETHICS 2000, the ABA Commission considering revisions to the ABA Model Rules of Professional Conduct.

2000-2002, Member, ADVISORY BOARD TO THE INTERNATIONAL BROTHERHOOD OF TEAMSTERS (This Board was charged with removing any remaining vestiges of organized crime to influence the Union, its officers, or its members.) This Board was part of "Project RISE" ("Respect, Integrity, Strength, Ethics").

2001-2008, Member, Editorial Board, CATO SUPREME COURT REVIEW.

2005-2006, Member of the Task Force on Judicial Functions of the Commission on Virginia Courts in the 21st Century: To Benefit All, to Exclude None

July, 2007, Riga, Latvia, International Judicial Conference hosted by the United States Embassy, the Supreme Court of Latvia, and the Latvian Ministry of Justice. I was one of the main speakers along with Justice Samuel Alito, the President of Latvia, the Prime Minister of Latvia, the Chief Justice of Latvia, and the Minister of Justice of Latvia

Since 1994, Member, Publications Board of the ABA Center for Professional Responsibility; vice chair, 1997-2001.

Since 1996, Member, Executive Committee of the Professional Responsibility, Legal Ethics & Legal Education Practice Group of the Federalist Society; Chair-elect, 1999; Chair, 2000

Since 2003, Member, Advisory Board, the Center for Judicial Process, an interdisciplinary research center (an interdisciplinary research center connected to Albany Law School studying courts and judges)

Since 2012, *Distinguished International Research Fellow* at the World Engagement Institute, a non-profit, multidisciplinary and academically-based non-governmental organization with the mission to facilitate professional global engagement for international development and poverty reduction, http://www.weinstitute.org/fellows.html

Since 2014, *Associate Editor* of the Editorial Board, THE INTERNATIONAL JOURNAL OF SUSTAINABLE HUMAN SECURITY (IJSHS), a peer-reviewed publication of the World Engagement Institute (WEI)

Since 2014, Member, Board of Directors of the Harvard Law School Association of Orange County

Since 2014, Member, Editorial Board of THE JOURNAL OF LEGAL EDUCATION (2014 to 2016).